# FIRST AMENDED AND RESTATED OPERATING AGREEMENT

# OF

# 6789 GOLDSBORO LLC

---

THE INTERESTS DESCRIBED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES ACT OF ANY STATE OR JURISDICTION. NO SALE, OFFER TO SELL, OR OTHER TRANSFER OF THESE INTERESTS MAY BE MADE BY A MEMBER UNLESS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT, OR UNLESS IN THE OPINION OF COUNSEL TO 6789 GOLDSBORO LLC THE PROPOSED DISPOSITION FALLS WITHIN A VALID EXEMPTION FROM THE REGISTRATION PROVISIONS OF THOSE.ACTS.



Execution Copy
2779005.7 27336/122546 07/18/2013

Trustee Ex. 1

# 6789 GOLDSBORO LLC

## FIRST AMENDED AND RESTATED OPERATING AGREEMENT

THIS FIRST AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") is made and entered into and shall be effective as the 18th day of July, 2013, by and among the undersigned (each a "Member" and collectively the "Members"), as all of the members of 6789 GOLDSBORO LLC (the "Company"), a Maryland limited liability company.

### Explanatory Statement

WHEREAS, the Company was formed by the filing of Articles of Organization with the SDAT on January 12, 2012; and

WHEREAS, the Members desire to set forth their agreements and understandings with respect to the Company, and to enter into this Agreement for the purpose of amending and restating the operating agreement of the Company in its entirety as follows.

NOW, THEREFORE, the Members, intending to be legally bound, agree as follows:

### Section I
### Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Act" means the Maryland Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore (if any), or is deemed obligated to restore pursuant to Sections 1.704-2(g)(1) and (i)(5) of the Regulations (i.e., the Interest Holder's Share of Minimum Gain and Member Minimum Gain); and

(ii) the deficit shall be increased by the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.

"Agreement" means this Agreement, as amended from time to time.

"Capital Account" means, with respect to any Interest Holder, the capital account on the books of the Company determined and maintained in accordance with applicable Treasury Regulations to Section 704(b) and (c) of the Code. It is intended that the Capital Accounts of all

Interest Holders shall be maintained in compliance with the provisions of Section 1.704-1(b) of the Regulations, and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Section 1.704-1(b)(2)(iv)(d) of the Regulations) to the Company by a Member, net of liabilities assumed or to which the assets are subject. A Member's "Initial Capital Contribution" shall be the total amount contributed by a Member (net of liabilities) pursuant to Section 3.2, including the amounts specified in Exhibit A and the amounts contributed by the Class A Members pursuant to Section 3.2.2. A Member's "Additional Capital Contribution" shall be the total amount contributed by a Member (net of liabilities) pursuant to Section 3.3.2.

"Cash Flow" means all cash funds derived from operations of the Company (including proceeds from the sale of Company assets and interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay Development Costs.

"Class A Member" means those Members listed on Exhibit A, as it may be amended from time to time, as having Class A Interests.

"Class B Member" means those Members listed on Exhibit A, as it may be amended from time to time, as having Class B Interests.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Cumulative Additional Capital Return" means a cumulative but non-compounded annual return equal to ten percent (10%) of the Unrecovered Additional Capital balance of the Members for each taxable year of the Company, distributable to the Members out of the Cash Flow of the Company. If for any taxable year the Cumulative Additional Capital Return is not paid in full, the portion of the Cumulative Additional Capital Return not paid for that year, together with any accumulated unpaid Cumulative Additional Capital Return for prior taxable years (collectively the "Unpaid Cumulative Additional Capital Return") shall be payable out of Cash Flow in subsequent years. If a Member's Unrecovered Additional Capital changes during the course of any taxable year, the Cumulative Additional Capital Return payable to the Member for that year shall be calculated based upon the weighted average of the Member's Unrecovered Additional Capital balances during the course of the year.

"Cumulative Initial Capital Return" means a cumulative but non-compounded annual return equal to ten percent (10%) of the Unrecovered Initial Capital balance of the Members for each taxable year of the Company, distributable to the Members out of the Cash Flow of the Company. If for any taxable year the Cumulative Initial Capital Return is not paid in full, the portion of the Cumulative Initial Capital Return not paid for that year, together with any accumulated unpaid Cumulative Initial Capital Return for prior taxable years (collectively the "Unpaid Cumulative Initial Capital Return") shall be payable out of Cash Flow in subsequent years. If a Member's Unrecovered Initial Capital changes during the course of any taxable year,

the Cumulative Initial Capital Return payable to the Member for that year shall be calculated based upon the weighted average of the Member's Unrecovered Initial Capital balances during the course of the year.

"Decision Date" means the date which is thirty-six (36) months after the date the Company closes on the acquisition of the Property.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis, provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero (0), Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Class A Members.

"Development Costs" means all costs incurred by the Company in acquiring, maintaining (e.g., annual real estate taxes, hazard insurance, utilities, security, repairs, mowing, etc.), entitling, and developing the Property, including but not limited to, fees and expenses for attorneys (including attorneys' fees associated with the contract for the purchase of the Property and for preparing and reviewing the Members' term sheet and this Agreement), engineers, architect, environmental, geotechnical, traffic and other engineers and consultants.

"Entitlements" means all governmental approvals necessary to permit the subdivision (or equivalent) of the Property for no fewer than twenty-six (26) single family or townhouse dwellings.

"Fiscal Year" means each calendar year of existence of the Company.

"Gross Asset Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Members, provided that the initial Gross Asset Values of the assets contributed to the Company pursuant to Section 3.2 hereof shall be as set forth in such Section;

(ii) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as determined by Members, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a de minimis interest) as

consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a partner capacity in anticipation of being a Member; provided that an adjustment described in clauses (A), (B), and (D) of this paragraph shall be made only if the Members reasonably determine that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(iii) The Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Members; and

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to (A) Regulations Section 1.704-1(b)(2)(iv)(m) and (B) subparagraph (vi) of the definition of "Profits" and "Losses" or Section 3.3(g) hereof, provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

"Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(i) the Member makes an assignment for the benefit of creditors;

(ii) the Member files a voluntary petition of bankruptcy;

(iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v) the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x) if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

(xii) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

"Majority in Interest of Class A Members" means Class A Members whose Percentage Interests in the aggregate are greater than 51% of the Percentage Interests owned by the Class A Members (i.e., 26% of all Interests as of the date of this Agreement).

"Majority in Interest of All Members" means a Majority in Interest of Class A Members, plus the Class B Member.

"Manager" is the Person designated as such in Section VI.

"Member" means each Person signing this Agreement.

"Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Section 1.704-2(i) of the Regulations.

"Membership Rights" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

"Minimum Gain" has the meaning set forth for the term "partnership minimum gain" in Section 1.704-2(b)(2) of the Regulations. Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" means a Capital Account with a balance of less than zero (0).

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations. The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Section 1.704-2(c) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder.

"Person" means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero (0).

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Section 1.704-1(b)(2)(iv)(i)) of the Regulations and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of,

notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v) in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Sections 4.2 hereof shall not be taken into account in computing Profit or Loss.

"Property" shall have the meaning given in Section 2.2.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"SDAT" means the State Department of Assessments and Taxation of Maryland.

"Target Amount" means the amount, for any Fiscal Year, which a Member would then be entitled to receive if, immediately following such Fiscal Year: (a) all of the assets of the Company (other than cash and claims of the Company for contributions) were sold for cash equal to their respective Gross Asset Values (or, in the case of assets subject to liabilities for which the creditor's right is limited to assets of the Company, the amounts of such liabilities, if greater than the aggregate Gross Asset Values of such assets); (b) all unconditional obligations to contribute to the Company were collected in full; and (c) the proceeds of such sale and collections, and all other cash of the Company, were applied to pay all debts of the Company with the balance distributed as provided in Section V of this Agreement.

"Transfer" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means, voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

"Unrecovered Additional Capital" means, at any time, the excess, if any, of (i) a Member's Additional Capital Contributions over (ii) the sum of all previous distributions made to such Member as a return of Additional Capital Contributions pursuant to this Agreement.

"Unrecovered Initial Capital" means, at any time, the excess, if any, of (i) a Member's Initial Capital Contributions over (ii) the sum of all previous distributions made to such Member as a return of Initial Capital Contributions pursuant to this Agreement.

"Voluntary Withdrawal" means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

## Section II
## Formation and Name; Office; Purpose; Term

2.1 Name of the Company; Organization. The name of the Company shall be "6789 Goldsboro LLC." The Members hereby ratify the Articles of Organization as filed with SDAT, as amended by the Resolution attached hereto as Exhibit B and intended to be filed with SDAT on or about the date of this Agreement (as amended, the "Articles of Organization").

2.2 Purpose. The Company is organized solely to purchase, acquire, buy, own, trade in, hold, develop, lease, manage, entitle, subdivide, sell, and otherwise deal in and with the real property and improvements thereon known as 6789 Goldsboro Road, Bethesda, Maryland 20817 (the "Property") and to do any and all things necessary, convenient, or incidental to that purpose, and for no other purpose whatsoever.

2.3 Term. The term of the Company commenced on the date the Articles of Organization were filed with the SDAT and shall be perpetual, unless sooner terminated pursuant to Section VIII of this Agreement.

2.4 Principal Office and Resident Agent. The principal office of the Company in the State of Maryland shall be located at 3925 Beech Avenue, Baltimore, Maryland 21211 or at any other place within the State of Maryland upon which the Manager selects and a Majority in Interest of Class A Members approve. The name and address of the Company's resident agent in the State of Maryland is as set forth in the Articles of Organization.

2.5 Title to Company Property. All property owned by the Company shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in such property. The Company must hold any of its assets in its own name.

## Section III
## Members; Capital; Capital Accounts

3.1 Members. The Members of the Company are set forth in Exhibit A attached hereto, as may be amended from time to time.

3.2 Initial Capital Contributions.

3.2.1. Contemporaneously with the execution of this Agreement, each Member shall pay and contribute to the Company such Member's Initial Capital Contribution as specified on Exhibit A. The Members acknowledge that the Initial Capital Contributions made by the Class A Members as specified in Exhibit A, totaling $1,785,000, cover (i) the purchase price for the Property ($1,350,000), (ii) all closing costs associated with the purchase of the Property ($35,000), (iii) $300,000 to be applied to the Class B Payment (as defined in Section 3.10), and (iv) the first $100,000 of the total $300,000 that the Class A Members will contribute pursuant to Section 3.2.2. The Members also acknowledge that the Initial Capital Contribution made by the Class B Member, totaling $306,192, equals (i) the Gross Asset Value of the Regional Sales Contract for the purchase of the Property ($300,000), and (ii) certain Developments Costs previously incurred by the Company and paid for by the Class B Member (totaling $6,192).

3.2.2. The Members recognize that the Company intends to fund the Development Costs with Capital Contributions made by the Class A Members. If the Manager at any time prior to the Decision Date determines that the Company requires additional Capital Contributions for the sole purpose of funding Development Costs, then the Manager shall give notice to the Class A Members of (i) the total amount of Capital Contribution required, (ii) the reason the Capital Contribution is required, (iii) each Class A Member's proportionate share of the total Capital Contribution (determined in accordance with this Section), and (iv) the date each Class A Member's Capital Contribution is due and payable, which date shall be no fewer than ten (10) business days after the notice has been given. Each Class A Member shall contribute its proportionate share of additional funds as an additional Initial Capital Contribution. The total additional Capital Contributions which the Manager may require the Class A Members to contribute during the term of this Agreement shall not exceed Three Hundred Thousand Dollars ($300,000) in the aggregate and all such amounts shall also be deemed Initial Capital Contributions under this Agreement (i.e., with respect to the Class A Members, all references to Initial Capital Contributions in this Agreement shall mean and include the Capital Contributions made by the Class A Members pursuant to both Section 3.2.1 and this Section 3.2.2). Pursuant to Section 3.2.1, the Class A Members are contributing the first $100,000 of the $300,000 on the date of this Agreement. A Class A Member's proportionate share of the total additional Capital Contribution required under this Section shall be equal to the product obtained by (1) multiplying the Class A Member's Percentage and the total additional Capital Contribution required, and (2) multiplying such amount by two (2). A Class A Member's proportionate share shall be payable in cash or by certified check. Notwithstanding anything to the contrary in this Agreement, the Class B Member shall not be obligated to make any Capital Contribution to the Company beyond that set forth in the last sentence of Section 3.2.1, which the Company acknowledges has already been made.

3.3 Additional Capital Contributions.

3.3.1. Except as provided in Section 3.2.2, no Member shall be required to contribute any additional capital to the Company, lend any funds to the Company or guarantee any loans for the Company, and, except as set forth in the Act, no Member shall have any personal liability for any obligation of the Company.

3.3.2. If additional capital is needed to fund Development Costs after the initial $300,000 is contributed by the Class A Members in accordance with Section 3.2.2, any Member may thereafter make such contributions ("Additional Capital Contributions") in cash to the Company.

3.4 No Interest on Capital Contributions. Interest Holders shall not be paid interest on their Capital Contributions, except as expressly provided otherwise in this Agreement. No Interest Holder shall be entitled to withdraw any part of his, her or its Capital Account or Capital Contribution or to receive any distributions from the Company except as expressly provided in this Agreement. Unless otherwise provided by law, no Interest Holder shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets of the Company.

3.5 Return of Capital Contributions. Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.

3.6 No Right to Partition. No Interest Holder shall have the right to require partition of the Property or to compel any sale or appraisal of the Property or any sale of a deceased Interest Holder's Interest in the Company's assets, except as specifically provided in Section VII of this Agreement.

3.7 Form of Return of Capital. If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but cash in return of the Interest Holder's Capital Contribution.

3.8 Capital Accounts. A separate Capital Account shall be maintained for each Interest Holder.

3.9 Loans to the Company. The Members shall not be obligated to make loans to the Company. Upon the agreement of a Majority in Interest of All Members, any Member may make loans to the Company upon commercially reasonable terms agreed upon by the Company and the Member. The amount of any loan shall not be an increase in the Member's Capital Contribution, or entitle the Member to any increase in the Member's share of the Profits or Losses of the Company, but the loan shall be repaid to the Member out of the net Cash Flow, together with interest at the rate of a cumulative but non-compounded annual return equal to ten percent (10%). Each payment made by the Company to a Member with respect to any loan shall be applied first to accrued interest and then to the outstanding balance of the principal thereof. The Company shall be deemed to have waived the statute of limitations in any action which may be brought for the collection of any loan by a Member to the Company.

3.10 Payment to Class B Member. Simultaneously with the closing on the Company's purchase of the Property, the Company shall make a distribution of capital to the Class B Member in the amount of $300,000 (the "Class B Payment"), such that the Class B Member's Unrecovered Initial Capital shall thereafter be $6,192.

## Section IV
## Allocations of Profit and Loss

4.1 Allocations of Profit or Loss. After giving effect to the special allocations set forth in Sections 4.2, for any taxable year of the Company, Profit or Loss shall be allocated among the Members, pro rata, to the extent necessary to cause the Capital Account balance of each Member (determined after reflection therein of allocations for such period under this Section IV) to equal his Target Amount; provided, however, that Losses allocated to a Member shall not exceed the amount that can be so allocated without causing the Member to have an Adjusted Capital Account Deficit at the end of such taxable year. Any Loss so disallowed shall be allocated to the other Members.

4.2 Regulatory Allocations. The following special allocations shall be made in the following order:

4.2.1. Company Minimum Gain Chargeback. Except as set forth in Section 1.704-2(f)(2), (3), and (4) of the Regulations, if, during any taxable year, there is a net decrease in Company Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Company Minimum Gain, computed in accordance with Section 1.704-2(g)(2) of the Regulations. It is the intent of the parties hereto that any allocation pursuant to this Section 4.2.1 shall constitute a "minimum gain chargeback" under Section 1.704-2(f) of the Regulations.

4.2.2. Qualified Income Offset. If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof), or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This Section 4.2.2 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.2.3. Nonrecourse Deductions. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.2.4. Member Loan Nonrecourse Deductions. Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Section 1.704-2(b) of the Regulations.

4.2.5. Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3 Tax Allocations.

4.3.1. Subject to Section 4.3.2 through Section 4.3.4, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, the Company's subsequent income, gains, losses and deductions shall be allocated among the

Members for tax purposes, to the extent permitted by the Code and other applicable law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

4.3.2. Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value.

4.3.3. If the Gross Asset Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Gross Asset Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) using the traditional method of Treasury Regulations Section 1.704-3(b).

4.3.4. Allocations pursuant to this Section 4.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profit and Loss, distributions or other items pursuant to any provisions of this Agreement.

4.4 Curative Allocations. In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is not specified in this Section IV (an "Unallocated Item"), or that the allocation of any item of the Company income, gain, loss or deduction hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)) (a "Misallocated Item"), then the Tax Matters Member may allocate such Unallocated Items, or reallocate such Misallocated Items, to reflect such economic interests; provided, that no such allocation will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby; and provided, further, that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

**Section V**
**Distributions**

5.1 Distributions of Cash Flow. Cash Flow shall be applied or distributed as follows and in the following order:

5.1.1. to the payment of all unpaid expenses of the Company; then

5.1.2. to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

5.1.3. to the Class A Members in an amount equal to their Unpaid Cumulative Initial Capital Return, pro-rata in accordance with the amount of their relative Unpaid Cumulative Initial Capital Returns, until paid in full; then

5.1.4. to the Class A Members in an amount equal to their Unrecovered Initial Capital, pro-rata in accordance with the amount of their relative Unrecovered Initial Capital balances, until reduced to zero ($0.00); then

5.1.5. to the Class A Members, in an amount equal to: (i) $7,500 if such distribution is made before the first anniversary of the date of this Agreement, (ii) $15,000 if such distribution is made on or after such first anniversary and before the second anniversary of the date of this Agreement, and (iii) $22,500 if such distribution is made on or after the second anniversary of the date of this Agreement, minus in each case amounts previously distributed to the Class A Members pursuant to this Section 5.1.5, such amount to be distributed to the Class A Members in proportion to their respective Percentage Interests; then

5.1.6. to the Class B Member in an amount equal to its Unpaid Cumulative Initial Capital Return, until paid in full; then

5.1.7. to the Class B Member in an amount equal to its Unrecovered Initial Capital balance, until reduced to zero ($0.00); then

5.1.8. to the Members in an amount equal to their Unpaid Cumulative Additional Capital Return, pro-rata in accordance with the amount of their relative Unpaid Cumulative Additional Capital Returns, until paid in full; then

5.1.9. to the Members in an amount equal to their Unrecovered Additional Capital, pro-rata in accordance with the amount of their relative Unrecovered Additional Capital balances, until reduced to zero ($0.00); then

5.1.10. the balance, to the Members in proportion to their respective Percentage Interests.

5.2 Liquidation and Dissolution.

5.2.1. If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with Section 5.1.

5.2.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

5.3 Withholding. All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

5.4 Tax Distributions. During each fiscal year, the Manager will use reasonable efforts to make cash distributions from the Company (each a "Tax Distribution") to each Member in an amount equal to the excess, if any, of (i) the product of (a) the highest federal,

state and local marginal income tax rate applicable to a person living in Maryland, multiplied by (b) the amount of net income allocated to such Member for such fiscal year (the "Tax Allocation"), over (ii) the aggregate net cash distributions made to such Member by the Company for such fiscal year or portion thereof (such excess of (i) over (ii) is hereinafter referred to as the "Tax Shortfall"). For the purposes of the preceding sentence, the Tax Allocation for a fiscal year or portion thereof shall be reduced by any net losses of the same character previously allocated to such Member, to the extent such losses were not previously taken into account under this Section. The Company may make Tax Distributions on an annual basis or on a quarterly basis, in the Manager's reasonable discretion. To the extent that there is insufficient cash to make Tax Distributions in the full amount of the Tax Shortfall, Tax Distributions shall be made to the Members on a pro rata basis in proportion to their respective Tax Shortfall amounts. No Member shall be required to make any Capital Contributions to fund Tax Distributions. Any Tax Distributions made pursuant to this Section 5.4 shall be treated as advance payments of amounts otherwise payable under Sections 5.1 and 5.3 and shall be considered to have been distributed under the provisions which correspond to the allocation of net income for such Member.

**Section VI**
**Management; Rights, Powers, and Duties**

6.1 Management.

6.1.1. Manager. Except as otherwise provided herein, the day-to-day operations of the Company shall be managed by a Manager, who may, but need not, be a Member. Gregory B. Myers is hereby designated to serve as the initial Manager. The Manager shall use commercially reasonable good faith efforts to, without limitation, obtain the Entitlements, ensure that the Property is properly maintained, and otherwise act in the best interests of the Company. If for any reason Gregory B. Myers cannot serve or resigns as Manager, Brian N. King shall be the successor Manager. If at any time after the twenty-fourth (24th) month following the date the Company closes on the purchase of the Property, the Class A Members reasonably believe that the Manager has not diligently pursued the Entitlements or will not be able to obtain the Entitlements by the Decision Date, then upon the affirmative vote of a Majority in Interest of Class A Members, the Class A Members may remove the Manager then acting and elect a new Manager. The Manager shall provide regular updates (no fewer than once per month) to the Members concerning the status of the Entitlements.

6.1.2. General Powers. Subject in all cases to the other provisions of this Agreement and the requirements of applicable law, the Manager shall have the general power and authority to manage and operate the day-to-day business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

6.1.2.1. enter into agreements and contracts and to give receipts, releases, and discharges, provided that no one agreement or contract with any one Person shall have a value in excess of $25,000 without the prior approval of a Majority in Interest of Class A Members (such approval not to be unreasonably delayed, conditioned or withheld);

6.1.2.2. purchase liability and other insurance to protect the Company's Property and business;

6.1.2.3. execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company, provided that the Manager shall not cause the Company to incur any liability or expense to any one Person, including Development Costs, in excess of $25,000 without the prior approval of a Majority in Interest of Class A Members (such approval not to be unreasonably delayed, conditioned or withheld);

6.1.2.4. make any and all expenditures which the Manager, in its reasonable discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization and operation of the Company and obtaining the Entitlements, provided that no one such expenditure shall exceed $25,000 without the prior approval of a Majority in Interest of Class A Members.

6.1.3. Major Decisions Requiring Consent. Notwithstanding anything to the contrary in this Agreement, in addition to such matters reserved to the Members herein and subject to the general restrictions governing the operation of the Company contained within Section 2.2 hereof, the Manager shall not undertake any of the following without the prior approval of all Members:

6.1.3.1. any financing, sale (except as provided in Section 7.6 or Section 7.7), exchange or other disposition of the Property and/or all of the Company's assets;

6.1.3.2. the Company's lending any money to any Member or other Person;

6.1.3.3. admitting additional Members to the Company or selling additional membership Interests;

6.1.3.4. filing on behalf of the Company any petition in bankruptcy or assignment for the benefit of creditors or the failure to defend against an involuntary petition for same;

6.1.3.5. merging or consolidating the Company with any other entity;

6.1.3.6. dissolving the Company; and

6.1.3.7. requiring Capital Contributions from a Member, except as provided in and as limited by Section 3.2.

6.1.4. Limitation on Authority of Members.

6.1.4.1. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

6.1.4.2. This Section 6.1 supersedes any authority granted to the Members pursuant to Section 4A-401 of the Act. Any Member who takes any action or binds the Company in violation of this Section 6.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

6.2 Meetings of and Voting by Members.

6.2.1. A meeting of the Members may be called at any time by the Manager or by any Member. Meetings of Members shall be held at the Company's principal place of business or at any other place in Baltimore, Maryland designated by the Person calling the meeting. Not less than ten (10) nor more than ninety (90) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney-in-fact.

6.2.2. Except as otherwise provided in this Agreement, the affirmative vote of Members holding fifty-one percent (51%) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members.

6.2.3. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument executed by and indicating the consent of Members required by this Agreement to approve a particular matter coming before the Members.

6.3 Personal Services.

6.3.1. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Manager and a Majority in Interest of All Members, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

6.3.2. Unless approved by a Majority in Interest of All Members, the Manager shall not be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the Manager shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

6.4 Duties of Parties.

6.4.1. The Manager shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any other Member for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the Manager by this Agreement or by law, unless the action was taken or omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence.

6.4.2. Except as otherwise expressly provided in Section 6.4.3 or Section 6.6, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member or Manager to conduct any other business or activity whatsoever, and the Member and Manager shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to each Member's and Manager's respective rights to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or Manager unrelated to the Company or the Property.

6.4.3. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

6.5 Liability and Indemnification.

6.5.1. Neither the Manager nor any officer of the Company shall be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed in good faith by the Manager or such officer and within the scope of the authority conferred on the Manager or officer by this Agreement, except for fraud, gross negligence, willful or wonton misconduct or an intentional breach of this Agreement.

6.5.2. The Company shall indemnify the Manager and any officer for any act performed by the Manager or officer in good faith believed to be within the scope of the authority conferred on the Manager or officer by this Agreement, except for fraud, gross negligence, or an intentional breach of this Agreement. The Company shall promptly notify the Members whenever the Manager or any officer has been indemnified by the Company for any act, matter, or thing whatsoever.

6.5.3. No Member of the Company shall have any liability under this Agreement or under the Act except as provided herein or as required by the Act. Except as required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company. The liability of each Member shall be limited solely to the amount of its Capital Contribution, except as provided in this Section 6.5. No Member of the Company shall be liable for any debts, obligations and liabilities,

whether arising in contract, tort or otherwise, of any other Member, the Manager or any officer of the Company.

6.6 Independent Activities. Each of the Members and Manager may engage in any other business activity. The Manager shall not be obligated to contribute its full time and efforts to the Company; however, the Manager shall diligently and faithfully devote such of its time to the business of the Company as may be necessary to properly conduct the affairs of the Company and obtain the Entitlements as promptly as reasonably possible. Except to the extent inconsistent with this Section, any of the Members or Manager may in the future engage in activities relating to the development and ownership of other real property, both for their own accounts and for others, and nothing contained herein shall be deemed to prevent such parties from continuing such activities, or initiating further such other limited or general partnerships, joint ventures, limited liability companies or other entities in which they are or may become a party, nor as requiring them to permit the Company or any of the Members or Manager to participate in any such operations in which they may be interested. Notwithstanding the foregoing to the contrary, neither the Manager nor any Member, or their affiliates, shall directly or indirectly purchase or develop any property in the immediate vicinity of the Property except through the Company.

## Section VII
## Transfer of Interests and Withdrawals of Members

7.1 Transfers.

7.1.1. Except as specifically permitted by this Agreement or consented to by all of the Members, no Member may sell, assign, mortgage, pledge, grant a security interests in, or otherwise transfer or encumber all or any part of the Member's Membership Rights or Interest, whether voluntarily or involuntarily, by operation of law or otherwise.

7.1.2. Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 7.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 7.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in violation of this Section 7.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights.

7.2 Voluntary Withdrawal. No Member shall have the right or power to Voluntarily Withdraw from the Company.

7.3 Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become an Interest Holder but shall not become a Member, and shall have all the rights of an Interest Holder.

7.4 Optional Buy-out in Event of Involuntary Withdrawal.

7.4.1. If a Member Involuntarily Withdraws, the withdrawn Member shall be deemed to offer for sale (the "Withdrawal Offer") to the Company all of the Membership Rights owned of record and beneficially by the withdrawn Member (the "Withdrawal Interest").

7.4.2. The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 P.M., local time, at the Company's principal office on the sixtieth (60th) day following the date the Members elect to continue the Company. At any time during the Withdrawal Offer Period, the Company may accept the Withdrawal Offer by notifying the withdrawn Member (the "Withdrawal Notice") of its acceptance. The withdrawn Member shall not be deemed a Member or Manager for the purpose of the vote on whether the Company shall accept the Withdrawal Offer.

7.4.3. If the Company accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase which shall be not earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Period.

7.4.4. If the Company accepts the Withdrawal Offer, the Company shall purchase the Withdrawal Interest for a price equal to the amount the withdrawn Member would receive if the Company were liquidated and an amount equal to the Appraised Value were available for distribution to the Members pursuant to Section V (the "Withdrawal Purchase Price"). The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date.

7.4.5. If the Company fails to accept the Withdrawal Offer, then the withdrawn Member or the withdrawn Member's successor, as the case may be, upon the expiration of the Withdrawal Offer Period, thereafter shall be treated as the unadmitted assignee of a Member.

7.5 Appraised Value.

7.5.1. The term "Appraised Value" means the appraised value of the Property determined as follows. Within fifteen (15) days after demand by either one or the other, the Company and the Withdrawing Member, pursuant to Section 7.4, or the Class A Members and the Class B Member, pursuant to Section 7.7, shall each appoint a MAI appraiser to determine the value of the Property. If the two (2) appraisers agree upon the value of the Property, they shall jointly render a single written report stating that value. If the two (2) appraisers cannot agree upon the value of the Property, they shall each render a separate written report and they shall appoint a third (3rd) MAI appraiser, who shall appraise the Property and determine the Property's value, and shall render a written report of his opinion thereon. If the appraisers cannot agree upon the third (3rd) MAI appraiser, then each of such appraisers will recommend one (1) MAI appraiser and the selection shall be by coin toss. Each party shall pay the fees and costs of the appraiser appointed by that party, and the fees and other costs of the third (3rd) appraiser shall be shared equally by both parties.

7.5.2. The value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the Property contained in the appraisal report of the third (3rd) appraiser is more than the higher of the first two (2) appraisals, the higher of the first two (2) appraisals shall

govern; and provided, further, that if the value of the Property contained in the appraisal report of the third appraiser is less than the lower of the first two (2) appraisals, the lower of the first two (2) appraisals shall govern.

7.6 Sale of Property. In the event that (a) the Entitlement of the Property is not completed by the Decision Date, or (b) (i) the Company has incurred all $300,000 of the Initial Capital Contributions paid by the Class A Members in accordance with Section 3.2.2, and (ii) no Member elects to make Additional Capital Contributions to the Company sufficient to cover any remaining or arising deficit, then the Class A Members shall have the unilateral right and authority (without the consent of the Class B Member), at their option, to require the Company to sell the Property, in its then-current development state, to an unaffiliated third-party purchaser.

7.7 Redemption of Class B Member. In the event that (a) the Entitlement of the Property is not completed by the Decision Date, and (b) the Class A Members do not elect to require the Company to sell the Property in accordance with Section 7.6, then the Class A Members may elect to determine the Appraised Value of the Property in accordance with Section 7.5. If the Appraised Value is less than or equal to the sum of Unpaid Cumulative Initial Capital Return, Unrecovered Initial Capital, Unpaid Cumulative Additional Capital Return, and Unrecovered Additional Capital, of the Class A Members, from the date of the contribution through the date the Appraised Value has been determined pursuant to Section 7.5 (collectively, the "Class A Investment"), then the Class A Members shall have the unilateral right and authority (without the consent of the Class B Member) to cause the Company to redeem the Class B Member's Membership Rights solely in consideration for the Company's previous distributions or other previous payments to the Class B Member. If the Appraised Value is greater than the Class A Investment, then in such event the Class B Member shall retain its Membership Rights; provided, however, the Class A Members shall continue to have the unilateral right and authority thereafter (without the consent of the Class B Member), at their option, to require the Company to sell the Property, in its then-current development state, to an unaffiliated third-party purchaser.

7.8 Prohibition of Pledges. No Member shall at any time pledge, mortgage, hypothecate or otherwise encumber any of its Interest, or permit any of its Interest to be pledged, mortgaged, hypothecated, encumbered or otherwise subjected to any lien, without the prior written consent of a Majority in Interest of All Members. No purported pledge, mortgage, hypothecation or encumbrance of, or lien on or security interest in, any Interest in violation of the provisions of this Agreement shall be valid or enforceable.

## Section VIII
## Dissolution, Liquidation, and Termination of the Company

8.1 Events of Dissolution. The Company shall be dissolved upon the happening of any of the following:

8.1.1. The sale or disposition of all of the Property;

8.1.2. The unanimous written agreement of all of the Members; or

8.1.3. The entry of a decree of judicial dissolution.

8.2 Procedure for Winding Up and Dissolution. If the Company is dissolved, the Manager shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section V.

8.3 Filing of Articles of Cancellation. If the Company is dissolved, the Manager shall promptly file Articles of Cancellation with SDAT. If there is no Manager, then the Articles of Cancellation shall be filed by the remaining Members; if there are no remaining Members, the Articles of Cancellation shall be filed by the last Person to be a Member; if there is neither a Manager, remaining Members, nor a Person who last was a Member, the Articles of Cancellation shall be filed by the legal or personal representatives of the Person who last was a Member.

## Section IX
## Books, Records, Accounting, and Tax Elections

9.1 Treasurer. The Class A Members may appoint a Treasurer, who shall maintain the Company's books of account and shall perform such other duties as may be assigned by the Manager or the Members. The initial Treasurer shall be Brian N. King. In the event Brian N. King resigns or is removed as Treasurer, the Class A Members may appoint Cristina J. King as replacement Treasurer (without the prior approval of the Class B Member); provided, however, that if the Class A Members appoint a replacement Treasurer other than Cristina J. King, such appointment shall be subject to the prior approval of the Class B Member (such approval not to be unreasonably delayed, conditioned or withheld). The Treasurer shall use commercially reasonable good faith efforts to, without limitation, discharge its duties as set forth in this Agreement and act in the best interests of the Company.

9.2 Bank Accounts. All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Treasurer shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

9.3 Books and Records.

9.3.1. The Treasurer shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Articles of Organization and this Agreement and all amendments to the Articles of Organization and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, or local tax returns. The Manager shall promptly provide to the Treasurer all documentation related to the Company's business as necessary for the Treasurer to maintain complete and accurate books and records. The Treasurer shall promptly provide to the Manager all information related to the Company's business as necessary for the Manager perform its obligations under this

Agreement and must diligently keep the Manager informed of and immediately upon receipt provide copies to Manager of any notices received by the Company at its principal office.

9.3.2. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

9.3.3. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

9.4 Annual Accounting Period. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Treasurer, subject to the requirements and limitations of the Code.

9.5 Reports. Within seventy-five (75) days after the end of each taxable year of the Company or as soon thereafter as the reports become available, the Treasurer shall cause to be sent to each Person who was a Member at any time during the accounting year then ended: (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member or the Manager in respect of the taxable year. In addition, within seventy-five (75) days after the end of each taxable year of the Company or as soon thereafter as tax information becomes available, the Treasurer shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. At the request of any Member, and at the Member's expense, the Treasurer shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

9.6 Tax Matters Partner. Brian N. King shall be the Company's tax matters partner ("Tax Matters Partner"). The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6221, *et seq.* The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities related to the Company which may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner may not compromise any dispute or extend the statute of limitations with the Internal Revenue Service without the approval of the Members.

9.7 Tax Elections. The Tax Matters Partner shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Tax Matters Partner's sole and absolute discretion; provided, however,

that no such election will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby.

**Section X**
**General Provisions**

10.1 Assurances. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

10.2 Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the Manager. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice sent by mail will be deemed given three (3) business days after it is mailed. A notice sent by overnight courier will be deemed given on the first (1) business day following the day it is deposited with the courier. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

10.3 Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

10.4 Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

10.5 Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Maryland.

10.6 Section Titles. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

10.7 Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

10.8 Jurisdiction and Venue. Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Maryland or any Maryland State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

10.9 Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

10.10 Separability of Provisions. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

10.11 Counterparts. This Agreement may be executed simultaneously in two or more counterparts and electronically, including by transmission of PDF (Portable Document Form) or a comparable image, each of which shall be deemed an original for all purposes and all of which, when taken together, shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. An electronically executed and/or delivered counterpart or copy of this Agreement shall be effective and admissible as an original for all purposes.

10.12 Estoppel Certificate. Each Member shall, within ten (10) days after written request by any Member or the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.

[The remainder of this page is intentionally left blank.]

[Signatures contained on the following pages.]

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST: MEMBERS:

**SERV TRUST**, a Maryland statutory trust

_______________ By: _______________, TRUSTEE (SEAL)
Gregory B. Myers, Trustee

_______________ By: _______________ (SEAL)
Daniel J. Ring, Trustee

_______________ _______________ (SEAL)
**Brian N. King**

_______________ _______________ (SEAL)
**Cristina J. King**

**CRISTINA AND BRIAN KING CHILDREN'S TRUST**

_______________ By: _______________ (SEAL)
Vevita Leon, Trustee

_______________ By: _______________ (SEAL)
Brian N. King, Trustee

_______________ By: _______________ (SEAL)
Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:

MEMBERS:

**SERV TRUST**, a Maryland statutory trust

______________________ By: ______________________ (SEAL)
Gregory B. Myers, Trustee

Sandra Capone
SANDRA CAPONE

By: , TTEE (SEAL)
Daniel J. Ring, Trustee

______________________ ______________________ (SEAL)
**Brian N. King**

______________________ ______________________ (SEAL)
**Cristina J. King**

**CRISTINA AND BRIAN KING CHILDREN'S TRUST**

______________________ By: ______________________ (SEAL)
Vevita Leon, Trustee

______________________ By: ______________________ (SEAL)
Brian N. King, Trustee

______________________ By: ______________________ (SEAL)
Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST:

MEMBERS:

**SERV TRUST**, a Maryland statutory trust

_____________________ By: _____________________ (SEAL)
Gregory B. Myers, Trustee

_____________________ By: _____________________ (SEAL)
Daniel J. Ring, Trustee

_____________________ _____________________ (SEAL)
**Brian N. King**

_____________________ _____________________ (SEAL)
**Cristina J. King**

**CRISTINA AND BRIAN KING CHILDREN'S TRUST**

_____________________ By: _____________________ (SEAL)
Vevita Leon, Trustee

_____________________ By: _____________________ (SEAL)
Brian N. King, Trustee

_____________________ By: _____________________ (SEAL)
Timothy Lynch, Trustee

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS OR ATTEST: MEMBERS:

**SERV TRUST**, a Maryland statutory trust

_______________ By: _______________ (SEAL)
Gregory B. Myers, Trustee

_______________ By: _______________ (SEAL)
Daniel J. Ring, Trustee

_______________ _______________ (SEAL)
**Brian N. King**

_______________ _______________ (SEAL)
**Cristina J. King**

**CRISTINA AND BRIAN KING CHILDREN'S TRUST**

_______________ By: _______________ (SEAL)
Vevita Leon, Trustee

_______________ By: _______________ (SEAL)
Brian N. King, Trustee

_______________ By: _______________ (SEAL)
Timothy Lynch, Trustee

MANAGER:

______________, MANAGER (SEAL)
Gregory B. Myers

**6789 GOLDSBORO LLC**

**AMENDED AND RESTATED OPERATING AGREEMENT**

**Exhibit A**
**List of Members, Capital, and Percentages**

| **Name, Address, and Taxpayer I.D. Number** | **Membership Class** | **Initial Cash Capital Contribution (as of July 18, 2013)** | **Percentage Interests** |
|---|---|---|---|
| Brian N. King<br>3925 Beech Avenue<br>Baltimore, MD 21211<br>SS#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 | Class A Member | $714,000 | 20% |
| Cristina J. King<br>3925 Beech Avenue<br>Baltimore, MD 21211<br>SS#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 | Class A Member | $714,000 | 20% |
| Cristina and Brian King Children's Trust<br>3925 Beech Avenue<br>Baltimore, MD 21211<br>EIN#20-6405435 | Class A Member | $357,000 | 10% |
| Serv Trust<br>4505 Wetherill Road<br>Bethesda, MD 20816<br>EIN#27-6725119 | Class B Member | $306,192 | 50% |

**6789 GOLDSBORO LLC**

**AMENDED AND RESTATED OPERATING AGREEMENT**

**Exhibit B**

**Resolution to Change Principal Office and Resident Agent**

[See attached]

## RESOLUTION TO CHANGE PRINCIPAL OFFICE OR RESIDENT AGENT

The ~~directors/stockholders/general partner~~authorized person of

6789 Goldsboro LLC,

(Name of Entity)

organized under the laws of Maryland, passed the following resolution:

(State)

**[CHECK APPLICABLE BOX(ES)]**

☑ **The principal office is changed from: (old address)**

3158 Braverton Street, Suite 206

Edgewater, MD 21037

**to: (new address)**

3925 Beech Avenue

Baltimore, MD 21211

☑ **The name and address of the resident agent is changed from:**

Daniel J. Ring

3158 Braverton Street, Suite 206, Edgewater, MD 21037

**to:**

Danielle Stager Zoller

233 E. Redwood St., Baltimore, MD 21202

I certify under penalties of perjury the foregoing is true.

[signature], MANAGER /Gregory B. Myers, Manager

~~Secretary or Assistant Secretary~~

~~General Partner~~

Authorized Person

I hereby consent to my designation in this document as resident agent for this entity.

SIGNED [signature]

Resident Agent