

Proposed Goldsboro Place Subdivision
6789 Goldsboro Road
Bethesda, Maryland 20817

Report Date:
August 17, 2017

**LIPMAN FRIZZELL & MITCHELL**
Real Estate Consultants

6240 Old Dobbin Lane, Suite 140
Columbia, Maryland 21045
Phone: 410-423-2300
Fax: 410-423-2410
www.LFMvalue.com

# APPRAISAL REPORT

**Prepared for:**

**Gordon Feinblatt LLC**
Ms. Danielle S. Zoller, Esquire
233 East Redwood Street
Baltimore, Maryland 21202

LFM #:17-237

Trustee Ex. 3

LIPMAN
FRIZZELL &
MITCHELL
Real Estate Consultants

August 17, 2017

Ms. Danielle S. Zoller, Esquire
Gordon Feinblatt LLC
233 East Redwood Street
Baltimore, Maryland 21202

RE: Appraisal Report
Proposed Goldsboro Place Subdivision
6789 Goldsboro Road
Bethesda, Maryland 20817

Dear Ms. Zoller:

In accordance with your request, we have prepared an appraisal of the above-referenced property. This appraisal report sets forth the pertinent data gathered, the techniques employed, and the reasoning leading to our value opinions.

The subject property consists of a 5.23 acre site located at 6789 Goldsboro Road in Bethesda, Maryland 20817 currently improved with a vacant residence and proposed to be improved with a residential townhouse subdivision. The subject is further identified as Tax Map GN41, Parcels P619 and P735. The current zoning is R-60 which allows townhouse development under the "Optional Method Cluster Development". The subject property is currently not subdivided and there are no approvals in place.

The property is located in the Bethesda section of Montgomery County, an upscale, primarily residential section of the Washington Metropolitan area. The site enjoys 475+/- front feet on the north side of Goldsboro Road, just east of its intersection with MacArthur Boulevard and west of its intersection with Tulip Hill Terrace.

The following is a summary of the subject's strengths and weaknesses:

## Strengths

- Housing prices and the demand for housing in the subject property's market area are strong, as the subject neighborhood and market area are part of the prestigious River Road corridor.

- The surrounding neighborhood is largely built-out, with limited opportunity for developing new housing units.

## Weaknesses

- The site exhibits steep slopes and a stream which traverses the majority of its length, greatly impacting and limiting potential development. The only buildable portion of the property is along its Goldsboro Road frontage, east of where the on-site stream crosses Goldsboro Road.

- There are no approvals in place for subdivision into a townhouse subdivision, which is itself a conditional use.

## Highest and Best Use

Residential development of the site is both financially feasible and maximally productive and therefore, the subject's highest and best use. However, due to the topography of the site and the stream which traverses it, in addition to its lack of approvals for townhouse development which is a conditional use with unknown lot yield at this time, this potential use of the site is speculative as of the date of valuation.

## Bethesda Chevy Chase Master Plan /Density Implications

Review of the current Master Plan for the area provides critical insights into the ability of the subject property to be developed. Pertinent sections from page 67 of that Plan are as follows:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| P8 | P619 P735 | MacArthur Blvd and Goldsboro Rd | 5.23 acres | House (26du potential) | R-60 | Town-house (26 du potential) | R-60 | -Should not expect to receive full density<br>-Development Should cluster in relatively flat area adjacent to Goldsboro Rd<br>-Suitable for cluster to preserve steep slopes | -Reduce density due to extreme environmental constraints (slopes, possible wetlands)<br>-Enhance and protect the environmental character of site |

It becomes quite clear that, while zoning allows a density of 26 dwelling units, ostensibly in a townhouse format, the site's physical constraints severely limit its potential buildout; further confirmation of the property's development limitations. Excerpts of a telephone conversation we had with Marco Fuster, lead reviewer of the subject's plan and on staff at MNCPPC-MC, relating specifically to the most recent development proposal submitted by the property owners are as follows:

1) The site poses extreme environmental constraints and impacts
2) There are overlapping regulations which impact the site
3) The site has numerous features which impact on potential development including a stream with possible wetlands, flood plain, steep slopes and severe topography issues, forest conservation areas, soil conditions, and a sewer line which runs along Goldsboro Road.

Based on the issues raised in the Master Plan and those again cited by the MNCPPC-MC representative, it is obvious that the subject developer's proposed density of 19 townhouses could never have been achieved and was therefore unrealistic from the get-go, so much so that a density of less than half of that originally proposed is more likely. It should be noted that realistic density potential directly affects the site's market value.

Based on our physical inspection of the subject property and site conditions we have studied via topographical maps and other publicly available data, together with plans submitted by the developer which note the physical features we saw on-site, and consistent with the development criteria set forth in the Master Plan and addressed by Marco Fuster, we have attempted to lay out townhouse units on the flat area of the subject property along its Goldsboro Road frontage.

We have measured the site's frontage along Goldsboro Road, east of the stream crossing (frontage west of the crossing is too shallow for development) to be 264 ft. Assuming 26 ft. wide luxury garage townhouses (the narrowest acceptable in this market) and imposing the appropriate side yard setbacks, we conclude that six to eight townhouse units would maximize the site's potential.

Specifically, such density could be achieved in two sticks of three units each, one stick of three and one stick of four, or two sticks of four each. This then becomes the baseline for our valuation of the subject property in terms of its density potential.

## Value Conclusion:

Based upon a lot yield of six to eight townhouse lots, we apply a unit value of $165,000/lot derived later in this report in the sales comparison approach. This results in a market value range as follows: (6 lots x $165,000/lot = $1,000,000, rounded) or (8 lots x $165,000/lot = $1,325,000, rounded) resulting in a final value range of **$1,000,000 to $1,325,000 (ONE MILLION DOLLARS to ONE MILLION THREE HUNDRED TWENTY FIVE THOUSAND DOLLARS).**

We developed our analyses, opinions, and conclusions and prepared this report in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute; and the requirements of our client as we understand them.

Ms. Danielle S. Zoller, Esquire is the client in this assignment. The intended users are Gordon Feinblatt LLC and their client in this matter.

No borrower, property purchaser or property seller, and no party other than those parties specifically identified above shall rely on the appraisal for any purpose or be considered an intended user of the appraisal. However, we have abstracted the operating agreement for 6789 Goldsboro Road LLC (see addenda) and acknowledge that this report may be utilized in the context of a redemption of the Class B member's interest.

The acceptance of this appraisal assignment and the completion of the appraisal report submitted herewith are contingent on the following extraordinary assumptions and/or hypothetical conditions:

## Extraordinary Assumptions:

In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time.

## Hypothetical Conditions:

No hypothetical assumptions were employed in this assignment.

Based on the analysis contained in the following report and by way of summary, our value conclusions involving the subject property are as follows:

### VALUE CONCLUSION

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

This letter of transmittal is not considered valid if separated from this report, and must be accompanied by all sections of this report as outlined in the Table of Contents, in order for the value opinions set forth above to be valid.

Respectfully submitted,
Lipman Frizzell & Mitchell LLC

M. Ronald Lipman, MAI
Principal
Maryland License #04-1072
License Expires December 31, 2018

Sheldon A. Stern, MAI
Senior Appraiser
Maryland License # 04-1976
License Expires January 14, 2019

# Table of Contents

Summary of Salient Facts ........ 1
Aerial & Street Map Views ........ 2
Introduction ........ 3
Washington, D.C. Metropolitan Area Analysis ........ 7
Montgomery County, Maryland Analysis ........ 10
Neighborhood Analysis ........ 21
Market Analysis ........ 23
Property Description ........ 25
Zoning Overview ........ 29
Assessment and Tax Data ........ 31
Subject Strengths & Weaknesses ........ 33
Highest and Best Use ........ 34
Appraisal Methodology ........ 35
Sales Comparison Approach ........ 36
Conclusion ........ 50
General Assumptions and Limiting Conditions ........ 51
Certification ........ 55
Certification ........ 56
Addenda ........ 57

# Summary of Salient Facts

| | |
|---|---|
| Property Name: | Proposed Goldsboro Place Subdivision |
| Address: | 6789 Goldsboro Road<br>Bethesda, Montgomery County, Maryland 20817 |
| Tax Parcel Number: | Tax Map GN41, Parcels P619 and P635 |
| Property Owner: | 6789 Goldsboro LLC |
| Property Rights Appraised: | Fee Simple |
| Zoning: | R-60, Residential – Moderate Density |
| Site Size: | 5.46 acres (237,650 square feet) |
| Property Description: | The subject property consists of a residential parcel containing irregular topography with steep slopes and a stream which traverses the site and is improved with a vacant residential dwelling built in 1935. |
| Extraordinary Assumptions: | In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time. |
| Hypothetical Conditions: | No hypothetical assumptions were employed in this assignment. |
| Highest and Best Use: | Residential Cluster Development |
| Date of Inspection: | July 3, 2017 |
| Report Date: | August 17, 2017 |

### VALUE CONCLUSION

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

# Aerial & Street Map Views



**Note:** Outlined above is the entire proposed Goldsboro Place townhouse subdivision.



# Introduction

## Client and Other Intended Users of the Appraisal

The client in this assignment is Gordon Feinblatt LLC and the intended users of this report are Gordon Feinblatt LLC and their client and no others.

## Intended Use of the Appraisal

The intended use of this report is to support an analysis by Gordon Feinblatt LLC of the subject property as it relates to its current development potential and the operating agreement for 6789 Goldsboro Road LLC .

## Real Estate Identification

The subject property is located at 6789 Goldsboro Road, Bethesda, Maryland 20817. The Montgomery County Assessor identifies the subject property as Tax Map GN341, Parcels P619 and P735.

**TAX MAP**




## Real Property Interest Appraised

We have appraised the fee simple interest in the subject property.

## Type and Definition of Value

The purpose of this appraisal is to develop an opinion of the market value of the subject property. "Market Value," as used in this appraisal, is defined as "the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1) Buyer and seller are typically motivated.

2) Both parties are well informed or well advised, each acting in what they consider their own best interests;
3) A reasonable time is allowed for exposure in the open market;
4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sale concessions granted by anyone associated with the sale."

(Source: The Dictionary of Real Estate Appraisal, Sixth Edition, pg. 142)

The "as is" value is the value of the property in its present condition under market conditions prevalent on the date of the appraisal.

Please refer to the Glossary in the *Addenda* for further definitions of terms employed in this report.

## Date of Report

The date of this report is August 17, 2017, the date of the letter of transmittal.

## Valuation Scenarios and Effective Dates of Value

We developed opinions of value for the subject property under the following scenarios and corresponding effective dates of value:

| Valuation | Effective Date of Value |
|---|---|
| "As Is" | July 3, 2017 |

We completed an appraisal inspection of the subject property on July 3, 2017.

## Use of Real Estate as of the Effective Date of Value

The subject property existed as a single lot with a vacant single family dwelling completed in 1935 as of the effective date of value.

## Use of Real Estate as of the Date of this Report

Assumed to be the same as above.

## Ownership and Sales History

According to tax assessment records, title to the subject property is vested in 6789 Goldsboro LLC. This entity purchased the property in July 2013 from Virginia J. Dawson, Trustee for $1,350,000. Other than the above, we are not aware of any more sales, listings, or offers for the subject property within the past three years.

## Scope of Work

The scope of work includes all steps taken in the development of the appraisal. These include 1) the extent to which the subject property is identified, 2) the extent to which the subject property is inspected, 3) the type and extent of data researched, 4) the type and extent of analysis applied, and 5) the type of appraisal report prepared. These items are discussed as follows:

### Extent to Which the Property was Identified

#### Legal Characteristics

The subject was legally identified via an inspection of the property, State of Maryland and Montgomery County tax assessment records.

#### Economic Characteristics

Economic characteristics of the subject property were identified via an analysis of the local housing market, as well as a comparison to properties with similar locational and physical characteristics.

#### Physical Characteristics

The subject was physically identified via a general inspection of the property by the appraiser, as well as a visual review of aerial photography.

### Extent to Which the Property was Inspected

We inspected the subject on July 3, 2017.

### Type and Extent of the Data Researched

We researched and analyzed: 1) market area data, 2) property-specific, market-analysis data, 3) zoning and land-use data, and 4) current data on comparable sales in the competitive market area.

### Type and Extent of Analysis Applied

Surrounding land use trends, the condition of the property, demand for the subject, and relative legal limitations were observed and analyzed in concluding the subject's highest and best use. The subject was then valued based on the highest and best use conclusion, relying on the sales comparison approach.

### Appraisal Report Type

This is an Appraisal Report as defined by the Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2a. Please see the Scope of Work above for a description of the level of research completed.

### Appraisal Conformity

We developed our analyses, opinions, and conclusions and prepared this report in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); the

Interagency Appraisal and Evaluation Guidelines; the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute; and the requirements of our client as we understand them.

## Extraordinary Assumptions

In this assignment we make the assumption that the subject property will yield up to eight townhouse lots, although it has not received site plan approval for any lots at the present time.

## Hypothetical Conditions

No hypothetical assumptions were employed in this assignment.

# Washington, D.C. Metropolitan Area Analysis

The Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area (MSA) includes: Calvert, Charles, Frederick, Montgomery and Prince George's Counties in Maryland; Arlington, Clarke, Culpeper, Fairfax, Fauquier, Loudoun, Prince William, Rappahannock, Spotsylvania, Stafford and Warren Counties, and the Cities of Alexandria, Fairfax, Falls Church, Fredericksburg, Manassas and Manassas Park, located in Northern Virginia; Jefferson County, in West Virginia; and the District of Columbia.




The Washington MSA's population grew by an average annual rate of 1.5% between 1990 (4,122,259) and 2000 (4,796,183), according to the U.S. Census Bureau. In 2016, the MSA had an estimated population of 6,131,977, an increase of 0.9% over 2015, at 6,078,469. The population for the MSA had an average annual change of 1.5% and a total change of 16.5% from 2006 to 2016. The Washington MSA's population is projected to increase to 6,446,853 in 2020 and 7,231,458 in 2030, according to reports from the Metropolitan Washington Council of Governments Cooperative Forecasts 9.0 for the District of Columbia and Jefferson County, West Virginia, the Weldon Cooper Center for Public Service for Virginia counties and cities, and the Maryland Department of Planning for Maryland counties.

In 2016, the Washington, D.C. MSA had an estimated average annual labor force of 3,313,056, with an average unemployment rate of 3.8%, compared to an average rate of 6.0% for the District of Columbia, 4.3% for Maryland, 4.0% for Virginia, 6.0% for West Virginia and the U.S. average unemployment rate of 4.9%.

In June 2017, the Washington, D.C. MSA had an estimated labor force of 3,424,661 with an unemployment rate of 3.9%, compared to a rate of 6.4% for the District of Columbia, 4.2% for Maryland, 3.9% for Virginia, 5.1% for West Virginia and the U.S. unemployment rate of 4.4%.

The early 1990s produced a depressed economic environment for the Metropolitan area with cutbacks in employment by the Federal Government, the area's largest employer. This was followed by corporate mergers and layoffs in the mid-1990s. By the late 1990s the economy had improved and private sector hiring was strong, with low unemployment and resurgence in demand for commercial development. During 2002, the economy in the Metropolitan area was stagnant with low mortgage interest rates responsible for a strong housing market. By 2005, a strong seller's market developed for both residential and commercial real estate that began to slow down by year end, as interest rates rose. Sales activity in the housing market declined in 2006 through 2009, while commercial activity remained relatively stable.

According to reports from the U.S. Census Bureau, the estimated median household income for the Washington, D.C. MSA increased from $71,013 in 2005 to $85,844 in 2015, an average annual increase of 1.9% and a total change of 20.9%. The MSA's 2015 median income was 0.9% higher than the 2014 median income of $85,059. Median income for the MSA was 17.4% higher than the District of Columbia's median household income of $73,115, 13.3% higher than Maryland's income of $75,784, 29.6% higher than Virginia's income of $66,263 and 104.5% higher than West Virginia's median household income of $41,969.

The residential market in the Washington Metropolitan area was extremely active during the first half of this decade, although home sales began to slow in 2006 and pricing began to decline since that time. The extreme expansion experienced between 2000 and 2005 ended and the market is in the process of finding equilibrium.

According to reports from the Metropolitan Regional Information Systems, Inc. (MRIS), in 2016, the MSA had an average home sale price of $400,431, an increase of 2.0% over 2015, at $392,474 (previous data has been changed with the addition of Culpeper and Rappahannock counties to the MSA). During the same period, the number of units sold in the MSA went from 80,115 in 2015 to 86,071 in 2016, an increase of 7.4%.

In June 2017 the average home sale price in the MSA was $425,115, an increase of 3.4% over June 2016, at $411,111. During the same period, the number of units sold in the MSA went from 9,561 in June 2016 to 10,035 in June 2017, an increase of 5.0%. The average year-to-date (YTD) 2017 home sale price in the MSA was $408,901, an increase of 3.0% over YTD 2016, at $396,854. The total number of units sold in the MSA (YTD) went from 40,247 in 2016 to 43,121 in 2017, an increase of 7.1%.

In late 2007, financial markets began to deteriorate from a period of rapid growth in real estate prices and economic activity during the 2000s. What followed was a deep and unprecedented global economic recession, which has come to be known as The Great Recession. Real estate markets in particular were profoundly affected by this recession in comparison to past recessions.

The duration and far reaching impact of The Great Recession has been unprecedented as have been measures in monetary and fiscal policy undertaken by the U.S. Government to combat the ongoing problems. The Federal Reserve has lowered the Federal Funds Target Rate to a range of 0 to 0.25%, the lowest rate since December of 2008 and over $5 trillion has been added to the nation's debt since January of 2008. Standard & Poor's Ratings Services revised its outlook on the U.S. long-term credit rating from AAA to AA+ to reflect future concerns regarding the ability of the U.S. Government to fulfill its obligations as a result of its increased debt loads, without major policy changes.

During the last three years, the Washington, D.C. MSA has shown signs of stabilization. The MSA experienced increases in the average home sale price from 2010 through 2016, after decreases in 2008 and 2009. The average unemployment rate decreased in 2011 through 2016, after increasing unemployment in 2009 and 2010. These recent signs of stabilization indicate a recovery from the late 2000s and early 2010s.

Going forward, the Washington, D.C. MSA's economic base will continue to be a positive influence as it recovers. Economic growth may not again reach the pace set in the mid-2000s, however, the MSA's favorable demographic trends and location will assist in stabilizing and, ultimately, growing its economy.

# Montgomery County, Maryland Analysis

## Location

Bordering Washington, D.C. to the immediate northwest, Montgomery County represents one of Maryland's most populated and affluent jurisdictions. It comprises a land area of 495± square miles and is bordered by Frederick County to the northwest, Howard County to the northeast, Prince George's County to the southeast and the District of Columbia and Virginia to the south and west, respectively. Montgomery County has 19 municipalities including: Barnesville, Brookville, Town of Chevy Chase, Chevy Chase View, Chevy Chase Village, Village of Chevy Chase (Section 3), Village of Chevy Chase (Section 5), Gaithersburg, Garrett Park, Glen Echo, Kensington, Laytonsville, Martin's Additions, North Chevy Chase, Poolesville, Rockville, Somerset, Takoma Park and Washington Grove. The centrally located City of Rockville serves as the County seat and is 15 miles from Washington, D.C., 37 miles from Baltimore, MD, 132 miles from Philadelphia, PA and 223 miles from New York, NY.



## Population

The U.S. Census Bureau estimated Montgomery County's 2000 population at 873,874, which had an average annual growth rate of 2.1% from 1980, at 579,053. In 2016, the County had an estimated population of 1,043,863, an increase of 0.7% over 2015, at 1,036,233. The County experienced an overall total increase in population of 12.7% and an average annual increase of 1.2%, from 2006 to 2016. Montgomery County is projected to have a population of 1,067,000 in 2020 and 1,153,900 in 2030, according to reports from the Maryland Department of Planning. The County's anticipated modest rate of growth in this decade is expected to occur primarily outside the Capital Beltway (I-495). A summary of population history and forecast is shown in the following chart.

### HISTORICAL AND PROJECTED POPULATION – SUBURBAN WASHINGTON REGION

| | | | Average Annual Growth Rates | | | | |
|---|---|---|---|---|---|---|---|
| | 2006 | 2016 | 2006-2016 | 2020 | 2016-2020 | 2030 | 2020-2030 |
| MARYLAND | 5,627,367 | 6,016,447 | 0.7% | 6,224,510 | 0.9% | 6,612,190 | 0.6% |
| Suburban Washington Region | 2,002,800 | 2,199,503 | 0.9% | 2,247,150 | 0.5% | 2,402,500 | 0.7% |
| Frederick County | 224,211 | 247,591 | 1.0% | 265,650 | 1.8% | 304,050 | 1.4% |
| **Montgomery County** | **926,492** | **1,043,863** | **1.2%** | **1,067,000** | **0.5%** | **1,153,900** | **0.8%** |
| Prince George's County | 852,097 | 908,049 | 0.6% | 914,500 | 0.2% | 944,550 | 0.3% |

*Sources: 2006 & 2016 - U.S. Census Bureau, Release Date: March 2017; 2020 & 2030 - Projections: Maryland Department of Planning.*

## Employment

The County's talented workforce and strategic location have influenced its development as one of the nation's largest centers of research and development activity and private and governmental employment. The County's anticipated future employment growth is expected in the private sector, particularly in the areas of service, high technology and related industries. A survey of the County's total employment, broken down by sector of work, is shown in the following chart.

### SUMMARY OF EMPLOYMENT

| SOURCE | Annual 2014 | Annual 2015 | % Change 2014-15 | Annual 2016 | % Change 2015-16 |
|---|---|---|---|---|---|
| Government | 89,580 | 89,344 | -0.3% | 89,763 | 0.5% |
| Natural Resources & Mining | 304 | 308 | 1.3% | 310 | 0.6% |
| Construction | 23,662 | 23,585 | -0.3% | 23,332 | -1.1% |
| Manufacturing | 11,304 | 11,666 | 3.2% | 11,946 | 2.4% |
| Trade, Transportation & Utilities | 57,824 | 57,695 | -0.2% | 56,846 | -1.5% |
| Information | 12,608 | 12,354 | -2.0% | 11,780 | -4.6% |
| Financial Activities | 30,040 | 30,607 | 1.9% | 29,790 | -2.7% |
| Professional & Business Services | 98,782 | 99,022 | 0.2% | 102,397 | 3.4% |
| Education & Health Services | 67,618 | 69,925 | 3.4% | 71,561 | 2.3% |
| Leisure & Hospitality | 41,005 | 41,827 | 2.0% | 43,203 | 3.3% |
| Other Services & Unclassified | 22,616 | 22,552 | -0.3% | 22,521 | -0.1% |
| Total | 455,343 | 458,885 | 0.8% | 463,449 | 1.0% |

*Source: Maryland Department of Labor, Licensing & Regulation*

In June 2017, the estimated civilian labor force for Montgomery County was 567,794, with an unemployment rate of 3.5% (not seasonally adjusted), compared to a rate of 3.9% for the Washington, D.C. MSA, 4.2% for the State of Maryland and the U.S. unemployment rate of 4.4% (seasonally adjusted). Government employment accounts for 19% of the Montgomery County work force with the remaining 81% in the private sector. The top ten employers in Montgomery County are listed in the following chart.

**TOP TEN EMPLOYERS**

| Employer | Product/Service | Employees |
|---|---|---|
| National Institutes of Health* | HQ/Medical research/Federal government | 17,580 |
| U.S. Food and Drug Administration* | HQ/Food & drug R&D & standards/Federal government | 13,855 |
| Naval Support Activity Bethesda* | Medical services/Federal government | 12,000 |
| Marriott International | HQ/Hotels, motels/Accommodation & food services | 5,800 |
| Adventist Healthcare | HQ/Medical services/Health care | 4,290 |
| Montgomery College | Higher Educations/Educational services | 3,190 |
| National Oceanic & Atmospheric Admin.* | HQ/Weather analysis & reporting/Federal government | 2,920 |
| National Institute of Standards & Technology* | HQ/testing and standards; R&D | 2,835 |
| Kaiser Foundation Health Plan | Medical services/Health care | 2640 |
| U.S. Nuclear Reg. Comm.* | HQ/utilities regulation | 2340 |

*Note: Excludes post offices, state and local governments; national retail and national food service; includes higher education. Sources: Economic development agencies statewide and Maryland Department of Business and Economic Development, 2016.*

**Employee counts for federal and military facilities exclude contractors to the extent possible; embedded contractors may be included.*

## Income

According to the U.S. Census Bureau, estimated median household income for Montgomery County increased from $81,874 in 2005, to $98,314 in 2015, an average annual increase of 1.8% and a total increase of 20.1%. The County's 2015 estimated income was 29.7% higher than Maryland's median income of $75,784. Median household income growth in the County from 2005 to 2015 is shown in the following chart.

**MEDIAN HOUSEHOLD INCOME**

| Year | Income | Annual % Change | Total % Change |
|---|---|---|---|
| 2005 | $81,874 | - | - |
| 2006 | $87,019 | 6.3% | 6.3% |
| 2007 | $91,440 | 5.1% | 11.7% |
| 2008 | $93,895 | 2.7% | 14.7% |
| 2009 | $93,774 | -0.1% | 14.5% |
| 2010 | $88,559 | -5.6% | 8.2% |
| 2011 | $92,288 | 4.2% | 12.7% |
| 2012 | $94,365 | 2.3% | 15.3% |
| 2013 | $97,873 | 3.7% | 19.5% |
| 2014 | $97,279 | -0.6% | 18.8% |
| 2015 | $98,314 | 1.1% | 20.1% |
| Average Annual % Change | | 1.8% | |

*Sources: U.S. Census Bureau*

## Assessable Tax Base

The assessable tax base is affected by physical growth, the economy and market prices. In FY 2016 (as of the November 30, 2016 base estimate date), the County had an estimated assessable tax base of $178.612 billion, an increase of 4.3% over 2015, at $171.300 billion. The County experienced an average annual increase of 2.4% and a cumulative change of 26.5% from 2006 to 2016, as set forth in the following chart.

### ASSESSABLE TAX BASE

| Year* | Tax Base (In $Billions) | Annual % Change | Cumulative % Change |
|---|---|---|---|
| 2006 | $141.182 | - | - |
| 2007 | $163.916 | 16.1% | 16.1% |
| 2008 | $182.492 | 11.3% | 29.3% |
| 2009 | $182.804 | 0.2% | 29.5% |
| 2010 | $174.841 | -4.4% | 23.8% |
| 2011 | $163.570 | -6.4% | 15.9% |
| 2012 | $158.918 | -2.8% | 12.6% |
| 2013 | $160.520 | 1.0% | 13.7% |
| 2014 | $164.438 | 2.4% | 16.5% |
| 2015 | $171.300 | 4.2% | 21.3% |
| 2016 | $178.612 | 4.3% | 26.5% |
| Average Annual % Change | | 2.4% | |

*Source: State Department of Assessments and Taxation.*
** For Tax Years beginning July 1st.*

## Retail Sales

According to reports from the Comptroller of Maryland, Bureau of Revenue Estimates (BRE), Montgomery County had sales totaling $9.135 billion in 2016 an increase of 0.7% over 2015, at $9.072 billion. The County experienced an average annual increase of 0.2% and a cumulative growth rate of 1.8% from 2006 to 2016, as shown in the following chart.

### RETAIL SALES

| Year* | Retail Sales (In $Billions) | Annual % Change | Cumulative % Change |
|---|---|---|---|
| 2006 | $8.976 | - | - |
| 2007 | $9.052 | 0.8% | 0.8% |
| 2008 | $8.985 | -0.7% | 0.1% |
| 2009 | $8.537 | -5.0% | -4.9% |
| 2010 | $8.065 | -5.5% | -10.2% |
| 2011 | $8.337 | 3.4% | -7.1% |
| 2012 | $8.716 | 4.5% | -2.9% |
| 2013 | $8.631 | -1.0% | -3.8% |
| 2014 | $8.697 | 0.8% | -3.1% |
| 2015 | $9.072 | 4.3% | 1.1% |
| 2016 | $9.135 | 0.7% | 1.8% |
| Average Annual % Change | | 0.2% | |

*Source: Comptroller of Maryland - Bureau of Revenue Estimates (BRE) Consolidated Revenue Reports; Sales and Use Tax Summaries.*
** Fiscal Years through June 30th.*

## Housing

The housing stock of Montgomery County mostly consists of single family housing for the upper income purchaser. Metropolitan Regional Information Systems, Inc. (MRIS), in their report on housing statistics, stated that the average sale price of an existing home in Montgomery County in 2016 was $505,285, an increase of 0.8% over 2015, at $501,305. The number of units sold in the County went from 12,191 in 2015 to 12,896 in 2016, an increase of 5.8%. Historical changes in average sale price and number of units sold from 2006 to 2016 are shown in the following chart.

### AVERAGE HOME SALE PRICES AND UNITS SOLD

| Year | Units Sold | % Change | Avg. Price | % Change |
|---|---|---|---|---|
| 2006 | 13,494 | -- | $529,046 | -- |
| 2007 | 10,355 | -23.3% | $550,188 | 4.0% |
| 2008 | 8,519 | -17.7% | $503,965 | -8.4% |
| 2009 | 10,375 | 21.8% | $434,246 | -13.8% |
| 2010 | 10,408 | 0.3% | $441,618 | 1.7% |
| 2011 | 9,500 | -8.7% | $451,963 | 2.3% |
| 2012 | 10,155 | 6.9% | $465,510 | 3.0% |
| 2013 | 11,461 | 12.9% | $500,338 | 7.5% |
| 2014 | 10,976 | -4.2% | $503,956 | 0.7% |
| 2015 | 12,191 | 11.1% | $501,305 | -0.5% |
| 2016 | 12,896 | 5.8% | $505,285 | 0.8% |

*Source: Metropolitan Regional Information Systems, Inc. (MRIS)*

In June 2017 the average home sale price in the County was $545,893, a decrease of 0.1% from June 2016, at $546,394. During the same period, the number of units sold in the County went from 1,532 in June 2016 to 1,519 in June 2017, a decrease of 0.8%. The average year-to-date (YTD) 2017 home sale price in the County was $524,221, an increase of 4.6% over YTD 2016, at $501,290. The total number of units sold in the County (YTD) went from 6,127 in 2016 to 6,300 in 2017, an increase of 2.8%. A comparison of 2017 to 2016, for average home sale prices and number of units sold in Montgomery County on a monthly and YTD basis, is shown in the following chart.

### AVERAGE HOME SALE PRICES & NO. OF UNITS SOLD - MONTHLY/YTD COMPARISON

| Month | 2016 Units Sold | 2017 Units Sold | 2016-2017 % Change | 2016 Average Price | 2017 Average Price | 2016-2017 % Change |
|---|---|---|---|---|---|---|
| January | 646 | 704 | 9.0% | $451,298 | $482,017 | 6.8% |
| February | 658 | 701 | 6.5% | $494,907 | $517,511 | 4.6% |
| March | 841 | 1,013 | 20.5% | $473,902 | $510,481 | 7.7% |
| April | 1,103 | 1,117 | 1.3% | $527,180 | $546,156 | 3.6% |
| May | 1,347 | 1,246 | -7.5% | $514,061 | $543,266 | 5.7% |
| June | 1,532 | 1,519 | -0.8% | $546,394 | $545,893 | -0.1% |
| YTD | 6,127 | 6,300 | 2.8% | $501,290 | $524,221 | 4.6% |

*Source: Metropolitan Regional Information Systems, Inc. (MRIS)*

According to reports from the U.S. Census Bureau, in 2016, Montgomery County issued new residential building permits for 2,170 dwelling units (including multi-family), an increase of 4.3% over 2015, at 2,080. Of those permits issued in 2016, 1,414 were for single-family units, an increase of 3.4% over 2015, at 1,367 single-family units. During the same period, the County issued multi-family permits for 756 units, an increase of 6.0% over 2015, at 713 multi-family units.

The dollar value of all new permits issued in Montgomery County, in 2016, was $425.0 million, a decrease of 4.7% from 2015, at $445.8 million. The number of units and the construction costs for building permits issued in the County from 2006 to 2016 are shown in the following chart.

**RESIDENTIAL BUILDING PERMITS**

| | Number of Units | | | | Construction Costs ($millions) | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Single-Family | Multi-Family | Total | % Change | Single-Family | Multi-Family | Total | % Change |
| 2006 | 1,237 | 1,794 | 3,031 | -- | $343.4 | $230.8 | $574.2 | -- |
| 2007 | 1,408 | 2,051 | 3,459 | 14.1% | $387.6 | $276.5 | $664.0 | 15.6% |
| 2008 | 997 | 479 | 1,476 | -57.3% | $259.8 | $76.2 | $336.1 | -49.4% |
| 2009 | 862 | 0 | 862 | -41.6% | $244.5 | $0.0 | $244.5 | -27.2% |
| 2010 | 909 | 990 | 1,899 | 120.3% | $225.1 | $118.3 | $343.3 | 40.4% |
| 2011 | 1,031 | 1,481 | 2,512 | 32.3% | $236.5 | $197.9 | $434.5 | 26.5% |
| 2012 | 1,174 | 2,807 | 3,981 | 58.5% | $238.3 | $265.6 | $503.8 | 16.0% |
| 2013 | 1,652 | 1,862 | 3,514 | -11.7% | $326.7 | $197.3 | $523.9 | 4.0% |
| 2014 | 1,440 | 2,399 | 3,839 | 9.2% | $297.3 | $327.8 | $625.1 | 19.3% |
| 2015 | 1,367 | 713 | 2,080 | -45.8% | $298.7 | $147.1 | $445.8 | -28.7% |
| 2016 | 1,414 | 756 | 2,170 | 4.3% | $322.5 | $102.5 | $425.0 | -4.7% |

*Source: U.S. Census Bureau*

## Commercial/Industrial Markets

In second quarter 2017, CoStar reported Montgomery County's existing office space at 72.8 million square feet, with a vacancy rate of 13.8%. Industrial/flex space totaled 25.9 million square feet, with a vacancy rate of 9.3%. Retail space in the County totaled 41.9 million square feet, with a vacancy rate of 3.5%. The County had a total combined existing RBA of 140.7 million square feet, with an overall vacancy rate of 9.9%. Montgomery County's RBA for office, industrial/flex, retail, and combined space and vacancy rates for fourth quarters 2010 through 2016 and second quarter 2017, are shown in the following chart.

**COMMERCIAL RBA AND VACANCY RATES**

| | Office | | Industrial/Flex | | Retail | | Combined | |
|---|---|---|---|---|---|---|---|---|
| Year/Qtr. | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy | Sq. Ft. | Vacancy |
| 2017 2Q | 72,832,744 | 13.8% | 25,934,240 | 9.3% | 41,907,009 | 3.5% | 140,673,993 | 9.9% |
| 2016 4Q | 72,813,634 | 13.8% | 25,934,240 | 8.7% | 41,830,784 | 3.3% | 140,578,658 | 9.7% |
| 2015 4Q | 72,495,725 | 14.1% | 25,734,160 | 10.0% | 40,943,966 | 3.7% | 139,173,851 | 10.3% |
| 2014 4Q | 72,345,503 | 13.7% | 25,727,160 | 10.7% | 40,855,521 | 3.9% | 138,928,184 | 10.3% |
| 2013 4Q | 71,176,577 | 12.6% | 25,713,560 | 11.1% | 40,317,439 | 4.2% | 137,207,576 | 9.8% |
| 2012 4Q | 70,803,616 | 12.1% | 25,713,560 | 11.7% | 39,759,794 | 4.2% | 136,276,970 | 9.7% |
| 2011 4Q | 69,844,809 | 12.1% | 25,713,560 | 12.8% | 39,613,395 | 4.2% | 135,171,764 | 9.9% |
| 2010 4Q | 69,806,861 | 12.6% | 25,713,560 | 13.0% | 39,333,142 | 4.4% | 134,853,563 | 10.3% |

*Source: CoStar*

Traditionally, Montgomery County is considered one of the metropolitan area's strongest and most desirable office markets. As a result of negative market forces, new project delivery and construction activity was very modest in the early 1990's with build-to-suit developments being the only new construction. As the aggregate economy strengthened in the late 1990's, Montgomery County experienced a positive building environment. In the current economy, new commercial construction has leveled off with almost no speculative activity. The Federal government is expanding its facilities by lease arrangements with developers on private land and government owned land as they establish new requirements based on recent events.

Montgomery County is currently home to 250 biotech companies. New technology parks are planned along the I-270 and Rt. 29 corridors, adding to the County's global reputation as a technology center. According to the Maryland Department of Business & Economic Development, the County's business parks include:

- White Oak Science Gateway (formerly the East County Science Center) – 115-acre site to include a business incubator, a pilot manufacturing facility, lab facility, build-to-suit office space and a higher education facility adjacent to the new U.S. FDA headquarters campus.

- Montgomery College Germantown Campus Technology Park – Up to one million square feet of planned development which includes an academic and training facility that is tied in with the college's biotech program. It also includes a business incubator and build-to-suit facilities.

- LifeSci Village (formerly East County Science Center) – 300-acre mixed-use development focusing on advanced technologies; adjacent to the U.S. FDA headquarters campus.

- Great Seneca Science Corridor – This area (17.5 million sq.ft.) is being developed for scientific research and development.

- Johns Hopkins University Belward Research Campus – 108 acres are to be developed for research and education in addition to the 36 acres currently under use.

Business incubators in Montgomery County include: Germantown Innovation Center, Germantown; Bethesda Green Business Incubator, Bethesda; Association for Entrepreneurial Science (AES), Rockville; Rockville Innovation Center, Rockville; William E. Hanna, Jr. Innovation Center at Shady Grove, Rockville; Silver Spring Innovation Center, Silver Spring; and the Wheaton Business Innovation Center, Wheaton, Maryland. A Market Profile for Montgomery County's industrial and office properties is shown in the following chart.

**MARKET PROFILE DATA**

| Land - cost per acre | Low | High | Average |
|---|---|---|---|
| Industrial | $146,200 | $2,500,000 | $972,430 |
| Office | $154,800 | $2,892,400 | $1,147,700 |
| **Rental Rates - per square foot** | | | |
| Warehouse / Industrial | $10.00 | $29.00 | $11.88 |
| Flex / R&D / Technology | $17.00 | $28.50 | $22.84 |
| Class A Office | $13.50 | $51.00 | $32.09 |

*Source: Montgomery County Department of Economic Development, 2016*

## Transportation

Despite consistently heavy traffic patterns and vehicular congestion within its major highway corridors, transportation throughout the County and its surrounding metropolitan area is considered adequate. Montgomery County is served by the Capital Beltway (I-495) which travels in an east/west direction through Prince George's County and Virginia, and in a generally circular orientation around the District of Columbia. It is linked to the north by U.S. Route 29, and Interstates 270 and 95 which provide access between the Capital Beltway and Baltimore and Howard Counties, as well as Rockville/Shady Grove, Bethesda, Gaithersburg, and Frederick County. There are 150 buses, including Metrobus, operating along 39 routes in the County, plus extensive service via the County's Ride-On bus system. Taking advantage of this highway system, are 123 local and long-distance trucking companies.

An 18.8-mile Inter County Connector (I-200) toll road has been completed from I-270/I-370 to I-95 (Contracts A-C), which greatly eases east/west travel linking Prince George's and Montgomery Counties, according to reports from the Maryland Department of Transportation. The limited access highway begins from the west at I-270/I-370 in Montgomery County, MD and ends at US 1 in Prince George's County, MD.

The ICC is a limited access toll facility that has been constructed in the following sequence:

A. I-270/I-370 to MD 97 - 7.2 miles of six-lane highway (opened February 2011).

B. MD 97 to US 29 – 6.9 miles of six-lane highway (opened November 2011).

C. US 29 to I-95 - 3.8 miles of six-lane ICC highway, 1.3 miles of US 29 road improvements and 1.9 miles of I-95 auxiliary lane and C-D roadway improvements (opened November 2011).

D/E. Contract D/E Modified is the fourth design build contract of the ICC. It consists of collector-distributor lanes along I-95 from the ICC to just north of MD 198 and includes the extension of the ICC from the eastern terminus of Contract C to a partial interchange at Virginia Manor Road and a new signalized intersection at U.S. 1, near the Muirkirk MARC commuter rail station (opened to traffic as of November 2014).

The County also has extensive rail service in the form of twelve Metrorail stations that serve three of the system's busiest stops. Commuters have access to the MARC commuter rail and long-distance passenger service is provided by AMTRAK. CSX Transportation provides freight rail service to the area.

Montgomery County is also served by the Helen Delich Bentley Port of Baltimore (renamed for former Congresswoman, Helen Delich Bentley on June 2, 2006, in celebration of the 300th anniversary of the Port), which is located at Dundalk, Curtis Bay, Locust Point and Canton Yards. The Port is a significant economic engine for the region and considered to be a leading U.S. automobile and break-bulk port with six public terminals, including a state-of-the-art Intermodal Container Transfer Facility, adjacent to Seagirt Marine Terminal, which serves import and export accounts, accommodating loading and discharge at the seaport. Another ICTG is located at Dundalk Marine Terminal, a general cargo facility with direct rail access. The Port is one of America's top container terminals due to its strategic Mid-Atlantic location, inland setting and 50' channel, and is ranked as one of the nation's top "Ro-Ro" (roll-on, roll-off) ports. The Port is generally ice-free year round and can be approached from the south via the Chesapeake Bay or from the north via the Delaware Bay and Chesapeake-Delaware Canal.

Montgomery County's commercial passenger and air cargo services are available through the Baltimore/Washington International Thurgood Marshall Airport, Washington Dulles International Airport and Ronald Reagan Washington National Airport. The County is also served by the Montgomery County Airpark which provides regional, commuter and corporate air service and is owned by the Montgomery County Revenue Authority.

## The Great Recession

In late 2007 financial markets began to deteriorate from a period of rapid growth in real estate prices and economic activity during the 2000s. What followed was a deep and unprecedented global economic recession which has come to be known as The Great Recession. Real estate markets in particular were profoundly affected by this recession in comparison to past recessions.

One of the most destructive legacies of The Great Recession has been the nationwide erosion in home prices following dramatic increases in the mid-2000s which were fueled by easy credit and speculation. In Montgomery County the **average home sale price** increased from $253,507 in 2000 to $550,188 in 2007, or 117%. In 2016, the average sale price was $505,285, down 8.2% from the high. **Residential building permit values** decreased from a peak of $717.4 million in 2005 to $425.0 million in 2016, a decrease of 40.8%.

On a positive note, **retail sales** in Montgomery County grew from $8.976 billion in 2006 to $9.135 billion in 2016, a cumulative increase of 1.8%.

The effects of The Great Recession can also be found in **unemployment**, which, in Montgomery County, averaged 3.5% annually between 2006 and 2009, with a high of 5.3% in 2009, and a low of 2.6% in 2007. In 2010 unemployment jumped to 5.6% in 2010. The average unemployment rate decreased to 5.3% in 2011, 5.2% in 2012, 5.0% in 2013 4.4% in 2014, 3.9% in 2015 and 3.3% in 2016.

**Median household income** in the County increased by 6.3% in 2006 then slowed to an increase of 1.1% in 2015. Montgomery County's **assessable tax base** decreased from 2010 to 2012, after steady increases from 2004 to 2009 and then increased in 2013 through 2016. **Vacancy rates** have also increased for office RBA but decreased for industrial/flex and retail commercial property types since 2010.

The duration and far reaching impact of The Great Recession has been unprecedented as have been measures in **monetary and fiscal policy** undertaken by the U.S. Government to combat the ongoing problems. The Federal Reserve has lowered the Federal Funds Target Rate to a range of 0 to 0.25%, the lowest rate since December of 2008 and over $5 trillion has been added to the nation's debt since January of 2008. Standard & Poor's Ratings Services revised its outlook on the U.S. long-term credit rating from AAA to AA+ to reflect future concerns regarding the ability of the U.S. Government to fulfill its obligations as a result of its increased debt loads, without major policy changes.

## Conclusions

Montgomery County represents one of the Washington MSA's most populated and affluent submarkets. Due to its stable population base and proximity to a variety of quality educational facilities, its civilian labor force is generally considered talented and highly educated. This characteristic is evidenced by the extensive concentration of high tech industries within its boundaries and its historically low unemployment rates.

During the last four years, Montgomery County has shown signs of stabilization. Home prices increased in 2010 through 2014, after two years of decreases in 2008, 2009 and 2015 and then increased again in 2016. Retail sales decreased every year from 2008 through 2010, increased in 2011 and 2012, decreased in 2013, and then increased in 2014 through 2016. The average unemployment rate decreased in 2011 through 2016, after two years of increasing unemployment in 2009 and 2010. These recent signs of stabilization indicate a recovery from the late 2000s and early 2010s.

Going forward, Montgomery County, as well as the Washington, D.C. Region, will continue to benefit from the presence of the Federal Government. The County's proximity to Washington and Baltimore and its economic base will be a positive influence as it recovers. Economic growth may not again reach the pace set in the mid-2000s, however, Montgomery County's favorable demographic trends and location will assist in stabilizing and, ultimately, growing its economy.

# Neighborhood Analysis

**NEIGHBORHOOD MAP**




The subject property is situated in Bethesda, Montgomery County, Maryland. Bethesda is just north of the District of Columbia, within the southern portion of Montgomery County. Its general boundaries are formed by the Capital Beltway to the north, Connecticut Avenue (Route 185) to the east, Bradley Boulevard (Route 191) to the south, and Bradley Lane to the west. Commercial development of varying age and form can be found along the neighborhood's major arteries and residential uses are oriented along minor roads. The area is largely built-out, being an inner suburb of Washington, D.C. The largest land users are the National Institutes of Health (NIH) and National Naval Medical Center located on the east and west sides of Wisconsin Avenue, just south of the Capital Beltway. The subject property's location is in the northwestern portion of the neighborhood near the Glen Echo area and the Potomac River.

The subject property is located in zip code 20817 within Montgomery County. Information from ESRI Business Analyst Online was obtained regarding this area known as Bethesda. ESRI estimated the number of households in 2017 at 38,385, an increase of 6.5% (1.3% on average per year) over the 2010 population of 36,050 and an increase of 4.4% (0.9% on average per year) over 2017 to 40,065 in 2022. ESRI projects the 2017 households at 13,812 and an increase in the number of households by 535, or 2.9% (0.8% on average per year), over the next five years, totaling 14,347 in 2022. The area's 2017 median household income of $180,412 is well above the State of Maryland ($76,754) and the United States ($56,124).

The area is well served by road and public transportation systems. Major north/south arteries include Old Georgetown Road (Route 187), River Road (Route 190), Connecticut Avenue (Route 185) and Wisconsin Avenue (Route 355), all of which carry traffic from Montgomery County into

Washington, D.C., with interchanges at the Capital Beltway (I-495). Major east/west arteries include East West Highway (Route 410) which carries traffic from New Carrollton and Hyattsville through the Bethesda area, and Bradley Boulevard (Route 191), which carries traffic from Connecticut Avenue into the Potomac area of southwestern Montgomery County. The Capital Beltway (I-495) runs along the northern boundary of the neighborhood and is the primary east/west artery in the area. I-495 has interchanges with Connecticut Avenue, Wisconsin Avenue/Rockville Pike, Old Georgetown Road, and Interstate 270. In addition, the neighborhood has access to mass transit along major routes, and access to the Metro system with the Bethesda station at Wisconsin Avenue and Old Georgetown Road.

Residents have access to all necessary amenities. Shopping is readily available throughout the area with most of the retail uses in Bethesda concentrated in the Woodmont Triangle area formed by Woodmont Avenue, Old Georgetown Road and Battery Lane. The Montgomery Mall is location on Democracy Boulevard, west of Old Georgetown Road adjacent to I-270. Retail uses are also found along Rockville Pike corridor, north of I-495. Shopping needs in the immediate neighborhood can be found along the River Road corridor, northwest of Little Falls Parkway. Employment opportunities exist within the commercial and office developments in the area and to the south within the limits of Washington, D.C. Residents have access to public and private recreational amenities and public and private schools.

The area is served by all necessary utilities. The Washington Suburban Sanitary Commission (WSSC) provides public water and sewer service. Electricity is provided by PEPCO, while Washington Gas provides natural gas service. Verizon Communications provides local phone service. All utilities are available in sufficient quantities to serve the neighborhood and support development.

In summary, Bethesda is a neighborhood with households of above-average economic means. Growth is limited due to the neighborhood's built-out nature. New residential development is primarily achieved by builders or households purchasing older units, which are razed for redevelopment. The subject is situated along Goldsboro Road, west of River Road, a major north/south artery in Bethesda. The subject is well located in the neighborhood with good access to commuter routes, public transportation, and employment centers.

# Market Analysis

The purpose of this section is to provide relevant information about the marketplace in which the subject's residential component will compete.

## Local Housing Market Statistics

The Maryland Association of Realtors (MAR) track residential sales statistics that provide a context for neighborhood-specific and property-specific data. It should be noted that, generally, these reports do not include new house offerings and sales. It does, however, provide insight into the market environment in which the subject neighborhood and surrounding areas exist. We researched housing trends within Maryland and Prince George's County.

### HOUSING MARKET PERFORMANCE

#### STATE OF MARYLAND

| Year | # of Sales | % Change | Average Sales Price | % Change |
|---|---|---|---|---|
| 2001 | 80,169 | n/a | $184,953 | n/a |
| 2002 | 84,976 | 6.0% | $210,015 | 13.6% |
| 2003 | 89,371 | 5.2% | $241,025 | 14.8% |
| 2004 | 98,242 | 9.9% | $286,554 | 18.9% |
| 2005 | 98,858 | 0.6% | $341,006 | 19.0% |
| 2006 | 82,787 | -16.3% | $357,674 | 4.9% |
| 2007 | 63,585 | -23.2% | $362,197 | 1.3% |
| 2008 | 46,910 | -26.2% | $341,066 | -5.8% |
| 2009 | 53,025 | 13.0% | $300,573 | -11.9% |
| 2010 | 54,605 | 3.0% | $291,202 | -3.1% |
| 2011 | 53,971 | -1.2% | $277,897 | -4.6% |
| 2012 | 56,530 | 4.7% | $282,179 | 1.5% |
| 2013 | 63,556 | 12.4% | $308,950 | 9.5% |
| 2014 | 62,791 | -1.2% | $307,154 | -0.6% |
| 2015 | 73,044 | 16.3% | $305,055 | -0.7% |
| 2016 | 79,956 | 9.5% | $309,502 | 1.5% |
| Jan - Jul 2016 | 46,093 | n/a | $313,567 | n/a |
| Jan - Jul 2017 | 48,410 | 5.0% | $326,788 | 4.2% |

#### MONTGOMERY COUNTY

| Year | # of Sales | % Change | Average Sales Price | % Change |
|---|---|---|---|---|
| 2001 | 15,543 | n/a | $275,079 | n/a |
| 2002 | 16,030 | 3.1% | $320,418 | 16.5% |
| 2003 | 16,533 | 3.1% | $363,147 | 13.3% |
| 2004 | 17,753 | 7.4% | $429,480 | 18.3% |
| 2005 | 17,011 | -4.2% | $507,340 | 18.1% |
| 2006 | 13,523 | -20.5% | $529,511 | 4.4% |
| 2007 | 10,360 | -23.4% | $550,210 | 3.9% |
| 2008 | 8,516 | -17.8% | $503,958 | -8.4% |
| 2009 | 10,376 | 21.8% | $434,297 | -13.8% |
| 2010 | 10,401 | 0.2% | $441,492 | 1.7% |
| 2011 | 9,490 | -8.8% | $451,479 | 2.3% |
| 2012 | 10,094 | 6.4% | $465,597 | 3.1% |
| 2013 | 11,051 | 9.5% | $501,345 | 7.7% |
| 2014 | 10,612 | -4.0% | $505,458 | 0.8% |
| 2015 | 11,789 | 11.1% | $504,038 | -0.3% |
| 2016 | 12,471 | 5.8% | $503,261 | -0.2% |
| Jan - Jul 2016 | 7,377 | n/a | $511,856 | n/a |
| Jan - Jul 2017 | 7,460 | 1.1% | $528,431 | 3.2% |

Source: MAR

The data indicates growth in sales volumes through 2005 with significant declines in 2006, 2007, and 2008. Pent up demand was released in 2009, during which time the number of sales increased by 13.0% in the State and 42.7% in the County. Since then, demand has been stable for most years in the State with significant growth in 2013, 2015, and 2016. In the County, growth was positive in 2010 and 2011, declined in 2012-2014 and increased significantly in 2015 and 2016. In terms of sales prices, the peak was reached in 2006/07, then declined through 2011. Prices in the State, overall, have been relatively stable for the past four years, while Montgomery County has experienced growth. Year-to-date statistics for 2017 indicated continued strong growth in demand and prices. We expect continued growth in the residential market over the near term.

Using MRIS, the regional multiple list database, we analyzed sales data for townhouses aged five years or less within Zip Code 20817, the subject's neighborhood. This data identifies two townhouse subdivisions. River Quarry Subdivision located along River Road just outside the Capital Beltway (I-495) near Seven Locks Road recorded nine MRIS townhouse sales between the years 2012 and 2015. These large units which ranged from 3,900 to 4,500sq.ft., indicated sales prices ranging from $950,000 to $1,150,00 over this time period.

More current in the subject property's zip code is the opening of Montgomery Row Subdivision being developed by EYA Builders. The development reached the market in mid-2016 and is planned with 168 townhouses. This subdivision is located along the Democracy Boulevard corridor on Fernwood Road, near the Montgomery Mall, the current Marriott International headquarters and the I-270 spur. These 22 foot wide townhouse contain from 1,700 to 2,650sq.ft. Current sales prices have ranged from $850,000 to $1,200,000. Reports indicate that 54 units have sold.

EYA Builders are also developing the Grosvenor Heights Subdivision on Grosvenor Lane just outside the Capital Beltway near the Grosvenor Metro. These townhouse units are 24 foot wide with 2,500 to 3,400 sq.ft. and are being offered from $1,100,00 to $1,350,000. The development will contain 142 units. The property is located at 5315 Merriam Street in the adjacent Bethesda zip code 20814.

## Conclusion

The housing market in Montgomery County is strong, as evidenced by countywide statistics presented at the beginning of this section. The current average sales price for Montgomery County is $528,431 for the first seven months of 2017. New townhouse communities in the subject property zip code begin in the mid $800,000 to well over $1,000,000.

The subject property will consist of no more than 8 townhouse lots located along the north side of Goldsboro Road, which is a well-established, luxury single-family market. Considering the subject property's proposed small size and configuration as a townhouse project, we project an accelerated sellout period for the project. We estimate sales prices for the finished townhouse product to be in excess of $1,000,000 and the townhouse lots to be 26 foot wide. We assume the subject lots will capture their fair share of total demand for the market and as such, we project a sellout for the subject townhouses to be less than one year.

# Property Description

The subject is an irregularly shaped parcel located on the north side of Goldsboro Road, between MacArthur Boulevard and Massachusetts Avenue. The site contains 5.46 acres (237,650 sq.ft.) in two parcels found on Montgomery County Tax Map GN341, Parcels P619 and P735. It is improved with an older, vacant dwelling completed in 1935 and containing 4,236sq.ft.

The site exhibits irregular topography with severe slopes and contains a stream which bisects the property. It also exhibits numerous other features including steep slopes, flood plain area, forest conservation areas and potential soil conditions. The topography is relatively flat along its 475+/- frontage on Greensboro Road, rising steeply to the north. Impacting the site is a sewer line which runs along its southern boundary adjacent to Goldsboro Road.

Based upon the site conditions described above, a proposed site plan that was submitted in late 2015 and now before MNCPPC Planning Board found below proposing 19 townhouse lots is unrealistic. The Bethesda Chevy Chase Master Plan approved and adopted in 1990, outlines the challenges for the site and complex development requirements that must be met in order to receive planning board approval for any realistic site plan. The unapproved plan submitted is shown below.

**PROPOSED SITE PLAN**



The topography map below identifies steep slopes which negatively impact the subject property. Currently improving the site is an older, vacant structure in poor condition indicated on the map, which will be demolished to make way for new townhouse construction. This improvements does not contribute value to the subject.

**TOPOGRAPHY MAP**



According to Montgomery County Flood Hazard Map. No. 24031C0435D, effective September 296, 2006, the subject is located in Zone X, an area of minimal flooding on most of the site except certain areas which border Goldsboro Road.

## FLOOD PLAIN MAP




The subject has access to all necessary public utilities. Electricity is provided by Potomac Electric Power, natural gas is provided by Washington Gas, while Verizon provides local telephone service. Washington Suburban Sanitary Commission serves the site with both domestic water and sanitary sewer. This appraisal has identified environmental and soil conditions that could negatively impact development.

We have determined that the site could conceivably be developed with anywhere from six to eight townhouse units in two sticks of three, one stick of three and one stick of four, or two sticks of four each. This then becomes the baseline for our valuation of the subject property in terms of its density potential.

## Subject Photographs



View of Subject Frontage Along Goldsboro Rd.



View of Entry to Property from Goldsboro Rd.



View of Subject Improvements



View of Stream Which Traverse Subject Property



View of Stream Which Traverse Subject Property



View Looking West Along Goldsboro Road With Subject Property on the Right

# Zoning Overview

## ZONING MAP




## Zoning Designation

The subject property is zoned R-60, Residential, One-Family, Detached, within Montgomery County. The purpose of this zone is:

1. To provide designated areas of the County for moderate density uses;
2. The predominant use is residential in a detached house;
3. A limited number of other building types may be allowed under the optional method of development.

## Development Regulations

Permitted uses under the standard method development standards include single-family detached residences, and townhouse development under the cluster development method.

The minimum lot size for detached residential lots is 6,000 sq.ft. Lot width at front building line is 60 ft. Lot width at front lot line is 25ft. The maximum density is 7.26 units per acre. Maximum lot coverage is 35%.

Minimum setback requirements are: (1) Front Yard – 25 feet, (2) Side Yard – 8 feet per side, and (4) Rear Yard – 20 feet.

## Cluster Development Method

Under the cluster development method, the minimum usable area is 5.0 acres. The Planning Board may allow development to proceed under optional development method Cluster Development on a smaller site than allowed in Usable Area if the subject property is recommended for cluster development in a master plan or if it finds that cluster development on a smaller site would be more suitable than standard method development for environmental reasons.

The minimum lot area is 1,500sq.ft., with the lot width at front building line to be determined at site plan stage of approvals. The lot width at front lot line is 14ft. for a townhouse.

## Legal, Conforming Status

The Goldsboro Road site in its current configuration as a single family lot does not have an approved site plan consistent with zoning regulations under the cluster development method which allows townhouse development. The appraiser estimates the site can be developed with up to eight townhouse lots under the optional Cluster Development Method.

# Assessment and Tax Data

## Assessment Methodology

The State of Maryland has enacted a real estate assessment procedure called the Triennial Assessment. Under this procedure, one-third of all properties are re-assessed each year. The increase, if any, in assessment is phased-in during a three-year period, one-third per year. Decreases take effect immediately. Assessments are based on 100% of market value.

## Assessed Values and Property Taxes

The subject property was assessed as of January 1, 2017 for a total of $1,418,900. The current assessment is slightly less than its prior cycle value of $1,429,400.

| Account No. | Year Assessed | Land | Improvements | Total |
|---|---|---|---|---|
| 07-00421275 | 2017 | $997,800 | $421,100 | $1,418,900 |
| 07-00421264 | 2017 | $29,400 | $0 | $29,400 |
| | | | Total Assessment | $1,448,300 |

The subject's phase-in values are as follows:

### PHASE-IN ASSESSMENTS

| | Tax Year | Assessment |
|---|---|---|
| Base Year | 2016/17 | $1,458,800 |
| Phase-in Yr. 1 | 2017/18 | $1,448,300 |
| Phase-in Yr. 2 | 2018/19 | $1,448,300 |
| Phase-in Yr. 3 | 2019/20 | $1,448,300 |

## Tax Rates

The appropriate tax rates for the subject property are as follows:

### TAX RATES

| Jurisdiction | Rate |
|---|---|
| Montgomery County | $1.0129 /$100 of Assessment |
| State of Maryland | $0.1120 /$100 of Assessment |
| Total | $1.1249 /$100 of Assessment |

## Property Taxes

The real estate tax burden for the subject is calculated as follows:

### TAX CALCULATION

| | 2017/18 | 2018/19 | 2019/20 |
|---|---|---|---|
| Assessed Value | $1,448,300 | $1,448,300 | $1,448,300 |
| Times: Tax Rate/$100 | $1.1249 | $1.1249 | $1.1249 |
| Estimated Tax | $16,292 | $16,292 | $16,292 |

## Metropolitan Charges

As the subject property is provided metropolitan services, a charge of $686 has been levied against it by Montgomery County for the 2017/18 levy year. It is estimated that these charges will remain relatively constant over a reasonable holding period.

## Summary of Taxes

| | 2017/18 | 2018/19 | 2019/20 |
|---|---|---|---|
| Real Estate Taxes | $16,292 | $16,292 | $16,292 |
| Metropolitan Charges | $686 | $686 | $686 |
| Total Taxes Due | $16,978 | $16,978 | $16,978 |

## Conclusions

According to the Montgomery Tax Assessor's Office the subject's property taxes are current as of the date of value. The property's assessed value is above our indicated value conclusion.

# Subject Strengths & Weaknesses

At this point, we pause to summarize the subject's strengths and weaknesses.

## Strengths

- The subject property is located in a largely built-out area in Bethesda consisting of single family homes with residents having above average income levels.

- Due to the size of the subject property, the site represents a small infill development with potential yield no more than eight townhouse lots.

## Weaknesses

- The property faces development challenges dues steep slopes, forest conservation areas, a stream which crosses the site, environmental concerns including a potential flood plain area and irregular topography.

These strengths and weaknesses were considered in our analysis and valuation of the subject property.

# Highest and Best Use

The Highest and Best Use of a property is the reasonably probable and legal use of vacant land or an improved property that is: physically possible, appropriately supported, financially feasible, and that results in the highest value. These four conditions are discussed as follows:

**Physically Possible:**
The subject property includes a single undivided lot with physical and environmental challenges which limit its development potential.

**Legally Permissible:**
There is no approved site developed plan. Townhouse development must receive site plan approval under the Optional Method Development Standard utilizing cluster development, in order for the subject property to be a legal, conforming use.

**Financially Feasible:**
The subject property is situated in Bethesda along the River Road corridor in Montgomery County. As previously indicated, demand is strong for housing in this portion of the county. Development of townhouse lots along the flat portion of the site situated along Goldsboro Road is most likely. This approach will hold development costs down and help create a financially feasible development.

**Maximally Productive:**
Townhouse construction is maximally productive.

## Conclusion

Our analysis of the project indicates that highest and best use of the subject's site is townhouse construction. The most likely buyer of the subject property's townhouse lots is a local builder or developer. The most likely users are owner-occupied households upon completion of vertical improvements.

# Appraisal Methodology

## Three Approaches to Value

There are three traditional approaches typically available to develop indications of real property value: the cost, sales comparison, and income capitalization approaches.

### Cost Approach

The cost approach is based upon the principle of substitution, which states that a prudent purchaser would not pay more for a property than the amount required to purchase a similar site and construct similar improvements without undue delay, producing a property of equal desirability and utility. This approach is particularly applicable when the improvements being appraised are relatively new or proposed, or when the improvements are so specialized that there is little or no sales data from comparable properties.

### Sales Comparison Approach

The sales comparison approach involves the direct comparison of sales and listings of similar properties, adjusting for differences between the subject property and the comparable properties. This method can be useful for valuing general purpose properties or vacant land. For improved properties, it is particularly applicable when there is an active sales market for the property type being appraised – either by owner-users or investors.

### Income Capitalization Approach

The income capitalization approach is based on the principle of anticipation, or the assumption that value is created by the expectation of benefits to be derived in the future, such as expected future income flows including the reversion, or future re-sale of the property appraised. Its premise is that a prudent investor will pay no more for the property than he or she would for another investment of similar risk and cash flow characteristics. The income capitalization approach is widely used and relied upon in appraising income-producing properties, especially those for which there is an active investment sales market.

## Subject Valuation

The subject includes a 5.46 acre site with potential for subdivision with up to eight townhouse lots. As such, the only applicable valuation method is the Sales Comparison Approach. We fully developed the Sales Comparison Approach to reflect bulk townhouse lot purchases in the market.

# Sales Comparison Approach

## Introduction

The Sales Comparison Approach is developed to derive a market value for the subject property under its highest and best use as townhouse lots. However, there are currently no site plan approvals in place for any development at the subject property.

## Methodology

Land is most often valued using the Sales Comparison Approach. This approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same utility. In the sales comparison approach, the opinion of market value is based on closed sales, listings and pending sales of properties similar to the subject property, using the most relevant units of comparison. The comparative analysis focuses on the difference between the comparable sales and the subject property using all appropriate elements of comparison.

A systematic procedure for applying the sales comparison approach includes the following steps: (1) researching and verifying transactional data, (2) selecting relevant units of comparison, (3) analyzing and adjusting the comparable sales for differences in various elements of comparison, and (4) reconciling the adjusted sales into a value indication for the subject site.

### Unit of Comparison

The unit of comparison depends on land use economics and how buyers and sellers use the property. The unit of comparison for the residential lots in this analysis is the price paid per townhouse lot.

### Elements of Comparison

Elements of comparison are the characteristics or attributes of properties and transactions that cause the prices of real estate to vary. The main elements of comparison that are considered in sales comparison analysis are as follows: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, (4) expenditures made immediately after purchase, (5) market conditions, (6) location and (7) physical characteristics.

### Comparable Sales Data

A search of data sources and public records, a field survey, and interviews with knowledgeable real estate professionals in the area was conducted to obtain and verify sales of comparable townhouse lots. We used the sales summarized on the following pages in our analysis, as these sales are judged to be the most useful in developing an opinion of the market value of the subject property.

Summarized in the chart below are comparable land sales of sites which were developed with townhouses. We analyzed the comparable land sales to derive a market value for the subject property's site which has the potential to be subdivided into up to eight townhouse lots.

## COMPARABLE SALES SUMMARY – TOWNHOUSES

| Sale No. | Subject | 1 | 2 | 3 | 5 |
|---|---|---|---|---|---|
| **Address** | **6789 Goldsboro Road** | **1902 Chapman Ave.** | **3605 Chevy Chase Lake Dr.** | **1166 Findley Road** | **10435 Fernwood Road** |
| City, State | Bethesda, MD | Rockville, MD | Chevy Chase, MD | Kensington, MD | Bethesda, MD |
| Date of Sale | | Nov-16 | Feb-16 | Sep-15 | Jun-15 |
| Sale Price | | $10,365,000 | $16,640,000 | $3,665,000 | $22,000,000 |
| No. of Lots | 8 | 61 | 62 | 26 | 168 |
| No. of MPDU Units | 0 | 9 | 10 | 4 | 21 |
| Lots Net of MPDU's | 8 | 52 | 52 | 22 | 147 |
| Lot Size (Sq.Ft.) | 1,690 | 720 | 1,073 | 1,205 | 1,050 |
| Lot Width (Ft.) | 26 | 18 | 24 | 23 | 22 |
| **Price/Lot (Net of MPDU's)** | | **$199,327** | **$320,000** | **$166,591** | **$149,660** |
| House Price | | Asking Price: Not Available | Asking Price: $1,500,000 | Asking Price: $570,000 | Asking Price: $775,000 |
| Lot-to-House Price Ratio | | n/a | 21.3% | 29.2% | 19.3% |

## COMPARABLE SALES MAP



## Land Comparable Sale No. 1



1902 Chapman Avenue Subdivision

### Property Identification

| | |
|---|---|
| Property/Sale ID | 111723/17211 |
| Property Type | Subdivision-Residential |
| Address | 1902 Chapman Avenue |
| City, State Zip | Rockville, Maryland 20852 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map GQ63, Subdivision 201, Block 5, Lot 16, Plat 25184 |
| Latitude/Longitude | 39.060199/-77.120010 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 11-17-2016 |
| Sale Price | $10,365,000 |
| Gross Land Acres | 2.407 |
| $/Gross Land Acre | $4,306,011 |
| Gross Land SF | 104,853 |
| $/Gross Land SF | $98.85 |
| No. of Lots | 61 |
| $/Lot | $169,918 |
| Grantor | 1900 Chapman Project Owner LLC |
| Grantee | Winchester Homes, Inc. |
| Property Rights | Fee Simple |
| Deed Book/Page | 53231/00406 |
| Financing Descrip. | None Recorded |

## 6789 Goldsboro Road

### Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 2.407 | Proposed Use | For Sale Townhouses |
| Gross SF | 104,853 | Utilities | All Available |
| No. of Lots | 61 | Zoning Code | MXTD |

### Verification

| | |
|---|---|
| Confirmed With | Co-Star, Assessment Records |

### Remarks

The site is located on east side of Chapman Avenue between Twinbrook Parkway, Thompson Avenue and CSX Railroad/WMATA right-of-way. It is also a short distance east of Rockville Pike and the nearby Twinbrook Metro stop. The site will contain 61 townhouse units. The townhouses will be 16 to 18 foot wide and 40 ft. deep with front loaded, two car garages. All site plan approvals were in place.The property was about 60% thru the process to ultimately obtain a building permit. There will be 9 MPDU units or about 15% of the total units. The adjacent parcel from which the subject was subdivided will contain 319 apartments on Lot 15.



1902 Chapman-Aerial

## Land Comparable Sale No. 2




The Brownstones at Chevy Chase Lake Subdivision

### Property Identification

| | |
|---|---|
| Property/Sale ID | 111724/17212 |
| Property Type | Subdivision-Residential |
| Address | 3605 Chevy Chase Lake Drive |
| City, State Zip | Chevy Chase, Maryland 20815 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map HN43, Parcel E, Chevy Chase Lake Station, Plat 25182 |
| Latitude/Longitude | 38.995572/-77.073019 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 02-05-2016 |
| Sale Price | $16,640,000 |
| Gross Land Acres | 3.270 |
| $/Gross Land Acre | $5,088,685 |
| Gross Land SF | 142,441 |
| $/Gross Land SF | $116.82 |
| No. of Units | 62 |
| $/Unit | $268,387 |
| No. of Lots | 62 |
| $/Lot | $268,387 |
| Grantor | Chevy Chase Lake Development Corporation |
| Grantee | CC Homes Associates LLC |
| Property Rights | Fee Simple |
| Deed Book/Page | 51624/0347 |
| Financing Terms | Partially seller financed |

## 6789 Goldsboro Road

### Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 3.270 | Density (Units/Ac) | 18.96 |
| Gross SF | 142,441 | Proposed Use | For Sale Townhouses |
| No. of Units | 62 | Utilities | All Available |
| No. of Lots | 62 | Zoning Code | CRT-1.5 |

### Verification

| | |
|---|---|
| Confirmed With | SDAT/CoStar |

### Remarks

The grantor was the Housing Opportunities Commission of Montgomery County (HOC) which took back substantial financing in the transaction. The development to be built by EYA will contain 62 townhouses selling for $1,500,000 to $1,800,000 with 2,900 to 3,100 sq.ft. that will be 22-24 ft. wide with two car garages and elevators. There will be with 10 MPDU units selling in the low $200,000's. The property backs up to the Capital Crescent Trail and the proposed Purple Line.



Brownstones at Chevy Chase Lake Aerial

## Land Comparable Sale No. 3



Kensington Overlook Subdivision

### Property Identification

| | |
|---|---|
| Property/Sale ID | 110121/16262 |
| Property Type | Subdivision-Residential |
| Address | 1166 Findley Road |
| City, State Zip | Kensington, Maryland 20895 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Tax Map HQ61 , Block G, Lots 1-26 and A-K, Plat 24829 |
| Latitude/Longitude | 39.036107/-77.060955 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 09-03-2015 |
| Sale Price | $3,665,000 |
| Gross Land Acres | 3.020 |
| $/Gross Land Acre | $1,213,576 |
| Gross Land SF | 131,551 |
| $/Gross Land SF | $27.86 |
| No. of Units | 26 |
| $/Unit | $140,962 |
| No. of Lots | 26 |
| $/Lot | $140,962 |
| Grantor | Wheaton Land Investment, LLC |
| Grantee | K. Hovanian Homes of Maryland, LLC |
| Property Rights | Fee Simple |
| Deed Book/Page | 51096/17 |
| Financing Descrip. | None recorded |
| Financing Terms | None |

## 6789 Goldsboro Road

### Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 3.020 | Density (Units/Ac) | 8.61 |
| Gross SF | 131,551 | Proposed Use | 25 TH & 1 SFD |
| No. of Units | 26 | Zoning Code | RT-8 |
| No. of Lots | 26 | | |

### Verification

| | |
|---|---|
| Confirmed With | Seller, DAIC, Deed |

### Remarks

DAIC indicates the location of Kensington Heights as being at the SW corner of University Boulevard West and Valley View Avenue

The property description in the deed is lengthy. Refer to the deed for more information. The seller indicated that these were engineered and recorded lots at the time of sale. They were not finished lots. The seller confirmed that this is the sale of 25 single family attached lots and 1 single family home lot. At the time of sale the lots were recorded and the development approved/entitled. The site was lightly wooded and level to gently rolling. Site development work commenced within a month of the sale. All utilities were available along University Boulevard and Valley View. The TH units are being marketed in early 2016 for a base price of $570,000 containing 1,900 to 2,000sq.ft., with lots widths ranging from 21 to 24 foot. There are 4 MPDU units selling in the $170,000's. Property was subsequently marketed as Kensington Overlook.



Kensington Overlook Aerial

## Land Comparable Sale No. 4



Montgomery Row at Rock Spring Subdivision

### Property Identification

| | |
|---|---|
| Property/Sale ID | 108169/15134 |
| Property Type | Residential (Single-Family) |
| Address | 10435 Fernwood Road |
| City, State Zip | Bethesda, Maryland 20817 |
| County | Montgomery |
| MSA | Washington, DC-MD-VA-WV |
| Tax ID | Map GP43, Lot P5 in Rock Spring Park, Plat 24078 |
| Latitude/Longitude | 39.026141/-77.138760 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 06-15-2015 |
| Sale Price | $22,000,000 |
| Gross Land Acres | 9.070 |
| $/Gross Land Acre | $2,425,579 |
| Gross Land SF | 395,089 |
| $/Gross Land SF | $55.68 |
| No. of Lots | 168 |
| $/Lot | $130,952 |
| Grantor | Rock Spring III, IV & V LLC (Founders) |
| Grantee | RS Homes Associates (EYA) |
| Property Rights | Fee Simple |
| Deed Book/Page | 50481/301 |
| Days on Market | Unknown |
| Financing Descrip. | Cash to grantor |
| Financing Terms | Conventional |

## 6789 Goldsboro Road

### Property Description

| | | | |
|---|---|---|---|
| Gross Acres | 9.070 | Proposed Use | Residential |
| Gross SF | 395,089 | Utilities | Available |
| No. of Lots | 168 | Zoning Code | I-3 |

### Verification

| | |
|---|---|
| Confirmed With | Kevin McGloon, Cushman |

### Remarks

This vacant parcel is is situated in the Rock Spring office park and was approved for 440,000 sq.ft. of office space. The sellers (Founders) were asking $50/FAR, but were unable to obtain an office user for the site. Founders shifted its buyer pool and went residential. EYA is the buyer who will improve the site with 168 townhouses (21 MPDU & 147 market rate) with prices ranging from-$770,000 to $1,050,000 and containing 1,800 to 2,700sq.ft. of improvements and 20 to 22 foot wide. The MPDU units are selling for the low $200,000's. The site has roughly eight developable acres, but was able to obtain a density based on 17 acres based on the area of the larger Rock Spring Park project. The property was under contract for 3.5 years while approvals were obtained. Approximately 1.5 acres along Fernwood Road will be dedicated to Montgomery County for the North Bethesda Transitway. The site is bound by Rockledge Drive on the west, Fernwood Road on the south, and Rock Spring Drive on the east. As of mid-2017 it was reported the community was 50% sold out.




Montgomery Row at Rock Spring-Aerial

## Analysis of Comparable Land Sales – Townhouse Lots

In developing an estimate of land value, we investigated transactions of bulk townhouse lots located within somewhat comparable locations in Montgomery County. From our investigations, we obtained information on numerous sales, the most pertinent of which are summarized on the previous pages. We compared these sales to each other and to the subject and made adjustments for significant differences including location, conditions of sale, physical characteristics including lot size and width and any other significant differences. The characteristics of the comparable land sales in relation to the subject property are discussed in the following paragraphs. Our analysis of the comparable sales is summarized below.

### Transaction Adjustments

Transaction adjustments include 1) real property rights conveyed, 2) financing terms, 3) conditions of sale, 4) expenditures made immediately after purchase, and 5) market conditions.

#### Property Rights

All of the comparable sales reflect fee simple property rights as does the subject property.

#### Financing

Comparable Sale No. 2 was adjusted upward for financing provided to support the transaction by the grantor the Housing Opportunities Commission of Montgomery County (HOC) which affected the transaction.

#### Conditions of Sale/Motivation

None of the comparable sales were affected by the conditions of sale or motivation of the grantor.

#### Anticipated Expenditures

All of the comparable sales have approved site plans unlike the subject property's raw condition with no approvals in place. This necessitated each property undergoing the approval process which defined the number of approved lots and added significant value to each comparable sale.

#### Market Conditions/Time

Comparable Sale No. 4 was adjusted upward for market conditions to reflect its long contract period and the subsequent improvements in the residential markets.

### Property Adjustments

Property adjustments are based on locational, lot size and lot width adjustments and are applied after the application of transactional adjustments.

#### Location/Amenities

Comparable Sale Nos. 1, 3 and 4 were adjusted upward for their inferior locations in comparison to the subject property's Goldsboro Road location along the River road corridor. Comparable No. 2 was adjusted downward for a superior Chevy Chase location.

#### Lot Size

Based upon the surrounding neighborhood characteristics and that of the site, the appraiser assumes the subject's lot sizes to be above average in size and at a minimum to measure 26 foot wide by 65 foot deep, resulting in a lot containing 1,690sq.ft. Upward adjustments were therefore made to all of the comparable sales for their inferior lot size.

Lot Width

The subject's lot widths at 26ft. are also assumed to have the greatest width based upon its location and the high end townhouse product envisioned for the site. We adjusted Comparable Sales Nos. 1, 2, 3 and 4 upward for their inferior lot width.

## Summary of Adjustments & Conclusion: Townhouse Lots

Based on the preceding comparative analysis, adjustments made to the comparable sales are summarized on the summary chart found on the following page. The analysis of comparable sales suggests a raw lot price (without site plan approval) ranging between $154,930 and $165,391 for the subject's proposed townhouse lots.

We conclude an average raw townhouse lot value without any site plan approvals at **$165,000/lot** for the subject's proposed townhouse lots ranging from 6 to 8 lots. This results in a market value ranging from **$1,000,000 to $1,325,000.**

Found on the following page is an adjustment grid which reflects that all of the comparable townhouse lot sales have site plan approvals in place, in comparison to the subject property's totally raw condition with no site plan approvals.

## SUMMARY OF ADJUSTMENTS

| Sale No. | Subject | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Address | 6789 Goldsboro Road | 1902 Chapman Ave. | 3605 Chevy Chase Lake Dr. | 1166 Findley Rd. | 10435 Fernwood Rd. |
| Subdivision | | Chapman Ave. | Brownstones at Chevy Chase Lake | Kensington Overlook | Montgomery Row at Rock Spring |
| City | Bethesda | Rockville | Chevy Chase | Kensington | Bethesda |
| Date of Sale | Aug-17 | Nov-16 | Feb-16 | Sep-15 | Jun-15 |
| Sale Price/Lot | | $199,327 | $320,000 | $166,591 | $149,660 |
| No. of Lots | 8 | 52 | 52 | 22 | 147 |
| Typical Width (Ft.) | 26 | 18 | 24 | 23 | 22 |
| Typical Size (Sq.Ft.) | 1,690 | 720 | 1,073 | 1,205 | 1,050 |
| Transactional Adjustments | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% |
| Financing | | 0% | -15% | 0% | 0% |
| Conditions of Sale/Motivation | | 0% | 0% | 0% | 0% |
| Anticipated Expenditures | | -40% | -40% | -40% | -40% |
| Market Conditions/Time | | 0% | 0% | 0% | 20% |
| Adjusted Sales Price | | $119,596 | $144,000 | $99,955 | $119,728 |
| Property Adjustments | | | | | |
| Location/Amenities | | 10% | -5% | 40% | 15% |
| Lot Size | | 20% | 15% | 10% | 15% |
| Lot Width | | 15% | 5% | 5% | 10% |
| Composite Adjustment | | -13% | -48% | -7% | 12% |
| Total Adjusted Price/Lot | | $173,414 | $165,600 | $154,930 | $167,619 |

| | |
|---|---|
| Minimum Adjusted Price | $154,930 |
| Maximum Adjusted Price | $173,414 |
| Average Adjusted Price | $165,391 |

# Conclusion

## Summary of Value Indications

The Sales Comparison Approach was developed to derive market value, as is, of the subject property. We have developed the value conclusion in a range to reflect the subject property's raw condition and the fact that the site plan approval process faces challenges based upon the site's severe topography and other critical factors. The summary chart below summarizes our final value conclusion for the property, developed within a range.

**VALUE CONCLUSION**

| Value Premise | Interest Appraised | Effective Date | Indicated Value Range |
|---|---|---|---|
| As Is | Fee Simple | July 3, 2017 | $1,000,000 to $1,325,000 |

## Exposure Time and Marketing Periods'

As part of the appraisal process, it is necessary to estimate the exposure time for the subject property. The Appraisal Institute defines exposure time as "the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market".

The definition assumes that the property was actively exposed and aggressively marketed to potential purchasers through marketing channels commonly used by sellers of similar type properties. The definition also assumes that the property was offered at a price reflecting the most probable mark-up over market value and that a sale was consummated under the terms and conditions of the definition of market value required by the regulation.

In estimating the subject's exposure time, we considered current economic and real estate market conditions and information from brokers and other market participants. We focused on market conditions existing prior to and as of the effective date of this appraisal. After a significant decline in the residential market, conditions in the subject's market have stabilized and demand for residential properties has increased.

The subject must be realistically priced in order to be marketable. Our analysis of the property is based on current market conditions and the outlook of today's buyers. It is our opinion that the subject property would be attractive to land developers and could be sold within a period of 12 months, if reasonably priced. If the property is not priced reflective of today's market, it likely will not sell.

Based on this analysis, it is concluded that the subject's exposure time would be 12 months. This opinion assumes that the property is priced consistent with your appraisers' opinion of market value and marketed through normal channels. A change in market conditions is not foreseen for at least 24 months for this type of development property. Therefore, the marketing time for the subject property is also 12 months.

# General Assumptions and Limiting Conditions

This appraisal is subject to the following limiting conditions:

1) The legal description – if furnished to us – is assumed to be correct.

2) No responsibility is assumed for legal matters, questions of survey or title, soil or subsoil conditions, engineering, availability or capacity of utilities, or other similar technical matters. The appraisal does not constitute a survey of the property appraised. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management unless otherwise noted.

3) Unless otherwise noted, the appraisal will value the property as though free of contamination. Lipman Frizzell & Mitchell LLC will conduct no hazardous materials or contamination inspection of any kind. It is recommended that the client hire an expert if the presence of hazardous materials or contamination poses any concern.

4) The stamps and/or consideration placed on deeds used to indicate sales are in correct relationship to the actual dollar amount of the transaction.

5) Unless otherwise noted, it is assumed there are no encroachments, zoning violations or restrictions existing in the subject property.

6) The appraiser is not required to give testimony or attendance in court by reason of this appraisal, unless previous arrangements have been made.

7) Unless expressly specified in the engagement letter, the fee for this appraisal does not include the attendance or giving of testimony by Appraiser at any court, regulatory, or other proceedings, or any conferences or other work in preparation for such proceeding. If any partner or employee of Lipman Frizzell & Mitchell LLC is asked or required to appear and/or testify at any deposition, trial, or other proceeding about the preparation, conclusions or any other aspect of this assignment, client shall compensate Appraiser for the time spent by the partner or employee in appearing and/or testifying and in preparing to testify according to the Appraiser's then current hourly rate plus reimbursement of expenses.

8) The values for land and/or improvements, as contained in this report, are constituent parts of the total value reported and neither is (or are) to be used in making a summation appraisal of a combination of values created by another appraiser. Either is invalidated if so used.

9) The dates of value to which the opinions expressed in this report apply are set forth in this report. We assume no responsibility for economic or physical factors occurring at some point at a later date, which may affect the opinions stated herein. The forecasts, projections, or operating estimates contained herein are based on current market conditions and anticipated short-term supply and demand factors and are subject to change with future conditions.

10) The sketches, maps, plats and exhibits in this report are included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumed no responsibility in connection with such matters.

11) The information, estimates and opinions, which were obtained from sources outside of this office, are considered reliable. However, no liability for them can be assumed by the appraiser.

12) Possession of this report, or a copy thereof, does not carry with it the right of publication. Neither all, nor any part of the content of the report, or copy thereof (including conclusions as to property value, the identity of the appraisers, professional designations, reference to any professional appraisal organization or the firm with which the appraisers are connected), shall be disseminated to the public through advertising, public relations, news, sales, or other media without prior written consent and approval.

13) No claim is intended to be expressed for matters of expertise that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers. We claim no expertise in areas such as, but not limited to, legal, survey, structural, environmental, pest control, mechanical, etc.

14) This appraisal was prepared for the sole and exclusive use of the client for the function outlined herein. Any party who is not the client or intended user identified in the appraisal or engagement letter is not entitled to rely upon the contents of the appraisal without express written consent of Lipman Frizzell & Mitchell LLC and Client. The Client shall not include partners, affiliates, or relatives of the party addressed herein. The appraiser assumes no obligation, liability or accountability to any third party.

15) Distribution of this report is at the sole discretion of the client, but third-parties not listed as an intended user on the face of the appraisal or the engagement letter may not rely upon the contents of the appraisal. In no event shall client give a third-party a partial copy of the appraisal report. We will make no distribution of the report without the specific direction of the client.

16) This appraisal shall be used only for the function outlined herein, unless expressly authorized by Lipman Frizzell & Mitchell LLC.

17) This appraisal shall be considered in its entirety. No part thereof shall be used separately or out of context.

18) Unless otherwise noted in the body of this report, this appraisal assumes that the subject property does not fall within the areas where mandatory flood insurance is effective. Unless otherwise noted, we have not completed nor have we contracted to have completed an investigation to identify and/or quantify the presence of non-tidal wetland conditions on the subject property. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

19) The flood maps are not site specific. We are not qualified to confirm the location of the subject property in relation to flood hazard areas based on the FEMA Flood Insurance Rate Maps or other surveying techniques. It is recommended that the client obtain a confirmation of the subject's flood zone classification from a licensed surveyor.

20) If the appraisal is for mortgage loan purposes 1) we assume satisfactory completion of improvements if construction is not complete, 2) no consideration has been given for rent loss during rent-up unless noted in the body of this report, and 3) occupancy at levels consistent with our "Income and Expense Projection" are anticipated.

21) It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

22) Our inspection included an observation of the land and improvements thereon only. It was not possible to observe conditions beneath the soil or hidden structural components within the improvements. We inspected the buildings involved, and reported damage (if any) by termites, dry rot, wet rot, or other infestations as a matter of information, and no guarantee of the amount or degree of damage (if any) is implied. Condition of heating, cooling, ventilation, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. Should the client have concerns in these areas, it is the client's responsibility to order the appropriate inspections. The appraiser does not have the skill or expertise to make such inspections and assumes no responsibility for these items.

23) This appraisal does not guarantee compliance with building code and life safety code requirements of the local jurisdiction. It is assumed that all required licenses, consents, certificates of occupancy or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value conclusion contained in this report is based unless specifically stated to the contrary.

24) When possible, we have relied upon building measurements provided by the client, owner, or associated agents of these parties. In the absence of a detailed rent roll, reliable public records, or "as-built" plans provided to us, we have relied upon our own measurements of the subject improvements. We follow typical appraisal industry methods; however, we recognize that some factors may limit our ability to obtain accurate measurements including, but not limited to, property access on the day of inspection, basements, fenced/gated areas, grade elevations, greenery/shrubbery, uneven surfaces, multiple story structures, obtuse or acute wall angles, immobile obstructions, etc. Professional building area measurements of the quality, level of detail, or accuracy of professional measurement services are beyond the scope of this appraisal assignment.

25) We have attempted to reconcile sources of data discovered or provided during the appraisal process, including assessment department data. Ultimately, the measurements that are deemed by us to be the most accurate and/or reliable are used within this report. While the measurements and any accompanying sketches are considered to be reasonably accurate and reliable, we cannot guarantee their accuracy. Should the client desire a greater level of measuring detail, they are urged to retain the measurement services of a qualified professional (space planner, architect or building engineer). We reserve the right to use an alternative source of building size and amend the analysis, narrative and concluded values (at additional cost) should this alternative measurement source reflect or reveal substantial differences with the measurements used within the report.

26) In the absence of being provided with a detailed land survey, we have used assessment department data to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, we reserve the right to amend this appraisal (at additional cost) if substantial differences are discovered.

27) If only preliminary plans and specifications were available for use in the preparation of this appraisal, then this appraisal is subject to a review of the final plans and specifications when available (at additional cost) and we reserve the right to amend this appraisal if substantial differences are discovered.

28) Unless otherwise stated in this report, the value conclusion is predicated on the assumption that the property is free of contamination, environmental impairment or hazardous materials. Unless otherwise stated, the existence of hazardous material was not observed by the appraiser and the appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required for discovery. The client is urged to retain an expert in this field, if desired.

29) The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey of the property to determine if it is in conformity with the various requirements of the ADA. It is possible that a compliance survey of the property, together with an analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this could have a negative effect on the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in developing an opinion of value.

30) This appraisal applies to the land and building improvements only. The value of trade fixtures, furnishings, and other equipment, or subsurface rights (minerals, gas, and oil) were not considered in this appraisal unless specifically stated to the contrary.

31) No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated, unless specifically stated to the contrary.

32) Any estimate of insurable value, if included within the scope of work and presented herein, is based upon figures developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, we strongly recommend that the Client obtain estimates from professionals experienced in establishing insurance coverage. This analysis should not be relied upon to determine insurance coverage and we make no warranties regarding the accuracy of this estimate.

33) The data gathered in the course of this assignment (except data furnished by the Client) shall remain the property of the Appraiser. The appraiser will not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished to the appraiser. Notwithstanding the foregoing, the Appraiser is authorized by the client to disclose all or any portion of the appraisal and related appraisal data to appropriate representatives of the Appraisal Institute if such disclosure is required to enable the appraiser to comply with the Bylaws and Regulations of such Institute now or hereafter in effect.

34) Acceptance and/or use of this appraisal report constitutes acceptance of the foregoing general assumptions and limiting conditions.

# Certification

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
4. I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of the appraisal within the three-year period immediately preceding acceptance of this assignment.
5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.
7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
9. M. Ronald Lipman, MAI made a personal inspection of the property that is the subject of this report.
10. No one provided significant real property appraisal assistance to the person signing this certification.
11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.
12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
13. As of the date of this report, I, M. Ronald Lipman, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.

M. Ronald Lipman, MAI
Principal
Maryland License #04-1072
License Expires December 31, 2018

# Certification

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
4. I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of the appraisal within the three-year period immediately preceding acceptance of this assignment.
5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.
7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
9. Sheldon A. Stern, MAI made a personal inspection of the property that is the subject of this report.
10. No one provided significant real property appraisal assistance to the person signing this certification.
11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.
12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
13. As of the date of this report, I, Sheldon A. Stern, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.

Sheldon A. Stern

Sheldon A. Stern, MAI
Senior Appraiser
Maryland License #04-1976
License Expires January 14, 2019

# Addenda

Glossary
Abstract of Operating Agreement
Qualifications
    M. Ronald Lipman, MAI - Principal
    Sheldon A. stern, MAI- Senior Appraiser
Client List

## Glossary

Definitions are taken from the Dictionary of Real Estate Appraisal, 5th Edition (Dictionary), the Uniform Standards of Professional Appraisal Practice (USPAP) and Building Owners and Managers Association International (BOMA).

### Absolute Net Lease

A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. (Dictionary)

### Additional Rent

Any amounts due under a lease that is in addition to base rent. Most common form is operating expense increases. (Dictionary)

### Amortization

The process of retiring a debt or recovering a capital investment, typically though scheduled, systematic repayment of the principal; a program of periodic contributions to a sinking fund or debt retirement fund. (Dictionary)

### As Is Market Value

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Dictionary)

### Base (Shell) Building

The existing shell condition of a building prior to the installation of tenant improvements. This condition varies from building to building, landlord to landlord, and generally involves the level of finish above the ceiling grid. (Dictionary)

### Base Rent

The minimum rent stipulated in a lease. (Dictionary)

### Base Year

The year on which escalation clauses in a lease are based. (Dictionary)

### Building Common Area

The areas of the building that provide services to building tenants but which are not included in the rentable area of any specific tenant. These areas may include, but shall not be limited to, main and auxiliary lobbies, atrium spaces at the level of the finished floor, concierge areas or security desks, conference rooms, lounges or vending areas food service facilities, health or fitness centers, daycare facilities, locker or shower facilities, mail rooms, fire control rooms, fully enclosed courtyards outside the exterior walls, and building core and service areas such as fully enclosed mechanical or equipment rooms. Specifically excluded from building common areas are; floor common areas, parking spaces, portions of loading docks outside the building line, and major vertical penetrations. (BOMA)

### Building Rentable Area

The sum of all floor rentable areas. Floor rentable area is the result of subtracting from the gross measured area of a floor the major vertical penetrations on that same floor. It is generally fixed for the life of the building and is rarely affected by changes in corridor size or configuration. (BOMA)

### Certificate of Occupancy (COO)

A statement issued by a local government verifying that a newly constructed building is in compliance with all codes and may be occupied.

### Common Area (Public) Factor

In a lease, the common area (public) factor is the multiplier to a tenant's useable space that accounts for the tenant's proportionate share of the common area (restrooms, elevator lobby, mechanical rooms, etc.). The public factor is usually expressed as a percentage and ranges from a low of 5 percent for a full tenant to as high as 15 percent or more for a multi-tenant floor. Subtracting one (1) from the quotient of the rentable area divided by the useable area yields the load (public) factor. At times confused with the "loss factor" which is the total rentable area of the full floor less the useable area divided by the rentable area. (BOMA)

### Common Area Maintenance (CAM)

The expense of operating and maintaining common areas; may or may not include management charges and usually does not include capital expenditures on tenant improvements or other improvements to the property.

CAM can be a line-item expense for a group of items that can include maintenance of the parking lot and landscaped areas and sometimes the exterior walls of the buildings. CAM can refer to all operating expenses.

CAM can refer to the reimbursement by the tenant to the landlord for all expenses reimbursable under the lease. Sometimes reimbursements have what is called an administrative load. An example would be a 15 percent addition to total operating expenses, which are then prorated among tenants. The administrative load, also called an administrative and marketing fee, can be a substitute for or an addition to a management fee. (Dictionary)

Condominium

A form of ownership in which each owner possesses the exclusive right to use and occupy an allotted unit plus an undivided interest in common areas.

A multiunit structure, or a unit within such a structure, with a condominium form of ownership. (Dictionary)

Conservation Easement

An interest in real property restricting future land use to preservation, conservation, wildlife habitat, or some combination of those uses. A conservation easement may permit farming, timber harvesting, or other uses of a rural nature to continue, subject to the easement. In some locations, a conservation easement may be referred to as a conservation restriction. (Dictionary)

Contributory Value

The change in the value of a property as a whole, whether positive or negative, resulting from the addition or deletion of a property component. Also called deprival value in some countries. (Dictionary)

Debt Coverage Ratio (DCR)

The ratio of net operating income to annual debt service (DCR = NOI/Im), which measures the relative ability to a property to meet its debt service out of net operating income. Also called Debt Service Coverage Ratio (DSCR). A larger DCR indicates a greater ability for a property to withstand a downturn in revenue, providing an improved safety margin for a lender. (Dictionary)

Deed Restriction

A provision written into a deed that limits the use of land. Deed restrictions usually remain in effect when title passes to subsequent owners. (Dictionary)

Depreciation

In appraising, the loss in a property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date. 2) In accounting, an allowance made against the loss in value of an asset for a defined purpose and computed using a specified method. (Dictionary)

Disposition Value

The most probable price that a specified interest in real property is likely to bring under the following conditions:

1) Consummation of a sale within a exposure time specified by the client; 2) The property is subjected to market conditions prevailing as of the date of valuation; 3) Both the buyer and seller are acting prudently and knowledgeably; 4) The seller is under compulsion to sell; 5) The buyer is typically motivated; 6) Both parties are acting in what they consider to be their best interests; 7) An adequate marketing effort will be made during the exposure time specified by the client; 8)Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto; and 9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

Easement

The right to use another's land for a stated purpose. (Dictionary)

EIFS

Exterior Insulation Finishing System. This is a type of exterior wall cladding system. Sometimes referred to as dry-vit.

Effective Date
The date at which the analyses, opinions, and advice in an appraisal, review, or consulting service apply. 2) In a lease document, the date upon which the lease goes into effect. (Dictionary)

Effective Gross Income (EGI)
The anticipated income from all operations of the real property after an allowance is made for vacancy and collection losses and an addition is made for any other income. (Dictionary)

Effective Rent
The rental rate net of financial concessions such as periods of no rent during the lease term and above- or below-market tenant improvements (TIs). (Dictionary)

EPDM
Ethylene Diene Monomer Rubber. A type of synthetic rubber typically used for roof coverings. (Dictionary)

Escalation Clause
A clause in an agreement that provides for the adjustment of a price or rent based on some event or index. e.g., a provision to increase rent if operating expenses increase; also called an expense recovery clause or stop clause. (Dictionary)

Estoppel Certificate
A statement of material factors or conditions of which another person can rely because it cannot be denied at a later date. In real estate, a buyer of rental property typically requests estoppel certificates from existing tenants. Sometimes referred to as an estoppel letter. (Dictionary)

Excess Land
Land that is not needed to serve or support the existing improvement. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land may have the potential to be sold separately and is valued separately. (Dictionary)

Expense Stop
A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying any operating expenses above a stated level or amount. (Dictionary)

Exposure Time
1) The time a property remains on the market. 2) The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market. (Dictionary)

Extraordinary Assumption
An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis. (Dictionary)

Fee Simple Estate
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. (Dictionary)

Floor Common Area
Areas on a floor such as washrooms, janitorial closets, electrical rooms, telephone rooms, mechanical rooms, elevator lobbies, and public corridors which are available primarily for the use of tenants on that floor. (BOMA)

Full Service (Gross) Lease
A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called a full service lease. (Dictionary)

Going Concern Value
The market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the market value of the going concern.

The value of an operating business enterprise. Goodwill may be separately measured but is an integral component of going-concern value when it exists and is recognizable. (Dictionary)

Gross Building Area
The total constructed area of a building. It is generally not used for leasing purposes (BOMA)

Gross Measured Area
The total area of a building enclosed by the dominant portion (the portion of the inside finished surface of the permanent outer building wall which is 50 percent or more of the vertical floor-to-ceiling dimension, at the given point being measured as one moves horizontally along the wall), excluding parking areas and loading docks (or portions of the same) outside the building line. It is generally not used for leasing purposes and is calculated on a floor by floor basis. (BOMA)

Gross Up Method
A method of calculating variable operating expense in income-producing properties when less than 100 percent occupancy is assumed. The gross up method approximates the actual expense of providing services to the rentable area of a building given a specified rate of occupancy. (Dictionary)

Gross Retail Sellout
The sum of the appraised values of the individual units in a subdivision, as if all of the units were completed and available for retail sale, as of the date of the appraisal. The sum of the retail sales includes an allowance for lot premiums, if applicable, but excludes all allowances for carrying costs. (Dictionary)

Ground Lease
A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Dictionary)

Ground Rent
The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Dictionary)

HVAC
Heating, ventilation, air conditioning. A general term encompassing any system designed to heat and cool a building in its entirety.

Highest and Best Use
The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are 1) legal permissibility, 2) physical possibility, 3) financial feasibility, and 4) maximally profitability. Alternatively, the probable use of land or improved –specific with respect to the user and timing of the use–that is adequately supported and results in the highest present value. (Dictionary)

Hypothetical Condition
That which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (Dictionary)

Industrial Gross Lease
A lease of industrial property in which the landlord and tenant share expenses. The landlord receives stipulated rent and is obligated to pay certain operating expenses, often structural maintenance, insurance and real estate taxes as specified in the lease. There are significant regional and local differences in the use of this term. (Dictionary)

Insurable Value
A type of value for insurance purposes. (Dictionary)
(Typically this includes replacement cost less basement excavation, foundation, underground piping and architect's fees).

Investment Value
The value of a property interest to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. (Dictionary)

Just Compensation
In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position as he or she would be if the property had not been taken. (Dictionary)

Leased Fee Interest

A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease). (Dictionary)

Leasehold Interest

The tenant's possessory interest created by a lease. (Dictionary)

Lessee (Tenant)

One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement. (Dictionary)

Lessor (Landlord)

One who conveys the rights of occupancy and use to others under a lease agreement. (Dictionary)

Liquidation Value

The most probable price that a specified interest in real property should bring under the following conditions:

1) Consummation of a sale within a short period.
2) The property is subjected to market conditions prevailing as of the date of valuation.
3) Both the buyer and seller are acting prudently and knowledgeably.
4) The seller is under extreme compulsion to sell.
5) The buyer is typically motivated.
6) Both parties are acting in what they consider to be their best interests.
7) A normal marketing effort is not possible due to the brief exposure time.
8) Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.

The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

Loan to Value Ratio (LTV)

The amount of money borrowed in relation to the total market value of a property. Expressed as a percentage of the loan amount divided by the property value. (Dictionary)

Major Vertical Penetrations

Stairs, elevator shafts, flues, pipe shafts, vertical ducts, and the like, and their enclosing walls. Atria, lightwells and similar penetrations above the finished floor are included in this definition. Not included, however, are vertical penetrations built for the private use of a tenant occupying office areas on more than one floor. Structural columns, openings for vertical electric cable or telephone distribution, and openings for plumbing lines are not considered to be major vertical penetrations. (BOMA)

Market Rent

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement including permitted uses, use restrictions, expense obligations; term, concessions, renewal and purchase options and tenant improvements (TIs). (Dictionary)

Market Value

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

a. Buyer and seller are typically motivated;

b. Both parties are well informed or well advised, and acting in what they consider their own best interests;

c. A reasonable time is allowed for exposure in the open market;

d. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

e. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Market Value As If Complete

Market value as if complete means the market value of the property with all proposed construction, conversion or rehabilitation hypothetically completed or under other specified hypothetical conditions as of the date of the appraisal. With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of

completion, this estimate of value shall reflect the market value of the property as if complete and prepared for occupancy by tenants.

Market Value As If Stabilized

Market value as if stabilized means the market value of the property at a current point and time when all improvements have been physically constructed and the property has been leased to its optimum level of long term occupancy.

Marketing Time

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of the appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Standards Board of the Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time). (Dictionary)

Master Lease

A lease in which the fee owner leases a part or the entire property to a single entity (the master lease) in return for a stipulated rent. The master lessee then leases the property to multiple tenants. (Dictionary)

Modified Gross Lease

A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a double net lease, net net lease, partial net lease, or semi-gross lease. (Dictionary)

Operating Expense Ratio

The ratio of total operating expenses to effective gross income (TOE/EGI); the complement of the net income ratio, i.e., OER = 1 – NIR (Dictionary)

Option

A legal contract, typically purchased for a stated consideration, that permits but does not require the holder of the option (known as the optionee) to buy, sell, or lease real property for a stipulated period of time in accordance with specified terms; a unilateral right to exercise a privilege. (Dictionary)

Partial Interest

Divided or undivided rights in real estate that represent less than the whole (a fractional interest). (Dictionary)

Pass Through

A tenant's portion of operating expenses that may be composed of common area maintenance (CAM), real estate taxes, property insurance, and any other expenses determined in the lease agreement to be paid by the tenant. (Dictionary)

Potential Gross Income (PGI)

The total income attributable to real property at full occupancy before vacancy and operating expenses are deducted. (Dictionary)

Prospective Future Value Upon Completion

Market value "upon completion" is a prospective future value estimate of a property at a point in time when all of its improvements are fully completed. It assumes all proposed construction, conversion, or rehabilitation is hypothetically complete as of a future date when such effort is projected to occur. The projected completion date and the value estimate must reflect the market value of the property in its projected condition, i.e., completely vacant or partially occupied. The cash flow must reflect lease-up costs, required tenant improvements and leasing commissions on all areas not leased and occupied.

Prospective Future Value Upon Stabilization

Market value "upon stabilization" is a prospective future value estimate of a property at a point in time when stabilized occupancy has been achieved. The projected stabilization date and the value estimate must reflect the absorption period required to achieve stabilization. In addition, the cash flows must reflect lease-up costs, required tenant improvements and leasing commissions on all unleased areas.

Replacement Cost

The estimated cost to construct, at current prices as of the effective appraisal date, a substitute for the building being appraised, using modern materials and current standards, design, and layout. (Dictionary)

Reproduction Cost

The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all of the deficiencies, super-adequacies, and obsolescence of the subject building. (Dictionary)

Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Dictionary)

Sandwich Leasehold Estate

The interest held by the original lessee when the property is subleased to another party; a type of leasehold estate. (Dictionary)

Sublease

An agreement in which the lessee (i.e., the tenant) leases part or all of the property to another party and thereby becomes a lessor. (Dictionary)

Subordination

A contractual arrangement in which a party with a claim to certain assets agrees to make his or her claim junior, or subordinate, to the claims of another party. (Dictionary)

Substantial Completion

Generally used in reference to the construction of tenant improvements (TIs). The tenant's premises are typically deemed to be substantially completed when all of the TIs for the premises have been completed in accordance with the plans and specifications previously approved by the tenant. Sometimes used to define the commencement date of a lease.

Surplus Land

Land that is not currently needed to support the existing improvement but cannot be separated from the property and sold off. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Dictionary)

Triple Net (Net Net Net) Lease

A lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management. Also called NNN, triple net lease, or fully net lease. (Dictionary)

(The market definition of a triple net lease varies; in some cases tenants pay for items such as roof repairs, parking lot repairs, and other similar items.)

Usable Area

The measured area of an office area, store area or building common area on a floor. The total of all the usable areas or a floor shall equal floor usable area of that same floor. The amount of floor usable area can vary over the life of a building as corridors expand and contract and as floors are remodeled. (BOMA)

Value-in-Use

The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Value in use may or may not be equal to market value but is different conceptually. (Dictionary)

# Abstract of 6789 Goldsboro Road LLC – First Amended & Restated Operating Agreement

| | |
|---|---|
| Date: | July 18, 2013 |
| Definitions: | Cumulative Initial Capital Return: means a cumulative but non-compounded return equal to 10% on the Unrecovered Initial Capital Balance.<br><br>Cumulative Additional Capital Return: means a cumulative but non-compounded return equal to 10% on the Unrecovered Additional Capital Balance.<br><br>Decision Date: 36 months after the date the Company closes on the acquisition (that date is July 19, 2016).<br><br>Entitlements: means all governmental approvals necessary to permit the subdivision of the property for no fewer than 26 single family or townhouse dwellings.<br><br>Majority in Interests of Class A Members is greater than 51%.<br><br>Majority and Interest of All Members: means majority in interests of Class A Members, plus the Class B Member.<br><br>Manager: Gregory B. Myers for day-to-day operations of the Company. |
| Term: | Perpetual |
| Initial Capital Contributions: | Class A Members: $1,785,000<br><br>Class B Members: $306,192 (reflects the Gross Asset Value of the sale contract [$300,000] and certain development costs previously incurred [$6,192]) |
| Additional Capital Contributions: | Class A Members are subject to Capital Calls not to exceed $300,000. |
| Partition: | No Interest Holder shall have the right to require partition of the Property. |
| Allocation of Profits & Loss: | Pro rata |
| Distributions of Cash Flow: | After the payment of all unpaid expenses, debts and liabilities, distributions shall be made first to the Class A Members in an amount equal to their Unpaid Cumulative Capital Return (pro rata), then to Class A Members in the amount equal to their Unrecovered Initial Capital (pro rata); next to the Class A Members in an amount equal to $7,500/year for the first three years for a total of $22,500. Then to the Class B Member in an amount equal to its |

| | |
|---|---|
| | Unpaid Cumulative Initial Capital Return, then to the Class B Member in an amount equal to its Unrecovered Initial Balance, next to the Members in an amount equal to the Unpaid Cumulative Additional Capital Return. Next to the Members in an amount equal to their own unrecovered additional capital (pro rata), thence, the balance to the Members in proportion to their Respective Percentage Interest. |
| Management: | The Manager, Gregory B. Myers, has the general power and authority to manage and operate the day-to-day business and affairs of the Company, however, contracts in excess of $25,000 require prior approval of the Majority and Interest of Class A Members. Major decisions require approval of all Members including financing and sale. |
| Transferability: | No Member may sell, assign, mortgage, pledge, grant, security interests in or otherwise transfer or encumber all or any part of the Member's Membership Rights or Interests. |
| Withdrawal: | No Member shall have the right to or power to voluntarily withdraw from the Company. |
| Redemption of Class B Member: | In the event that a) the entitlement of the property is not completed by the Decision Date and b) the Class A Members do not elect to require the Company to sell the property in accordance with Section 7.6, then the Class A Members may elect to determine the appraised value of the property in accordance with Section 7.5. If the appraised value of the property is less than or equal to the sum of Unpaid Cumulative Initial Capital Return, Unrecovered Initial Capital, Unpaid Cumulative Initial Additional Capital Return and Unrecovered Additional Capital, then the Class A Members shall have the unilateral right and authority (without consent of the Class B Member) to cause the Company to redeem the Class B Membership Rights solely in consideration for the Company's previous distributions or other previous payments to the Class B Member. If the appraised value is greater than the Class A Investment, then in such event the Class B Member shall retain its Membership Rights; provided, however, the Class A Members shall continue to have the unilateral right and authority thereafter (without the consent of the Class B Member) at their option to require the Company to sell the Property, in its then current development state to an unaffiliated third party purchaser. |

# Qualifications of M. Ronald Lipman, MAI
Principal
Lipman Frizzell & Mitchell LLC



## State Certifications
State of Maryland
Commonwealth of Virginia
District of Columbia

## Education

Masters Degree in Business Administration (Real Estate Major) – American University,

Bachelor of Arts Degree (Business Administration Major) Duke University

## Contact Details


410-423-2328 (p)
410-423-2410 (f)

Lipman Frizzell & Mitchell LLC
6240 Old Dobbin Lane
Suite 140
Columbia, MD 21045

www.LFMvalue.com
rlipman@LFMvalue.com


### Membership/Affiliations
Member (MAI): Appraisal Institute (Chapter Pres.-'78 & '79)
Licensed Broker - Maryland Real Estate Commission
Board of Trustees - Mid Atlantic Realty Trust (NYSE), Chairman Investment Committee (1993-2003)

### Teaching/Instructor Assignments
SREA 101 and 201 Courses, 1971-1980, Loyola & Notre Dame Colleges
Annual School of Maryland Assessing Officers, 1969-1973, 1978-1980
Condemnation Course IV for Appraisal Institute, Baltimore 1979/80
Capitalization Theory & Techniques, for Appraisal Institute, Balt/, 1981
Income Property Valuation for Maryland Tax Court, 1984
Md. Chapter, Appraisal Institute - R41-c Seminar, 1985
Internal Rate of Return Seminar for Md. Commercial Assessors, 1986
Acquisition of Real Estate - John Hopkins Univ. Continuing Studies, 1987
The Appraisal of Real Estate, Masters Prog. - JHU MBA program, 1992

No articles have been published in the last ten years

### Qualified as Expert Witness Before the Courts of:
Baltimore City; Baltimore, Anne Arundel, Montgomery, Howard, Prince Georges, Carroll, Frederick & Cecil Counties; Fairfax County, VA, District of Columbia Superior Court; U.S. District Court of Maryland; Federal Bankruptcy Court; Los Angeles County Superior Court; Federal Tax Court; Maryland Tax Court; American Arbitration Association, NY; Court of Common Pleas, Erie, PA

Numerous appraisals have been completed for all types of income and owner/user properties including office buildings, apartment complexes, shopping centers and industrial properties in addition to raw land and finished sites for development of these uses and special purpose properties such as mobile home parks, marinas and assisted living facilities.

# QUALIFICATIONS OF SHELDON A. STERN, MAI

## Senior Appraiser

Lipman Frizzell & Mitchell LLC

## State Certifications

State of Maryland

## Education

Masters Degree in Real Estate and Urban Development - American University

Master of Business Administration - University of Baltimore

Bachelors Degree in Business Administration/Accounting - University of Maryland College Park
Johns Hopkins University - School of Continuing Studies

## Contact Details

410-423-2366 (p)
410-423-2410 (f)

Lipman Frizzell & Mitchell LLC
6240 Old Dobbin Lane
Suite 140
Columbia, MD 21045

sstern@LFMvalue.com
www.LFMvalue.com

## Membership/Affiliations

Member: Appraisal Institute - MAI Designation
Licensed Broker: Maryland Real Estate Commission
Certified Property Manager (CPM): Institute of Real Estate Mgmt.

## Appraisal Institute & Related Courses

Basic Valuation Procedures
Real Estate Appraisal Principles
Capitalization Theory and Techniques, I, II, III
Cade Studies in Real Estate Valuation
Valuation Analysis and Report Writing
Standards of Professional Practice

## Seminars

Current Trends in Real Estate Acquisition, Commercial Real Estate Leasing, Market Research in Real Estate, Site Evaluation and Land Development

## Experience

### Senior Associate

Lipman Frizzell & Mitchell LLC (2016-Present)
Valbridge Property Advisors | Lipman Frizzell LLC (2013-2016)
Lipman Frizzell & Mitchell LLC (1987-2013)

### Property Manager/Real Estate Analyst

Dreyfuss Brothers, Inc. (1978-1986)
I. Stern – Real Estate (1975-1979)

### Board of Directors

CHAI, Comprehensive Housing Assistance, Inc.
(1990-2003, 2007-Present)

### Expert Witness

Federal Bankruptcy Court, Property Tax Assessment Appeals Board (PTAAB), Participant: MICPEL Trial Advocacy Program

### Speaker

MD Assoc. of Assessment Officers 1998 Conference – Apartment/Low Income Housing Valuation

Appraisal/valuation and consulting assignments include: apartment buildings; retail buildings and shopping centers; office buildings; industrial buildings; residential subdivisions; and vacant industrial, commercial and residential land. Assignments also include tax credit valuations, Fannie Mae and Freddie Mac reports, and HUD MAP valuations and comparability studies. Assignments have been concentrated in the Baltimore/Washington Metropolitan areas including northern Virginia.

## Representative Clients of Lipman Frizzell & Mitchell LLC

### Developers/Investors/Advisors:

A&R Development Corporation
ATAPCO
Bavar Properties Group
Bozzuto Group
Casey Management, Inc.
Cignal Corporation
Clark Enterprises, Inc.
Continental Realty
Cordish Companies
Corporate Office Properties Trust
Enterprise Homes Inc.
Federal Realty Investment Trust
Forest City Enterprises
FRP Development Corporation
General Growth Properties
Greenebaum & Rose
H & S Properties
Harrison Group
Heritage Properties
Himmelrich Associates, Inc.
Home Properties
James Keelty & Co.
James F. Knott Realty Group
The JBG Companies
J.P. Morgan Investment
Jones Lang LaSalle
Kimco Realty
KLNB Retail
Lerner Enterprises
Lubert-Adler Management Inc.
MacKenzie Commercial
Manekin Corporation
Merritt Properties
Muni Cap, Inc.
NVR, Inc.
Riparius Development Corp.
Ryland Homes
Shelter Development
Southern Management Corp.
St. John Properties
Time Group
Toll Brothers, Inc.
Trammel Crow
Vornado Realty Trust
Whiting Turner

### Accounting Firms:

Grant Thornton
Ernst & Young
Ellin & Tucker Chartered
Hertzbach & Company
PWC

### Corporate:

7-Eleven, Inc.
Allied Chemical
Amtrak
Apple Computer
AT&T
Black & Decker
Blue Cross/Blue Shield
Chaney Enterprises
Chrysler Realty Corp.
Costco Wholesale Corp.
CSX
Exxon Mobil
Ford Motor Company
GEICO
General Electric
General Motors
Google
Home Depot
Hyatt Hotels
IBM
Intel
JCPenney
Kaiser Permanente
Lockheed Martin Corp.
Lord & Taylor
Macy's
Marriott Corporation
McDonalds Corporation
Noxell
Peebles Stores
PEPCO
Percontee, Inc.
Safeway Inc.
Sears Roebuck & Co.
Solo Cup
Target Corporation
Toyota
T. Rowe Price
Verizon Wireless
Wal-Mart
Washington Gas
Wawa, Inc.

### Lenders/Mortgage Brokers:

Aetna Insurance
Allstate Investments LLC
Artisan's Bank
AXA Equitable
Bank of America
Bank of New England
BB&T
CalPERS
Canada Life Assurance Co.
Capital Funding Group, Inc.
Cecil Bank
Chesapeake Bank
Citibank Bank
Columbia Bank
Community Bank of the Chesapeake
Eagle Bank
FCNB Bank
FNMA
GE Capital
GMAC
Goldman Sachs
Harford Bank
HSBC
JP Morgan Chase
Key Bank
M & T Bank
Money Store
Morgan Stanley Capital I Inc.
Nationwide Insurance Co.
New York Life
NorthMarq Capital Inc.
Northwest Savings Bank
Old Line Bank
PNC Bank
Revere Bank
Prudential Ins. Co. of America
Sandy Spring Bancorp
State Farm Insurance Co.
Travelers
Sun Life of Canada
SunTrust
TIAA/CREF
Transamerica
United Bank
Walker & Dunlop
Wells Fargo Bank
Wilmington Trust

### Law Firms:

Abramoff, Neuberger, LLP
Arent Fox LLP
Ballard Spahr LLP
Blank, Rome LLP
DLA Piper (US)
Eccleston & Wolfe
Fedder & Garten
Friedman & Friedman, LLP
Gallagher, Evelius & Jones LLP
Gibbs & Haller
Goodwin Procter LLP
Gordon Feinblatt LLC
Hogan Lovells
Jacobs & Dembert, P.A.
Lerch Early & Brewer
Linowes & Blocher LLP

London & Mead
McGuire Woods LLP
Miles & Stockbridge P. C.
Miller, Miller & Canby
Niles, Barton & Wilmer LLP
Paley Rothman
Pasternak & Fidis, P.C.
Rosenberg Martin & Greenberg
Saul Ewing LLP
Semmes, Bowen & Semmes
Shapiro, Sher Guinot & Sandler
Shulman Rogers
Squire Patton Boggs, L.L.P.
Steptoe & Johnson LLP
Tydings & Rosenberg LLP
Venable LLP
Whiteford, Taylor & Preston LLP
Wilkes Artis Chartered
Zuckerman Spaeder LLP

Institutional:

American University
Archdiocese of Baltimore
Bon Secours Health System
Catholic Charities
Coppin State University
Franklin Square Hospital
Greater Baltimore Medical Center
Good Samaritan Hospital
Harry & Jeanette Weinberg Foundation
Johns Hopkins Hospital
Mass. Institute of Tech. (MIT)
Morgan State University
Northwest Hospital Center
St. Agnes Hospital
St. Joseph Medical Center
St. Paul School
Sinai Hospital/LifeBridge Health
Sisters of Notre Dame
Towson University
University of Maryland
University of MD Medical System

Governmental/Other:

Baltimore City
Baltimore County
Baltimore Development Corp.
Blaustein Family Interests
BOMA
Carroll County
Cecil County
District of Columbia
D.C. Housing Finance Agency
Estate of Jack Kent Cooke
Federal Communication Commission
Federal Deposit Insurance Corp.
Federal Home Loan Bank Board
Frederick County
Harford County
Anne Arundel County
Howard County
Internal Revenue Service
MD Dept. of Natural Resources
MD Economic Development Corp.
Maryland Historical Trust
Maryland Insurance Deposit Fund
MNCPPC
Maryland Stadium Authority
Mass Transit Administration
Montgomery County
Prince George's County
MD State Highway Administration
U.S. Army Corps of Engineers
U.S. Dept. of Housing & Urban Development
U.S. Dept. of Justice
U.S. Dept. of the Navy
U.S. General Services Admin.
U.S. Naval Academy Athletic Assoc.
U.S. Postal Service
Washington, D.C. Office of Tax & Revenue
Washington Suburban Sanitary Commission

Recreational:

Argyle Country Club
Baltimore Country Club
Bethesda Country Club
Burning Tree Golf Club
Caves Valley Golf Club
Columbia Association
Country Club of Maryland
Country Club at Woodmore
Elkridge Club
Four Streams Golf Club
Green Spring Valley Hunt Club
Hillendale Country Club
Hunters Oak Golf Course
Lakewood Country Club
Maryland Club
Norbeck Country Club
Suburban Country Club
Woodmont Country Club