**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

USBC-MD G FILED
1 JUL '25 PM3:34

In re:

GREGORY B. MYERS,

Debtor.

Case No. 15-26033-MCR
(Chapter 7)

BRIAN KING, *et al.*,

Plaintiffs,

v.

Adv. No. 24-00007

ROGER SCHLOSSBERG, Trustee,

Defendant.

NOTICE OF FILING

DEBTOR, GREGORY B. MYERS HEREBY FILES IN THE RECORD OF THIS CASE A COPY ~~OF~~ THE JANUARY 3, 2023 "COURT TRIAL" TRANSCRIPT IN CIVIL NO. 436977V, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A".

147

RESPECTFULLY SUBMITTED on this ~~30th~~ 1st day of ~~June~~ July, 2025.



GM

GM

Gregory B. Myers, *pro se*
700 Gulf Shore Blvd. N.
Naples, Florida 34102
(301) 325-2312
gregbmyers@verizon.net

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on ~~June 30~~ July 1, 2025, a copy of the foregoing was furnished to the following parties:

GM

Roger Schlossberg
Frank J. Mastro
P.O. Box 2017
Hagerstown, MD 21742-2017

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy., Suite 665
Henderson, NV 89012

Gregory B. Myers, *pro se*

EXHIBIT "A"

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
------------------------------X
                              :
BRIAN KING, ET AL.,           :
                              :
          Plaintiffs,         :
                              :
              v.              :        Civil No. 436977V
                              :
SERV TRUST, ET AL.,           :
                              :
          Defendants.         :
                              :
------------------------------X
```

COURT TRIAL

Rockville, Maryland January 3, 2023

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
------------------------------X
                              :
BRIAN KING, ET AL.,           :
                              :
          Plaintiffs,         :
                              :
               v.             :         Civil No. 436977V
                              :
SERV TRUST, ET AL.,           :
                              :
          Defendants.         :
                              :
------------------------------X
```

Rockville, Maryland

January 3, 2023

WHEREUPON, the proceedings in the above-entitled matter commenced

BEFORE: THE HONORABLE DAVID LEASE, JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:

MAURICE VERSTANDIG, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, Suite 114-160
Potomac, Maryland 20854

FOR DEFENDANT 6789 GOLDSBORO, LLC:

ERIC PELLETIER, Esq.
FRANCES WILBURN, Esq.
Offit Kurman, P.A.
7501 Wisconsin Avenue, Suite 1000W
Bethesda, Maryland 20814

FOR DEFENDANT SCHLOSSBERG:

FRANK MASTRO, Esq.
Schlossberg, Mastro & Scanlan
P.O. Box 2067
Hagerstown, Maryland 21742

# I N D E X


| | Page |
|---|---|
| Judge's Ruling | 20 |
| Opening Statements: | |
| Maurice VerStandig, Esq. For the Plaintiffs | 22 |
| Eric Pelletier, Esq. For the Defendants | 30 |

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiffs: | | | | |
| Brian King | 36 | 65 | 81 | -- |
| Frances Wilburn | 86 | -- | -- | -- |
| For the Defendants: | | | | |
| (None) | | | | |

| EXHIBITS | MARKED | RECEIVED |
|---|---|---|
| For the Plaintiffs: | | |
| Exhibit Nos. 1-22 | -- | 35 |
| Exhibit No. 23 | -- | 74 |
| Exhibit No. 24 | -- | 70 |
| Exhibit No. 25 | -- | 78 |
| Exhibit No. 26 | -- | 85 |
| Exhibit No. 27 | -- | 85 |
| For the Defendants: | | |
| (None) | | |

I N D E X (cont.)

Page

Closing Arguments (cont.):

Maurice VerStandig, Esq. 94
For the Plaintiffs

Eric Pelletier, Esq. 109
For the Defendants

Frank Mastro, Esq. 115
For the Defendants

Judge's Ruling 125

P R O C E E D I N G S

THE COURT: All right. Good morning, everyone.

MR. VERSTANDIG: Good morning.

THE COURT: Please be seated.

THE CLERK: Calling Case No. 436977V, Brian King, et al. v. Serv Trust, et al.

MR. VERSTANDIG: Good morning, Your Honor. Maurice VerStandig appearing on behalf of Brian King, Christina King, and the Christina and Brian King Children's Trust.

THE COURT: All right.

MR. VERSTANDIG: And I'm joined by Brian King, who is seated to my left.

THE COURT: All right. Good morning.

MR. PELLETIER: Good morning, Your Honor. Eric Pelletier here for 6789 Goldsboro, LLC.

MS. WILBURN: Good morning, Your Honor. Frannie Wilburn on behalf of the 6789 Goldsboro, LLC.

THE COURT: All right. Good morning.

MR. MASTRO: Good morning, Your Honor. Frank Mastro on behalf of nominal defendant, Roger Schlossberg. He's the Chapter 7 trustee of the bankruptcy estate of Greg Myers.

THE COURT: Okay. All right.

MR. VERSTANDIG: Your Honor, a preliminary matter.

THE COURT: Yes.

MS. VERSTANDIG: There are, and I don't mean this to

become a side opening, but there are essentially four issues that would be triable today.

THE COURT: Okay.

MR. VERSTANDIG: All of the attorneys in this courtroom concur that if my clients succeed on the first issue, which is an action for declaratory judgment with an entity known as Serv Trust as the alter ego of Gregory Brian Myers, that with due respect and deference, you would be without jurisdiction to hear the other three matters. And we would not bother you again with them. We would take them to the U.S. Bankruptcy Court to the District of Maryland and permit Judge Ruark to sift through them.

THE COURT: Okay.

MR. VERSTANDIG: Because --

THE COURT: Now the question I had about that, because I saw your memo this morning on the alter ego, and the two things was one is the order of abstention from the United States Bankruptcy Court was dated, I think, January 30th of 2019. But your amended complaint alleging the alter ego was not filed until February 11th of 2019. So my question is, I don't see how -- I'm not sure how the order of abstention from the United States Bankruptcy Court encompasses the alter ego claim since it was not a claim in existence at the time of the abstention order from the Bankruptcy Court.

MR. VERSTANDIG: Yes, Your Honor. I can address that

fairly simply, fortunately. We had originally filed the alter ego claim as a standalone adversarial proceeding in the United States Bankruptcy Court.

THE COURT: Okay.

MR. VERSTANDIG: Which is what begat the order of abstention. After the order of abstention where the court indicated, and obviously I paraphrase, that this action was already pending. At the time it was just a declaratory judgment for redemption of the membership interest and some issues related. I will periodically today make reference to issues related to claims against Mr. Myers solely for the record. I want it to be clear, as I know everyone is, we are not pursuing any claims against Mr. Myers individually today. And any contextual references I make are merely for context.

But because this matter was already pending, once the Bankruptcy Court abstained, which had the effect of closing out --

THE COURT: Right.

MR. VERSTANDIG: -- that precise cause of action in that court, we then amended and brought it here.

THE COURT: Okay. All right. See, I don't have all the bankruptcy filings, but I did get the order of abstention. The other question I had is under, it's sort of a hybrid under the Frow doctrine, which is that when you have claim against one party, in essence are they in default or not. We can

debate whether they are or not in default. But under that doctrine is where somebody would have potential joint liability or liability based upon the defaulting party's liability.

And under the Frow doctrine, you can either one of two things. You sort of abstain from going forward because you don't want to try it twice. Or two, you can enter the judgment, but then it's a nonfinal judgment because anything that I do today in essence necessarily would be nonfinal because we're not putting all of the claims against all the parties for not getting to an adjudication. So we don't have a final judgment today under any circumstance. Now there's mechanisms by which you can request a final judgment be entered, and this may be an appropriate case, it may not be, I don't know. But that's up to -- and then the Appellant Courts often times second guess, and I've seen us reversed more times than not by certifying the final judgment when in fact the Special Appeals says you really shouldn't do that because you don't want piecemeal litigation. So I'm trying to sort of figure out how I deal with that.

And then the other issue that I had a concern about was the alter ego claim. Seems to be the one that would be most closely aligned with potential liability for Mr. King in the sense that, I think under paragraph 80 of your finding -- or of your amended complaint, you state that "his expenditures of monies belonging to Serv Trust is a form pattern habit of

gross breach of his fiduciary duties as trustee." Which would in essence mean that I'd have to make a finding that he breached his duties as a trustee, which could potentially be -- the concern would be used in a claim by any beneficiary of the trust to say he breached his fiduciary duties to me, so.

MR. VERSTANDIG: So Your Honor, I think I can address that in two parts. And if it's okay with you, I'll take the latter --

THE COURT: Okay. Sure.

MR. VERSTANDIG: -- first and the former second. The existence of parallel bankruptcy estates creates some admittedly bizarre legal constructs.

THE COURT: Yes. I don't even know how that's possible. I don't know how there's still a bankruptcy. I was looking to see that the Florida bankruptcy would have ceded to the Maryland bankruptcy that's still pending from what I see.

MR. VERSTANDIG: There are two --

THE COURT: I mean, I first thought that Maryland had been just closed out and that his discharge was disallowed and was closed. And then you would've had the second bankruptcy in Florida where I guess Mr. King now purportedly resides.

MR. VERSTANDIG: So I'm actually normally a bankruptcy attorney, and without geeking out on eccentricities of circuit splits --

THE COURT: I did my fair number of adversarial

proceedings, but I never was a bankruptcy guy. I didn't do like -- I would only litigate in adversary proceedings.

MR. VERSTANDIG: There is a two-estate doctrine. Obviously without litigating in front of you or it belonged to the courts, I would respectfully suggest that in many courts in many circuits, the second case probably would've been properly dismissed. That's obviously not what happened.

THE COURT: Right. Okay.

MR. VERSTANDIG: But I think the posture of the two cases will answer your second question. The Chapter 7 case in Maryland was filed as a Chapter 11 case and then converted to Chapter 7. All of that happened before the Chapter 13 case was filed in Florida.

THE COURT: Right.

MR. VERSTANDIG: Which means that on the date that the Chapter 11 relief was entered, and then on the date of conversion to Chapter 7, a unitary estate was created. And upon conversion of Chapter 7, that unitary estate vested in Mr. Schlossberg as Mr. Myers' bankruptcy trustee. At no point since is there any contention that Mr. Schlossberg has abandoned or otherwise disposed of the assets of that estate. So when Mr. Myers then went down and filed in Florida several years later, he had not regained legal or equitable --

THE COURT: I read your argument.

MR. VERSTANDIG: Yes.

THE COURT: So I understand it, I just -- it's one of those -- I hate having one side of an argument, so.

MR. VERSTANDIG: I appreciate.

THE COURT: Yes.

MR. VERSTANDIG: Look, it's eccentric. I'm happy to recognize that. But I would say that because of that, any claims against Mr. Myers that are related to the findings that may or may not be reached today would necessarily be jurisdictionally vested in the Maryland Bankruptcy Court, which is the court that has issued the order of abstention. I would also say to whatever extent there are any reservations about the Florida bankruptcy court's cognizance of what we plan to do today, the exercise that was carried out over the past 96 hours where this matter --

THE COURT: I'm going to just tell you, I just got an email from -- my chambers just got an email from Mr. Myers. It's purported copied to you all. I don't know if you saw it. But it's an email from 9:37, so I doubt you've seen it since you've been talking to me. He says that in response to the two orders of remand by the United States Bankruptcy Court for the Middle District of Florida a short time ago, he claims they're not final and that both orders were appealed to the United States District Court for the Middle District of Florida, part of 9:38 a.m. on January 3, 2023. So he said he has now appealed the remand.

MR. VERSTANDIG: Your Honor, without litigating in front of you issues that I imagine I won't end up litigating in Tampa, Florida, where I --

THE COURT: I understand. I'm just concerned now if it's a nonfinal, is the remand stayed. I mean, that's what I'm trying to figure out.

MR. VERSTANDIG: So I would argue no for two reasons. One, I think the punitive nonfinality is actually belied by, and obviously I haven't seen the email, I just --

THE COURT: No.

MR. VERSTANDIG: -- know what you shared with us, but it's belied by the appeal. I'm not sure how Mr. Myers could appeal a nonfinal order without leave of the trial court, in this case being the U.S. Bankruptcy Court for the Middle District of Florida. And two, looking at the motion for remand and the orders that were entered in the two matters early this morning by the Florida Bankruptcy Court, I would argue it is contextually quite evident that the Florida Bankruptcy Court intends for us to proceed. And the reason we requested emergency relief, and a point in fact is we were able to get a ruling on an emergency motion without so much as a single business hour elapsing between when the emergency remand was requested and when the order was handed down, is because the exigency created by everyone's intent to move forward in your court today.

THE COURT: Right.

MR. VERSTANDIG: I would also say in terms of the nonfinality of any order, there's probably two means through which that can be addressed. And I'll huddle with counsel. I don't want to put the cart in front of the horse. We would probably do so shortly after you ruled. The two cognizable means that immediately come to mind are one, we can ask you, as you intimated, to certify something as a final order. But two, depending on how you rule, and certainly I do not feign to take anything for granted going to today, I think there's a very real universe where if Serv Trust is found to be Mr. Myers' alter ego, we would then -- and I do not speak for Ms. Wilburn or Mr. Pelletier -- there's a very real universe where we would then happily dismiss all extent claims. Mr. Myers does not have any affirmative claims in this case. We do not need him to join us in consenting to a dismissal of all of the other matters that pend. We would do so without prejudice so that they may be appropriately raised in the Bankruptcy Court, and then we would have ourselves a final order just a few moments after you signed it.

THE COURT: Well, the other thing is I'm not hearing that there's any stay that was issued by the Bankruptcy Court or by the Middle District of Florida. And so unless you all hear of a stay, then you need to let me know. But I think generally I agree with you. It's likely to be a final order,

it's been appealed, but an appeal does not necessarily stay --

MR. MASTRO: Right.

THE COURT: -- in the line of order.

MR. MASTRO: Right.

THE COURT: What it could do is this could all be moot if the Appellate Court decided that it was going to reverse the Bankruptcy Court, so. And I know you wanted to say something for a while, so I'm happy to from you.

MR. MASTRO: Yes. Again, Frank Mastro on behalf of the bankruptcy trustee in Maryland. I agree wholeheartedly with everything Mr. VerStandig is saying. I'll just add additionally that the order of remand refers to the arguments raised by Mr. VerStandig in his remand motion, one of which was remand on equitable grounds, which are made expressly nonappealable under the applicable statute. So in addition to the order being purportedly not final in Florida, the grounds make it expressly nonappealable.

THE COURT: Right. Because, I mean, the bankruptcy --

MR. MASTRO: And as Your Honor just pointed out, that was my other point I was going to make was that there's no stay in effect.

THE COURT: Right.

MR. MASTRO: So we don't see any reason from the bankruptcy trustee's perspective, anyway, that this proceeding

can't proceed today.

THE COURT: Okay.

MR. MASTRO: I mean, his bankruptcy estate's been open for over seven years and we really want to get a resolution.

THE COURT: I know. I see my friend, Judge Lipp, was the original judge on this. So the order of abstention also doesn't note that any issues with respect to the stay can be litigated in this court. Because one of the things that when I was looking at the abstention order, it says so numeral factors from the discretionary abstention applies as stated by -- oh, it states the Glass v. Glass case where "the state court may not grant relief from the stay. This matter is committed exclusively to the Bankruptcy Court. But it may when presented with an issue to determine whether factually or legally a stay is in effect and whether a particular action is about to take or as already taken is subject to a stay."

So it says here, "There's no need for the Bankruptcy Court to wait in the State litigation, the state court has been presiding over litigation for a while." And we get in bits and spurts and then it stops. So it says that the state court determines the Government's stay is applicable based on the relationship between the debtor and Serv Pro [sic], then the matter will be stayed and the parties can come back to this court to figure out how to proceed.

So it sort of punted this -- even the issue is to whether -- and all I'll say is really I actually thought we were going to go forward on your Count I today, their count against Serv Pro [sic] and that we weren't going to go forward on the alter ego because of the close relationship between the parties. And that I didn't know if the alter ego got you anything. Certainly doesn't seem to get you more of anything in a sense that Count I gets you, if you're successful on that, the redemption of the rights from Serv Pro [sic], and then really then you're sort of done. And then their claim is against Serv Pro [sic] for the amount due on the notes. And if they're successful, I think that can be litigated without affecting Mr. Myers, basically, under a Frow doctrine.

The reason that sort of I would go forward on their claim today, as opposed to the waiting until the defaulting parties, because I don't know when and if Mr. Myers would ever be subject to determination in this court depending on what the Bankruptcy Courts decide. They could modify the claims or reduce the claims. And I understand that in the Maryland Court that the -- I guess I'm looking for the word, it's escaping me at the moment -- discharge was denied or revoked. I guess it was a discharge and then it was subsequently taken back. So I would have to think about the alter ego claim. What I'm going to propose we do, just so we don't waste everybody's time, is why don't we put on evidence of all of it. And then I'll think

about whether or not -- because I do think, and I'll ask the trustee's counsel. Under the order of abstention, if I am to decide whether or not the estate would apply to the altered ego claim that was not decided in the Bankruptcy Court, the way I read the abstention order. I'm just asking if the trustee has any thoughts on that.

MR. MASTRO: I mean, the --

MR. VERSTANDIG: I have but one sentence, and then I'll sit down --

MR. MASTRO: Yes. I mean, the --

MR. VERSTANDIG: -- shut up, I promise.

THE COURT: Okay.

MR. VERSTANDIG: I believe, and obviously I'm reading into Judge Lipp's language.

THE COURT: Right.

MR. VERSTANDIG: I believe the determination of the applicability of the stay is synonymous with the existence of the alter ego relationship, and the two are legally coterminous. If it is an alter ego, the stay applies for all other purposes and we return to the Bankruptcy Court.

THE COURT: All right.

MR. VERSTANDIG: If it is not an alter ego, the stay applies for no other purposes understanding the monetary claim is stayed by virtue in Florida Bankruptcy and we go forward in your court. But you did not direct that to me and --

THE COURT: Okay.

MR. VERSTANDIG: -- I mean no disrespect.

THE COURT: All right.

MR. MASTRO: Yes. And my understanding is that with respect to the Maryland Bankruptcy, there is no stay in effect as to the alter ego because of the order of abstention saying you need to go litigate this in state court. To the extent there was any sort of stay in Florida, that's been lifted.

THE COURT: Right. But I would agree then, yes. But I was troubled by the language in the stay order, which says a state court has concurrent jurisdiction with the Bankruptcy Court to determine the applicability of the automatic stay, and then goes on to cite the Glass case and says basically if I determine that the stay applies, then I send it back to the Bankruptcy Court to determine what happened. Which to me is, I've never really seen that in a abstention order.

MR. MASTRO: And I think the posture of these cases was a lot different, what is it, five years ago, 2017, 2018, that order?

THE COURT: 2019, yes.

MR. MASTRO: 2019. So I'm not sure off the top of my head what the posture of the case was at that time where possibly there could've been something here to litigate in terms of does the stay apply or not. It may be does the stay apply as to the other claims besides the alter ego.

THE COURT: Okay. I mean, yes, that's what I said it's --

MR. MASTRO: So and to the extent he was making that argument at that time, and again, it's been so many years, Your Honor, I don't recall off the top of my head.

THE COURT: Uh-huh.

MR. MASTRO: Well, was he making an argument that the stay applies to these other claims back in 2019? I don't know off the top of my head.

THE COURT: Okay. All right. And dealing with the alter ego, I mean, Maryland's probably the worst state to try to push forward an alter ego argument given the fact that the court says you still have to prove fraud or the paramount equity even in an alter ego situation and the paramount equity has been defined as fraud. So I'm still waiting for the case that ever comes out and says, well, there's not fraud here, but there's a paramount equity. And I understand that you may be actually alleging fraud in a certain extent. Certainly, fraudulent conveyance, and so forth, is sort of at the heart of the allegations.

MR. VERSTANDIG: Your Honor, to go to what you said a moment ago. I know we're all prepared to proceed on all of the causes of action today.

THE COURT: Uh-huh.

MR. VERSTANDIG: I enjoy this colloquy more than I

probably give off because I find this fascinating. But at the same time --

THE COURT: Let's get going.

MR. VERSTANDIG: -- maybe there's some sense in putting on some evidence.

THE COURT: Yes.

MR. VERSTANDIG: And then in closing, we can have -- I mean, there's really, it's not even a chicken and egg so much as a chicken eating an omelet for breakfast, and we can try to figure out where that all falls.

THE COURT: Okay. Sounds fine to me. All right. So who wants, I guess my understanding was the King defendants were going to go first, or do you want to put the note on first?

MR. VERSTANDIG: Your Honor, if I can -- we'll go first.

THE COURT: Okay.

MR. VERSTANDIG: I'll give a brief opening with your blessing. And then as is probably manifest, I do intend to put Mr. King on the stand. And there are some exhibits in front of you that we're going to try to find our way into evidence.

JUDGE'S RULING

THE COURT: All right. And why don't you just do a little bookkeeping. There was a motion to recuse me that was filed. And I did get your motion to stay every other motion

that was pending. I agree with you on everything but the recusal. I think that since I have to potentially decide an issue about the stay potentially from the order of abstention, that as far as you would have at least standing to complain about me hearing the case, I have looked at his motion, I've looked back I think about a year ago. He orally made the same motion. The motion is based upon my affiliation with the firm of Gordon Feinblatt between the years of 1991 and 1997. Frankly, if Mr. Myers had not raised the fact that Gordon Feinblatt has some connection, which I'm still not even sure exactly what it is, I wouldn't have been aware of it. But certainly I've had attorneys from Gordon Feinblatt actually appear and represent parties before the Court in litigation given the amount of time, which would now be close to 25 years, probably more than 25 years, that I have no problem hearing the case. I don't believe that it would affect my ability to be fair and impartial in the case.

Therefore, I am going to deny the motion for recusal for a second time in this matter. With respect to, there was an order or motion filed to -- this is bookkeeping from my clerk here. Shoot, what did I do with that? All right.

So there's the King parties filed a motion to hold the debtor's pending motions in abeyance pending termination of the automatic stay. That was joined by 6789 Goldsboro, LLC. So I'm going to grant that motion with the exception of the

motion for recusal, which I have denied. All right.

MR. PELLETIER: Your Honor, before we get off to the races --

THE COURT: Sure.

MR. PELLETIER: -- this is Eric Pelletier for the record. I just wanted to clarify the order of operations here. Are we going to do opening statement, opening statement, his evidence, my evidence, just keep it going because --

THE COURT: Yes. Let's just do that.

MR. PELLETIER: Okay. To that end, Mr. VerStandig's exhibits end at No. 22. I don't have tabs from 23 up, but I can mark them with a plaintiff's exhibit sticker.

THE COURT: Okay. That's fine.

MR. PELLETIER: Okay.

THE COURT: You shouldn't have that many I wouldn't think.

MR. PELLETIER: I have like four.

THE COURT: Yes. I was going to say.

MR. PELLETIER: Thanks.

THE COURT: Okay. All right. So if you want to give an opening, I'm happy to hear you.

OPENING STATEMENT BY MAURICE VERSTANDIG, ESQ.

ON BEHALF OF PLAINTIFFS

Thank you, Your Honor. And I will try to trim this down because I think some of it may be redundant to what was

just discussed.

THE COURT: Okay.

MR. VERSTANDIG: But at core, there are three questions that will come before the Court today as it concerns my clients. I think that Mr. Pelletier and Ms. Wilburn have a separate client with a separate interest, albeit a related one.

The first question is whether or not Serv Trust was Mr. Myers' alter ego at the time he sought bankruptcy relief in 2015. The second question is whether or not the King parties, which is going to be the colloquial reference to Brian King, Christina King, and the Christina and Brian King Children's Trust, have properly exercised the redemption mechanism under the amended and restated operating agreements of 6789 Goldsboro, LLC to redeem the class B interests therein we maintain formerly held by Serv Trust.

And then the third question I would imagine is going to be the least advocated today given the absence of a lawyer for Serv Trust, but Serv Trust has counterclaims in this matter. The counterclaims allege myriad things that we maintain to be fantastically and whimsically imaginative, but that bear no resemblance to this universe or even close parallel thereto. And --

THE COURT: With respect to the counterclaims, I mean, there's not going to be any evidence presented.

MR. VERSTANDIG: Right.

THE COURT: So I would imagine at the close of the case you can ask for a motion on that.

MR. VERSTANDIG: Yes, Your Honor.

THE COURT: And so that's how I anticipated that we would deal with those claims. I know there was summary judgment motions filed, and I understand what their claims were, but without evidence in court, and since they have not either appeared or appeared by counsel here today, then we'll dispose of those at the appropriate time.

MR. VERSTANDIG: Thank you, Your Honor. Your Honor, by way of background, what the evidence is going to show, and it certainly seems you have read this file in great detail and we appreciate that you seem to know this better than we often encounter when we come to judges for the first time, second time, and so on and so forth, is that Gregory Myers found himself in a situation where he needed money. And I'll reiterate what I said earlier. There's going to be a lot of references to Mr. Myers today. None of them are in furtherance of any claims for monetary relief against him initially.

Mr. Myers needed money in general and Mr. Myers found a property at 6789 Goldsboro in Bethesda, Maryland, that he thought could be profitably developed, but he lacked the resources to acquire it. And through various circumstances he was introduced to Mr. King, and they agreed that on negotiated terms, which will be reflected in the record, they would move

ahead with Mr. King and his family putting up, when I say the lion's share of the capital, I mean to the extent that what came out of Mr. Myers' camp is statistically de minimis in nearly every regard.

And a bargain was inherent in all of this. Mr. King and his family would put up almost all of the money. In fact, as soon as they closed on the acquisition of the property, the $6,000 and some odd dollars that had been put up by Serv Trust, which I'll get to in a moment, would be dwarfed by a $300,000 distribution from the company to Serv Trust to fund Mr. Myers' lifestyle. And in exchange for the King parties putting up all the money to acquire the property to pay lawyers to investigate the development of property, architects to investigate the development of the property, engineers to work on the project, and so on and so forth, they would have the class A membership interest in this entity, and Serv Trust would have the class B membership interest.

And under the terms of the operating agreement, there would be a period of three years. And if at the end of those three years the property had been sold, money would be divided up accordingly. And if at the end of three years, the property appraised for more than the cumulative capital contributions of the King parties to date, they're willing to go forward accordingly, that would mean that Mr. Myers as the finder, who became the manager of 6789 Goldsboro and was chiefly in charge

of its development using the financing of the King parties, had been successful in creating value, then everyone would go ahead. But if at the end of three years, or anytime thereafter, the property appraised for less than the cumulative capital contributions of the King parties, Serv Trust and trust would be redeemed, and they'd be deemed for no consideration.

And in essence, this was a great deal for Mr. Myers. He had no money, nothing to put up, and get $300,000 minus the $6,000 and change, as soon as closing occurred, and Mr. King was giving him the opportunity. If you can make this a profitable project, you're going to end up owning half of it, you'll get half the proceeds, and everything is wonderful. And if not, you get $300,000 for your trouble, which is not bad for three years of work, I might add. And if it doesn't work out, I, meaning Mr. King and his family, have borne the entirety of the financial obligations other than $6,000 and change, and we will redeem the interest and do what we can today and get out of this project.

And low and behold, the three years came and went, and on the third anniversary, Mr. King did nothing. Kept giving Mr. Myers a chance. Believed that Mr. Myers might actually be making good progress. And they marched forward and they marched forward, but finally, and the evidence will show this in some detail, Mr. Myers endeavored to defraud Mr. King, Christina King, and the Christina and Brian King Children's

Trust. And at that point, Mr. Myers was ousted as manager and the redemption mechanism was triggered, and it was triggered in accord with the operating agreement with a demand being sent to Serv Trust and an appraiser being timely appointed. That appraiser conducted an appraisal, you will see that appraisal in the record. The appraisal puts the property value between of $1 million and $1.35 million at that moment in time.

The King parties' class A contributions toward the project were close to, if not in access, of $3 million at that point in time. And thusly, Serv Trust had its interests redeemed. Now Serv Trust had the option to appoint a counter availing appraiser to get someone to go out and look at it, of Serv Trust's choosing, to be paid by Serv Trust, and to say no, it's worth 5 million, it's worth 10 million, whatever a certified appraiser may do. Serv Trust did not exercise that option. And we know that Serv Trust got the King parties' demand because we have a response from Mr. Myers in his capacity as trustee of Serv Trust acknowledging receipt thereof, which will be part of the record today.

Now let's take a step back and talk about Mr. Myers and Serv Trust and what the record will show there. The record will show that Mr. Myers put this investment project in the name of Serv Trust because he was enmeshed in litigation in myriad jurisdictions, had not paid a mortgage in a great many years, and was financially insolvent by every measure and

almost certainly destined for bankruptcy when he found us. He used Serv Trust to move money to himself and to his wife, Barbara Ann Kelly, for almost -- and I will emphasize the word almost because there are some exceptions -- almost exclusively the benefit of himself and his wife.

And at first it is evident that the project was placed in the name of Serv Trust so that it would not be an asset of Mr. Myers' collectable, sizable, garnishable or otherwise speakable by any of his creditors. And then that took on a very real form when Mr. Myers sought bankruptcy relief. And when Mr. Myers was in bankruptcy, he was initially a debtor in Chapter 11. That is the ultimate open kimono construct. Everyone gets to see just about everything, its monthly operating reports. So how could he hide vast monies that he needed to go on and pursue a lifestyle that involved country clubs, leisure and vexatious pursuits? By constantly using Serv Trust as his alter ego.

And time and again, he went to Mr. King, and for reasons that were clearly personal to Mr. Myers, his desire to pay country club dues, his desire to pay his own lawyers, his desire to put monies into the registry of a court in a case in which he is personally a party, he asked that 6789 Goldsboro loan funds to Serv Trust. And what the record will show is that 6789 Goldsboro time and again loaned those monies, you'll hear about that from Mr. Pelletier and Ms. Wilburn. And almost

as soon as those monies were in Serv Trust, out they went to Mr. Myers and Ms. Kelly.

Now I said almost, but I want to emphasize it in the interest of candor. There are a handful of expenses that were clearly for the benefit of Mr. Myers' children. We can't deny that some monies were used to benefit his children. But ultimately, it is a pittance of the vast sums of money that went in and out of Serv Trust. And that is what guides a lot of the alter ego issues that we'll be presenting today.

So Your Honor, we believe the evidence is going to show that under the operating agreement the redemption mechanism was properly exercised, and that if you choose to rule on that matter, you will find that Serv Trust is no longer a member of 6789 Goldsboro, LLC, and that the only members, and we ask the Court to enter a declaratory judgment, are Mr. King, Ms. King, and the trust for the benefit of the children. If you choose to rule on the alter ego issue, and to some degree we respectfully submit, it may be mutually exclusive at the close of evidence. I think you're going to be constrained to one or the other.

We believe the evidence will show that Mr. Myers exercised complete dominance over Serv Trust. That that dominance was used to propagate harms to the detriment of his creditors, including his bankruptcy trustee who's represented by counsel in your court today, and that actual harms were in

fact perpetrated because the assets of Serv Trust were thusly not made available to his bankruptcy estate and not made available for distribution to his creditors or negotiations through the operation of the entity. And that is why Mr. Myers' first bankruptcy trustee is represented by counsel in your courtroom today. We understand this is an unusual case. We understand it comes with a lot of baggage and a lot of years. We appreciate your time, and we look forward to putting on our evidence.

THE COURT: All right. Thank you.

OPENING STATEMENT BY ERIC PELLETIER, ESQ.

ON BEHALF OF THE DEFENDANTS

Good morning, Your Honor. Eric Pelletier here for 6789 Goldsboro, LLC, with Ms. Wilburn, of course. And I can just tell you I'm going to be brief and I will be nowhere near as eloquent. I have a far more simple case, and I have the benefit of piggybacking off of Mr. VerStandig's case which, and I don't disagree with his opening. Ms. Wilburn and I represent 6789, which I may refer to it as. We have two claims; they're both being presented against Serv Trust. And just for the record, we are not proceeding against Mr. Myers here today. Count I is a breach of contract claim for a promissory note. Count III is a promissory estoppel claim for which we're only proceeding against Serv Trust.

It'll be very clear when you receive the note, it's a

very simple claim, and we've already pointed out that I'm only going to have a few exhibits, that the promissory note, the maker and the borrower was Serv Trust. The holder was 6789 Goldsboro Road, LLC. The note covers both prior advances, which the note memorializes, and allows for future advances to be made. You will see evidence today, a tally sheet that Mr. King has kept during the course of the loans and has kept current, that the total loan was $635,000 under the promissory note. The interest under the note provided, in the note itself is 10 percent, which through January 1st I think it was, totaled to $499,937.50. The total due, principle and interest, under the note will be shown to be $1,264,737.76. Added to that, there are attorney's fees provided in the note. The attorney's fee total, as of these many years of litigating, is $129,826. And of course, you'll see from the bills, that includes 4As and Bankruptcy Court, so on and so forth.

And then comes the other issue, which is the promissory estoppel issue, which Mr. VerStandig actually referred to in his opening in passing. And that is the $300,000. The initial advance was $300,000, not covered specifically within the promissory note, but the understanding was that Mr. Myers would take the money, make good on it, they would do the reconciliation of the sort that Mr. VerStandig explained during his opening statement, and at the end, the $300,000 would come back to 6789, and that was why the loan was

made at the get-go to start off this whole adventure. That will be our case. It's going to be very simple.

THE COURT: Why wasn't the 300,000 included in the note?

MR. PELLETIER: It came before the note and it wasn't included, and we can go into that with Mr. King.

THE COURT: Okay.

MR. PELLETIER: But my understanding was it was considered an initial distribution to come back out and be repaid after the project became successful, which ultimately it didn't because of stonewalling, and so on, of Mr. Myers.

THE COURT: I mean, isn't that just a definition of a loan?

MR. PELLETIER: It is a loan.

THE COURT: I mean, if you're saying it's not a capital -- or distribution.

MR. PELLETIER: Frankly, it is effectively a loan. It was supposed to be paid back.

THE COURT: Okay.

MR. PELLETIER: It was supposed to be reconciled at the end. It wasn't free money. It wasn't a gift to Mr. Myers.

THE COURT: Okay.

MR. PELLETIER: It was a comeback.

THE COURT: All right. So then you do disagree with what counsel said, because he said at the end of the day he was

going to get the $300,000.

MR. PELLETIER: Well, I think that's a minor disagreement.

THE COURT: Okay.

MR. PELLETIER: He said he was going to get it before the project was effectively stonewalled when Mr. Myers not doing anything he was supposed to do under the operating agreement, not pursuing the property valuation, so on and so forth.

THE COURT: Okay. My understanding was that the big problem was he didn't get the subdivision numbers that you were looking for from the county I would guess. The overall goals for all the -- what are we looking for, 16 units? I may have the number wrong.

MR. PELLETIER: Right.

THE COURT: But it's the number of units that you were trying to get.

MR. VERSTANDIG: Nineteen.

MR. PELLETIER: Yes.

THE COURT: Thirty-two, all right. I had it in half so.

MR. VERSTANDIG: Nineteen, you were close.

THE COURT: Nineteen. Okay, 19. So they were looking for 19, and you just didn't get that approval. And then that really was, to me, is at least what I thought was the

big problem was that at that point then the project wasn't going to be profitable given the outlays of that.

MR. PELLETIER: Well then there was no opportunity for the valuation process to go forward after that because Mr. Myers sat on his hands.

THE COURT: Right. I got you. All right.

MR. PELLETIER: Thank you, Your Honor.

THE COURT: All right. I'm going to ask the counsel for the trustee if you have any --

MR. MASTRO: No. We have --

THE COURT: -- information.

MR. MASTRO: We have no position.

THE COURT: All right. All right. So call your first witness, or go through it any way you want.

MR. VERSTANDIG: Your Honor, we call Brian King, but I think we're going to do a couple of things to make this a little bit shorter --

THE COURT: Okay.

MR. VERSTANDIG: -- given how we're postured today.

THE COURT: All right. Mr. King, he can testify from counsel table --

MR. VERSTANDIG: Excellent.

THE COURT: -- if he likes. That way he can look at documents. There's nobody -- there's no jury here or anything. And actually, I get a better view of him from here than I do

from on the stand.

THE CLERK: Do you want me to swear him in?

THE COURT: Yes. If you could stand and raise your right hand, please.

THE CLERK: Thank you.

THE COURT: All right. Sir, you can have a seat and make yourself comfortable. Counsel, you may proceed.

MR. VERSTANDIG: Thank you. Your Honor, I don't want to be abusive of the fact that there's no opposing counsel, but in the interest of streamlining things, we have marked 22 exhibits that have been handed to Your Honor with the copies also handed to the clerk of the Court. They're each marked 1 through 22. At this time, the King parties move the admission of Exhibits 1 through 22.

THE COURT: All right. They'll be no objection obviously, so I'll go ahead and I'll admit the Exhibits 1 through 22 at this time.

MR. VERSTANDIG: Thank you, Your Honor.

(The documents marked for identification as Plaintiff's Exhibit Nos. 1 through 22 were received in evidence.)

BRIAN KING

the plaintiff, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VERSTANDIG:

Q Mr. King, please state your name for the record.

MR. VERSTANDIG: Your Honor, is it okay if I sit -- keep sitting?

THE COURT: You can have a seat if you would like.

MR. VERSTANDIG: Thank you. It seems awkward hovering over my client.

THE COURT: Okay.

THE WITNESS: Brian King.

BY MR. VERSTANDIG:

Q And Mr. King, what's your business address?

A 3925 Beech Avenue, Suite 100, Baltimore, Maryland, 21211.

Q Mr. King, what is it that you do for a living?

A I own property, have a property management company, and have developed properties in the past.

Q Do you have any relationship with the entity known as 6789 Goldsboro, LLC?

A Yes. It's an entity that I went into to develop the land.

Q Okay. And are you a class A member of that entity?

A I am a class A member.

Q Okay. And are the other class A members your wife, Christina King, and the Christina and Brian King Children's

Trust?

A That is correct.

Q Okay. And was there previously, and I understand this is one of the issues we're litigating today, a class B member?

A Yes.

Q Okay. And that was an entity that at least had held itself out as Serv Trust, correct?

A That is correct.

Q Okay. So let's talk about 6789 Goldsboro. May I assume that there is a piece of property located at 6789 Goldsboro Road?

A Yes. It's a single-family property that sits on five-and-a-half acres.

Q And when did you first learn about the existence of this property?

A I learned about it in 2013.

Q And how is it that you learned about it?

A Through the trustee of my trust. He let me know that he had an acquaintance that was looking for an investor in a development property. And at that time, I was looking for additional investments.

Q Now, you said the trustee of your trust. I want to just be careful for purposes of the record. Is that a reference to the Christina and Brian King Children's Trust?

A Yes. He's trustee of the King Trust, yes.
Q Okay. And who was the acquaintance of your trustee?
A Timothy Lynch.
Q Was he the acquaintance or was he the trustee?
A Oh, I'm sorry. The trustee was Greg Myers. I mean, sorry.
Q Let's try this again. The Christina and Brian King Children's Trust, was Timothy Lynch a trustee of that trust?
A Yes, he was.
Q All right. And is he the individual who introduced you to an acquaintance of his?
A He is.
Q All right. And was that acquaintance of his Gregory Myers?
A It is.
Q Okay.
A Thank you.
Q At the time, did Mr. Myers share with you that he was going through anything or experiencing any issues?
A When we met, I understood that he was having some financial problems. He let me know that personally as we were going into this investment. But I saw the opportunity in the investment, so we moved forward. And at that point, the financial problems didn't seem to be that elevated. I didn't understand the extent of it at that time.

Q Okay. Now Mr. King, did the investment, as you moved forward, proceed in Mr. Myers name or proceed in someone else's name?

A The investment proceeded in Serv Trust as the 50 percent capital class B shareholders.

Q And did Mr. Myers share with you that that's because he didn't want to hold the asset in his name?

A He did. He had -- he was having some issues and he felt it would be best for the LLC, the entity, to his shares of the entity to be held in his Serv Trust, which was another entity.

Q And you agree --

THE COURT: So I'm clear, Serv Trust was the trust, not an LLC, right?

MR. VERSTANDIG: Yes. Your Honor, Serv Trust is what we maintain to be a statutory trust.

THE COURT: Right.

MR. VERSTANDIG: And it is not an LLC.

THE COURT: Okay. I just -- it might have been that he initially was talking about setting it up as an LLC. I just want to make sure that he was always looking to have it at least held in that third-party entity.

BY MR. VERSTANDIG:

Q Mr. King, if you could look at Exhibit 1. If you turn to the signature pages, which I'll submit to you begin

about six pages before the end of the exhibit, or maybe seven pages -- turn back a couple. One more. One more. All right. Do you recognize the signature of Mr. Myers above his name?

A I do.

Q All right. And above Mr. Myers' signature, does it say Serv Trust, a Maryland Statutory Trust?

A It does.

Q And is that how Serv Trust had been represented to you at the time you, Ms. King, and your children's trust entered into the Goldsboro arrangement with Serv Trust?

A Yes.

Q Now, did there come a time when Mr. Myers sought bankruptcy relief?

A I believe he wanted to -- at some point in 2015, he came to me in the middle of our -- when we were in the middle of doing the redevelopment and let me know that some of his financial woes was turning into him going into personal bankruptcy.

Q Now, because the exhibits are all into evidence, I'm actually going to skip a head a bit. If you could look at Exhibit 4. From the beginning of the Goldsboro arrangement with Serv Trust as the class B member and yourself, your wife and your children's trust as a class A member, where there times when Mr. Myers asked for money?

A Yes.

Q Okay. Please tell the Court about that. For what reasons was he asking for money and how did this work?

A Originally, he came at the closing when we bought the entity. He initially requested $300,000 as a advance to early distribution of funds that he would eventually pay back, you know, when we sold -- sold the property. He initially kind of ran through those initial funds very quickly, I think we closed in July and by January we was starting to come back to me and ask me for additional funds. And that seemed to happen more and more frequently, and I continued to feel that there was value in the property, we were making some progress, and I continued to lend him money through the course.

The second question is what was he using it for. He was coming and asking me -- he was having some financial problems with some properties in Florida. He was -- he needed to get -- put gas in his tank, he had country club bills that he mentioned that needed to be paid. There are -- there is a lot of, like, lifestyle monies that he was burning through very quickly. I believe he was paying mortgages on homes in other investments that he had. Paying legal fees to kind of keep him -- initially it was to kind of keep him out of bankruptcy, and then I think it turned into paying for bills for his bankruptcy.

Q Now, looking at Exhibit 4.

MR. VERSTANDIG: And Your Honor, let me clarify

something that's going to become inadvertently confusing. I believe Mr. King is going to testify about this is a spreadsheet he keeps in the ordinary course of business. The version is our Exhibit 4 is a copy of that spreadsheet as it existed on May 14, 2018. I have reason to believe that 6789 Goldsboro may offer a different version into evidence that has a later date. Their interests are slightly different. Ours would be -- the points we'll try to make is slightly different. So if this spreadsheet looks like it morphs later on today, I promise you there will be a good explanation in closing.

THE COURT: Okay.

BY MR. VERSTANDIG:

Q So Mr. King, looking at this spreadsheet, let's start with this. Is this something you created?

A Yes, it is.

Q Okay. Can you explain to the Court, starting on the top half of the first page, what these numbers, rows, and columns mean?

A The top half, it was my way to keep track of all monies that flowed into 6789 Goldsboro. You can -- and on the first page, you can see that it's the King would be myself and my wife, and on the bottom it's the King Trust. So the two of those kind of mirror kind of what was spent. There is kind of the origination date, the closing happened on July 18th. Simultaneously, you can see up top on the King you can see

1.105 roughly, approximately, a million dollars was 80 percent of the property, the trust, the King Trust owns 20 percent, so you can see that equals the entire purchase price of, like, $1.35 million to buy this piece of property. Simultaneously, at closing you can see kind of the 80-20 split of the distribution advance that went out to Serv Trust.

Q Is that the 240 on the top half and the 60 on the bottom half?

A That is correct.

Q Okay.

A And then these loans are all calculated based on -- simple interest based on the day that the loans were made. So when they hit the bank account, the monies flowed out of the account. The interest rate that was agreed upon on the loan was 10 percent, so you can see that the days outstanding, and this spreadsheet is as of 5/14. You see days outstanding, you see the principal of all money that was put into Goldsboro, 6789 Goldsboro, the interest on each one of those advances, and the principal and interest in the last column.

Q Mr. King, if you turn to the second page, about one-third of the way down the page we see a total combined contribution line. And do I understand that the number directly next to that is the total combined principal contributions of yourself, your wife, and your children's trust without the application of any interest?

A That is correct.

Q And that's $2.79 million, correct?

A That is, yes, approximately. Yes.

Q Okay. Now at the bottom of the second page, there's an area that on the left is marked as Loans to Serv Trust. Now help me understand what these numbers are.

A So the initial spreadsheet, this tracks all capital that went into Serv Trust. So this included most of the soft development costs plus any other monies that flowed out. And the -- Greg, Mr. Myers, continued to ask for additional funds to fund his lifestyle. I, you know, at the time I agreed to continue to fund this as we were making progress and I saw value there. But you can see that, like loans to Serv Trust 2/27 -- 2/27/2014, which was about seven or eight months after the closing where I had initially advanced him 300,000. He came back and asked for another 100,000. So at this point, I wired him another $100,000, and then you can see that all of the advances that I had made to him, which is what kind of that section of the spreadsheet shows, is he continued to come back to me asked me for more money for, you know, a multiple -- a lot of reasons to fund a lifestyle, to keep him out of bankruptcy, for a lot of reasons. I'm not, yes.

Q All right. Can you turn to Exhibit 5? And Mr. Pelletier and Ms. Wilburn may cover more of this later in the day, but is this a promissory note that represents some, albeit

not all, of those loans to Serv Trust?

A That is correct.

Q And if you look at the first line of the promissory note, can you read from the words For Value Received Forward into the record?

A "The undersigned Serv Trust, a Maryland statutory trust."

Q Thank you. And once again, was Serv Trust holding itself out as a statutory trust when this note was entered into?

A It was.

Q And that was in May of 2015, correct?

A That is correct.

Q Thank you. Now, Exhibits 6 through 10 are email communications that have been admitted into evidence that all involve yourself and Mr. Myers. Do I understand correctly that these are exemplifications on an anecdotal basis of the reasons Mr. Myers was asking monies to be loaned to Serv Trust?

A That is correct.

Q Okay. In any of these emails, does he ever say that Serv Trust needs the money or does he suggest that it is he who needed the money?

A Either in phone conversations or in these emails, it's -- he's telling me that he needs it -- he was using it to, again, to fund his lifestyle, to pay his bills, put gas in his

tank. He was trying to keep loans afloat down in Florida so that they did not go into default. There is -- again, there is a lot of things that were kind of going on in addition to trying to run, you know, manage the property. But when he was asking for money, it was not most of the time. There were a couple of cases where he told me that it was to fund -- he needed to pay his kid's education. But some of it -- most of the time it was to do things like pay the country club bill or pay an attorney or keep a mortgage up to date.

Q Now, looking back to Exhibit 4 a second, do I understand the last loan was made on August 5, 2016?

A August 5th, yes. That's correct.

Q If you could turn to Exhibit 10. Is this an email he sent five days later?

A Yes it is.

Q Would you characterize this email for the Court and how you understood it as the recipient?

A Over time, Mr. Myers was getting more desperate, more aggressive towards me to kind of push me to continue to advance him, you know, advance him loans to his -- he was falling further and further into, you know, some financial issues. I was trying to just keep our relationship just about the development. But this email was -- I was having Danielle (phonetic sp.), which it references in here, she was working on the promissory note.

Q Hold on. Who's Danielle?

A Danielle is the attorney that was working on the promissory note.

Q Okay.

A And it was taking some additional time. It just normal, kind of business, you know, relationships with lawyers, and I wasn't her only customer. And he was just getting desperate and needed monies quicker and he was putting pressure not only on me but, you know, was having put money, some --

Q This says, "Your decision hurts me and could possibly put the project in jeopardy. If I cannot pay my ongoing expenses, then I suspect this will not end well." Correct?

A Yes.

Q And it's referenced to him, not to Serv Trust, right?

A That is correct.

Q And did you interpret this as some sort of vague threat?

A I did. And he was acting more and more desperate as time went on. And at some point, I decided that the monies that were lent out were -- this is a business, it's a risk. And part of my risk that I took was making loans, you know, loans to him. And if I did not feel that the property was going to support that, at this point I told him that I would not be making any more advances to him.

Q Now, Mr. King, Exhibit 11, do I understand correctly

is a compendium of checks that were received in discovery during this case from Serv Trust? Meaning checks that were issued by Serv Trust to third parties, or at least alleged third parties?

A That is correct.

Q Okay. And I'm going to ask you briefly, if you look at the upper righthand corner you'll see Bates numbers as they that were appended to these checks. Could you go to the one that's marked 317?

A Okay.

Q And is that a check payable to the Walton County Clerk of the Court?

A It is for $5,578.

Q All right. And could you go to check 342?

MR. PELLETIER: Page 342?

MR. VERSTANDIG: I'm sorry. I'm sorry. Bates number 342.

THE COURT: Yes.

MR. VERSTANDIG: Not check number 342, I misspoke.

THE COURT: All right.

THE WITNESS: Walton County Clerk of Courts for $3,686.31 with the case number listed below.

BY MR. VERSTANDIG:

Q And if I'm reading this correctly, the case number ends in 6-6-0, correct?

A That is correct.
Q Okay. Now, let's jump ahead for a moment, and we'll come back to this, to Exhibit 14, which I understand is the list of assets Mr. Myers filed in his bankruptcy; is that correct?
A That is correct.
Q And if you go to page 17 and use the page numbers at the top of the page as your guide as opposed to the bottom. The federal courts have weirdly (unintelligible) it seems. Do you see a reference on page 17 to monies paid into the Walton County Court Registry?
A Yes. Funds paid into Walton County Court Registry for the property at 147 Silver Way for $22,117.86.
Q Okay. So we know from the checks that monies were paid to Walton County Clerk of the Court, and we know from this that there are monies paid to the Walton County Clerk of the Court for 147 Silver Laurel Way, correct?
A That is correct.
Q All right. Now if you go to page -- I'm sorry, Exhibit 15 and turn to page 5. On the third line, do you see a foreclosure action for 147 Silver Laurel Way?
A Yes. Bank of America, yes. Foreclosure action 147 Silver Way.
Q And is there a case number next to it?
A Yes. CA000660.

Q And do you understand from this that the checks Serv Trust was cutting were being used to put monies into the registry of the court for an action in which Mr. Myers was a party?
A Yes. Yes. It looked -- I mean, Serv Trust is writing checks directly to the -- for the 147 Silver Way.
Q And then when Mr. Myers filed bankruptcy, he claimed that the monies from those checks were his asset, correct?
A That is correct.
Q Now, I'm going to back up just for clarification purposes. Let's look briefly at Exhibit 12. Is this a compendium of wire transfers, all of an outgoing nature, that you received in discovery in this case?
A That is correct.
Q And does this show, as best we understand it, all of the outgoing wires of Serv Trust to third parties, or at least alleged third parties?
A That is correct.
Q Now, I'd like to look briefly at Exhibit 13, which is a motion to intervene that was actually filed in this case. If you go a couple of pages in, you'll see there's a motion to dismiss attached to that. And if you go to page 7 in the motion to dismiss, you'll see that it was signed by Mr. Myers.
THE COURT: I guess, unfortunately, I have just three pages of the motion to dismiss, if that's attached as a part of

13.

MR. VERSTANDIG: Your Honor, may I --

THE COURT: You may approach.

MR. PELLETIER: I have an extra. You can have my copy.

MR. VERSTANDIG: I won't admit I made these.

THE COURT: That's all right. I just have one, two, three, and then --

MR. PELLETIER: We have a copy you can have, Your Honor.

THE COURT: Oh, I see. Okay. I got it. No, I got it. I got it. It's just a blank page in here. I thought that was the next item, so I have it all.

MR. VERSTANDIG: Okay.

BY MR. VERSTANDIG:

Q And is this signed by Mr. Myers?

A Yes. This is signed by Mr. Myers.

Q And what did he write about the signature?

A Serv Trust, a Maryland statutory trust.

Q Thank you.

MR. VERSTANDIG: Your Honor, Court's indulgence for a moment.

THE COURT: All right. Sure.

MR. VERSTANDIG: Making some slight --

BY MR. VERSTANDIG:

Q Mr. King, did there come a time when Mr. Myers was discharged as the manager of 6789 Goldsboro, LLC?

A Yes. January, yes. At some point, we discharged when I kind of felt that he was going to defraud. I got the impression that he was going to try to defraud me, which is what I kind of felt.

Q So had there previous to that been a time when the class A members offered to buy Serv Trust interest in the company as a means of giving Mr. Myers more money when the loan stopped?

A That is correct.

Q And for how much money did the class A members offer to buy Serv Trust's interest in the company at that point in time?

A Minus the advances, the loan, I mean, the buyout number that he would've received at that point was right around close to a million dollars. I did that, I mean, I went through that exercise just to kind of help him. He was desperate for money. I didn't need to make him an offer, I didn't want to give him an offer, but -- or not didn't want to, I did. I just felt it was going to help him get out of his bankruptcy if he was able to get the monies earlier, but he didn't accept it.

Q Now just for clarity, you said minus the advances it would've been a million dollars. So I understand the offer would've been something in the neighborhood of $2 million and

Serv Trust would have to have repaid all the advances, and thus would net it out something in the neighborhood of a million dollars?

A That is correct.

Q And when this offer was made to Mr. Myers, was it in or about September 2016?

A That is -- September 2016.

Q And was a finite period of time put on the offer?

A Yes. I gave him -- I put two weeks he had to accept the offer in September 2016.

Q And during those two weeks, did you receive an acceptance of the offer from Mr. Myers?

A I spoke to him multiple times and got some emails from him during that time, and at no point did he ever say that he was accepting the offer.

Q Okay. Now subsequent to those two weeks, did 6789 Goldsboro have certain meetings with zoning, planning or other regulatory figures in Montgomery County?

A Yes.

Q Okay. And can you describe generally what was gleaned and learned during those meetings?

A Before -- I'm sorry, before or after I made the offer?

Q After you made the offer and after the two weeks elapsed where you didn't get an acceptance.

A Yes. I believe with Parks and Planning we had an additional -- we had an October meeting, November meeting, and December meeting. And I believe that I was able to attend all of those, having conversations with him in person. And at those meetings, we were moving forward with the zoning, trying to get the, you know, change it from a single-family to a multi, like 19-townhouse development.

Q And if we go back and look at the operating agreement which we'll cover, it actually contemplates 19 units as the threshold for development in one of the sections, correct?

A That is correct.

Q Okay. So I'm sorry, I didn't mean to cut you off. You said you were trying to get approvals for 19 units and you had these meetings with Parks and Planning?

A Yes.

Q What happened during these meetings?

A Greg, as manager, was kind of making, you know, made presentations with our development team. At some point, and after the December meeting -- and we never got any rulings from Parks and Planning, we just got some guidance from them that by the December meeting because the land sits on some slopes. There's a creek that runs down the middle, and we were looking to develop on one side of the creek that runs down the middle. The Parks and Planning was having some issues with us doing the development on some of the steep slopes. So they were never --

they gave us some guidance that they weren't going to give us the 19 units, and that's kind of the way those three meetings kind of ended up is we never went any further with Parks and Planning.

Q Now, let's briefly detour and just talk about exhibits, I believe it's 20, 21, and 22. Are these communications from the interim period between when your offer to Mr. Myers expired and when negative news came from Parks and Planning?

A Yes. This -- the first -- Exhibit 20 is a text conversation that I had with Mr. Lynch, who was one of the trustees. And it was my impression from the meeting kind of what happened, and my impression was that they were going to shave off two to four units from the number that we were asking. I let them know that our breakeven was somewhere in the -- around seven. So I, you know, I let him know that we had some room to give up from the development side, and he said good news, and then fingers crossed. And then at that point, I just said FYI, I just got a call to revisit doing a buyout with Mr. Myers. He was looking for more dollars than I had originally offered him for the potential units -- no, it's like for potential units than what I had offered two months ago. I told him I'm not considering it at this time.

Q And just to be clear because Mr. Myers' name is not actually in the bottom text, Mr. Myers is the person referenced

when you say just got a call, correct?

A That is correct.

Q And at the top, it's a little bit cut off, but do I understand this is from December 15, 2016?

A Yes. This was the text to Mr. Lynch. I believe I was driving home. I was on my way back from the Parks and Planning meeting that day.

Q All right. So after the initial offer to Mr. Myers was made and expired, you're sharing with Mr. Lynch that Mr. Myers has come back and is trying to negotiate different terms, still pursuing a potential buyout?

A The buyout that I had offered had a firm date on it, two weeks after the September offer. And I'm not sure what Mr. Myers' impression was from this meeting. Maybe he thought that we were going to get more shaved off than two to four. And maybe some of his financial issues that he was having, which was maybe a better thought was --

THE COURT: Don't tell me what you speculate --

THE WITNESS: Okay.

THE COURT: -- as to what was going on. Just tell me what he said to you and what your responses were.

THE WITNESS: The text says what my response was. He came back, tried to renegotiate the price, was asking for additional funds over what I had offered him. And --

THE COURT: But did he make a firm request of you?

Did he say give me 1.5 million at this point?

THE WITNESS: I don't recall at this point.

THE COURT: Okay.

THE WITNESS: I think if he would've given me a number, I think he just wanted more money.

THE COURT: Okay. So the 2 million was not acceptable to him at that point?

THE WITNESS: That's -- that is correct.

THE COURT: Okay.

BY MR. VERSTANDIG:

Q Now after the deadline for the 2 million passed, and after he asked for more money, do I understand correctly Exhibits 21 and 22 sort of show him conducting business as usual after the deadline to accept the 2 million had passed?

A That is correct. I mean, he was at the Parks and Planning meetings in October, November, and December without issue.

Q Now at that December meeting, did Parks and Planning have any sort of good news, bad news or impactful news as to the potential of this project?

A I'm sorry, can you say that again?

Q Yes. Did there come a time when Parks and Planning told you you weren't getting 19 units?

A That is correct, yes.

Q All right. Did there come a time when they suggested

it might be a much lower number?

A Yes.

Q All right.

A It was sometime in mid-January.

Q Okay. And what was your understanding of what they would approve?

A My understanding was it was going to be the high single digits -- the high single digits.

Q Could I understand that to mean somewhere between 6 and 10?

A That would be somewhere between six and nine.

Q That's a good point; 10 is not a single digit. Thank you. All right. And after that, did there come a time when Mr. Myers feigned to have timely accepted your original offer?

A Yes. I believe -- again, the date kind of slips me, but I believe it was January 18th. I got a very short, brief email from Mr. Myers saying -- it probably said Brian, for me to kind of paraphrase it, Brian, why didn't you close on the offer that I gave you in October? I accepted it.

Q And without telling me anything that you said to your lawyers, what did you do thereafter?

A I immediately called my attorneys. I had them draft a letter Mr. Myers. I fired him as a manager as I felt I was being defrauded. I contacted the development team, told them Mr. Myers is, in writing, that Mr. Myers is no longer the

manager of 6789 Goldsboro. I'd be taking over those responsibilities. And, yes, I think that's --

Q All right. And did there come a time when you elected to exercise the class A -- or I should say the class A members elected to exercise the class A members redemption mechanism under the operating agreement?

A So the way the operating agreement was written, it was written for that three-year term. I had --

Q You can look at Exhibit 17, might be helpful here.

A Yes. Initially it was for a three year -- he had three years to develop it as the manager. After three years, which was I think July of 2016, we were continuing to move forward. It wasn't until -- it wasn't until August of 2017 that we elected -- after, again, after I understood that he was going to try to defraud me, I retained counsel and elected to redeem the class B shares of Goldsboro.

Q And Exhibit 18 is his email acknowledging receipt of the letter from my firm triggering the redemption mechanism?

A Serv Trust has received correspondence from you, from the VerStandig Law Firm dated August 23, 2017.

Q And I think he threatens to both suing and (unintelligible) somewhere in there, correct?

A That is correct.

Q And ultimately you did have an appraisal completed, correct?

A Yes. By Lipman, Frizzell & Mitchell.

Q And that's the appraisal Exhibit 19, correct?

A That is correct.

Q And if we turn to, I believe it's page 5 -- I'm sorry, page 3 of that document. Do we see the appraised value at 1 million to 1.325 million?

A Yes. The value that they came to was $1 to $1.325 million of the property.

Q And then this is shown on Exhibit 4, which is for the record, at this moment in time, August 17, 2017, had the class A member's capital contributions exceeded $1.325 million?

A Without looking back, they probably doubled that number. Well, maybe even more than doubled that number. It was much more at that point, it was a soft costs and loans out to Mr. Myers.

Q All right. And did Serv Trust ever designate a counter appraiser pursuant to the operating agreement?

A In the operating agreement, they had -- the way that I believe it was written, they had the opportunity to get their own appraisal. And if they were so far apart, then we would even out to get the third appraisal, but yes. We got our appraisal, and Serv Trust had the opportunity to get an additional appraisal for their number.

Q And did they avail themselves to that opportunity?

A They did not.

Q Okay. And to this day, the 3rd day of January of 2023, have you ever seen an appraisal of 6789 Goldsboro Road from Serv Trust or Mr. Myers?

A I have not.

Q Thank you.

MR. VERSTANDIG: Your Honor, I have no further questions for Mr. King at this time.

THE COURT: All right. Anybody have any questions for Mr. King?

MR. PELLETIER: I do not, Your Honor. I would start my case unless Mr. Mastro has questions.

MR. MASTRO: No questions, Your Honor.

THE COURT: All right. Let me just see if I have any questions.

BY THE COURT:

Q So the map of contributions against the value of the property, the 1.325, you counted the loans to Mr. Myers as part of the contributions of the King entities?

A Yes.

Q All right. And since those loans were personal to Mr. Myers, why were they counted as part of the project costs?

A The way I was keeping my spreadsheets at the time, I was keeping all the capital that I was putting into Goldsboro. And I have the --

Q But you knew --

A -- I have the costs --

Q -- you knew this wasn't going to Goldsboro. I mean, you knew that the reason that those payments were going to Mr. Myers --

A Well, the spreadsheet shows --

Q -- to pay his personal expenses?

A -- the money that was going -- the monies that were -- I mean, I have it in other, I have it in -- well, in this spreadsheet, if you take out the monies that went to Mr. Myers minus the monies that were actually submitted to it, those are the monies that were actually went to the soft costs of the development. And I have those in my Quicken program of -- this spreadsheet just is a way to reconcile all the monies that went in.

Q I understand. The question I have, and you're sort of going to it is, excluding the loans to Mr. Myers, did the King entities -- capital or cost contributions exceed $1.325 million?

A Oh, yes. Yes.

Q Okay.

A Yes.

Q Then it makes it easy, so. All right. So I don't have to determine whether that would be an appropriate number to use for Mr. Myers' loans. Okay. Great.

MR. VERSTANDIG: Your Honor, if I may?

THE COURT: Do you have any questions based on my questions. Sure.

MR. VERSTANDIG: Yes. Let me, appreciating the last point you made which I think takes care of the whole thing, but let me try to clarify one thing.

THE COURT: Okay.

BY MR. VERSTANDIG:

Q When Mr. Myers would ask for money, would you lend him the money or would 6789 Goldsboro lend him the money?

A 6789 Goldsboro was lending him the money.

Q All right. And 6789 Goldsboro, notwithstanding the question I just asked, was really lending the money to Serv Trust that was then giving it to Mr. Myers, right?

A That is correct.

Q And for 6789 Goldsboro to have the money to loan to Serv Trust, would you, your wife, and your children's trust have to put that money into 6789 Goldsboro?

A Yes. So that was the flow of money. I put it -- I didn't just write a check to him personally. I put it into the entity to keep track of it, and then 6789 Goldsboro then distributed it and made those cash wires, checks out to either Greg personally I think in one instance, but sometimes directly -- sometimes to Serv Trust.

Q All that notwithstanding, just to echo what the judge just asked you, even if you put aside those loans, the capital

contributions by class A members still exceeded $1.35 million on the date of the appraisal?

A That is correct.

MR. VERSTANDIG: Your Honor, nothing further.

THE COURT: Okay. All right. What I'm going to do is before we begin your case, we're right at 11:00, and that's usually when we take a morning break. We'll take 15 minutes, let everybody stretch your legs, use the restroom, we'll come back at 11:15 and we'll pick up then.

MR. PELLETIER: Thank you, Your Honor.

MR. VERSTANDIG: Thank you, Your Honor.

THE CLERK: All rise. Court stands in recess.

(Recess)

THE COURT: Good morning again, everyone. Please be seated.

THE CLERK: Back on the record.

THE COURT: All right. All right. I'm happy to hear your case.

MR. PELLETIER: Thank you, Your Honor. Eric Pelletier for 6789 Goldsboro, LLC, calling, or continue on the examination with Mr. King.

THE COURT: Okay. All right, Mr. King, just remember you're still under oath.

THE WITNESS: Okay.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. PELLETIER:

Q Mr. King, for the record, you're here as 6789 Goldsboro, Goldsboro, LLC's corporate designee?

A I am.

Q And do you have a title with the company currently?

A Manager.

Q Okay. How long have you been manager?

A Since January 2017.

Q Okay. And looking back in exhibit, at an exhibit you saw this morning as promised, it's Exhibit No. 5, Exhibit No. 5 in the materials that Mr. VerStandig showed you.

A Uh-huh.

Q Do you recognize that document?

A It's a promissory note that I signed with Serv Trust.

Q Okay. And who is the borrower, just to be clear?

A Serv Trust of Maryland statutory trust.

Q Okay. And the holder of the note is 6789 Goldsboro?

A Yes.

Q And that's a true and accurate copy of the note and so forth?

A Yes.

Q And whose initials are on the bottom of each page of the note?

A Greg Myers.

Q How do you know that?
A I have seen those initials before.
Q Okay. Now Section 1 of that exhibit, Exhibit 5, Plaintiff's Exhibit 5, lists prior advances. So, can you explain to me what is meant by the term prior advances?
A When we were kind of working together, we did not, this, this note, promissory note was made in 2015. From the start of the business relationship, he had come to, come and asked me for advances; and in, May 2015, we kind of memorialized all the promissory, all the loans that were made out to, that served 6789 Goldsboro made to Serv Trust.
Q Okay. And those are reflected in Exhibit 1?
A That is correct.
Q Section 2 refers to future advances. What, can you explain to me what is meant by future advances?
A I understood at the time that these loans that were being made out to him were not going to, were not going to stop. So, we, any additional advances, advances that we made in the future were, would be covered under future advances.
Q Okay. And did you keep track of the future advances?
A I did.
Q Okay. I'm going to refer you to, well, how did you do that?
A Through a spreadsheet.
Q Okay. Now if you could refer to the white notebook

which are my --

A Yeah.

Q -- my exhibits? Under Tab 3, they're misnumbered, but it's Exhibit 24.

A Yes.

Q Do you recognize that?

A Yes. it's a portion of a bigger spreadsheet that I keep.

Q Okay. And can you just walk us through what is shown on Exhibit 24?

A Yes. This is the loans that 6789 Goldsboro made to Serv Trust after the closing. So, you can see the original on, the original portion of these notes have, these loans started, an origination date of February 27, 2014, and they go the whole way up to August of 2016 with, this, this spreadsheet is current up to January 1, 2023. So, you can see the days outstanding, the principle that was advanced, 635; the interest due; and the principle and interest at the end of, which is the total.

Q Now just to be clear, if you could refer back to the promissory note which is in front of you at Exhibit 5, was there a, a maturity date under that note? I believe it's on page 2.

A The maturity date is December 31, 2017.

Q Okay. Now just going back to the exhibit I had just

shown you, Exhibit 24, there's an entry here, the second column says, "Due date," on Exhibit 24; and it says, January 2, 2023, can you explain why you used that date, what, what the date was used for on this exhibit?

A That date is to calculate the interest outstanding. So, each of these loans were, like let's take the first loan and it's $400,000. There's, the difference between the, the, the 2014 date and the 2023 date is 3,230 days. So, it's simple interest on a principle of $100,000. There's $89,000 of interest, approximately $89,000 worth of interest due, and principle and interest is the last column.

Q Okay. And just to clarify, and I'm sorry I'm hopping back between exhibits, but back to page 2 of Exhibit, of the promissory note, Exhibit 5, does, does this note provide for when interest starts to be calculated and how?

A Yes, it --

Q What section, sir?

A It is interest, Section 3.

Q Uh-huh. And when does interest commence?

A It commences on the, when they, when the loans were actually made to Serv Trust.

Q Okay. So, going back again to the spreadsheet, the days outstanding --

A Yes?

Q -- what, what does that column reflect now?

A The number of days since the loan was made.

Q Okay. And just going through the rest of the columns, do we know what the principle is? Well, actually, why don't you explain what's listed in the principle column.

A In the principle column, it's, these are, these are funds that were either written, or sent to Serv Trust or Mr. Myers directly for 600, for a total of $635,000 in, in loans that were made after closing.

Q Okay. So, so, each of these, each of these entries in the column titled principle is an amount of a loan made under the note?

A Correct.

Q Okay. And what's the next column over?

A Interest due on, on the principle for that individual loan. So, I kept track of them individually because that's the way it was done in the promissory note.

Q And the final column?

A It just adds those, the principle and interest due together to give you --

Q Per loan, for each loan?

A For each loan.

Q Okay.

A Correct.

Q Now going down to the bottom in bold, what is the principle interest and principle and interest combined total of

each?

A $1,134,937.50.

Q And you kept this in, in a, in the usual course of 6789 Goldsboro's business?

A Yes.

MR. PELLETIER: We'd move this Exhibit No. 24 into evidence, Your Honor.

THE COURT: All right. Plaintiff's 24 is received, or, yeah, the plaintiff.

MR. PELLETIER: Is it 24? It should be --

THE COURT: 6789 Goldsboro's 24 is received, which is Plaintiff's 24 is received.

(The item marked for identification as Plaintiffs' Exhibit No. 24 was received in evidence.)

MR. PELLETIER: Thank you, Your Honor.

BY MR. PELLETIER:

Q And just for point of clarification, Mr. King, I'm going to show you, now it's lost in the, in the papers here on our table. I'm going to show you what's been marked and the Judge has it exhibit, as Exhibit 27. Do you recognize what Exhibit 27, which may be tucked in the very back pocket --

A Yeah.

Q -- okay? Do you recognize what that is, sir?

A It's kind of the, the bigger spreadsheet that gives all the details.

Q Well, first, just answer the question.

A Yes. Yes.

Q Do you recognize this?

A I do.

Q Okay. Who, who compiled this?

A I, I do.

Q And how current is this document?

A As of January 1, 2023, its current.

Q Okay. And I can't remember the exhibit number of the one that Mr. VerStandig put in, but is this merely, of Exhibit 4, is this an update to Exhibit 4, just to bring current? It's a little bit different printed format, but --

A Yeah. The copy that Mr. VerStandig had was, was May 14, 2018.

Q And it was calculated as of that date because trial was supposed to happen at that time?

A Yeah, I, yes.

Q Okay.

A I'm assuming, yes.

Q Okay. And just looking at the freestanding Exhibit 27, it's in my hand, the very last page, and there's printed pages, is that correct, sir?

A That's correct.

Q The very last page has the loans to Serv Trust and I'm just doing this for housekeeping purposes. The section that's titled on page 3 of Exhibit 27, loans to Serv Trust, is that the same thing as what we just introduced into evidence, Exhibit 24?

A That is correct.

MR. PELLETIER: Did Your Honor follow that? I don't want to confuse the record.

THE COURT: Yeah. Yeah, I have it the 630 was to Serv Trust.

BY MR. PELLETIER:

Q So, sir, what is the total amount of principle and interest that, under the promissory note per se that Goldsboro was seeking from Serv Trust today?

A The 635, plus the interest, which would be the $1.134 million and change.

Q Okay. And so, just to be clear, all these loans have actually funded?

A They have.

Q Has any of, any of the, have any of these loans been repaid at all?

A There has been no repayment of either principle or interest as of today.

Q Sir, does the promissory note allow for recovery of attorneys' fees?

A It does.

Q I'm going to ask you to turn to, in the white notebook, if you could, to Exhibit 23. Do you recognize Exhibit 23?

A These are invoices from Offit Kurman.

Q Okay. And is, have these invoices been paid?

A Yes.

Q Okay. Now just to be clear, you said invoices. If you could turn to the very last page of Exhibit 23? That page is not an invoice, is that correct, sir?

A That is correct.

Q And what's your understanding of what that very last page is?

A These are, these are billable charges that will be billed on the January bill.

Q Thank you, sir. And with respect to everything else, the invoices, these are true and accurate copies of invoices that you've actually received from Offit Kurman?

A Received and paid.

Q Received and paid?

MR. PELLETIER: Your Honor, I'd offer Exhibit --

THE WITNESS: Except for this --

MR. PELLETIER: -- I'll offer Exhibit 23 into evidence.

THE COURT: All right. Plaintiff's 23 is received.

(The item marked for identification as Plaintiffs' Exhibit No. 23 was received in evidence.)

BY MR. PELLETIER:

Q And Exhibit 23 itemizes all the time entries for time spent by each person rendering billed services, is that right?

A That is correct.

Q Okay. What do you do for a living, sir?

A I own and develop real estate.

Q And during the course of your development and management, and develop, real estate management and development business, do you employ the services of attorneys?

A Yes.

Q How often?

A Very often.

Q In the, in, where does your business operate, what state?

A Maryland.

Q And can you just describe for me what, through the course of your business, what your interactions are with your attorneys, what kind of services do you seek from them?

A If I'm, if I'm closing on a deal, it would be real estate attorney. If I'm doing, somebody reviewing my lease, it would be, it just depends. I mean I have a lot of facets of

owning and managing a business. So, it could be human resources. It could be estate. It could be real estate. It could be litigation.

Q And do you, do you have an opinion on the issue of whether or not the attorneys' fees of 6789 Goldsboro has been charged, i.e., Exhibit 23, what's shown in Exhibit 23, do you have an opinion on whether or not those fees are fair and reasonable?

THE COURT: How can he opine to that?

MR. PELLETIER: Your Honor --

THE COURT: Usually, I give, I'll give an attorney --

MR. PELLETIER: And we're prepared --

THE COURT: -- an affidavit or something along those lines.

MR. PELLETIER: We, we could do that. We're prepared to do that, but to answer your question directly, there's a case on point. It's Zachair v. Driggs.

THE COURT: Okay.

MR. PELLETIER: And it says a lay person can render an opinion on attorneys' fees and the reasonableness, like a lay opinion in like a conversion case in some sense --

THE COURT: Okay.

MR. PELLETIER: -- it's a lay opinion. And also, Your Honor, I think this falls under one of those cases where it's an element of damages. So, it would be for the Court to

opinion on anyway.

THE COURT: Well, it is, I mean I'm not sure if it, you know, I was looking at it under here in the collection, it says in event of it falling apart, it needs to pay the holder reimbursement upon fees. And, you know, it's unclear as to whether it's an action of damages or whether it's you're entitled to get your fees afterwards which you would get in terms of, under the rule. It sets forth the, you know, the analysis that I have to go through under --

MR. PELLETIER: Well --

THE COURT: -- the 2-700 rules.

MR. PELLETIER: Yeah, the 2-700 rules. So, I will admit my weakness in understanding the one that is prevailing party versus --

THE COURT: Right.

MR. PELLETIER: -- versus element of damages.

THE COURT: Right.

MR. PELLETIER: To me, my, my thinking was this is an element of damages because it just doesn't say the winner or the prevailing party gets the fees; but, in any event, we're able to put on Mr. Wilburn who can opine on it. We can go through the reasonableness --

THE COURT: Okay.

MR. PELLETIER: -- factors.

THE COURT: All right. Well, let him opine since he

started the case.

BY MR. PELLETIER:

Q So, sir, do you have an opinion on whether or not the bills rendered to you by Offit Kurman to, you know, represent you in this matter are fair and reasonable?

A Yes, sir. They seem reasonable to me.

Q And so, sir, if you could turn to Exhibit 25 in the white notebook, if you have it, Exhibit 25, is it numbered for you, sir?

A Yes, it is.

Q What's the title of that document at the very top? There are some numbers.

A A client number with 6789 Goldsboro dispute with Serv Trust.

Q Okay. And have you seen this before?

A Yes.

Q What is it?

A It is the, the bills that, that, that I received and paid, or you could, and paid, total billed fees, fees billed, hard costs, soft costs and total A&R.

Q Okay. So, this is a tally of the bills, plus the whip, which is the last page of Exhibit 23?

A Yes, this does include the unbilled part.

Q Okay.

MR. PELLETIER: We'd move, we'd offer Exhibit 25 into

evidence, Your Honor.

THE COURT: All right, 25 is received.

(The item marked for identification as Plaintiffs' Exhibit No. 25 was received in evidence.)

BY MR. PELLETIER:

Q If you could turn to Exhibit 26, sir? Do you recognize that document?

A Yes.

Q It's titled, total amount due and owing. Can you explain to me what's reflected on that exhibit?

A This is the principle of the promissory note that we looked at earlier, the interest due and the attorneys' fees that I've incurred for a total of $1,264,737.76.

Q And you were seeking that as part of a judgment against Serv Trust today?

A Yes.

Q Did 6789 loan additional sums beyond the amounts we've just discussed? Did it loan additional sums to Serv Trust?

A Yes.

Q How much?

A $300,000 at closing.

Q Okay. And, and I think you said that was, what, 2013

or 2014?

A 2013 at the closing, so it happened in July of 2013.

Q And just to sort of clarify things, when you're referencing the closing, what was the closing, the closing for?

A The closing was when 6789 bought the property at 6789 Goldsboro Road.

Q Okay. And what was the $300,000 loaned related to?

A It was a loan made to Serv Trust so that they could make a capital contribution into the, into the company.

Q And so, if, and I lost you. I think, if you could just turn to in the black notebook Exhibit 1, which is the first-amended and restated operating agreement --

A Yes.

Q -- of Goldsboro. Are the capital contributions reflected in that document?

A Yes, they are, on, I think, the third to last page. It shows the initial, the third column is initial capital contributions as of July 18, 2013; and the last, the Class B members contribution was $306,192. And this, the Serv Trust had already invested $6,192 into this and my, they were able to add the $300,000 loan that I made to Serv Trust.

Q The 6789 made to Serv Trust?

A That 6789 made to Serv Trust and that's how they got to the $306,192.

Q Okay. Did that, did that $306,192 remain in 6789

Goldsboro's operating accounts?

A No, that was immediately distributed out to Serv Trust at closing. I think it was wired at closing.

Q So, the capital contribution came back out?

A Yes.

Q And what was your understanding of the terms of, of how that $300,000 was going to be repaid?

A That would be repaid at closing.

Q Closing on what?

A When, if we, if we ever, I'm sorry, so if we ever sold the property, the $300,000 would be, would, would, depending on how the waterfall, I forget exactly what the waterfall is, but it would be deducted from the capital account of, of Serv Trust, the Class B member at that time prior to, as the closing statements were, were made up.

Q Has that $300,000 been repaid to date to 6789 Goldsboro?

A No, it has not.

Q And in allowing that money to come out of Goldsboro's account, what was your, did you rely on the, strike that. There was a promise of repayment of that sum?

A Yes.

Q Did you rely on that in making the loan?

A Yes.

Q And do you, do you here today, you meaning you as a

managing member of 6789 Goldsboro, LLC, seek that as part of the recovery in this case against Serv Trust?

A Absolutely, yes.

MR. PELLETIER: If I can have your indulgence, Your Honor? I'm just going to look at my notes if I can find them, Your Honor.

BY MR. PELLETIER:

Q Sir, would you have allowed, excuse me, would you have allowed Serv Trust to withdraw that sum from 6789's account with, if, if you understood that it would not be repaid?

A No.

Q And it hasn't been paid to date?

A It has not.

MR. PELLETIER: Your Honor, I have no further questions.

THE COURT: Do you have any questions?

MR. VERSTANDIG: Your Honor, I have one question.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. VERSTANDIG:

Q During the course of your various dealings in your capacity as a manager of 6789 Goldsboro, did you come to learn the name of Mr. Myers' spouse?

A Barbara Ann Kelly.

Q Thank you.

MR. VERSTANDIG: Nothing further.

THE COURT: Okay. Do you have any --

MR. MASTRO: No questions, Your Honor.

THE COURT: All right. I have a couple questions.

BY THE COURT:

Q Has the, has the property, 6783, been sold? Have you sold, has, has, has the property at issue or at 6789 Goldsboro, has that been sold?

A No.

Q Okay. If, if the interest is redeemed, what does that do to the claim for the $300,000?

A I'm sorry?

Q I'm just trying to see, you're trying to redeem his, his claim, or his equity interest, and then you're also seeking to recover that interest from him. I'm trying to figure out, are you, is that, are you double-dipping in a sense?

A The $300,000, if in the spreadsheet --

Q You made, you, you lent money to Serv Trust. Serv Trust then makes a capital contribution?

A Yes.

Q And then for your sake, is it then immediately sent out, that capital contribution back to Serv Trust? So, in essence, I mean I, it looks illusory to me that there's any actual capital contribution from Serv Trust at all in this

endeavor. I mean what you're putting on your books and putting out to the public is that there's a $300,000 contribution from Serv Trust but, in essence, there isn't.

A No, that the monies went straight out to Mr. Myers at closing.

Q Okay. So, when Mr. Myers --

A So, they, they never --

Q -- directly?

A To Mr. Myers, well, to Serv Trust.

Q All right.

A And --

Q I mean it, it, I mean it looks like a shell game. It looks like money goes in and money comes right back out.

A Well, I, for my purposes, I would put, I would infuse capital into the property --

Q Uh-huh.

A -- and then I would have the property lend money to, to Mr. Myers.

Q All right.

A It was either to lend money to Mr. Myers or pay for soft costs.

Q But, but I understand that's on the loans, but I'm trying to, this is a capital contribution, what you're carrying on your books is a capital contribution which Serv Pro is purported to make and that's fine, you make a loan of $300,000

to Serv Pro and Serv Pro signs a promissory note and then they put the money in this capital; but then they don't do that. There's, there's no documentation as I've seen; and then the money just goes right back to Serv Pro, Serv Trust. So, I mean it's not really a capital contribution at all. Their contribution to me seems to be $6,192. And I'm just trying to figure out why, why, why are we going through the hoops to do that in this transaction?

A Well, I lent the money, the $300,000 to Serv Trust at the beginning and that money is --

Q But there was no note or anything at that time?

A I believe it was covered in the operating agreement.

Q Okay.

A I'm sorry, the first-amended restated operating agreement. So, initial capital contributions in Section 3.2.1 goes over the buying of the property and then, again, the, how the money flows in and out because of the language of the document, it's very, I need an attorney to kind of interpret it. But it's, it states in there how the monies --

Q Yeah, but they're saying, I mean it's defined as a gross asset value of the regional sales contract for the purpose of the property, $300,000. So, it's characterized as, it looks like some type of payment out to, acknowledges some, some value they received for sort of a finder's fee. That's fine. I, I can certainly ask counsel if they can try to

describe to me how the payment was made and why it's due, and what the interaction between redeeming their interest and then seeking repayment of that money. All right. Anything else? Any questions based on my questions?

MR. PELLETIER: I have no questions based on your questions, Your Honor.

(Witness excused.)

MR. PELLETIER: I would just move in the Exhibits 23 to, I think it's 27, Plaintiff's, 6789 Goldsboro's.

THE COURT: All right. THE COURT: To the extent we haven't admitted 23 through 27, I'll receive. I did have an extra copy of the last exhibit that was in here.

MR. PELLETIER: I can come up and get it when, when, when you tell me to.

THE COURT: Didn't need to scan it twice. I don't know how we're going to scan it. It's over-sized, so, so, we'll --

THE CLERK: I'll figure it out.

THE COURT: Well, all right. All right.

(The items marked for identification as Plaintiffs' Exhibit Nos. 26, 27 were received in evidence.)

MR. PELLETIER: Your Honor, and if Your Honor is willing to hear, we would put on Ms. Wilburn as, on evidence of

attorneys' fees.

THE COURT: Yeah, I think it's probably appropriate just to make sure that there's a basis for the charges and the reasonableness of the fees, and the amount, and -- she was never sworn.

FRANCES WILBURN

called as a witness on behalf of the plaintiffs, having been first duly sworn, was examined and testified as follows:

THE COURT: All right. You can have a seat and make yourself comfortable.

THE WITNESS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. PELLETIER:

Q Ms. Wilburn, where were you on the night of -- I've always wanted to do that. I've had it done to me. So, if you could state your full name for the record?

A Frances C. Wilburn.

Q And what do you do for a living?

A I am an attorney with the law firm of Offit Kurman.

Q And when you say you're an attorney, what, what state bars are you, have you been licensed by?

A Yes, I am admitted to practice in the Commonwealth of Virginia since 2008, the state of Maryland since January of 2008 and the District of Columbia since 2008.

Q And can you explain to me what type of law you

practice?

A Yes, I would characterize it as commercial litigation. The majority of my cases deal with breach of promissory notes, breach of leases, breach of contracts and I've appeared in, before this Court over a hundred times.

Q This court meaning the circuit court, as opposed to this, Your Honor, Judge Lease?

A Correct.

Q Right. But you've appeared in front of Judge Lease?

A I have

Q Have you had a chance to go through what's been marked as Plaintiff's Exhibit 23 in this case which is the bills and WIP from Offit Kurman?

A Yes, I have.

Q And before we get into that, can you give me your general description of what this case -- strike that. Have you been involved in representing, excuse me, 6789 Goldsboro, LLC, since the inception of this case or very close to it?

A Yes. I became involved in late fall of 2018. I was involved in drafting pleadings. This case involves the collection and the pursuit of remedies under a promissory note and hopeful collection. I took the deposition of Mr. Myers. I prepared for the deposition. There were various motions, dispositive motions. There are dueling bankruptcy proceedings and we were monitoring those to see what the status of the

bankruptcy would do to our case, 6789's case. We prepared for this trial. We prepared our witnesses. We reviewed and advised on motions that were filed as recently as, by Mr. Myers as recently as Friday.

Q And, and part of that representation included filings in the bankruptcy court?

A Yes.

Q Okay. That's the Maryland Bankruptcy Court?

A Correct, including our proof of claim.

Q So, Ms. Wilburn, you said you've been practicing law in the state of Maryland for 13 years?

A Yes.

Q And have you ever opined as to attorneys' fees previously?

A I have never been qualified as an expert to opine on attorneys' fees.

Q And have you reviewed bills for attorneys' fees from, during the course of your practice?

A Yes.

Q And are, have you revealed, reviewed bills for attorneys' fees for firms other than Offit Kurman?

A Yes.

MR. PELLETIER: Your Honor, I'd move to have Ms. Wilburn qualified as an expert on the issue of attorneys' fees.

THE COURT: All right. I'll receive her as an expert

on the issue of attorneys' fees.

BY MR. PELLETIER:

Q So, Ms. Wilburn, you've had a chance to review the bills that are listed in Exhibit 23 of plaintiffs' exhibits?

A Yes.

Q And do you have an opinion as to whether or not those bills are reasonable?

A Yes. My opinion is that the bills are fair and reasonable. The hourly rates charged by each attorney are fair and reasonable. The amount of time and labor required by this case necessitated the time and expense that the attorneys from Offit Kurman provided. This, these are fees that are customarily charged in this area. This case has been pending since, Offit Kurman has been involved in the case for four years due to the duration of time. I think that the total charges are very fair and reasonable and I think the experience, reputation and ability of myself and Mr. Pelletier dictate that the attorneys' fees are fair and reasonable in this instance.

Q So, I, I suspect you're laughing as to my qualifications, but that's okay. As far as the, the, the tenor of the opponent and the litigiousness of the opponent, does that factor into your opinion at all?

A Yes, it does.

Q How so?

A Mr. Myers has filed multiple motions in this case, multiple bankruptcies, sent multiple emails to counsel over the last four years and I think that has definitely played impact on the total amount of the attorneys' fees in this case and our responses, I think, were fair, reasonable and necessary.

Q And, and what about the timing of Mr., Mr. Myers' filings of motions in this case, can you, can you characterize that?

A They were typically done at the last minute. We were all scrambling to try to file out-of-court responses.

MR. PELLETIER: Your Honor, I have no further questions. I believe Ms. Wilburn has opined as to the reasonableness of these fees, unless Your Honor has some questions of her.

THE COURT: Just a quick question.

BY THE COURT:

Q In terms of the rates that, that are charged, do you find that his rates are customary among attorneys of similar backgrounds in the Montgomery County area?

A Yes, I do.

Q And in looking at the bills when you reviewed them, did you review to see if there was any overlap with anything that the King defendants were doing in the case such that work that was done could have simply ben piggybacked on their filings?

A I did review that and I also compared it to the docket, which I printed out and reviewed, and I found that there was no overlap.

Q Okay. All right. Thank you. Any questions --

A Thank you.

Q -- based on my questions? I should ask counsel --

MR. MASTRO: No, Your Honor.

THE COURT: -- if you had any questions?

MR. MASTRO: No, Your Honor.

THE COURT: All right. All right. Thank you.

MR. PELLETIER: Thank you, Your Honor.

(Witness excused.)

THE COURT: So, that's the plaintiffs' case, second case, I would guess. No additional witnesses?

MR. PELLETIER: No witnesses from me, Your Honor.

THE COURT: All right. All right. So, unless you have any type of rebuttal --

MR. VERSTANDIG: Your Honor, to the extent we haven't, I guess, retract, we would rest. We have not rebuttal today.

THE COURT: Okay. So, we'll rest. I'll note that the exhibits, I think all exhibits have been admitted at this point. So, I'll take, everyone, how long do we think we want to argue?

MR. VERSTANDIG: Your Honor, I'm going to have one

motion before argument which will take about 30 seconds.

THE COURT: Okay.

MR. VERSTANDIG: And then I anticipate my closing will be 10 minutes, which in my experience means it will be 25 minutes.

THE COURT: Okay. All right.

MR. VERSTANDIG: And we'll --

THE COURT: All right. And there's, I'm just trying to think. I think we can get it in before lunch if we, maybe I'd love to shoot, and then I'll adjourn for lunch at 1 o'clock if we don't have it, finished it up at that point, all right?

MR. VERSTANDIG: Your Honor, if, at this time if all parties have resented pursuant to Maryland Rule 2-519, we move for judgment as a matter of law on the affirmative claims for the Serv Trust, I'm sorry, brought by Serv Trust. There's no evidence to support any of the claims as annunciated in the most recent pleading by Serv Trust; and to the contrary, the uncontradicted records reveals that the core assertion underlying those claims, mainly, that the buyout agreement was properly contradicted $1 million is fictitious, fraudulent and belied by fact. Accordingly, we ask for judgment as a matter of law to Serv Trust's claims brought on the (unintelligible).

THE COURT: Had they filed an amended complaint?

MR. VERSTANDIG: Yes, I can tell you what the operative pleading is if you give me a second. There is a

second-amended counterclaim that was docketed January 10, 2019.

THE COURT: January 10, 2019?

MR. VERSTANDIG: Yes.

THE COURT: All right. All right. So, does anyone else want to be heard?

(No affirmative response.)

THE COURT: Just to make it short, okay, on that motion?

MR. PELLETIER: I, I don't have, I don't.

THE COURT: Because I don't know if, if their claims went to your claim also.

MR. PELLETIER: We would move for, affirmatively on our claim. I don't think there's any dispute of fact.

THE COURT: Because I thought it was, I'm not sure if it did or not, but it may have been all included in the sense that they were, your claims were supposed be paid from that. So, based upon the fact that Serv Trust has failed to appear, or failed to present any evidence in support of its counterclaim, the second-amended counterclaim, which was filed on January 10, 2019, I'll grant the motion for judgment given the fact that there's lack of any evidence to support it.

Moreover, I would note that the evidence that was presented in court, that on a motion for judgment in a bench trial the Court is allowed to make factual findings. It is not required to look at the case in the light most favorable to the

party. We would note that the facts as presented in this Court suggest that the basis for the underlying claims that there was an affirmative acceptance, a timely acceptance of the offer is, I just simply don't find that to be accurate and, and it appears to be a bit manufactured.

MR. VERSTANDIG: Thank you, Your Honor.

THE COURT: All right.

MR. VERSTANDIG: Your Honor, if I may be heard in closing?

THE COURT: You may.

MR. VERSTANDIG: Thank you.

CLOSING ARGUMENT BY MAURICE VERSTANDIG, ESQ.

ON BEHALF OF THE PLAINTIFFS

MR. VERSTANDIG: Your Honor, we are down to two issues as it concerns my clients. The first is the alter ego issue referenced in our opening and the second is the redemption issue referenced in our opening.

Because we moved the exhibits cumulatively, and while Mr. King did speak to some of the things in there, we never necessarily got into the meat, I'd like to walk through some of what is contained in our binder in the examination review.

And I'll start with the myriad of checks and wire transfers from Serv Trust, Joint Exhibits 11 and 12. If the Court were to sit down and scrutinize every single page of those exhibits, the Court would discover that during the

relevant time period, which is the only time period for which we have records which would share specific dates, $1.371 million and change exited Serv Trust accounts. And of the $1.371 million and change, $783,150 went to Gregory B. Myers. And I don't mean indirectly. I mean either the check was made to him or the wire went to him. $434,525 went to Barbara Ann Kelly, who was identified in evidence as Mr. Myers' wife. 16,825 went to various courts. $16,713.33 went to legal fees and my favorite, $4,911.73 went to country club dues.

And I also want the record to show, though, that we're being candid and our contention is that this was from Mr. Myers, and by extension his wife, and wasn't really for his children. I will tell you that if you sat down and looked at everything, you would see there are $64,527 in distributions for the children's schools and housing based upon the memorandum lines on the checks and the reasonable extrapolation of the parties to whom the checks were made payable. We are surmising that if it's payable to a private school, it was likely for the tuition for one of his kids. In one case, there was a check to what appears to be, again based on the memo line, an apartment complex and some suggestion that it's for one of his kids to live there and credit it to them.

So, of the 1.371 million and change, just over 64,000 went to his children; and by contract, 783,150 went to him; 434,525 went to his wife; and let's not forget the $4,900 that

went to Kenwood Country Club.

We talked about --

THE COURT: Let me ask you this. Do, is in here, has there ever been a, produced or presented a copy of Serv Trust's trust agreement?

MR. VERSTANDIG: Your Honor, we have it. It is notably not in our, it is not in evidence.

THE COURT: Is there, I'm trying to figure out who, who are the, I mean who are the beneficiaries of the trust?

MR. VERSTANDIG: My understanding is that it's for the benefit of his children.

THE COURT: His children? Okay.

MR. VERSTANDIG: I want to be careful with my words --

THE COURT: Okay.

MR. VERSTANDIG: -- about having it in front of me. Yeah, it was always represented it was, you know, for the benefit of his children. That's why I took some care to note that there are some tuition dollars and I cannot say --

THE COURT: Uh-huh.

MR. VERSTANDIG: -- that it's never benefited his children, but we point out that there is an --

THE COURT: That it -- it seems that it was not an irrevocable trust I take it?

MR. VERSTANDIG: Not to the best of my knowledge.

THE COURT: If it was, there would be a lot of problems with payments back to him and his wife, but okay. And then when you think of it, just a thought came up, you're saying it's all alter ego of Mr. Myers, but you also may want to address why wouldn't it potentially be an alter ego of Ms. Kelly?

MR. VERSTANDIG: Your Honor, I think actually the law on alter ego is instructive on our, when we give (unintelligible). The law on alter ego in Maryland is the Hildreth case, which you saw in our papers, but for the record, 838 A.2d 120, honest to God, I don't know if it's 4709, or something, from the then Court of Appeals in 2003. It sets forth three elements for the establishment of an alter ego which I'll paraphrase.

First, is that the individual must have exercised dominion and must have done so singularly. So, here we would say that the evidence shows that Mr. Myers exercised singular dominion over the affairs of Serv Pro. I think the record evidence is that in a variety of ways one almost every single check, albeit not literally every single check, there's Mr. Myers' signature. All of these dealings of an informal natural, the emails, et cetera, are by Mr. Myers and to Mr. Myers. We would actually see anecdotally in this case that when Mr. Myers showed up and tried to file a motion to dismiss in proper person on behalf of the trust, he did so

individually. Periodically, you do see references to another trustee named Daniel Ring, whose name does appear on some signature blocks. I think we want to be candid, we believe his signature may be on a few of those checks, or some signatures that don't look like the others; but by and large, this was clearly dominated by Mr. Myers up to and including the effort to remove this matter to federal court late last Friday and some of these shenanigans, or whatever term, this morning.

Second prong under Hildreth is the use of the dominance for some equitable wrong or the advancement of a wrong. And your question was about his wife and I would point to the fact that the record just doesn't show her controlling the trust. We don't seem to know what's discussed in their bedroom, nor is it really our problem. It's under Maryland law to inquire. There's privilege there. But we don't actually see her in any of the emails. We don't see her signature on any checks. We don't see her name on any agreements.

What we do see, and I would argue this is not coincidental, is that the lion's share of distributions were made to Mr. Myers. And then if you look at his petition for bankruptcy relief which is Exhibit 2, and that's dated November 18, 2015, the record establishes that on November 18, 2015, Mr. Myers became a debtor in bankruptcy. And I have to tell you, it's the darndest thing, not a single distribution to him thereafter. Suddenly, it all goes, well, almost all goes to

his wife.

I would point out that the one, two, three, four, five, six, seven, eight, nine, 10, the 11 distributions immediately preceding the date when he sought bankruptcy relief went to Mr. Myers, 15,000, 15,000, 30,000, 14,900, 15, 30, 30, 15, 15, 15, 14,800; and then once he seeks bankruptcy relief, it all starts going to Barbara Ann Kelly; but the emails, coupled with Mr. King's testimony, even though it was going to Ms. Kelly, it was from Mr. Myers' expenditures, desires and lifestyle. He's the one who said he's getting F'd, and F'd is the actual word. He didn't spell out the word, fortunately. He's the one with the country club dues. He's the one who then in his bankruptcy has scheduled an asset as being the deposits in the Circuit Court for Walton County, Florida, even though we know from the checks those were really paid over by Serv Trust. It's Mr. Myers who says he needs money to pay his lawyers. And when Mr. Myers makes the threats at the end when the loans stop, he makes clear that he needs money for his purposes or bad things are going to happen.

So, I respect the question that it may well be that if Maryland didn't have a marital privilege and we lift the veil on what happened between Mr. Myers and Ms. Kelly, we could determine whether or not there is a hand behind the scenes; but there's simply no evidence that we were able to discern here in discovery and, respectfully, I said there's no evidence in the

record from today that shows her exercising any dominance. To the contrary, the evidence seems to show that many of the distributions to her, again, many, not all, I want to be careful with those words, seem to follow Mr. Myers' bankruptcy occurred at a time when he had money passing through this accounts that would be subject to outside scrutiny and seemed to be pretextual in nature with her acting as, you know, a shell in its furtherance.

Second Hildreth factor is use of that dominance to perpetrate an equitable wrong or a fraud. This is where the bankruptcy comes in. The testimony today is that Mr. Myers was deeply indebted at the time this project began and that the express reason for wanting to put the project in the name of Serv Trust as opposed to himself was so that it wouldn't be there and it would be accessible to his myriad of creditors. The ultimate creditor is represented in court. The ultimate creditor at the end of the day is Mr. Myers' trustee. He is the individual statutorily charged with marshalling Mr. Myers' assets pursuant to his 2015 bankruptcy in Maryland and as a matter of law, marshalling them and liquidating them, and dispersing the money to all the creditors in kind net of serving administrative expenses.

And we see that when Mr. Myers filed his schedules, the lists of all his assets, he claims the money in the court registry was his because he claims that property is his and

exempt as the tenants of the entirety; but he didn't claim Serv Trust was his. He didn't claim the trust in Goldsboro was his. In fact, if you look at the exhibit that is the bankruptcy court's revocation of Mr. Myers' discharge, which is number three, you'll see that one of the things Mr. Myers did was where he thought he had equity in properties and/or his wife owned, he would have Serv Trust put a lien on those properties so that it had an interest before any persons would be available for Mr. Myers' creditors. He has time and again used Serv Trust to hide and obstruct assets from the reach and view of his creditors. Mr. Schlossberg gave the ultimate exemplification incarnation of his creditors with Mr. Schlossberg being the person to divide the money and give it to those creditors. So, we have the second Hildreth factor and we also have the third which is the propagation of actual harm. And that's where the timeline in this case becomes interesting. When Mr. Myers sought bankruptcy relief in 2015, it was November 18th, he had not yet tried to defraud the Class A members of Goldsboro. The three years had not yet passed under the Goldsboro operating agreement. There had been no adverse rulings or intimations of rulings from any zoning bodies.

Now I don't mean to suggest the rulings would be different if he didn't go into bankruptcy. We have the benefit of hindsight and it turns out this may have been an ill-fated project; but at that moment in time, Mr. Schlossberg should

have been able to step in as the Class B member of Serv Trust, I'm sorry, of Goldsboro. And whether it be liquidated pursuant to the operating agreement, reach some sort of deal with the parties to sell the interest to them, actively participate, whatever he would deem appropriate as trustee, that was his asset, but he was denied it because Mr. Myers fraudulently concealed it.

Mr. Myers used it as his alter ego. Serv Trust was there to keep things away from his creditors, not to help him be earnest and candid under Title 11 of the United States Code in furtherance of his bankruptcy; and it looks like those were his designs from the beginning. I'm not sure Mr. King understood this was all going on. I'm not sure anyone would have understood it when someone, you know, has to put something in the name of something else, you just sort of shrug and say let's go forward. Those were the designs and we have evidence not only of paramount equitable wrongs because Mr. Myers' creditor case is defrauded, but before it. So, incident, we meet the alternate criteria.

And I know Mr. Mastro will want to eloquently speak to this, but we would also submit that the bankruptcy court's request to you to make a determination as to the applicability of the automatic stay ought to be understood as being coterminous with a determination of the alter ego question if the alter ego exists and if we prevail on that cause of action.

And I believe everyone in here is in accord that the automatic stay precludes you, no offense and I don't mean to --

THE COURT: Well, I understand the thought would be then Serv Trust is Myers' for the purpose of the bankruptcy; and so, any judgment against Serv Pro is de facto judgment against --

MR. VERSTANDIG: Right.

THE COURT: -- Myers?

MR. VERSTANDIG: It comes, Goldsboro's obligation to file a proof of claim in the bankruptcy and then either Mr. Mastro and I need to find a way to try to negotiate a deal; or I need to bring my redemption claim against Mr. Schlossberg in the bankruptcy court under Section 157, Title 28 in the United States Code, or what's known as a core proceeding because it's an action against the trustee at that point in time. But let me touch on the redemption side of it because we put on our evidence.

THE COURT: Right, but let me ask a question. Talking about what the Florida court did in terms of their order because I thought it was a very interesting order about Mr., because it said, it seemed to, I mean I, you can read the order two ways. You can read the order as saying that we're not to decide anything against, that would affect Myers individual; but that was if he, but it's in the sentence where it talks about if he is a trustee of Serv Pro. So, I guess

trying to, if you look at the sentence structure, it seems to be related only to that. I'm not giving it that reading, but I just didn't know if anybody thought about it that way because it seemed to be, you know, it says it's, you know, the stay is lifted. He says he's not a trustee and then it says, but if he is a trustee, then the case can pursue against him as trustee, but can't affect any individual liability. So, it seems to me that that relates to him being a trustee, not overall, but --

MR. VERSTANDIG: Well, I think that's accurate. I think that's accurate for three reasons. One, everyone is in accord the guaranteed claim against him did not proceed today. No one is trying to advance that claim. The stay is in place. We can't seek monetary relief (unintelligible).

Two is what you just said. A reasonable reading of that order clearly contemplates that relief against him as trustee, even if he were to become trustee again, is within the scope of what is being lifted. Three, I know I said I had three points, it's actually four. Three, the Maryland bankruptcy estate was created first. If Serv Trust is Mr. Myers' alter ego, that only impacts Mr. Myers and his creditor base as it existed on, I forget what date it was, November 18, 2015, or something proximate thereto. As a matter of fact and law alike, but does not impact Mr. Myers or his creditor base because they existed when the Florida bankruptcy was filed which means the automatic stay arising under the Florida

bankruptcy wouldn't touch upon it. It was never part of the estate. It was never an action against him as he was there at that time. It's an action against him as a faux fiduciary as the law existed in November of 2015.

And I'll do one better. If I had put on a case today that showed Serv Trust was loyally and faithfully administered for the benefit of his children up until November of 2015, but then after Mr. Schlossberg was appointed as trustee, Myers got frustrated and started using it as his alter ego, then it wouldn't be Mr. Mastro's (unintelligible), it would have to be someone on behalf of the Florida bankruptcy trustee and it would be an issue related to the Florida bankruptcy which is the later filing.

Finally, as to the fourth point there, I would look at the order of remand which the Judge did us the benefit of saying it was for the reasons set forth in our emergency motion seeking a remand.

THE COURT: Yeah, but I don't have your emergency motion.

MR. VERSTANDIG: Then I could -- I think you do. It was sent to chambers.

THE COURT: Oh, was it? Okay.

MR. VERSTANDIG: Yeah, it was.

THE COURT: Okay.

MR. VERSTANDIG: If you need me to officially docket

it, I'm, I can ask you to take judicial notice of it. I think it's --

THE COURT: Is it, it was filed in the Florida bankruptcy?

MR. VERSTANDIG: It was filed in the Florida bankruptcy.

THE COURT: So, it's on ECF?

MR. VERSTANDIG: It's on ECF.

THE COURT: All right.

MR. VERSTANDIG: And --

THE COURT: Then I can take judicial notice --

MR. VERSTANDIG: -- a copy was sent to chambers.

THE COURT: -- and then I can take judicial notice --

MR. VERSTANDIG: Yeah.

THE COURT: -- of what was filed in ECF as it's a material that is commonly used by courts and lawyers to look at dockets and filings.

MR. VERSTANDIG: Your Honor, there's a multitude of arguments, and I'll be very candid, this all happened Friday and --

THE COURT: I understand.

MR. VERSTANDIG: -- my Friday night and Saturday morning were spent researching and drafting; but, one, the factual background set forth in the remand motion makes absolutely clear that we want to go forward this week and we're

asking for an emergency relief so we can to deal with the alter ego issues; and, two, one of the legal arguments we make is in favor of equitable extension. Now we do argue that they moved it to the wrong court, they removed it outside of the limitations period set forth in the applicable rules, that there's a jurisdictional defect, among other things, but we also think it's a bad faith renewal. And that goes to general comity.

And I think knowing the Florida court was cognizant that we wanted to move forward on these issues this week and that somehow, even though I didn't get my motion filed until the early hours of Saturday, we got a ruling out of the Florida Bankruptcy Court before the open of business today, with yesterday being a federal holiday. It evinces the Florida court knows what we plan on doing here and they're in favor of. So, I think you do have the jurisdiction requisite to rule on the alternative issues.

The redemption issues are much simpler. In Section 7.5 and 7.7 of the operating agreement, which is Exhibit 1, based on your questions earlier, it sounds to me as though you've reviewed the pertinent language not going to sort of dryly read it back into the record; but at court, what Mr. King testified to, albeit it in legalese, at the end of three years there is an option to try to redeem the Class B interest. If the Class A members want to pursue that options, they exercise

their right to have the property appointed. The way they do that is by giving notice to the Class B member and designating an appraiser. The Class B member then has the right to pick its own appraiser. If the two appraisers come out with differing numbers that are materially different vis-à-vis the cumulative papal contributions that the Class A members to date, there's a mechanism to resolve that issue. If not, if the Class A contributions as of that date exceed the value of the property, the Class B and trustee is redeemed for consideration already rendered. And if it doesn't exceed the value of the property, the Class B and trustee moves on. There's actually, there's language in there that suggests the Class A members may not be allowed to do this again and again. It may be they only get one shot. We don't have to reach that question because we're here on the first shot; but it's pretty clear that the Class B interests have pretty good vested rights in the property if it appraises for more than what the Class A members have contributed. The problem is the Class A members contributed way more than what it appraised for. And because of Mr. Myers and Serv Trust intransigents, we don't have a countervailing appraisal. We have one appraisal that's in the record from between a million and a million 350. We have extensive evidence in the record that puts the Class A members' contributions, even withstanding the monies contributed, solely to be loaned to Serv Trust in excess of that number. And if

you consider the monies that were contributed to the company to be loaned to Serv Trust, it's actually more than (unintelligible).

So, we would respectfully submit that if Serv Trust is not Mr. Myers' alter ego, or if you choose not to reach the alter ego question, and no disrespect, I believe the record shows we have exercised the redemption mechanism in accord with the operating agreement and that Serv Trust has effectively waived any opportunity to argue the contract. They had 15 days to appoint a contrary appraiser. That was more than five years ago. No one was ever appointed. So, if you reach that issue, we would ask for a declaration that the Class B and trust has been redeemed. I will let Mr. Pelletier figure out what happens to $300,000. That is neither my problem, nor my horse; but we believe it has been redeemed if we get there and that the Class A members, Mr. King, Mr. King's wife and the trust for the benefit of their children, which I'm assuming actually is for the benefit of their children, are the only members of 6789 Goldsboro, LLC, as that entity exists today. Thank you, Your Honor.

THE COURT: All right. Thank you. All right.

CLOSING ARGUMENT BY ERIC PELLETIER, ESQ.

ON BEHALF OF THE PLAINTIFFS

MR. PELLETIER: Your Honor, Eric Pelletier for 6789 Goldsboro. I, again, once again, will not be as eloquent as

Mr. VerStandig, and I will be brief.

I think our case has been very simple. We have put on evidence that there was a promissory note which provided for attorneys' fees and interest; and monies were loaned under that promissory note and have not been repaid in the sum total of $1,264,737.76. The testimony and the evidence is uncontroverted.

The more interesting question that came up was what do we do, as Mr. VerStandig just referred to, the, with the $300,000 problem? And during your questioning of Mr. King, you pointed out that there are terms up to five what this equity is, equity contribution, gross adjusted value or gross adjusted fair market value, I think, is what you pointed out is in the amended and restated operating agreement; but I think the evidence is far more simple than reading through the operating agreement and the various provisions of the tax code that it incorporates and so on, and it is.

Greg Myers contributed 6,100, and I think it's $24, initially to put into Goldsboro. He also received $300,000 on top of that. So, the number comes up to the number listed in the back of the amended and restated operating agreement, 306,000 and change.

But, subsequently, there was an oral agreement that the money would be given to Mr. Myers, Serv Trust, Serv Trust, I want to emphasize that, but it would be repaid. And so it is

that, that number may not fall within the, the written promissory note in terms of what was loaned because it was an early-on loan, as Mr. King testified. It was loaned at the very beginning.

It came back out at the beginning but, nonetheless, Mr. Myers got the money. Mr. VerStandig has explained that Mr. Myers has sat on his hands and stonewalled every aspect of this case, including appraisal of property, so on and so forth; but the bottom line is there was a subsequent oral agreement money was going to be, would be given to Serv Trust and it would be repaid. That's where we are on the $300,000. There's no question that Serv Trust go that $300,000 and it hasn't been repaid.

So, and to the extent I can amend the, conform to the truth, we have a proof, rather, we have a promissory estoppel detrimental reliance claim in Count 3 and ask that Serv Trust, which is the party we're pursuing today, I think that applies because if the money wouldn't have been loaned, I think Mr. King testified if, if he knew it wasn't going to be repaid. There was an agreement that it would repaid.

THE COURT: But I mean that turns every contract claim into a fraud claim if you, in essence, what you're saying is, you know, I wouldn't have lent them money if I knew it wasn't going to be repaid; but to your extent alone, it doesn't get repaid, that doesn't make it, right, it only has, it only

becomes fraudulent if at the time that the money was received that it, that the person who received it had no intention of repaying it.

MR. PELLETIER: Well, but here's the thing. It's not, I'm not arguing for fraud. I mean there is an element of fraud in Mr. VerStandig's case in, in paramount equity and all that stuff.

THE COURT: Right.

MR. PELLETIER: And it's certainly here in the evidence, but what I'm saying, it's promissory estoppel. You know, I changed my position giving, I being Mr. King, changing position by loaning the money with the understanding that it would be repaid and it hasn't been repaid and damage has ensued; or if you don't want to look at it under that lense of quasi-contract, we, we would ask the Court to allow us to amend to conform to the proof for an unjust enrichment claim because there's no question that Serv Trust got this money and there's no question that it's unfair for them, they've received the benefit, they know they've received the benefit and it's, it's inequitable for them to retain that sum.

THE COURT: Well, but okay, I mean it may or may not be, it would be inequitable for nothing, but they brought this opportunity. It's 6789 Goldsboro to the King parties and so --

MR. PELLETIER: Right. And --

THE COURT: -- in essence, they said, oh, this is a

great opportunity. Mr. King testified that he thought it had worth even after he's given out hundreds of thousands of dollars to Mr. Myers, he still thinks it's got, that he's going to, he's not loaned him that money thinking it's not coming back; and he's thinking it's coming back from the sale and --

MR. PELLETIER: Well, so, here's the thing, Your Honor. And, and, and, and Mr. VerStandig, and there's in evidence, there is an appraisal that Mr. King, or the King family, or 6789 received; and Your Honor has been practicing law for a long time. You know what happens when, when parties have competing evaluations. The other side gets a valuation and says, oh, that property is worth, sorry about that, worth, worth $3 million.

THE COURT: Right.

MR. PELLETIER: And that's where Mr. Myers would get his, you know, get his benefit back on that $300,000 capital investment; but he just won't do that. He's, he has foiled the process by not cooperating in any respect ever in this case. He's only taken money, just the taking of all the money; and you've heard, you know, now hours of testimony about where the money went. We've got documents that show how it was used. There is a fog of inequity around this, notwithstanding the fact that above it all, Mr. Myers is sitting on his hands so that if he wanted to get that, that, that, that property, that value back in his capital contribution, quote, unquote,

"306,000 and change," they could sell the property and see where it lands; but, but that in itself has been frustrating.

THE COURT: But he can't now because he wants me to redeem that interest so that he will get nothing.

MR. PELLETIER: Well, and, and I, then that's as far as I'm going to go on that for that reason. So, but I'm just saying there is inequity that the last element of unjust enrichment. So, I, with that, I'll submit. I think we've proven our case to the tune of $1.5 million. You, you, you have the numbers in front of you and, you know, again, my arguments today have by, by virtue of the lingering bankruptcy issues, they are somewhat secondary because we don't know what's going to happen with alter ego and so on.

THE COURT: Let me ask you this. Counsel --

MR. PELLETIER: Thank you.

THE COURT: -- Mr. VerStandig says he thinks everybody is in agreement that if I find an alter ego that, in essence, then I lose my jurisdiction here, not necessarily ultimately, but I, I'm stayed at that point from finding in your favor based on the evidence today. Do you agree with that or disagree with that?

MR. PELLETIER: Well, I, I think, I'm going to be frank with the Court and candid, we talked into, over the weekend we had planned that I wouldn't put on any proof and that Your, Your Honor would rule on the alter ego issues and I

would just sit here and, and with Ms. Wilburn and, you know, try and be productive.

THE COURT: Okay.

MR. PELLETIER: But, but I, we understand that, Your Honor.

THE COURT: Okay. So, the, all right. I just want to make sure. All right. I'm happy to hear from the trustee because --

MR. MASTRO: Thank you, Your Honor.

THE COURT: -- in essence, what I'm hearing is that you ultimately are the one that would be claiming that you were defrauded or suffered fraud as a result of an alter ego issue?

CLOSING ARGUMENT BY FRANK MASTRO, ESQ.

ON BEHALF OF THE DEFENDANTS

MR. MASTRO: That's, that's right, Your Honor, and I think --

THE COURT: Okay.

MR. MASTRO: -- what I wanted to address was I think there may have been some confusion stemming from the order of abstention as to the applicability of the stay. And just to put things in context, I had a chance to kind of re-review this this morning and Mr. VerStandig referred to the Exhibit 3, which is the memorandum opinion denying the debtor a discharge. That's from September 28, 2018. A month later, and this is recited in the first paragraph of the order of abstention,

there is the adversary proceeding, the alter ego adversary proceeding is filed in the bankruptcy court. That's --

THE COURT: Okay.

MR. MASTRO: -- October 29, 2018.

THE COURT: All right. So, you're clear that the alter ego issue was at issue in the abstention?

MR. MASTRO: Right.

THE COURT: Okay.

MR. MASTRO: It was filed as an adversary in the bankruptcy court. And at the same time that adversary was going on, there was a proceeding here in Montgomery County that involved all of the claims today, except the alter ego.

THE COURT: Right.

MR. MASTRO: Okay? And then what happened was the very next day and this is, I think, on page 2 of the order of abstention, the plaintiff in the, in the adversary proceeding files a motion asking the court, the bankruptcy court, to declare whether or not the stay applies to the existing claims in Montgomery County here regarding the claims of six, seven, eight, nine, and the redemption claim that Mr. VerStandig is also litigating. So, and the argument being made in bankruptcy court is that these matters in Montgomery County should be stayed because if Serv Trust is deemed to be the alter ego of Mr. Myers, then the automatic stay is going to take effect.

THE COURT: Right.

MR. MASTRO: And the way the bankruptcy court deals with this is the bankruptcy court says, number one, I'm going to abstain on deciding the alter ego issue. That's really a matter of state law. The state court, Your Honor, here in Montgomery County, you can decide that.

And as to whether the automatic stay applies to the remaining claims, the claims of Goldsboro and the redemption claim, that can be, that can be determined, the applicability of the stay can be determined in this court. And, ultimately, when we, when Mr. VerStandig filed the amended complaint with the alter ego claim, the motion to determine the automatic stay, I guess, never was revived. So, I don't know that there's any motion before this Court right now to determine the automatic stay; but to the extent the Court wants to get a handle on that and, and understand that, we submit that, number one, the automatic stay in the Maryland bankruptcy does not apply, clearly does not apply to the alter ego claim --

THE COURT: Right.

MR. MASTRO: -- because that claim, the Maryland Bankruptcy Court said, no, you got to decide it, Judge Lease, here in Montgomery County. This is an estate court matter.

As for the, the other claims, the claims of the Goldsboro and the redemption claim, those claims, we would submit, it's, it's pretty easy if you decide the alter ego claim first --

THE COURT: Uh-huh.

MR. MASTRO: -- because then if you find that Serv Trust is the alter ego of Mr. Myers, then the stay is going to apply because then their, their judgments they are seeking against Serv Trust become judgments they are seeking against Mr. Myers. If, on the other hand, you find that Serv Trust is not the alter ego, then the stay clearly doesn't apply because you're seeking judgments against Serv Trust and that Serv Trust is a separate and distinct entity for Mr. Myers. That's the easy way to resolve it.

Whether this Court wants to get into some determination, well, you know, can I decide the claims of Serv Trust and the redemption claim, or the claims of Goldsboro against Serv Trust and the redemption claim while the alter ego is pending, that, that gets a little more harry. We'd submit that because, for the same reasons that were argued in the bankruptcy court, that because ultimately there's the possibility that Serv Trust could be determined to be the alter ego, that those claims should be deferred pending that resolution by this Court. So, I think that's really the threshold --

THE COURT: Uh-huh.

MR. MASTRO: -- issue that needs to be determined. And the bankruptcy trustee, obviously, has, has been patient through all the machinations by Mr. Myers going down to

Florida, coming back here and we, we'd simply ask the Court to rule on that issue at this time.

THE COURT: And do you, do you agree that if by ruling on the alter ego issue that I'm, if I'm saying, theoretically, ruled that, that it was an alter ego, that that would then, wouldn't affect Mr. Myers in his Florida bankruptcy because the asset would have been an asset of his Chapter 7 bankruptcy which was previous, or filed prior to the Florida bankruptcy?

MR. MASTRO: Correct.

THE COURT: Okay.

MR. MASTRO: Correct, because this goes to the, the alter ego predates, pre, pre, it's pre-petition as to the --

THE COURT: Right.

MR. MASTRO: -- Maryland bankruptcy; so, therefore, it's an asset that once he filed the Maryland bankruptcy, that becomes an asset of the Maryland bankruptcy estate.

THE COURT: Right.

MR. MASTRO: What he does afterward has no effect on the status of that particular asset.

THE COURT: Okay. All right.

MR. MASTRO: Thank you, Your Honor.

THE COURT: Thank you. All right. Anybody want to be heard in response to anything that, the questions that I had or anything else?

MR. VERSTANDIG: Very briefly, Your Honor. I want to address one point that you raised at the beginning today which went to the finality of judgments.

THE COURT: Uh-huh.

MR. VERSTANDIG: And I want to be very careful not to waive the grounds of procedure.

THE COURT: Well, here is what I would say. With respect to, I think, following what the, I think it was the trustee said is if I find that there's alter ego and from what the agreement is, is that I find that, and then I have to stay the balance of the case --

MR. VERSTANDIG: But --

THE COURT: -- pending further action in the bankruptcy court.

MR. VERSTANDIG: I would concur with that and without finding, like you don't even, beyond, if you make that finding, I strongly suspect, irony being well-appreciated, that one of us will then remove this case to the Maryland Bankruptcy Court to take it off your plate.

THE COURT: Okay. Well, understood. Great. And just, I don't, I don't think it's, I don't think I have a clear picture of how the two bankruptcies are working together and actually have a good idea of that. All right. I do have a lot of material that I'm going to look at. I'm going to look at what was reviewed there, but I, I want to get this resolved

today. I don't know how far everybody has traveled to be here --

MR. VERSTANDIG: Far.

THE COURT: Far? Okay.

MR. PELLETIER: No far for us. We're Main, Maryland.

THE COURT: Okay.

MR. MASTRO: I'm in Maryland.

THE COURT: Well, you're --

MR. MASTRO: So --

THE COURT: -- so you're not going out of town?

MR. MASTRO: No.

THE COURT: You're not, wouldn't go back to Baltimore or somewhere for your office or something? You, what I want to do, I want to bring you back around 3:30 --

MR. MASTRO: Okay.

THE COURT: -- to give the ruling. That way I've had an opportunity to review a lot of documents here and figure out what I have to review to make a decision. I will then put together my thoughts so I can make a ruling today, but I don't want to put this off any further and you'll get your ruling today; but get you back at 3:30, or is everybody okay? I mean I, I, if somebody wants to go back to your, you know, office?

MR. MASTRO: That works for me, Your Honor.

THE COURT: Okay. All right. We'll see everybody back at 3:30.

MR. PELLETIER: Thank you, Your Honor.
MS. WILBURN: Thank you, Your Honor.
MR. VERSTANDIG: Thank you.
THE COURT: Yeah. Do you need this?
THE CLERK: Yes, I do.
THE COURT: I thought so. All right. Great. Thank you all. Have a great lunch and we'll see you this afternoon.
THE BAILIFF: All rise.
THE CLERK: The Court stands in recess.
MS. WILBURN: Your Honor, can we leave the, our materials in here until 3:30?
THE COURT: Sure, yeah.
(Recess.)
THE BAILIFF: All rise. The Circuit Court for Montgomery County is back in session. The Honorable David Warren Lease presiding.
THE COURT: All right. Good afternoon, everyone. Please be seated.
THE CLERK: Calling, recalling Case No. 436977V, Brian King, et al. v. Serv Trust, et al.
THE COURT: Okay. Let's go ahead and have the parties just identify yourselves for the record, please.
MR. VERSTANDIG: Good afternoon, Your Honor. Maurice VerStandig on behalf of Brian King, Cristina King and the Cristina and Brian King Children's Trust. I'm joined in the

courtroom by Brian King, who is seated to my left.

THE COURT: All right.

MR. PELLETIER: Eric Pelletier and Frances Wilburn here for 6789 Goldsboro, LLC.

THE COURT: All right.

MR. MASTRO: Good afternoon, Your Honor. Frank Mastro on behalf of nominal defendant Roger Schlossberg, Chapter 7 Bankruptcy Trustee.

THE COURT: All right. Good afternoon. And my understanding is that Mr. Myers has joined us by Zoom, is that correct?

MR. MYERS: (No affirmative response.)

THE CLERK: Yes.

THE COURT: Okay.

MR. MYERS: I was told to be silent, Your Honor. Thank you.

THE COURT: Okay. Well, I, I just, we're just here for the ruling, but I just want to make sure that the record reflects that you're here on the record. I will let you know that this morning in your absence I did rule on your motion for, to disqualify me. I felt that that was before the Court and that before I could proceed, I did need to address that motion. I did address that motion. I denied the motion primarily for the reasons that I denied it last year, which was an oral motion that you had made, but I did want to let you

know that that was done.

This matter is before the Court for trial today. It really sets forth sort of two different tracks as to how the case would proceed and it primarily resolves from the order of abstention issued by the United States Bankruptcy Court back on January 30, 2019. In that order, Judge Lipp at the time specifically remanded the case or abstained from the case so that this Court could determine the, the application of the automatic stay based upon the relationship between the debtor and Serv Trust, then, and then making that determination whether or not the stay would be applied; and if so, then the parties would come back to the bankruptcy court to figure out how to proceed. So, that's sort of the, the preliminary issue is that the question as to whether or not Serv Trust served as the argument being an alter ego or whether it should be disregarded under the caselaw that was before the Court. If the Court makes the determination that Serv Trust is, indeed, an alter ego or that the trust entity should be disregarded for the purposes of the litigation, then the matter would be stayed and the matter would be then referred to the bankruptcy court in Maryland for further proceedings.

If, however, the Court determines that the, there is not an alter ego relationship, or that the entity should be disregarded, then the Court could proceed with respect to the claims against that entity only for the purposes of today's

proceedings. Those were the claims primarily as to whether there was an appropriate redemption of Serv Trust's interest in 6789 Goldsboro Road, LLC, and the second would be whether the amount of the promissory notes and the claim for promissory estoppel by 6789 Goldsboro Road against Serv Trust should be adjudicated in the amount of that judgment should be. That would be without effect on Mr. Myers; and as I pointed out this morning, under the Frow Doctrine, if Mr. Myers ultimately was successful in reducing or showing that that amount and ultimately was not due to, was not owed by Serv Trust, Serv Trust would be entitled to take advantage of that finding and that you can't have incongruent judgments, the Frow case, which is a United States Supreme Court case, which has been recognized in Maryland, dates back into the early 1800s.

So, initially, the Court has to determine whether or not the Serv Trust served as an alter ego -- can you go in? I just let a few of my papers in the chambers. Pull the stuff off my desk that's highlighted. I think I've got everything. All right.

JUDGE'S RULING

THE COURT: Well, I'll note at the outset that Serv Trust, there's an issue as to whether it is a statutory trust or if it is a non-statutory trust. Ultimately, that issue did not become material for me.

(Discussion off the record.)

THE COURT: All right. So, as I mentioned, the Court, I didn't find that it was actually material regardless of whether it was a statutory or non-statutory bill. I do note that under the Doctrine of Judicial Admission, that I do find that it was statutory in the sense that Mr. Myers had filed a document with the Court noting and signing it on behalf as the, that it was a statutory trust and that it was set forth in his motion for intervention which was Plaintiff's Exhibit 13 in the matter. At the time it says, bar, and it says, well, the documents that are associated with it note that and the signature page itself. That's, that's on page 7 of the motion. It says, "Serv Trust, a Maryland statutory trust signed by Mr. Myers, trustee," and that, it's set forth as a judicial admission for the purposes of this proceeding.

So, the parties have argued that the Court should view Serv Trust as an alter ego of Mr. Myers and that arguing that under the case of, that Hildreth v. Tidewater Equipment Company, Inc. case, that noted that the Court will apply the doctrine where the plaintiff establishes that there's complete domination of not only the finances, but of the policy and business practices in respect to transactions so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; two, that such control was used by the defendant to commit fraud or wrong, or perpetrate a violation of a statutory or other positive legal

duty or dishonest and unjust act in contravention of the plaintiff's legal rights; and, three, that such control and breach of the duty proximately caused injury or undue loss.

Now the court also in that case notes that the corporate shield will be disregarded where a corporation is used as a mere shield for the preparation of a fraud, the court shall disregard the fiction of this separate corporate entity. It's set forth in the bench memorandum that was provided by plaintiff that the issue of whether or not this doctrine would apply to other entities such as a trust has been decided in the affirmative in the Deckelbaum v. Cooter, Mangold case at 275 B.R. 737 (D. Md. 2001) case. I note that that case also had been on appeal before in In re Boyer, a matter in which was 145 F.3d 1323, which I believe was an unreported opinion. The underlying opinion was set forth was reported. I did review all three of those opinions and do conclude that the issues that can disregard an entity is not exclusive to corporations, although that's where the doctrine originated from.

So, what do we have here? You know, the question is that we had a situation where Serv Pro was, not Serv Pro, Serv, Serv Trust was operating at this time, a relevant time, and what the evidence presented to the Court shows is that it was operating merely as a conduit to distribute funds to Mr. Myers and his wife, Ms. Kelly, in an effort, the Court believes, to frustrate his creditors in this matter. That Mr. Myers

controlled this entity which purpose was to provide for the education, schooling and housing of the Myers' children. However, during the relevant period in this case, some $1.37 million was funneled through that entity to Mr. Myers and/or his wife, or other entities.

Now I note that the majority of it, some 738,000, was directly paid to Mr. Myers; 434,525 went to his wife, Ms. Kelly. Some 16,825 went to various courts. Those courts were for funds that were being paid into escrow which were then subsequently listed on Mr. Myers' bankruptcy filings as belonging to him. There were payments to attorneys of $16,713, country club membership. There were payments of $64,527 which were distributed to Mr. Myers' children's schools and housing; however, the Court finds that this amount of payment was of such a de minimis amount given the, in relationship to the $1.37 million which was funneled through Serv Trust as to show that the main goal and purpose of the, of Serv Trust was to shelter funds from Mr. Myers' creditors.

Now what I did go back and I read in great detail was the opinion in the United States Bankruptcy Court of the, which was Plaintiff's Exhibit 3, which was the trustee's decision, or strike that, granting the trustee's complaint denying discharge to Mr. Myers in Chapter 7 bankruptcy that had been converted from a Chapter 11. I don't need to go through all of what's in there, but what struck me is that the Court agreed with the

United States trustee that Myers knowingly and fraudulently made false oaths in his bankruptcy case sufficient to denying of a discharge, citing to Mr. Myers that Mr. Myers explained that the other 50 percent owner of Goldsboro, who we, was undisclosed at the time of his one, or of his 341 meeting, made capital contributions to Goldsboro that could then be loaned to the Serv Trust and that money went to the benefit of the beneficiaries of the trust, is what he testified to.

The timing of the loans from Goldsboro to the execution of the Goldsboro guaranty, combined with Myers oscitation of his liability to Goldsboro at the 1341 meeting were sufficient to require a finding of fraudulent intent for the purposes of Section 727(a)(4). The Court there found it was not believable that he simply forgot to include the largest, unsecured creditor in the first of several versions of his schedules when he had executed a personal guarantee in favor of that creditor six months prior to the filing of the bankruptcy and was requesting advances from the creditor up to and after the filing of his petition.

The advances to Serv Trust, which funds were then made available, and the Court, that court then found that the funds were then made available to Myers and/or Kelly, purportedly to pay for the child's education or household expenses. That opinion also notes that Mr. Myers was adamant at trial that every payment that he and/or Kelly ever received

from Serv Trust was for the benefit of his children. He then argued that he was always considered the Serv Trust payments to be loans regardless of how they were classified in the schedules or what was said at the 341 meeting because neither he nor Kelly is the beneficiary of Serv Trust.

Myers' classification of the payments he and/or Kelly received from Serv Trust as loans is suspect if, as irrefutably testified to by Myers, every payment from Serv Trust to Myers and/or Kelly was for the benefit of their children, it then appears Serv Trust was serving its intended purpose, i.e., providing for the Myers children. Such payments would not be loans to Myers and/or Kelly. They would have been distributions to the trust beneficiaries.

The Court further goes on to note that Myers testified at the 341 meeting that Serv Trust can distribute money for anything to his children's benefit, including food, clothing and tuition. Myers was adamant that his children's expenses exceeded any amounts ever distributed on their behalf by Serv Trust. He admitted that he did not keep a log of the expenses he paid on behalf of the children and that he deposited the funds into his own checking account, but maintained that the tuition expenses alone exceeded any amounts received from the trust.

The Court further noted that Mr. Myers testified that there were ongoing litigation between Serv Trust and Goldsboro,

so he did not what to characterize the advances made from Serv Trust to Goldsboro as reflected in the Goldsboro's promissory note as loans. On the other hand, when he testified during his own cross-examination, he testified that his second-amended schedule reflected no income because by then there were no more loans from Serv Trust, there were no more loans from Goldsboro, and so there was no more income and then I lost my disability in March of 2016; and I believe Goldsboro made its last loan in August of 2016. This testimony makes clear that the advances from Goldsboro to Serv Trust were going to Myers and Kelly.

The Court further noted that, in other words, when Goldsboro was not included in the debtor's bankruptcy case, Serv Trust was asserting a greater lien on lot six of the sale proceeds because that would enable Myers to access those funds through Serv Trust. And so, what I found from the testimony here is that I, I find it inconceivable that $1.37 million was used for the children's education. There's no evidence of that whatsoever. It is, it is beyond the pale. I find that at his bankruptcy proceeding, Mr. Myers' explanation of what the funds were, how they were obtained and what they were for were contradicted by himself, which notes that during this time that these funds were being provided to as a way to avoid his creditors and to avoid payment to those creditors. They were basically shielding these, these amounts of money from his creditors.

So, I do find, one, that he did have --

MR. MYERS: I'm sorry, Your Honor, I thought I wasn't a party to this proceeding?

THE COURT: Sir --

MR. MYERS: You're saying it's about me.

THE COURT: What I'm saying is I'm deciding whether or not you were, whether or not Serv Trust is an alter ego. This is what the abstention from the bankruptcy court is about. And so, I'm finding that based upon these proceedings --

MR. MYERS: You understand, Your Honor, you do understand the abstention order is irrelevant because I filed subsequent Chapter 13.

THE COURT: I understand that. Sir, I understand that is your belief, all right? And you can certainly appeal --

MR. MYERS: (Unintelligible).

THE COURT: -- that based on that. I will make my findings here today and you may, and you will do with them with what you want; but I believe that the subsequent Chapter 13 is not relevant to the abstention order and I will make that clear in my holding as I get further along.

So, what I do find is that the --

MR. MYERS: From the, from Judge Lipp, the order you're reading from where he makes a finding of fact that Serv Trust was established by my mother in 2010 for the benefit of

my five children, the finding of fact --

THE COURT: I see that finding, sir. What I'm finding is that based on the evidence here and the amounts of money that was transferred through that organization to you and your wife personally, that the, whether it was established for that purpose, it was not utilized for that purpose. It was rather utilized to defraud your creditors and to defraud the bankruptcy court and to defraud the trustee.

MR. MYERS: I --

THE COURT: Sir --

MR. MYERS: How could I defraud my creditors when I've never owned any property that was put into Serv Trust? How could it defraud my creditors when they and Offit Kurman represented me and Serv Trust before the, it got there.

THE COURT: All right, sir.

MR. MYERS: How could it defraud my creditors if it's a Maryland common law centric trust and the law in Maryland is clear that nothing I do as a trustee could ever affect the corpus of that trust?

THE COURT: All right. Well, I disagree. One, is I found that it is a statutory trust based on your filings in this court; and so, based on that --

MR. MYERS: That, that's --

THE COURT: -- that's where we are.

MR. MYERS: -- to intervene. Nothing I do, Your

Honor, and you know this, nothing I do as a trustee can change that trust document.

THE COURT: Well, I --

MR. MYERS: And I must say --

THE COURT: -- it does when you, it does when you perpetrate fraud and that's what I'm getting to here. So, I would ask if you just please --

MR. MYERS: You're just finding --

THE COURT: -- I'm making my findings --

MR. MYERS: -- you're making findings of fraud?

THE COURT: I'm making findings that you perpetrated and used this, you used the, that the Serv Trust was used to perpetrate a fraud, yes, that's what I'm finding.

MR. MYERS: On who?

THE COURT: On the bankruptcy trustee in this case.

MR. MYERS: He never brought that claim.

THE COURT: He is here. He made that claim in court today. So --

MR. MYERS: Well, it's too late. He's already past his time to make that claim; and, by the way, if you read in that order, you will find that Judge Lipp said that I did not transfer any property to anybody fraudulent.

THE COURT: All right.

MR. MYERS: She denied the trustee's claim on that count.

THE COURT: All right. Well, what I'm finding here is that based on the evidence that was presented to me today, that I've seen that it's rather clear that the monies that were sent through the trust to you and your wife personally, which were --

MR. MYERS: Yeah.

THE COURT: -- greater than a million dollars, was --

MR. MYERS: Yeah?

THE COURT: -- used in order to shield those funds from your creditors.

MR. MYERS: What creditors?

THE COURT: And, and, therefore --

MR. MYERS: What creditors?

THE COURT: -- and, therefore, I am going to find that --

MR. MYERS: Well, you haven't identified a creditor.

THE COURT: Sir, I'm not here to argue with you. I'm giving my opinion. So, I ask that you --

MR. MYERS: It has to be paid from, in fact, in the King party admittedly have no claim against me; and the bankruptcy court has found that. And Goldsboro has nothing but a guarantee from me. I owe Goldsboro nothing. So, how did I defraud anybody?

THE COURT: All right.

MR. MYERS: You, sir, are, this is disgraceful. This

is a common law centric trust that the bankruptcy court found was established by my mother in 2008.

THE COURT: Well, what I'm going to do here is, what I'm going to do here is when you get back, you're going to go right back to that same bankruptcy court and then you can make --

MR. MYERS: I'm going to the bankruptcy court.

THE COURT: Well, going back --

MR. MYERS: I'm going to Florida where this case currently is which you ignored --

THE COURT: Well, this --

MR. MYERS: -- that order.

THE COURT: This case is currently in Maryland also, sir; and so, you can make your arguments in Maryland or you can make your arguments -- I'm going to leave it up to the bankruptcy courts as to how to deal with this case; and so, as I go through my findings here, I find that it would be under an alter ego --

MR. MYERS: It sounds like --

THE COURT: -- situation.

MR. MYERS: This case sounds like a lot of findings about me when the case went, when the claims against me are stayed. You just said you made a finding of fraud against me.

THE COURT: Well, that, that, money went through that, that entity, Serv Trust, were used to defraud. So, the

entity Serv Trust was used as a fraudulent vehicle and, therefore, it's going to be, its, its trust will be disregarded and I will find that it is an alter ego or that --

MR. MYERS: There is --

THE COURT: -- it was used to, was used to perpetrate a fraud.

MR. MYERS: There is no law in Maryland that allows alter ego for a common law centric trust.

THE COURT: Well, sir, first, I found that, one, I disagree with you; and, secondly, I find as a matter of judicial admission in this case that it is a statutory trust that you set forth and signed a document submitted to this Court identifying as such. So, if you want to argue that it's different, that ship has sailed. I'm, you're bound by the representations of the Court. So --

MR. MYERS: Okay. I did not change that trust document. No trustee can come into court, sign a paper and make that trust document something it isn't.

THE COURT: Okay.

MR. MYERS: And by the way, where are the beneficiaries in this case? You have none of them before you. They weren't served. It's a common law trust.

THE COURT: Well, if, sir --

MR. MYERS: So, you don't have the parties before you to do this.

THE COURT: Well, sir --

MR. MYERS: This entire exercise, with all due respect, Judge, is a hack job by the trustee because Judge Albright made a ruling at a motion to dismiss that the contract that Mr. King signed is enforceable and that, yes, he did commit fraud if what we alleged was true. And Mr. VerStandig decided one month later for the first time after six years of doing business with Mr. King that, oh, now all of a sudden there's an alter ego claim. Never before did that come up. Why don't you do your job, sir, and look at the facts and look at what's going on here. There's a crime being committed here. Did you look at the facts of what was attached to my motion to remove where they altered tax returns? Did you look at that email, sir?

THE COURT: Well, sir, I, all I note is that the motion to remove was denied, or was remanded back, so --

MR. MYERS: I'm not asking that. I'm asking did you look at the email attached where the King party --

THE COURT: Sir, I'm not --

MR. MYERS: -- fraudulently submitted a tax return in this case in your court?

THE COURT: All right. Well, like I said, I'm, all I know is that the matters before me, I'm making my ruling based on the evidence that was before me today.

MR. MYERS: Right. You don't have the evidence. You

have a pack of lies is what you have.

THE COURT: Okay.

MR. MYERS: And by the way, Judge, I didn't hear where you said you ruled on my motion to dismiss for lack of subject matter jurisdiction because you have no order from the bankruptcy court allowing Mr. King to sue the Chapter 7 trustee.

THE COURT: All right. Well, I, I had previously denied that. If I hadn't, I'll deny it now. There is, I find that I have subject matter jurisdiction; and if I'm wrong about these things, Mr. Myers, then it's great, the subject matter, it was subject matter jurisdiction --

MR. MYERS: Okay. Well, I --

THE COURT: -- cannot be waived, period; and so, if bankruptcy court, or another court base your determination --

MR. MYERS: That is one --

THE COURT: -- that I don't have jurisdiction, then all of this is a nullity. Similarly --

MR. MYERS: One question. Is there anywhere in the record of this case an order, written order entered by the bankruptcy court, not an order of abstention, a written order that permits Mr. King to sue the Chapter 7 trustee?

THE COURT: Well, if I'm, I have an order of abstention that says I'm to make this determination as to alter ego.

MR. MYERS: No.

THE COURT: And that's what I'm making.

MR. MYERS: Is not going to make any determine -- it doesn't say that Mr. King can sue the Chapter 7 trustee. Without that order, in your opinion --

THE COURT: Well, I think, I think that --

MR. MYERS: -- you have --

THE COURT: -- I think that's for the Chapter 7 trustee to raise and is their issue, and you don't have standing to raise that issue. If you think it's a jurisdictional issue, then, again, Mr. Myers, you're going to have an opportunity to probably litigate this all back into bankruptcy court here --

MR. MYERS: Well, it's --

THE COURT: -- because what I will find and, and, sir, I'm going to ask you to just let me finish my ruling here so that I can make sure I get the facts that I wish to on the record.

MR. MYERS: Well, they're not, all deal with me and (unintelligible).

THE COURT: Okay. So, I do find that the second factor of alter ego was applicable, that it did, defendant did commit a fraud or wrong. And like I said, I also find that the use of the trust here was a mere shield for the preparation of fraud.

Lastly, I do note that such control did cause injury in the sense that the creditors of Mr. Myers were and, quote, strike that. That the bankruptcy trustee was deprived of potential assets in the bankruptcy estate. So, based on those findings, I do find that Serv Trust is either an alter ego or its forms should be disregarded as a perpetrator, as, as it was used to perpetrate fraud.

Based upon that finding, I do find under the order of abstention that the claims against Serv Trust here, as well as those against Mr. Myers, are stayed pursuant to the bankruptcy that's pending in Maryland at this time. Therefore, I will make a finding, a declaratory judgment that Serv Trust is a, the alter ego of the, of Mr. Myers in this case; and as such, the matter is stayed as to this litigation going forward at this time.

All right. Let me ask counsel if you can prepare a proposed order of declaration for the Court?

MR. VERSTANDIG: Thank you, Honor. We may email it to chambers, I assume?

THE COURT: Sure and send it to Mr. Myers, too --

MR. VERSTANDIG: Yes.

THE COURT: -- for his view.

MR. VERSTANDIG: Thank you. Should we do so prior to emailing it to chambers --

THE COURT: Yeah, why don't we just do that? Just,

well, just mail it to Mr. Myers with chambers.

MR. VERSTANDIG: Okay. Thank you. We will cc him on the --

THE COURT: All right.

MR. VERSTANDIG: -- chambers.

THE COURT: Is there, is there any clarification of my ruling that you need?

MR. VERSTANDIG: I appreciate your ruling. Thank you, Your Honor.

THE COURT: All right. Anybody?

MR. PELLETIER: Well, I'm here, Your Honor --

MR. MYERS: Well, I do --

MR. PELLETIER: -- this is Eric Pelletier for 6789 Goldsboro Road.

THE COURT: Okay. And just --

MR. MASTRO: Nothing, Your Honor, other than just to note for the record that the trustee didn't file an opposition to Mr. Myers' motion to dismiss for lack of subject matter jurisdiction and that's in the record as well.

THE COURT: Okay. All right. All right. Great. Thank you all very much.

MR. PELLETIER: Thank you, Your Honor.

MR. VERSTANDIG: Thank you, Your Honor.

THE COURT: Have a good day. Oh, based on that, like I said, I abstain the rest of the other, other matters.

MR. VERSTANDIG: Yes, Your Honor.

THE COURT: Oka.

THE BAILIFF: All rise.

THE CLERK: The Court stands in recess.

(The proceedings were concluded.)

Digitally signed by Tanja G. Gish

DIGITALLY SIGNED CERTIFICATE

**eScribers, LLC.** hereby certifies that the attached pages represent an accurate transcript of the electronic sound recording of the proceedings in the Circuit Court for Montgomery County in the matter of:

Civil No. 436977V

BRIAN KING, ET AL.

v.

SERV TRUST, ET AL.

By:

TANJA G. GISH
Transcriber