UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| In Re: | Case No. 15-26033 |
| GREGORY B. MYERS, | Chapter 7 |
| Debtor. | Greenbelt, Maryland<br>Monday, June 30, 2025 |
| : : : : : : : : : : : : : : : | |
| BRIAN KING, ET AL., | Adv. Proc. 24-00007 |
| Plaintiffs. | |
| v. | |
| ROGER SCHLOSSBERG, | |
| Defendant. | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF HEARING ON

RE: 24-00007
17 APPLICATION TO COMPROMISE CONTROVERSY FILED BY DEFENDANT ROGER SCHLOSSBERG
19 OBJECTION FILED BY DEBTOR GREGORY B. MYERS
20 MOTION FOR MISCELLANEOUS RELIEF FILED BY DEFENDANT ROGER SCHLOSSBERG
22 SUPPORT DOCUMENT FILED BY DEBTOR GREGORY B. MYERS
23 RESPONSE FILED BY DEBTOR GREGORY B. MYERS
24 RESPONSE FILED BY DEFENDANT ROGER SCHLOSSBERG

RE: 15-26033
1051 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
1052 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
1053 OBJECTION TO CLAIM FILED BY DEBTOR GREGORY B MYERS
1060 OPPOSITION FILED BY INTERESTED PARTY BRIAN KING, INTERESTED PARTY CRISTINA KING

BEFORE THE HONORABLE MARIA ELLENA CHAVEZ-RUARK,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For Roger Schlossberg, Chapter 7 Trustee: | Frank J. Mastro, Esq.<br>Roger Schlossberg, Esq.<br>SCHLOSSBERG & MASTRO<br>18421 Henson Boulevard<br>Suite 201<br>Hagerstown, MD 21742 |
| For Brian King: | Maurice B. VerStandig, Esq.<br>THE VERSTANDIG LAW FIRM, LLC<br>9812 Falls Road<br>Suite 114-160<br>Potomac, MD 20854 |
| Also Present: | Gregory B. Myers<br>Pro Se Debtor |
| Audio Operator: | Jennifer Whitfield<br>(301)344-3965 |
| Transcript prepared by: | ESCRIBERS<br>7227 North 16th Street<br>Suite #207<br>Phoenix, Arizona 85020<br>(800)257-0885 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

GREENBELT, MARYLAND - JUNE 30, 2025

THE CLERK: All rise. Silence, please, and come to order. The United States Bankruptcy Court for the District of Maryland is now in session, the Honorable Maria Ellena Chavez-Rurak presiding.

Please be seated. Calling the case of Gregory B. Myers, case number 15-26033. The matters for consideration for the Court today are docket entry 1051, objection to claim number 22, filed by the debtor, docket entry 1052, objection to claim number 23, filed by the debtor, docket entry 1053, objection to claim number 21, filed by the debtor, and docket entry 1060, opposition to objections, filed on behalf of the King parties.

And we're also calling adversary number 24-00007, King, et al. v. Schlossberg. The matters before the Court are docket entry 17, application to compromise controversy, filed on behalf of the defendant, docket entry 19, preliminary objection to trustee's application to compromise controversy filed by the debtor, docket entry 22, supplement to preliminary objection, filed by the debtor, docket entry 20, motion to strike debtor's objection, filed on behalf of the defendant, docket entry 23, response to motion to strike, filed by the debtor, and docket entry 24, response to opposition filed on behalf of the defendant.

Starting with counsel for the plaintiffs, please

state your name and clients for the record.

MR. MASTRO: Good morning, Your Honor. Frank Mastro on behalf of the Chapter 7 trustee, Roger Schlossberg.

THE COURT: Good morning.

MR. SCHLOSSBERG: Good morning, Your Honor. Roger Schlossberg, trustee, counsel to the trustee.

THE COURT: Good morning.

MR. VERSTANDIG: Good morning, Your Honor. Maurice VerStandig on behalf of Brian King, Cristina King, and Brian and Cristina King in their capacity as trustees of the Cristina and Brian King Children's Trust.

THE COURT: Good morning to you.

MR. MYERS: Good morning, Your Honor. Gregory Myers.

THE COURT: Good morning, Mr. Myers.

MR. MYERS: Morning.

THE COURT: All right. Well, we have a number of matters on the docket for today. We have, in the main bankruptcy case, Mr. Myers' objections to the three claims filed by we'll just refer to them as the King parties. And then in the adversary proceeding, we have the application to compromise controversy filed by the trustee and a motion to strike the debtor's objection to the trustee's motion.

The Court understands that there was also a motion to intervene filed by Mr. Myers and a motion to dismiss the adversary proceeding filed by Mr. Myers. Apparently, they

were filed after business hours on Friday evening and were just docketed literally just moments ago. So I don't know if the plaintiff and -- the plaintiffs and the defendant have had an opportunity to look at that. The Court is not going to consider the motion to intervene or the motion to dismiss today because they were just filed.

With regard to the motion to strike, and the Court has given Mr. Myers an opportunity to be heard on other matters, but the Court is going to deny the motion to strike filed by the trustee.

So Willemain v. Kivett, 764 F.2d 1019, decided by the Fourth Circuit in 1985 --

Please, everyone, have a seat. I'm sorry. You don't have to continue standing.

The court set forth the well-known rule that when a Chapter 7 case has an insolvent debtor, that the debtor -- or has an insolvent bankruptcy estate, that the debtor does not have a right to be heard. Here, Mr. Myers has been denied a discharge or his discharge was revoked. And therefore, to the extent any claims are not discharged in the bankruptcy proceeding, he has a pecuniary interest. So the Court is going to give him an opportunity to be heard.

Let me cite to a couple of cases. Grausz v. Englander, 321 F.3d 467, out of the Fourth Circuit, 2003. McGuirl v. White, 86 F.3d 1232, out of the D.C. Circuit, 1996.

And In re: Byrd, decided by Judge Catliota of this court, 2011 WL 589907, decided on February 10th, 2011, which was affirmed in the decision Byrd v. Johnson, 467 B.R. 832, out of the District of Maryland, 2012, and also affirmed in In re: Byrd, 484 Fed.Appx. 845, out of the Fourth Circuit, 2012.

And so those cases say that Willemain v. Kivett does not apply where a debtor is denied a discharge because bankruptcy actions could have an effect on the amount of the discharge claims that the debtor remains obligated to pay once the automatic stay is terminated.

So for all of those reasons, the Court is going to deny the motion to strike and allow Mr. Myers an opportunity to be heard.

All right. So that leaves us with the application to compromise controversy and the three claim objections. I propose that we put witnesses on the stand one time, instead of having them on the stand and then off. So the Court proposes that we hear the application and the claim objections together.

Let me start by asking the plaintiffs and the defendant if they have anything to say before the Court continues.

MR. VERSTANDIG: Your Honor, no objection to doing so in that manner. I would note, if the application to compromise is granted, my clients will withdraw the three

claims upon entry of an order granting the application becoming a final order beyond any appellate deadline.

THE COURT: All right. Thank you, Mr. VerStandig.

Mr. Mastro, is there anything you'd like to say before the Court continues?

MR. MASTRO: We have no objection to proceeding in the fashion that Your Honor has outlined.

THE COURT: All right. Mr. Myers, you're standing. What would you like to say?

MR. MYERS: Yes, Your Honor. Preliminary matter. There was a complaint demand for trial by jury filed this morning against you in your official capacity, Ramona D. Elliott, Roger Schlossberg, Frank Mastro, Schlossberg & Associates, P.A., and Maurice VerStandig. And there was also a motion to disqualify you that was filed in my bankruptcy case -- well, in this adversary and my bankruptcy case, predicated upon this complaint demand for jury trial being filed.

You have a per se conflict of interest. It's not even bias and prejudice. It goes far beyond that. And for those reasons, I don't believe you can hear this matter. I believe you need to recuse yourself, and another judge needs to take this matter up. And that's a matter that I believe needs to be heard before anything else can be heard in this case.

Additionally, if I understood the -- well, I'll leave that first. And then if I understood, did you suggest the order is they do their --

THE COURT: We're doing it all together, Mr. Myers.

MR. MYERS: But something was after something, according to what Mr. VerStandig said?

THE COURT: Mr. VerStandig said that his clients will withdraw their claims if the settlement is approved.

MR. MYERS: Okay. Will their claims go first, the claim objections to their claims?

THE COURT: The Court's going to hear them together.

MR. MYERS: Well, they won't have any standing in the adversary if they don't have a claim.

THE COURT: That's not true, Mr. Myers. Thank you.

MR. MYERS: Okay. Well --

THE COURT: With regard to your -- as I've told you numerous times, if you file something moments before a hearing is scheduled to begin, the Court does not have time to consider it. This hearing has been scheduled for almost two months, and so we're going to go forward with the hearing. And the Court will deal with your motions in the ordinary course.

I'm giving you an opportunity to be heard. So with regard to your motion to intervene, the Court will address that, if and when the time comes. I'm giving you an

opportunity to be heard as a party-in-interest.

With regard to your other motions, they were filed -- some were filed on Friday evening. Apparently, some were filed moments before this hearing began. I haven't seen what you filed this morning, and so I'm not going to consider it. If you wanted -- if you wanted the Court to consider a motion before this hearing, you should have filed it earlier. So --

MR. MYERS: Respectfully, respectfully, Your Honor, there's no time limit. Subject matter jurisdiction can be raised at any time. You have an obligation to consider and resolve your subject matter jurisdiction.

You have a clear conflict of interest. It cannot wait. It must be resolved. You must rule on it. That is the case law. I know it. You know it. And so if you don't, then everything here will be void. So you need to consider this and rule on it because you do have a clear conflict of interest.

THE COURT: Mr. Myers, I --

MR. MYERS: Thank you.

THE COURT: -- don't need you to tell me what I need to do. You can sit down. I'm going to go forward with the hearing. Thank you.

MR. MYERS: Okay. Well, then I'll place --

THE COURT: All right. So --

MR. MYERS: -- my objection on the record for --

THE COURT: It's on the record, Mr. Myers. Have a seat.

MR. MYERS: No, you can't cut me off.

THE COURT: Have a seat.

MR. MYERS: I can put my comments on the record. I object because of a lack of subject matter jurisdiction.

THE COURT: I heard you ten minutes ago. Thank you.

MR. MYERS: Okay.

THE COURT: All right. So Mr. Mastro, we're going to hear from I'm going to have you put on your case first since --

MR. MYERS: Judge Rurak, there's other jurisdictional matters.

THE COURT: Mr. Myers.

MR. MYERS: Jurisdiction has to be considered first. There is other jurisdictional matters.

THE COURT: I'm not going to hear --

MR. MYERS: Unrelated to this.

THE COURT: I'm not going to hear -- you can raise them as objections in connection with the case. I'm not going to have you try and derail the proceedings at this late hour. You've had time to file motions. You've raised subject matter jurisdiction in almost every proceeding, and I've rejected it.

If you want to raise an objection, you can raise it in connection with the proceeding. But we're going to get

started with our witnesses. Please have a seat. Thank you.

Mr. Mastro, call your first witness. We're not going to have opening statements.

MR. MASTRO: Okay. I call Roger Schlossberg, trustee.

MR. MYERS: I object to not having opening statements.

THE COURT: Objection's noted. Thank you.

Mr. Schlossberg, please come up and have a seat. Now, I'm going to ask what you have in your hands there. Are these your exhibits?

MR. SCHLOSSBERG: One of these books is our exhibits, and the others are materials that I think I might need to make reference to, and I'll be happy to identify them at any time I'm looking at them.

THE COURT: Okay.

MR. SCHLOSSBERG: And that's a blank page.

THE COURT: Okay. All right.

MR. MYERS: Objection, Your Honor. In the past, witnesses aren't allowed to bring materials up to the stand.

THE COURT: But do you have authority for that?

MR. MYERS: Every hearing in this case, Judge Lipp and yourself do not allow witnesses to bring materials to the stand.

THE COURT: You can take materials to the stand, but

you'll have to make them available to the other side if you're going to do that.

MR. MYERS: I don't have them. And I don't know what he's got. And he shouldn't be allowed to have up there any materials --

THE COURT: Mr. Schlossberg.

MR. SCHLOSSBERG: Your Honor, I'm not familiar with that rule. I apologize. Perhaps I'm an inexperienced litigant, and I'm an inexperienced witness. But I'm neither.

And I've been in this courtroom before. I have brought materials up with me. If I am making reference to something that's not an exhibit, I make a point of telling the Court what I'm looking at.

THE COURT: And that's fine. Just, we should be prepared to mark whatever you look at as an exhibit.

MR. MYERS: Let counsel mark it and hand it to --

THE COURT: Mr. Myers, I don't need any help from you. Thank you.

MR. MYERS: Well, I'm sorry, Your Honor.

THE COURT: Please stop talking.

MR. MYERS: Your Honor, you have. You have not allowed me to bring materials.

THE COURT: If you are not going to observe the decorum of this court and the rules and the procedures of this court, then you will not participate in these proceedings, Mr.

Myers. We've been through this before.

MR. MYERS: Yeah. You're violating my due process rights. You have ruled previously --

THE COURT: How am I doing that now?

MR. MYERS: You have ruled previously, you, in this court in one of my cases, many of my cases, and so has Judge Lipp. You are not allowed to bring materials up to the witness stand with you.

THE COURT: There is no rule that says that. If Mr. Schlossberg wants to bring materials to the stand with him, he can do that. And the materials will stay on the stand so that any other witnesses can look at them as well. We'll mark them as exhibits.

So Mr. Schlossberg, it's your choice. We can mark whatever as an exhibit, or we can put it back on the table. It's your call.

MR. SCHLOSSBERG: Your Honor, I wouldn't know what to mark at this point because I don't know that I'll need to look at something. So I will have them here. And if I get to that point, I'll pull them out of the notebook. And I will offer them to the Court.

MR. MYERS: I'm sorry. Excuse me, Your Honor.

THE COURT: That's fine. Thank you. All right.

MR. MYERS: He's not representing himself. He's up there as a Chapter 7 trustee. I'd like clarification on that.

THE COURT: Mr. Myers, if you keep speaking out of turn -- I want you to be able to participate in these proceedings, but you keep interrupting everyone. That is not the way it works. Stop it. I will give you a chance to be heard. And when it's your turn, I will hear from you. I'm speaking to Mr. Schlossberg right now.

Mr. Schlossberg, thank you. If you do pull anything out, we'll mark it as an exhibit, and we'll make it available to all of the parties in the room.

MR. SCHLOSSBERG: Understood, Your Honor.

THE COURT: Thank you. If you would turn and face Ms. Whitfield, she will place you under oath. Thank you.

THE CLERK: Please raise your right hand.

(Witness sworn)

THE CLERK: Please be seated and state your name and business address for the record.

THE WITNESS: Roger Schlossberg. Office is at 18421 Henson Boulevard, Suite 201, Hagerstown, Maryland 21742.

THE COURT: All right. Mr. Mastro, you may proceed.

MR. MASTRO: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MASTRO:

Q. Good morning, Mr. Schlossberg.

A. Good morning, Mr. Mastro.

Q. You are the Chapter 7 trustee in this case; is that

correct?
A. I have that privilege.
Q. And how long have you been the Chapter 7 trustee in this case?
A. February of 2017, I believe I was appointed, Your Honor.
Q. And how long have you been a Chapter 7 trustee in this district?
A. I have been a Chapter 7 trustee since July of 1982. I'm in my forty-second year.
Q. And --
A. Finishing it, actually.
Q. And in your forty-two years of being a Chapter 7 trustee, have you had occasion before to put forth before the Court a Rule 9019 motion for approval of a settlement?
A. I have.
Q. And what I want to focus on today, Mr. Schlossberg, is what informed your judgment to cause you to seek approval of the settlement that's currently before the Court.
MR. MASTRO: And I'll assume the Court's familiar with the papers, since we haven't gone through an opening so -- but Your Honor, if there's anything that you need clarification, please say so, and I'm happy to jump in and add that.
THE COURT: The Court has read all of the pleadings --

MR. MASTRO: Great.

THE COURT: -- that were noticed for today. Thank you.

Q. Mr. Schlossberg.

A. Yes, sir.

Q. We have an adversary proceeding, in which the trustee has been named as a defendant, and the King parties have been named as the -- they're the plaintiff, correct?

A. That is correct.

Q. And are you familiar with the claim that has been asserted by the King plaintiffs in this adversary proceeding?

A. I am.

Q. Okay. And just briefly, can you describe the nature of their claim? I believe it's a declaratory judgment claim.

A. Okay.

MR. MYERS: No. Objection.

THE COURT: On what basis?

MR. MYERS: He's testifying.

THE COURT: Overruled. You can describe the nature of the complaint, Mr. Schlossberg.

THE WITNESS: Thank you, Your Honor.

A. The -- the complaint is a two-count complaint. It includes -- oh, excuse me. No, this complaint is not. This complaint seeks the redemption, a declaration by the Court, that Mr. VerStandig's client, 6789 Goldsboro and the Kings --

and the King parties, as you described them earlier. If we're going to define them that way, I'll do that continuously, Your Honor. And the King parties have the right to redeem the class B stock. Oh, it was class B membership interests, I should say. The class B equity held by Serv Trust, a Maryland statutory trust, which -- of which Mr. Myers is the principal.

The theory is that under the terms of the operating agreement for 6789 -- I'm just going to call it that. The operating agreement for 6789 provided -- maybe I should take a moment to talk about what that provided. These folks entered into a deal in 2013. The King parties and Serv Trust, acting through Mr. Myers, entered into a deal in 2013 with regard to the acquisition of the property at 6789 Goldsboro Road in Montgomery County.

This tract of land was thought to be valuable and capable of subdivision into nineteen luxury townhouse lots. And these lots required subdivision approval from Montgomery County and from the MN -- Montgomery -- excuse me, Maryland-National Capital Park and Planning Commission. Montgomery County component. MC at the end. They -- they set it up. In order to be able to make this subdivision.

The agreement, and I'm referring to the first amended and restated operating agreement of 6789 Goldsboro LLC.

Q. And Mr. Schlossberg, can I jump in here? And I want to show you Exhibit 1. And I put that up on the screen because I

think that may be helpful. And ask you to identify it and then continue with your understanding of --

A. That is the document to which I'm making reference.

MR. MYERS: Objection, Your Honor. The problem with him having stuff up there is he just started to identify a document that hasn't been placed in the record as evidence. This is a evidentiary hearing. And then there's things popped up the screen.

THE COURT: Mr. Myers, stand up when you're addressing the Court.

MR. MYERS: Oh, I'm sorry, Your Honor.

THE COURT: Thank you.

MR. MYERS: Objection. He's just referenced a document that is not in the record. Has not been placed -- has not been marked as an evidentiary exhibit. I don't know what he's looking at. And now, there's a screen here that's not an exhibit.

This is improper. I'm entitled. If he wants to mark an exhibit, hand it to Mr. Schlossberg, and hand me a copy so I can see what it is so the exhibits are identified so the record is clear. Thank you.

THE COURT: Your objection's overruled. We use electronic copies of exhibits in this courtroom. And the exhibit that is being identified and described and in the process of being -- it's already been marked as Exhibit Number

1, and it's in the process of being identified. So your objection, I don't understand it, but the screen is showing you the exhibit.

MR. MASTRO: Thank you.

THE COURT: Mr. Mastro, you may continue.

MR. MASTRO: Thank you, Your Honor.

BY MR. MASTRO:

Q. Mr. Schlossberg, do you recognize what I've put on the screen that's been marked as pre-marked as Trustee Exhibit 1?

A. I do.

Q. And --

A. And I have the same copy in front of me in my notebook, Your Honor.

Q. And what are we looking at here?

A. We are looking at the operating agreement of 6789, which was formed in July of 2013. The execution date on this document -- how do I get to the end of that?

Q. I can scroll down.

A. No, it's right in the first paragraph, on page -- probably page 2. There we go. July 18th, 2013, they entered into this agreement. This agreement provided for a three-year period, during which Mr. Myers, as the manager of this LLC, was to act on behalf of the parties -- excuse me, on behalf of 6789 and the equity partners therein to --

MR. MYERS: Objection. The document speaks for

itself.

THE COURT: Objection overruled. Mr. Schlossberg can testify as to what his understanding of this agreement is.

A. For the purposes of getting the property approved for subdivision into hopefully nineteen town -- nineteen townhouse lots. The agreement went on to provide that Mr. Myers put precious little into it in terms of cash, whereas the class A members put $1,785,000 in as the initial capital investment. That initial capital investment was utilized to purchase the property from its then-owner for $1,350,000, plus roughly $35,000 of settlement expenses. And the remainder of the money was to be used as required in the administration of the purposes of the entity, and I just described what the purposes were. The agreement went on to --

MR. MYERS: Your Honor, objection. This isn't just, like, a running thing. He needs to ask a question. He needs to answer it. And I have a -- I need to have a chance to object. He can't just stand up there and testify for an hour about what he thinks about different subjects.

THE COURT: Objection overruled. You may continue.

THE WITNESS: Thank you.

A. The agreement goes on to provide that the class A members are obliged to bring additional capital to the table, as required for the purposes of the entity. They've committed themselves to three -- committed themselves to $300,000 of

additional capital, with no restriction on their ability to exceed that number, if they so choose.

The agreement goes on to make clear that the three-year period that I've just described as the period within which they expected or hoped or prayed to get the subdivision approval, that the expiration of that three-year period, the class A members have the right to seek to redeem their -- the class B -- I referred to it as stock, again. I apologize. It's membership interest, of course. Have the right to redeem the class B membership interest under an appraisal and redemption scheme that's set out in 7.7, I think it is. No, no, the -- the -- how do I move this page here?

BY MR. MASTRO:

Q. Yeah, I'll move it.

A. Fingers? Yeah, apparently so.

THE CLERK: Mr. Schlossberg, you don't have the option to move it at this time.

MR. MYERS: Oh, I can't move it?

THE CLERK: No, Mr. Fasano (ph.) has to move that.

MR. MYERS: Oh, that's not like the district court, where I did this. Okay. All right. I'm sorry.

BY MR. MASTRO:

Q. All right. I moved, Mr. Schlossberg, to section 7 of the --

A. Okay.

Q. -- operating agreement --
A. Go to the next page.
Q. All right.
A. Go to the next page, please.
Q. Okay. Did you review this portion of the operating agreement?
A. Yes.
Q. Okay. And what section would you like me to scroll down to?
A. I believe it's 7.7. There we go. Redemption.
Q. Okay.
A. The scheme is established through various sections, but I'm just going to focus on this. So let me set you up for it. The -- at -- at -- after the three-year period, the class A members had the right to demand an appraisal of the property.

The mechanism for doing that is it's a variation of the three-step that we've all seen lawyers in this sort of thing, where one party asks for an appraisal. The other party then -- and designates who their appraiser would be. The other party has a similar right to choose an appraiser. The appraisers get together. If they can't agree, they agree on a third appraiser. And you establish the appraised value of the property in that fashion.

That number, that appraised value number, is then utilized in connection with the redemption provision in

section 7.7. Under 7.7, if the class A members at any time after the three years wish, and if the property has not reached a state of entitlement, as it's used in this document, that is the zoning and subdivision has been approved -- I should say subdivision. I don't think it was a zoning issue per se. But they had entitlement to develop it for nineteen townhouse lots.

If they don't have that by the end of the three-year period, and they have the right, then, to exercise the appraisal option in connection with a proposed redemption.

THE COURT: All right. Hold on just one moment. Mr. Myers is standing.

Yes, Mr. Myers.

MR. MYERS: Objection, Your Honor. Relevance. Why is he even talking about this Serv Trust property is not property of this estate. He's never filed an adversary against Serv Trust. The Maryland case is ongoing and is on appeal currently. And there's no final judgment. What is the basis of his testimony? I'd like to know what the basis of this whole exercise in discussing Serv Trust, the King parties, and 6789 Goldsboro Road is because he has no -- he has no involvement in it.

THE COURT: Well, you will have an opportunity to cross-examine him. And you can ask those questions at that time. Your objection --

MR. MYERS: I can't get a proffer is what the basis of this is?

THE COURT: No. You can cross-examine him. Your objection's overruled.

I interrupted you, Mr. Schlossberg. Were you finished answering the question?

THE WITNESS: I don't think I was, Your Honor.

BY MR. MASTRO:

Q. Mr. Schlossberg, if I could just direct you here to the -- I think where you left off was you were getting into once the appraised value is established, what's the next step in the appraisal process and the redemption of class B member under 7.7?

A. Under the provisions of the agreement, and specifically section 7.7, the class A members have the right to seek to redeem the class B interest, the membership interest, if they -- if it is determined that the appraised value is less than the sum of the following items.

And we are looking here, Your Honor, at the fourth line in 7.7, Your Honor. Two. Three four. Oh, excuse me. Fifth line. Sentence. That line in the second word commences with, "If the appraised value is less than or equal to the sum of", and then there are four items that have to be summed up. There is the unpaid cumulative initial capital return, the unrecovered initial capital, the unpaid cumulative additional

capital return, and the unrecovered additional capital.

Now, Your Honor, the order in which they're put makes it a little unusual, so I'm going to try and explain what that is all about. The second phrase, the unrecovered initial capital, that refers to the $1,785,000 that had to be put up by the class A members.

MR. MYERS: Objection, Your Honor. The document is very complicated, drafted by Pillsbury, and he's out of the blue making up definitions that are not in the operating agreement.

THE WITNESS: That's not so Your Honor.

MR. MYERS: And he doesn't even have the final operating agreement.

THE COURT: Your objection's overruled. Mr. Myers, you'll have an opportunity to cross-examine him.

Please continue.

A. The unrecovered initial capital. The initial capital is the $1,785,000. The capital return referred to in the first phrase, unpaid cumulative initial capital return, refers to a provision earlier in this agreement, which says that the class A members are entitled to that phrase, initial capital return, which is calculated at ten percent per annum on the initial capital. That is a number which continues to run for the entire period from 2013, when it was first put in, until there's been a return of that capital. Excuse me. There's

been a recovery of that capital. At ten percent per year on $1,785,000, that's $178,500 per year.

Unrecovered initial capital is the initial capital that has not been paid back to these folks, that they have not recovered, which they could recover from operations if there was operational cash to take it from or on a sale or other development, just the way property works. Now, again, it's the sum of four things. So first, it's the sum of the 1 million-785 plus interest at ten percent per annum running on that rate up until the present time. Then you have the third item, unpaid cumulative additional capital return. And then the fourth, sort of out of order, the unrecovered additional capital.

The unrecovered additional capital, or let's just say the additional capital. Additional capital is monies that had to be put in to fund the operations of the entity as it tried to reach its goals, which initially was committed to be expended in the sum of $300,000 by the class A members.

MR. MYERS: Objection, Your Honor. There's no question here. I don't know what he is answering. What is the question that he's answering?

THE COURT: Objection overruled.

Mr. Schlossberg, you may continue.

THE WITNESS: Thank you, Your Honor.

MR. MYERS: On what question? What is the question,

please?

THE WITNESS: Yeah. I'm sorry. I keep getting interrupted here, as I'm trying to --

MR. MYERS: Yes, I'd like to know what the question is that he has --

THE WITNESS: It's obvious he's trying to disrupt me.

MR. MYERS: -- been answering for thirty minutes.

THE COURT: His understanding of the document. That was the original question.

MR. MYERS: So it's Roger Schlossberg, Chapter 7 trustee's understanding of this document. And he can just sit here for forty-five minutes and conjecture about what it means?

THE COURT: Yes, he can. Objection's overruled.

Mr. Schlossberg, please continue.

THE WITNESS: Thank you, Your Honor.

A. The additional capital was originally committed at $300,000, with no limitation on the ability of the class A members to put additional funds in.

Over a period of time, a very substantial additional sum was put in in excess of another million dollars, including some $600,000 plus that was put in by those, the class A members, put into Goldsboro as additional capital so that it, Goldsboro, could then lend that money to Serv Trust, and Serv Trust then lent that money to Mr. Myers. That $1 million is

additional capital on top of the million-3. I don't know how much additional was put in after May 2nd, 2018. Sorry. I was trying to remember the -- I have a note on that, but now I can remember it.

Since May 2nd, 2018, obviously there have been continuing expenses involved in the operation of this entity. There was taxes that had to be paid on an annual basis, which as of the date of the Lipman appraisal, were $17,000 a year. I'm sure they've gone up some, but if they haven't, let's just use the 17,000 --

MR. MYERS: Objection, Your Honor. This has nothing to do with the agreement. Now, he's testifying about taxes and the operation of 6789 Goldsboro LLC.

THE COURT: Objection overruled.

You may continue.

A. Those taxes would have to be paid on an annual basis from 2018 to this year. That's another 140, $150,000.

There are other expenses involved in the operation, which included utility charges, upkeep, landscaping, et cetera. I don't know what all those numbers are. I just know that somebody had to pay it, and the -- only the class A members were obliged to advance the money for that purpose. Perhaps Mr. Myers paid some of it, and if he did, I'm sure he'll tell us about that at some point. And he'll correct me on that apprehension that I have.

The important thing is here, Your Honor, on all that additional capital, it also has a return that was assured to the class A members. Just as there was an assured return of ten percent on the initial capital, there is also an assured return of ten percent on the additional capital. As of May 2nd, 2018, there was over $1 million of additional capital which had been expended. From that date forward --

MR. MYERS: Objection, Your Honor. There has been no basis set for him to make that statement. He has no knowledge of that, unless somebody can show a predicate for that testimony.

THE COURT: Your objection's overruled. You can question him on cross-examination as to the basis for that knowledge.

You may proceed.

A. I do not know, Your Honor, because it would require an extensive calculation. How much of that $1 million was expended on the first day in 2013, on July 13th -- July 18th, 2013, or if it was expended on May 1st -- excuse me. That was '13, of 2013, or if it was expended at the end of that period. So I'm not going to try and calculate how much of that should have accrued each year until 2018.

But as of 2018, there was over $1 million, slightly over $1 million, in expenditures funded by additional capital. At the ten percent additional capital return assured under the

terms of this agreement, that's another $100,000 a year, which would have been added in to the form -- the redemption formula. It's seven years since then, Your Honor. That's another $700,000, not including the calculation of the return on additional capital for the first five years from 2013 to 2018 and not including any additional capital put in after 2018.

BY MR. MASTRO:

Q. And Mr. Schlossberg, if I may, you pointed out before. You have you get an appraised value and then you have the sum of these four values that you're talking about. What happens next in the appraisal process?

A. The class A members get their appraisal, Your Honor. They obtained an appraisal, which is an exhibit here.

Q. Look, just, before we get to that, Mr. Schlossberg --

A. Yeah.

Q. -- just, under the agreement, what happens when you compare the two sets of numbers?

A. Thank you. I misunderstood.

Q. Then we can get to that.

A. Okay. If the appraised value is in excess of the -- if the appraised value is in excess of the sum, which is -- excuse me, in excess of the sum of those four items that I just described that the class A members are entitled to get as a return, either recovery of -- of initial or additional

capital or accrual of return on investment, as it is phrased in here as initial capital return or additional capital return. If the appraised value exceeds those numbers, there is no automatic right of redemption given to the class A members.

If, on the other hand, the expenses -- excuse me, the sum of the four items, if the sum of the four items exceeds the appraised value as a matter of law, as by operation of the document, the class A members are entitled to redeem the -- redeem the class B membership interest in consideration of past consideration, that is, these items which they haven't been paid.

MR. MYERS: Objection. Is he testifying as Chapter 7 trustee, or is he now, as a matter of law, "testifying" as some kind of expert? Because he's up there as a Chapter 7 trustee. He's not up there as a legal expert in operating agreements.

THE COURT: He is testifying as the Chapter 7 trustee appointed in this case.

You may continue. Objection's overruled.

MR. MASTRO: Thank you, Your Honor.

Q. Mr. Schlossberg, we have on the screen Exhibit 1. Again, just for the record, is this something that you reviewed and relied on in reaching your conclusion as to the settlement agreement and your support for it?

A. Yes.
Q. And is what we have on the screen a true and accurate copy of what you, in fact, reviewed?
A. Yes, it is.
MR. MASTRO: Your Honor, I would like to move Trustee's Exhibit 1 into evidence.
MR. MYERS: May I see it, please? Do you have an extra copy?
MR. MASTRO: It's on the screen, and I emailed you an extra -- I emailed you these exhibits.
MR. MYERS: But do you have an extra copy I can look at?
MR. MASTRO: No, I don't.
THE COURT: Mr. Myers, did --
Ms. Whitfield.
THE CLERK: Yes.
THE COURT: Was he included on the email with the protocols?
THE CLERK: Yes.
THE COURT: Mr. Myers, it is the procedure of this Court to use electronic exhibits. It's on the court's website. Those protocols were emailed to you. And so you're expected to look at the exhibits that have been docketed on the docket.
The trustee has eleven exhibits, and the King parties

have three exhibits. You, I note for the record, did not pre-file your exhibits as required, but we'll get to that if and when we need to. But these exhibits were pre-filed with the Court and sent to you. So if you do not have copies --

MR. MYERS: So Mr. --

THE COURT: So you did not bring copies with you?

MR. MYERS: I don't have copies, Your Honor. Mr. Mastro holding what he says is Exhibit 1. And Mr. Schlossberg is not reading off the screen. He's reading off of something. Piece of paper on the desk.

THE COURT: Well, he brought his own --

MR. MASTRO: Just for the record --

THE COURT: He brought his own copy of the exhibits so that he could look at them on paper form, which is what anybody is entitled to do, including you.

MR. MYERS: Okay. But don't you typically mark the exhibits and let him look at it first?

THE COURT: It's marked.

MR. MASTRO: Well, don't you mark it and hand it to him and let him read from the exhibit that's marked that's going to go into evidence?

THE COURT: It's marked. We use electronic exhibits in this courtroom.

MR. MYERS: Okay.

THE COURT: It's marked. If you would like the Court

to take a recess and print off a copy of the agreement, which has your signature on it, I'm happy to do that. Do we need to do that, Mr. Myers? Would you like a paper copy?

MR. MYERS: As long as I can look at it when I cross-examine him, if that's possible, then we don't need to take a break. But if not, yeah, I'd like to have a copy.

THE COURT: Court will take a five-minute recess. The Court will print copies for Mr. Myers because he did not bring his own copies, as instructed.

MR. VERSTANDIG: Thank you, Your Honor.

THE COURT: We will take five minutes.

THE CLERK: All rise.

THE COURT: Mr. Schlossberg, you are still on the stand. I would like you to stay in the witness box. You are not able to discuss your testimony with anyone.

THE WITNESS: I just want to get my bottle of water, if I can.

MR. MASTRO: I can bring it to him.

THE COURT: Thank you.

MR. MASTRO: Thank you.

THE CLERK: All rise. Court is now in recess.

(Whereupon a recess was taken)

THE CLERK: All rise. United States Bankruptcy Court for the District of Maryland now resumes its regular session, the Honorable Maria Ellena Chavez-Rurak presiding.

Please be seated.

THE CLERK: All right. So Mr. Mastro --

MR. MYERS: Thank you, Your Honor.

THE COURT: You're welcome.

So Mr. Mastro had moved for the admission of Exhibit 1.

Mr. Myers, do you have any objection?

MR. MYERS: Objection. Relevance.

THE COURT: Your objection's overruled. The Court will admit Exhibit Number 1.

(Agreement was hereby received into evidence as Trustees' Exhibit 1, as of this date.)

MR. MYERS: Well, what is the relevance of this exhibit?

THE CLERK: Mr. Mastro, ask your next question.

MR. MASTRO: Thank you, Your Honor.

RESUMED DIRECT EXAMINATION

BY MR. MASTRO:

Q. Mr. Schlossberg, did there ever come a point where the King parties demanded an appraisal pursuant to the appraisal procedures in the operating agreement that you just described?

A. Yes, sir.

Q. Okay. And I want to show you what we've pre-marked as Trustee's Exhibit 2. Do you recognize this document that's on the screen?

A. I do.
Q. Okay. And what are we looking at here?
A. We are looking at a letter from Mr. VerStandig on behalf of the King parties making a demand on Serv Trust as the class B party to -- to designate -- to designate an appraiser. Again, I can't move down the page as quickly so --
MR. MYERS: Objection. The letter speaks for itself.
THE COURT: Your objection's overruled.
Q. Okay. And Mr. Schlossberg, the letter is dated August 23rd, 2017. Does that fall more or less than three years after the operating agreement was entered into?
A. That's -- that's just over four years afterwards.
MR. MYERS: Clarification, Your Honor. You overruled my objection that the letter speaks for itself. Are you suggesting that it doesn't speak for itself, or you're noting my objection, for the record?
THE COURT: Your objection is noted, and it's overruled.
Mr. Mastro, please continue.
MR. MASTRO: Thank you, Your Honor.
Q. So Mr. Schlossberg, I believe your testimony is that you understand this letter to be a demand for an appraisal?
A. It is. It is a demand for appraisal. Yes, sir.
Q. Okay. And is this something that you reviewed and relied upon in forming your opinion regarding the settlement at

issue?
A. Yes.
Q. And is this a true and accurate copy of the demand letter sent by Mr. VerStandig?
A. It's true and accurate copy of the one that I --
Q. The one that you reviewed?
A. -- that I reviewed. Yes.
MR. MASTRO: Correct. Your Honor --
MR. MYERS: Objection. I don't know what that even means.
THE COURT: Objection's overruled. You can cross-examine the witness.
MR. MASTRO: Your Honor, I'd like to move Exhibit 2 into evidence at this time.
THE COURT: Any objection, Mr. Myers?
MR. MYERS: Yes, I object.
THE COURT: And the basis is?
MR. MYERS: The basis is this is just a copy that was filed in the Court record. I have no idea if it's a true and accurate copy.
THE COURT: Your objection's overruled, and Exhibit 2 is admitted.
(Demand letter from King parties was hereby received into evidence as Trustees' Exhibit 2, as of this date.)
Q. And Mr. Schlossberg, after this letter was sent, what is

your understanding as to whether or not an appraisal was ever performed?

A. My understanding is that there was an appraisal performed by the class A member -- at the request of the class A members by Lipman Frizzell prior to the date of that letter.

Q. And Mr. Schlossberg, let me show you what's been pre-marked as Exhibit 3. Do you recognize this exhibit?

A. I do.

Q. And is this the appraisal report from Lipman Frizzell that you were just referring to?

A. That is the one that I reviewed, and that is my understanding.

Q. And this is the appraisal report that you reviewed in connection with your evaluation of the settlement, the proposed settlement?

A. That is correct, Your Honor.

Q. Okay. And what did the appraisal say as to the value of the property?

A. The appraisal opined that as of July 3rd, 2017, the property had a value in a range between $1 million and $1,325,000.

Q. And is that value more or less than those four numbers we saw before that represented the contributions and returns of the class A member in Goldsboro?

A. Even without the consideration of the items as to which I

indicated a lack of knowledge, or in one case, computation, this valuation is by an order of magnitude less than the total that is the sum of those four items, Your Honor.

MR. MASTRO: And Your Honor, at this time, I'd like to move Exhibit 3 into evidence.

THE COURT: Well, isn't the appraisal hearsay, Mr. Mastro?

MR. MASTRO: Well, this is what Mr. Schlossberg relied upon in forming his opinion. So it's not necessarily offered for the truth, Your Honor. That it's just simply what he relied on and what the evidence would show in the adversary case.

MR. MYERS: Objection. Hearsay. It won't show anything, Your Honor.

THE COURT: Mr. Myers, please stand when you address the Court.

Mr. VerStandig, I see you standing.

MR. VERSTANDIG: Objection.

THE COURT: What would you like to say regarding this?

MR. VERSTANDIG: Your Honor, under 9019, the question is the reasonable exercise of the trustee's business judgment, not a mini trial of the underlying case. So the question for the Court is whether it's a true and accurate copy of what the trustee relied upon, not whether it's a true and accurate copy

of what an appraiser said, nor even of the underlying veracity. It's not being introduced for the underlying truthfulness thereof. It's being introduced to the truthfulness of the trustee's diligent review and reliance thereupon.

THE COURT: Mr. Myers, you're standing. What would you like to say?

MR. MYERS: Objection. Hearsay. Just as the Court said. This is a bogus appraisal, and it's worthless.

THE COURT: All right. Well, the Court is not going to admit the appraisal based on hearsay grounds. Of course, Mr. Schlossberg is welcome to testify about what he reviewed and what he considered, and he has already done that so -- but the Court does not need to admit Exhibit Number 3 to understand his testimony. So the Court will not admit it as hearsay.

Q. And Mr. Schlossberg, in your review of the position asserted by the King parties in this adversary case, did you come to any conclusions on your own as to the relative merits of their position?

A. As to the question of whether the four cited items in section 7.7, if the some of those items vastly exceeded the valuation performed by the -- the Lippman Frizell firm, and as such, I reached the conclusion in my valuation of what a trial would result in if this -- if the adversary went to trial. It

is my opinion that the conclusion of the fact finder would be that the total return to which the class A members are entitled under section 7.7 and the -- and the balance of the agreement, what they're entitled to is much higher than the valuation of the tract of property. And as such, they had the right to redeem without payment of any sums, other than that consideration they had already provided.

Q. Now, Mr. Schlossberg, did you also consider any potential defenses to the Kings' claim in the adversary case, including any defenses that were raised by Serv Trust when the case was in state court?

A. Of course, I did, Your Honor. My job as a Chapter 7 trustee in evaluating a compromise and settlement offer is to determine what's going to happen if I don't settle this case, if I take it to trial. If it goes to trial, I've told you already my initial conclusion, that they could reach the number that would allow them, that is, the class A members, that would allow the class A members to a declaration that the property had been redeemed and properly so.

On the other hand, Mr. Myers raised objections in the state court proceedings. Several objections. Number 1, he raised the objection that the -- that he had, in fact -- let me take this in order. I'm sorry. I want to get my thoughts in order, Your Honor.

Q. Mr. Schlossberg, maybe if I could just direct you here.

A. Go ahead.
Q. You had mentioned earlier in your testimony that the Lippman appraisal was dated six days prior to the date of the letter, what we what we saw marked as Exhibit 3, that is dated three days prior to what's been admitted as Exhibit 2. Did you have any --
A. I'm sorry, Mr. Mastro. I -- I had this problem in this courtroom a couple weeks ago. I really can't hear.
Q. I'm sorry. Let me get closer to the microphone.
A. Thank you.
Q. You mentioned in your testimony that the date of Exhibit 2 is August 23, 2017 --
A. Yes.
Q. -- and that the Exhibit 3, the appraisal, actually predates August 23.
A. Yes.
Q. Did that create a potential defense, in your mind, in your evaluation?
A. It -- it did not raise a -- a defense in my mind, but it did raise a defense, apparently, in Mr. Myers' mind. Mr. Myers urged in state court that the appraisal could not be considered to be a proper appraisal for purposes of the redemption analysis required because it was dated prior to the date that a demand was made for appraisal.
MR. MYERS: Objection, Your Honor.

Q. And --

MR. MYERS: Objection.

THE COURT: Basis.

MR. MYERS: I was not a party to the proceeding in state court. I didn't make an objection to the appraisal. He's making things up.

THE COURT: Well, you'll have an opportunity --

MR. MYERS: The transcript is clear that I'm not a party to that proceeding.

THE COURT: Your objection's overruled. You'll have an opportunity to testify and to cross-examine the witness.

Mr. Mastro.

MR. MYERS: Well, I'd appreciate if he says, when I made an objection, be specific as to what proceeding that I made such an objection.

THE COURT: All right. Your objection's overruled.

Mr. Mastro.

MR. MASTRO: Thank you, Your Honor.

Q. Mr. Schlossberg, you were saying you were considering the objections raised by Serv Trust in the state court. Is there anything in your review of the operating agreement that --

MR. MYERS: Objection.

THE COURT: Basis.

MR. MYERS: Mr. Mastro -- Mr. Schlossberg testified that the objection was by me. Now, Mr. Mastro is eliding over

that fact and saying the objection was by Serv Trust. I am not Serv Trust. So please be specific. Rephrase the question. Do something.

THE COURT: All right. Thank you.

Mr. Mastro, rephrase your question, please.

Q. Mr. Schlossberg, in considering the objection that was raised in the state court regarding the date of the appraisal, did you review it the -- in your review of the operating agreement, did you discover any provision addressing when the appraisal needed to be dated?

A. Well, in considering the objection that was raised in the state court on behalf of the class B member -- and I may have confused the issue. I didn't mean to confuse Mr. Myers. I thought he would be up to speed on it, but I apologize.

In considering that, Your Honor, I did review the operating agreement to see if the operating agreement had an express requirement that the appraisal be dated after the date of demand for appraisal. And in fact, not unsurprisingly, it is not. There is no such clause in the agreement that I could find. Perhaps I'll learn of some on cross-examination.

Q. Now, you testified you understood there was an appraisal that was done by the King -- you testified that you understood there was an appraisal done by the King parties?

A. Yes.

Q. Do you have any knowledge as to whether there was an

appraisal done by Serv Trust?
A. It is my understanding from review of the state court proceedings that there was none ever done by the Serv Trust parties by the class B -- class B member.
Q. And in your --
MR. MYERS: Objection. Basis.
THE COURT: You'll have an opportunity to cross-examine him. Your objection's overruled.
Please continue.
Q. And Mr. Schlossberg, did the fact that this Serv Trust did not have its own appraisal, is that a potential defense that you evaluated?
A. It -- it -- it is a defense that I evaluated because it was raised by the class B member in state court as a reason, as a defense, somehow, to the position of the King parties in that litigation. But in evaluating it, I don't think it's any defense at all. I mean, the reality is, Your Honor, when you have an appraisal provision --
MR. MYERS: Objection. He answered the question. Next question, please.
THE COURT: Objection overruled. Please continue.
A. When you have an appraisal provision similar to the one that's here, it's common practice. I can't ever remember not doing this. You go get your appraisal first and find out whether or not you're barking up the wrong tree. You've got

to know what you've got before you go into the process.

MR. MYERS: Objection.

THE COURT: Basis.

MR. MYERS: Common practice is irrelevant.

THE COURT: Objection overruled.

MR. MYERS: And by the way, Your Honor, Mr. Mastro seemed to suggest that Serv Trust didn't get an appraisal, and that's not been established and is a question. Thank you.

THE COURT: Well, you'll have an opportunity to put on evidence, Mr. Myers.

MR. MYERS: I just want to correct the record.

Mr. Mastro.

MR. MASTRO: Thank you, Your Honor.

BY MR. MASTRO:

Q. Mr. Schlossberg, were there any other defenses that you considered that perhaps were raised by Serv Trust or other defenses?

A. Yes, Your Honor. There -- there was a -- there was apparently a laudable attempt by -- by all parties, the class A members and the class B members, to resolve the -- the matter of the redemption by some kind of negotiation. And this, Your Honor, occurred in after the expiration of the three-year period in July of 2016. There apparently was some back and forth, and the parties entered into a memorandum of understanding. Excuse me. The parties considered a

memorandum of understanding, which was executed by the class A members and then delivered to Mr. Myers on behalf of the class B membership interest for execution.

Q. Okay. And Mr. Schlossberg, let me show you what I've marked -- what we've pre-marked as Exhibit 4. And is this the memorandum of understanding you were just referring to that you reviewed?

A. This is.

Q. And you reviewed this in connection with your evaluation of the proposed settlement?

A. I did.

Q. Okay. And you state that it was -- well, what's your understanding of the terms of the memorandum of understanding and when it needed to be accepted?

A. This document, Your Honor, is it's a very simple document. It's a simple transaction --

MR. MYERS: Objection. The document speaks for itself.

THE COURT: Objection's overruled. Please continue.

A. This is a simple document, Your Honor. And it's a simple, relatively simple, transaction. The class A members are going to buy-out the class B member by a purchase of the class B membership for $2 million. This document, it's hard to say what date it was prepared because there's no date on the document, but it is not difficult to figure out the range

of dates within which it could have happened.

It had to have happened after July 13th of 2016, the end of the three-year period, and it had to have occurred before September the 12th of 2016 because this document has at paragraph 6 provisions for mandatory execution and closing dates. The document had to be executed by September 12th of 2016, or the document shall be null and void. And I'm quoting from paragraph 6. And then the closing on the purchase would have had to have been made by less than a month later, October 7th, 2016.

So I know that the document was prepared or you can impute that the document was -- was -- was drafted between the 13th of July and the 12th of September. The copy that the Court sees is a copy that's signed by the King parties. It is not a copy that's signed by Mr. Myers.

In the state court litigation, the class B member urged that he, in fact, had executed that agreement and had caused it to be delivered by United States mail, having been posted on September 12th, 2016, within the terms of paragraph 6.

Q. Mr. --

MR. MYERS: Objection, Your Honor. The state record has a fully signed copy of this. Judge Albright reviewed it, and Judge Albright ruled it was an enforceable agreement. Mr. Schlossberg knows it, and they've intentionally put in here a document that's half signed, which is their typical MO.

This is outrageous. The document's been fully signed. There was a hearing in front of Judge Albright. Judge Albright ruled. Told Mr. VerStandig to his face, this is an enforceable agreement. Thank you.

THE COURT: Your objection is noted, and it's overruled. You are welcome to introduce another copy of the agreement as part of your case.

Mr. Mastro --

MR. MYERS: He doesn't have standing anyway so --

THE COURT: -- you may continue.

MR. MYERS: -- we'll get to that.

Q. And Mr. Schlossberg, let me show you what I've marked as Exhibit 5. It's an email chain that begins at the bottom, January 10, 2017, and concludes January 16th, 2017. Do you recognize this?

A. Yes, I've seen this before, and I relied on this in my exercise of my judgment.

Q. Okay. And --

MR. MYERS: Objection. Hearsay.

Q. And --

THE COURT: Your objection's overruled. He is the Chapter 7 trustee for you, Mr. Myers, and you were a party to this communication.

MR. MYERS: This still doesn't make it not hearsay.

THE COURT: All right. He stands in your shoes. He

is a Chapter 7 trustee. So he has the same right to the document that you would have outside of bankruptcy.

MR. MYERS: Excuse me, Your Honor. He would not have the same right. My estate was established on November 18, 2015. This document's dated January 16, 2017. He has no -- he doesn't stand in my shoes at all past November 18, 2015. Period.

THE COURT: All right. Well, he can offer it as a document that he reviewed and relied on in making his decision to enter into this settlement agreement, but it will not be offered for the truth of the matter asserted, Mr. Mastro.

MR. MYERS: Thank you.

BY MR. MASTRO:

Q. Okay. Mr. Schlossberg, you said you had reviewed this exhibit. I believe it's Number 5. And what, if any, conclusions did you draw from your review of this exhibit?

A. on its face, Mr. King rejects the assertion that Mr. Myers made that it had been sent to him by mail on September-- they put it into issue. Puts the question at issue, I think.

MR. MASTRO: Okay. And Your Honor, at this time, I want to move into evidence Exhibits 4 and 5.

MR. MYERS: Objection, Your Honor. Exhibit 4 is incomplete, and it's hearsay.

THE COURT: The objection is overruled, and it is admitted.

(Memorandum of understanding was hereby received into evidence as Trustees' Exhibit 4, as of this date.)

THE COURT: And Mr. Myers, you are welcome to introduce a copy of the memorandum of understanding in your case.

Exhibit 5 is also, for the reasons I stated, admitted not to prove the truth of the matter asserted but simply as a document that the trustee reviewed and considered in making his decision to enter into this settlement.

MR. MYERS: Objection. Same objection for Exhibit 5. It's hearsay.

THE COURT: Okay. It is not hearsay.

MR. MYERS: Why isn't it hearsay?

THE COURT: It's an agreement.

MR. MYERS: It's not an agreement. It's an unsigned, partial whatever. It's not the agreement.

THE COURT: All right. Well, to eliminate yet another issue for the appeal that is likely to follow whatever the Court's decision may be, the Court will admit Exhibit 4 not for the truth of the matter asserted but as a document that was considered by Mr. Schlossberg in reaching his decision.

For the same reason, the Court should admit Exhibit 3, but I'm not going to because the Court doesn't need to. We have the testimony of Mr. Schlossberg.

So Exhibit 4 and 5 are admitted not for the truth of the matter asserted.

(Email chain was hereby received into evidence as Trustees' Exhibit 5, as of this date.)

BY MR. MASTRO:

Q. And Mr. Schlossberg, did you consider anything else in evaluating this potential defense that the memorandum of understanding was executed by Serv Trust? Or by Mr. Myers here? I guess it's two members here that -- but something that Serve Trust asserted below.

A. I'm sorry. Can you clarify the question, please? I didn't understand it.

THE COURT: Reask the question.

Q. Yeah, I should do that. That wasn't a very artful ask. Mr. Schlossberg --

THE WITNESS: What exhibits are admitted at this moment, Your Honor? I'm sorry. I'm just getting confused.

THE COURT: At this point, Exhibits 1, 2, 4, and 5 have been admitted.

THE WITNESS: All right. 1, 2, 4, and 5. Okay.

THE COURT: Yes

THE WITNESS: Thank you.

THE COURT: You're welcome.

A. Go ahead, Mr. Mastro.

Q. Mr. Schlossberg, did you do any further investigation or

further review of any documents or materials in connection with the issue that was raised regarding the memorandum of understanding?

A. Yes.

Q. Okay. And what, if anything, did you look at or review?

A. Your Honor, it was brought to my attention that notwithstanding that the class B member takes -- was taking the position that he had accepted the terms of the memorandum of understanding in a timely way. It was my understanding that there was no closing on that by the date required for closing. Further, it was my understanding that there was continued action taken by the class B member towards the development of the property, notwithstanding the fact that he had exercised his right to be bought out for $2 million.

MR. MYERS: Objection.

THE WITNESS: I'm talking.

MR. MYERS: Objection. You say exercise his right. What are you talking -- the agreement is with Serv Trust.

THE WITNESS: Well, the memorandum --

MR. MYERS: Serv Trust is not a his.

THE COURT: You will have the opportunity to put on evidence and to cross-examine this witness, Mr. Myers.

Please continue, Mr. Schlossberg.

A. And that that was inconsistent with the assertion that there was a binding deal made under the memorandum of

understanding that would have yielded the class B member a net payment of about $1,250,000. I think $1,254,000. Because the $2 million was to be netted out under the terms of the memorandum of understanding so that the loans that had been made to -- by Goldsboro to Serv Trust for the purpose of then lending it to Mr. Myers had to be paid back. And there was a balance of $635,000 due on the principal, and there was approximately another 100, 105, 110 apparently due in interest, leaving a net that Mr. -- that the class B member could have walked away with for about a million and a quarter.

Q. Okay. And Mr. Schlossberg, you mentioned some possible inconsistencies. I want to show you Exhibit -- let me go to Exhibit 6, I believe. Let's start with that one. Showing you what's marked as Trustee's Exhibit 6. Again, it's an email chain, in which both Mr. Myers and Mr. King are parties to. It's in October of 2016. Do you recognize this?

A. I do.

Q. And is this one of the documents that you considered in connection with your evaluation of the MOU defense, I'll call it?

A. Yes, it is.

Q. Okay. And let me show you Trustee's Exhibit 7. This is another email chain with --

A. And that document's significant also because that's the day before closing was supposed to happen.

MR. MYERS: Objection. Hearsay.
Q. You're referring to Exhibit 6?
A. Yes.
Q. Okay.
THE COURT: Your objection's overruled. Continue.
Q. And Exhibit 7, as I was saying, this is an email chain in late November of 2016. Again, Mr. King and Mr. Myers are on this chain. Is this Exhibit 7 a document that you reviewed and considered in connection with your evaluation of the MOU defense?
A. It absolutely is, yes.
Q. Okay. And lastly, I want to show you Trustee's Exhibit 8, which is a single email from Mr. Myers to Mr. King and others dated December 15th, 2016. Is this an email that you considered as well?
A. I'm -- I'm sorry. I got caught up in -- in 7. So many pages. It's a very lengthy series of emails.
Q. Sorry. Exhibit 8.
A. Okay. 8. Got it.
Q. Is this an email that you considered?
A. Yes, it is.
Q. And are Exhibits 6, 7, and 8 true and accurate copies of emails that you reviewed?
A. They are true and accurate copies of the emails which I reviewed.

MR. MASTRO: And Your Honor, I'd like to move in Trustee's Exhibit 6, 7, and 8 at this time.

MR. MYERS: Objection. Hearsay.

THE COURT: The objection's overruled. The Court will admit Exhibits 6, 7, and 8, not to prove the truth of the matter asserted, but simply as documents and information considered by the trustee.

(Email chain was hereby received into evidence as Trustees' Exhibit 6, as of this date.)

(Email chain was hereby received into evidence as Trustees' Exhibit 7, as of this date.)

(Email chain was hereby received into evidence as Trustees' Exhibit 8, as of this date.)

THE COURT: Mr. VerStandig, you're standing.

MR. VERSTANDIG: Your Honor, solely for supplementation of the record. Had our position been elicited on the hearsay objection, we would have additionally noted them to each be statements by a party opponent. Simply noting for the record, understanding there may be a record. Thank you.

THE WITNESS: Your Honor, I'm sorry. I didn't hear Mr. VerStandig.

THE COURT: Mr. VerStandig made the point that they should also be admitted as an admission of a party opponent.

THE WITNESS: Okay.

THE COURT: And the Court will admit them as an admission of a party opponent.

MR. MYERS: Objection, Your Honor.

MR. VERSTANDIG: Thank you, Your Honor.

MR. MYERS: Who's the party opponent?

THE COURT: Are you not opposed to the trustee today, Mr. Myers?

MR. MYERS: I'm not a party to this case.

THE COURT: You're --

MR. MYERS: I'm a party-in-interest, but I'm not a party opponent. And they shouldn't be admitted on that basis.

THE COURT: Your objection's noted. Thank you. It's overruled. The Court admitted it not to prove the truth of the matter asserted as well.

So Mr. Mastro, please continue.

MR. MYERS: And that statement you just made is for Exhibits --

THE COURT: 5, 6, 7, and 8.

MR. MASTRO: Thank you, Your Honor.

BY MR. MASTRO:

Q. Mr. Schlossberg, in connection with the MOU defense and any other defenses that you considered, had you considered how these defenses might play out at a trial and what you'd need to do to prove these defenses?

A. Were I to embrace the positions that Serv Trust had taken

at trial in the state court, I -- I, of course, would have had to prove up all -- offer some evidence to support those defenses that they were raising. With respect to multiple of those defenses, there is clearly a difference of opinion as to what's the truth of -- of what was -- what happened and what was intended. So there was going to have to be witness testimony in this court on the adversary proceeding if I were to embrace those same theories of defense. That's going to have to be competent evidence with regard to the truth of the matter asserted by each of the documents we just discussed and the theories that they underpin.

Q. And who would your witness be?

A. I would only have one witness that I could possibly consider, Your Honor. I'd have to have Greg Myers be my witness as to all of these matters.

MR. MYERS: Objection.

THE COURT: Well, stand when you address the Court, please.

MR. MYERS: Objection.

THE COURT: What's the basis?

MR. MYERS: What's the basis of him saying he only has one witness, me? I'm not a trustee of Serv Trust.

THE COURT: Your objection's overruled. You'll have an opportunity to cross-examine him.

Mr. Mastro, continue.

Q. And you were saying, Mr. Schlossberg, that you would have Mr. Myers as --

A. Was interrupted, so let -- if I may continue?

Q. -- as your witness? Go ahead.

A. Mr. Myers is the -- was the manager of 6789 Goldsboro. He was critically involved in everything that happened while he was the manager of 6789. Mr. Myers was negotiating the memorandum of understanding. Mr. Myers was going to be a very --

MR. MYERS: Objection. There's no basis for that.

THE WITNESS: Your Honor, It's very hard to testify when you're constantly interrupted by somebody who's waiting until he finishes.

MR. MYERS: Well, fine. There's no objection for him to testify --

THE COURT: Mr. Myers.

MR. MYERS: -- as to what I was doing. He wasn't there.

THE COURT: Your objection is overruled. He is a Chapter 7 trustee who did an investigation. You can cross-examine him later.

Please continue.

A. Despite the fact that I don't like being interrupted, he's correct about what he just said. I wasn't there. He was. He just made the point for me. He has to be a witness

if any of these things are going to be tried to a trier of fact. That raises a big problem because Mr. Myers is patently a witness of questionable credibility.

MR. MYERS: Objection.

THE COURT: Basis.

MR. MYERS: Objection. Untrue.

THE COURT: Overruled. You may continue.

A. That's something else Mr. Myers and I would disagree about, I guess, but I -- I cannot imagine advancing to the Court Mr. Myers under oath. I -- my experience with Mr. Myers in this case has been such that he is a terrible witness. He insists that he is the only person who knows anything about anything. And he does not present a credible nor a very attractive witness for a trier of fact to embrace. I considered that I would be entirely hamstrung by having the witness to these events, the critical person with actual knowledge, getting on the stand and not being believed.

THE COURT: Mr. Mastro, your next question.

BY MR. MASTRO:

Q. And Mr. Schlossberg, I want to show you what I've marked as Trustee Exhibit 11.

A. Speak up, please.

Q. I want to show you what's been marked as Trustee Exhibit 11. This is a June 11, 2025 order of the bankruptcy court in the District of Columbia.

MR. MYERS: Excuse me, Your Honor. Did we skip 9 and 10?

THE COURT: We haven't gotten to them yet, Mr. Myers.

MR. MYERS: Oh, I just --

THE COURT: We're on Exhibit 11.

Q. And Mr. Schlossberg, do you recognize this exhibit?

A. I do. This is Judge Gunn's recent decision Mr. Myers last Chapter 13 case.

Q. Okay. And did you review it in connection --

A. Yes, I did.

Q. -- with your testimony today and your recommendation to the Court?

A. It certainly forms a portion of my -- my conclusions. Not that something fresh came to me from the reading of it, but it's a judicial determination regarding Mr. Myers and his propensity for abuse of the bankruptcy process.

MR. MYERS: Objection.

A. A sprawling tapestry of bad-faith abuse.

MR. MYERS: It's not a judicial anything. It's subject to a motion for reconsideration. There's no final order.

THE COURT: Your objection's overruled, Mr. Myers. You can't object simply because you disagree with something. You're going to have an opportunity to put on your case. If you disagree, you can bring it in then. But please, please

stop interrupting.

MR. MYERS: So he can misstate the facts?

THE COURT: You have an opportunity to cross-examine him.

MR. MYERS: Okay.

THE COURT: You don't get to interrupt him every time he speaks.

I'm sorry. Please continue.

Q. And Mr. Schlossberg, is Exhibit 11 an item that you reviewed and relied upon in forming your opinion relating to Mr. Myers' (indiscernible)?

A. Before I came into the courtroom today, I relied on this. I did not rely on this particular exhibit at the time that I filed the 9019 because Judge Gunn just entered this opinion, what, nineteen days ago.

MR. MASTRO: Your Honor, I'd like to move Trustee's Exhibit 11 into evidence.

MR. MYERS: Objection. It's not a final order.

THE COURT: Objection's overruled. It is admitted.

(Judge Gunn's order was hereby received into evidence as Trustees' Exhibit 11, as of this date.)

Q. And so Mr. Schlossberg, did you form a conclusion as to your likelihood of success in the adversary case?

A. I did.

Q. And what was that opinion?

A. Your Honor, I don't think I have much of a chance -- chance of a snowball in hell, as they would say, of prosecuting this case with a witness, the only witness that I could possibly put on the stand, and I would not ask anyone to accept that witness. I think that the defenses are -- weak is -- weak is too weak a term for the -- the defenses that were asserted below in the state court. They are I do not think going to prevail.

And as a result of that, I accepted the solicitation of interest of the King parties and tried to do that without looking too excited because I knew I needed to get this case settled and extract something for the estate out of this litigation because this litigation was going to be futile, expensive, and incredibly time consuming in this case, which has already going on, for my purposes, for eight years plus.

Q. And Mr. Schlossberg, let's pivot now to the settlement proposal that's before the Court and the proposed terms. One of the -- let me just read the proposed terms. Then I want to ask you about your --

A. Sure.

Q. -- consideration of these terms. First, the King plaintiffs, and I'm reading from document 17-1. This is our notice that was filed back on December 30th of 2024. Page 6.

THE WITNESS: May I get that from Your Honor? I have a copy of that?

THE COURT: Yes, you may.

Q. It's page 6, Mr. Schlossberg. Just let me know when you're there.

A. Just a sec.

MR. VERSTANDIG: Is this up on the screen, Mr. Mastro?

MR. MASTRO: Yes.

THE COURT: It's in the motion.

MR. MASTRO: Yeah, that's Exhibit 11 that's on the screen.

A. Yes, sir.

Q. Okay.

THE COURT: I'm sorry. It's not in the motion. It's in the notice of motion, docket number 17.

MR. MASTRO: Correct. Okay.

THE WITNESS: 17-1.

MR. MASTRO: 17-1. Page 6. I'm reading from the top, Your Honor.

Q. "The trustee and the King plaintiffs have agreed as follows: number 1, the King plaintiffs will pay to the trustee for the benefit of the estate the sum of $150,000, the settlement payment, upon court approval of the settlement, in order to redeem the entirety of Serv Trust's interest in Goldsboro and settle the redemption claim in the adversary case."

A. Yes, sir.
Q. "Number 2, upon successful negotiation of the settlement payment by the trustee, the parties will file a stipulation of dismissal in the adversary case, dismissing all claims therein with prejudice. And 3, the King plaintiffs also will reimburse the trustee for all reasonable legal fees and expenses that the trustee incurs in connection with the litigation of any appeals taken by any party in the event that the settlement motion is granted by this Court."
Are those are the terms of the settlement, as you understand it, Mr. Schlossberg?
A. They are. One element was added that I think makes it even more attractive, and that is the agreement of the King parties that they will withdraw their proofs of claim, which mirror the relief that sought in -- in the -- in the -- in the complaint.
Q. Okay. And Mr. Schlossberg, let's focus first on the first element of the settlement. The estate is receiving $150,000 from the King parties to redeem Serv Trust's interest in 6789 Goldsboro LLC. What is your take on that?
A. Well, Your Honor, you have to read that with item 3. They have to be read together, 1 and 3, because in -- in one settlement made in this case long ago, the settlement monies that were paid to me on behalf of the estate were somewhat chewed up by appellate litigation that resulted from it. As

of that date, I no longer entertain settlement proposals without a provision similar to this so that the monies that I get, paragraph 1, are the monies that I net at the end of the day. And in order to have that get-net result, I needed to have that.

As I've already explained, I don't think I could try this case. I'm fairly good in the courtroom. Mr. Merrit -- Mastro is better, but he knows what he's doing. At the end of the day, though, I don't think all of our talents brought to bear could prevail in the adversary proceeding.

So it's a very simple win-loss. I can't win on the one. And I take home $150,000 here on the other. So for that reason, I -- I think this is the sensible monetary decision to make in the case.

Q. Let me ask you this, Mr. Schlossberg. If, hypothetically, you were to prevail in the adversary case, this asset, the Serv Trust interest in the LLC, which is the only asset of the estate, correct?

A. Your Honor, that -- that -- that's -- that's the other side of it. If -- if the case goes to trial and we pull a rabbit out of our hat and we win, what do we do? We've denied Mr. VerStandig's client the ability to have the class B interest. I still got the class B interest. What a wonderful thing to have.

Now, who am I going to sell it to? Who is going to want

to buy into this position? This is a property which was apparently a little overoptimistically expected to yield nineteen townhouse lots in a very valuable section of -- of Montgomery County. According to the appraisal, which I read in this case, it is suitable for six to eight townhouse lots max.

According to my calculations, which admittedly are missing some numbers along the way for the -- for the class A interests, which have to be paid first before you start cutting up the equity that the people would be buying into, if I sell someone -- excuse me. If I sell someone the class B membership interest, they get to be a class B member under the operating agreement.

Under the operating agreement, the class B interest does not get to enjoy any of the proceeds, any of the income generated, by 6 -- 6789 until after the class A members have gotten back their initial capital, all of it, their initial capital return, all of it, the additional capital investment, and the additional capital return, as well as some other smaller niggling numbers. I think each of the class A members were entitled to $7,500 at the end of the first year. I'm not sure what that was all about. It's -- it's a -- it's a rounding error at this point.

As I calculate it -- calculated it -- calculate it today, we're talking about something in excess of 6 or $7 million and

maybe more than that that would have to be paid before anybody could ever get any kind of value or return for the class B membership interest. So who's going to -- who's going to jump at the opportunity to throw money at that opportunity? I don't think there's any buyers out there.

I'm going to have to go back to him. I'm going to have to go back to Mr. VerStandig and -- and negotiate with him again to buy it. To offer me a better number. Maybe they'll come back and offer me the memorandum -- the MOU number that they had offered in mid-2016. Not likely, but maybe they would. That's where I'd have to go.

Q. Okay. Mr. Schlossberg, is there any risk to the estate that the King parties could do a new appraisal and invoke the appraisal procedures once again?

A. Your Honor, if they lose, all it says is the appraisal process was flawed. I should say, let's say that the section 7.7 process. I don't want to call it appraisal or redemption because it's a melange of both. The process was flawed. Okay. Fine. What's going to stop Mr. VerStandig from sending me another letter, saying I got a new appraisal. You have fifteen days to designate your appraiser.

No, I don't want to be there because I'm pretty sure I know where it's going to be now, again. I -- I don't think that would be a very wise business decision to make in the exercise of my business judgment, which, of course, is the

standard here.

Q. And did you do any investigation as to what the property's value is worth now?

A. I -- I don't have the kind of money that would be necessary to go engage appraisers that I could justify the expense to the estate, Your Honor. I've done a little bit of online valuation review, but I don't call those online appraisals. We just call those online valuations.

Q. And --

A. And those valuations seem to be looking at the property as value for the old mansion that's still on the property. And they -- they are -- they are like $2 million. The range of that range. I -- I wasn't much impressed with the value of that.

It might be less. It might be more. I -- I don't know. I know this. The million-350 that they paid for it in 2013, Your Honor, is slightly higher than what the Lipman Frizzell appraisal showed the property to be worth five years -- or excuse me, four years later.

Q. And Mr. Schlossberg, I want to direct your attention to Exhibit 9, which I've put on the screen. You mentioned you looked at some online valuations. This is a Redfin valuation --

A. Sorry.

Q. -- that has the estimate range between 1.92 and 2.28 --

are you --

A. I'm sorry. I'm getting rid of the other book because we're not talking about anything out of that.

Q. Is Exhibit 9 one of the valuations you looked at (indiscernible)?

A. This is -- yeah, this is the Redfin, Your Honor. And this was printed a week ago. Well, two weeks ago. Thirteen days ago. And at that time, Redfin said it was worth, as I said, in the neighborhood of $2 million. They said $2,016,270. Again, for what that's worth. It's a -- it's an online valuation. It's not an appraisal.

MR. MASTRO: And Your Honor, I'd like to move Exhibit 9 into evidence at this time.

MR. MYERS: Objection. Hearsay. This is garbage. This has nothing to do with the development of that property.

THE COURT: The objection's overruled. This is publicly available information, and it is information that he relied on in reaching his decision.

So Mr. Mastro, at this point, Exhibits 1, 2, 4 through 9 and 11 have been admitted. Exhibit 3, the Court did not admit. And Exhibit 10 has not been discussed.

(Redfin valuation was hereby received into evidence as Trustees' Exhibit 9, as of this date.)

MR. MASTRO: Right. Court's indulgence for a second.

THE COURT: Okay.

Q. Okay. Mr. Schlossberg, let me just show you, then, Exhibit 10, since we haven't addressed that yet. Okay. And do you see Exhibit 10 on your screen, or do you have it in your binder there?
A. I have it in my binder right in front of me, and I see it on the screen as well.
Q. Okay.
A. It's the same document.
Q. And could you identify Exhibit 10 for the Court, please?
A. Your Honor, this is the decision that was made in the state court proceedings, as we've been referring to them, back in January of 2023, whereby Judge Lease entered a judgment on the alter ego declaratory judgment claim, wherein the court found that Serv Trust, a statutory trust under the laws of Maryland, was and is as of November 18th, 2015 the alter ego of Mr. Myers. And with that, the court then took note of the fact that in light of his bankruptcy proceedings and my role as his trustee, that the other claims in the case, the one that we're now talking about settling, were stayed by operation of Section 362 of the Bankruptcy Code.
Q. All right. And is this in Exhibit 10, is this an item that you reviewed and considered in connection with your evaluation of the proposed settlement?
A. It is.
MR. MASTRO: All right. And Your Honor, I move

Exhibit 10 into evidence.

THE COURT: Mr. Myers.

MR. MYERS: No objection.

THE COURT: Exhibit 10 is admitted.

(Judge Lease's decision was hereby received into evidence as Trustees' Exhibit 10, as of this date.)

Q. And Mr. Schlossberg, we've looked at the settlement terms. What is your recommendation, your opinion, regarding this settlement and the interests of the estate?

A. I -- Your Honor, I feel very strongly. I think I've expressed that probably by my vigor. But I think that the proposed 9019 settlement in this case is in the best interests of the bankruptcy estate and that it -- it is perhaps the last meaningful opportunity to get some value out of the redemption claim.

MR. MASTRO: Mr. Schlossberg, I have no further questions.

THE WITNESS: Okay.

MR. MASTRO: Thank you for your time.

THE COURT: All right. Thank you.

Mr. VerStandig, would you like to ask this witness any questions?

MR. VERSTANDIG: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. VERSTANDIG:

Q. Mr. Schlossberg, I want to go back to what you referred to as the MOU defense, which is the memorandum of understanding that may or may not have been executed and the dispute thereof. Do you recollect that?
A. Yes, sir.
Q. What is the date range you shared where the memorandum of understanding could theoretically have been executed?
A. That would be the three-year anniversary of the operating agreement, which was the effective date under that operating agreement of July 18th, 2013. The anniversary, July 18th, 2016.
Q. So not before July 18th, 2016, correct?
A. That is correct.
Q. Okay. And we heard a moment ago with Exhibit 10 that Serv Trust was found to be Mr. Myers alter ego, effective as of November 18th, 2015, correct?
A. Yes.
Q. Has Mr. Myers been a debtor in bankruptcy in this Court since November 18th, 2015?
A. Yes. This case has been pending -- I've -- I've -- I've forgotten the petition date, but I'm assuming you've given it to me accurately.
Q. Are you familiar with the docket in this case?
A. Yes, I'm familiar with that. Looked -- I've looked at it lots.

Q. At any point in time, did Mr. Myers as a debtor-in-possession or you as his Chapter 7 trustee seek leave of court to enter into the memorandum of understanding?
A. Well, now that -- now that you mention it, no. I -- I'm -- I am certain that there is no such entry.
Q. Thank you. Are you also familiar with the claims register in this case?
A. Yes.
Q. I'm showing you what's been marked as King Parties' Exhibit 1. Do you recognize this document?
A. You're going to have to spin it up for me.
Q. It's on your screen.
A. Yeah, but I can't move it.
Q. Oh. Sure.
A. That's a flaw in this system.
Q. Yeah. I will scroll --
A. Scroll it slowly enough so that I can read. Okay. I just saw what -- I know what this one is. So this is the proof of claim filed by you on behalf of the King parties with respect to the relief that has been sought in the complaint that is now pending in the adversary proceeding, which is 24-007.
Q. Thank you. Is this a true and accurate copy of proof of claim 21?
A. I can't tell you that, sir. I -- I -- I'm -- I'm not the

guy who looked at this recently.

Q. Okay.

A. This has been some time since I've looked at this. I trust you, as an officer of the court, that you're not trying to cook the books by putting a document on here with docket legends on it and that it's going to be -- turn out to not be a true and accurate copy. But I will assume that, and that's the basis for my assumption, Your Honor.

MR. VERSTANDIG: Your Honor, I move King Parties Exhibit 1 into evidence, mirroring entry 21 in the claims register.

THE COURT: Any objection, Mr. Myers, to the admission of Mr. King's proof of claim?

MR. MYERS: Other than all the writing at the very top is all -- I don't even understand what it's all typed over. So it's not a true and accurate copy.

THE COURT: The objection's overruled. The Court will admit King Parties' Exhibit 1. It appears to be -- and the Court did look at the proofs of claim that were filed. It appears to be a copy of claim number 21 filed on the claims register.

(Proof of claim 21 was hereby received into evidence as King Parties' Exhibit 1, as of this date.)

MR. VERSTANDIG: Your Honor, I move Exhibits 2 and 3 as well, being copies of claims 22 and 23 in the claims

register, respectively.

THE COURT: Mr. Myers, any objection?

MR. MYERS: No objection to the form, but not as to the truth of the matter.

THE COURT: All right. Well, the Court will admit King Parties' Exhibits 2 and 3. They appear to be duplicates of claim number 22 and claim number 23 on the claims register.

(Proof of claim 22 was hereby received into evidence as King Parties' Exhibit 2, as of this date.)

(Proof of claim 23 was hereby received into evidence as King Parties' Exhibit 3, as of this date.)

MR. VERSTANDIG: Thank you, Your Honor. Nothing further.

Your Honor, if the Court would permit, I would ask for a brief recess at the Court's convenience, but it is not a matter of urgency.

THE COURT: We will be taking a recess very shortly for the lunch break and to give Mr. Myers an opportunity to get his thoughts together for the cross-examination.

So is there any reason why now would not be a good time for a lunch break? That clock is about half an hour slow. It's 12:27.

MR. MASTRO: That's fine with me, Your Honor.

THE COURT: All right.

MR. VERSTANDIG: That's fine with me, Your Honor.

THE COURT: Mr. Myers.

MR. MYERS: It's fine.

THE COURT: Mr. Schlossberg.

THE WITNESS: Fine with me, Your Honor.

THE COURT: Okay. All right. Well, we are going to take a luncheon recess. As I said, it's 12:27. How much time would the parties like for a lunch break?

Mr. Mastro, how much time?

MR. MASTRO: I think an hour would be sufficient, Your Honor.

THE COURT: Okay. Would forty-five minutes be sufficient?

THE WITNESS: I don't know what fast food's like around here, Your Honor.

THE COURT: Okay. All right. So you are going to go out and -- okay.

THE WITNESS: Yes.

THE COURT: All right. We will reconvene at 1:30.

Mr. Myers, does that work for you?

MR. MYERS: That's fine.

THE COURT: Mr. VerStandig?

MR. VERSTANDIG: Yes, Your Honor.

THE COURT: All right. We will take a recess, and we will reconvene at 1:30.

Mr. Schlossberg, I know I don't have to tell you

this, but you are still under oath. You are still a witness on the stand. And therefore, you may not discuss your testimony with anyone, including your counsel.

THE WITNESS: Understood, Your Honor.

THE COURT: All right. Thank you.

THE CLERK: All rise.

MR. MYERS: Your Honor, is the room going to be open so I can work, or what do I do? Take all this with me or --

THE COURT: Mr. Myers, there is a conference room right between this set of double doors and the next set of double doors. There's a conference room on each side, and you're welcome to use either one of those.

MR. MYERS: Okay. Thank you.

THE COURT: And we're going to lock the courtroom, and we will unlock it just a few minutes before 1:30. So you're welcome to leave anything you'd like in the courtroom.

MR. MYERS: Thank you.

THE CLERK: All rise. Court is now in recess.

(Whereupon a recess was taken)

THE CLERK: All rise. Silence, please, and come to order. The United States Bankruptcy Court for the District of Maryland now resumes its regular session, the Honorable Maria Ellena Chavez-Rurak presiding.

Please be seated. Recalling the case of Gregory B. Myers, case number 15-26033, and the adversary case of King,

et al., v. Schlossberg, adversary number 24-00007.

THE COURT: All right. Mr. Myers, are you ready?

MR. MYERS: Sort of. Do my best.

THE COURT: All right. So before you start asking questions, I just want to review what's been admitted.

We have Trustee's Exhibits 1 and 2 have been admitted. Exhibit 3 was not admitted. Exhibit 4 was admitted. Exhibits 5 through 8 are admitted as admissions of a party opponent. Mr. Myers is a party-in-interest here in this proceeding opposing this settlement, and they are statements by him. So they are admitted. 9 was admitted, 10 was admitted, and 11 was admitted.

King Exhibits 1, 2, and 3 were all admitted.

And Mr. Schlossberg, while Mr. Myers is getting organized, I will remind you to let him finish his question before you start answering. We are recording, so let's try not to talk over each other so that we can make a transcript for the record.

THE WITNESS: Certainly, Your Honor.

THE COURT: All right. Thank you.

CROSS-EXAMINATION

BY MR. MYERS:

Q. Afternoon, Mr. Schlossberg.

A. Good afternoon.

Q. Do you recall on what date I filed my bankruptcy case?

A. Sir, you got to look at me because I can't -- I do not hear that well, sir. It's the same thing I told Mr. Mastro. Don't come over here, please.

Q. I'm allowed.

THE COURT: No, you are not allowed to come up here.

A. No, you're not.

THE COURT: Go back to the podium.

MR. MYERS: So what am I supposed to do? Look at him when I'm looking at my notes?

THE COURT: Yes. Everyone else manages to do it. I'm sure you can find a way to do it as well.

MR. MYERS: Well, it's hard to look at hwhen I'm doing this like this.

THE COURT: Just keep your voice up, and that will help.

Q. Do you recall on what date I filed my bankruptcy petition in this court?

A. No, I do not. I told, when I answered that question that I think Mr. VerStandig raised, I said, I'm not sure of the date that the case was actually filed in 2015.

Q. Okay. I will represent to you that I filed my bankruptcy case originally as a Chapter 11 reorganization, case number 15-26033, on November 18, 2015. That ring a bell?

A. Actually, no, it does not.

THE WITNESS: May I ask the Court to just confirm

that for me from the docket?

THE COURT: Yes, just give me one moment here. All right. So according to the Court's docket, Mr. Myers filed this case on November 18th, 2015.

THE WITNESS: 18th. Okay. Thank you, Your Honor.

THE COURT: Yes.

Q. 18?

A. 18.

Q. Okay. Now, we have that date. November 18, 2015's the petition date. So pursuant to 11 U.S.C. 541, if I didn't own something on November 18, 2015, then it wouldn't be property of my bankruptcy estate; is that correct?

A. I don't think it's proper for me to be giving legal opinions.

Q. I'm not asking you for your legal opinion. I'm asking you for your opinion as a Chapter 7 trustee.

A. Everything that you own under the pervasive definition in 11 U.S.C. Section 541 that you own as of the date of the filing, and that is a very broad everything, is property of your bankruptcy estate. And certain things that pop up afterwards can also become property of your bankruptcy estate.

Q. And what are the things that you referenced that can pop up afterwards that would become property in my bankruptcy estate?

A. Inherited property.

Q. Okay. And that's for 180 days, correct?
A. Well, the date of death is, is the operative. If the date of death is within 180 days afterwards.
Q. Okay.
A. There's also some others. I don't have a copy of 541 in front of me. I believe --
Q. Okay.
A. -- if someone wants to give me a Code, I'd be happy to--
Q. Okay.
A. -- go on with a --
Q. Right.
A. -- more complete answer.
Q. So on November 18, 2015, I had no ownership interest in Serv Trust?
A. Is that supposed to be a question?
MR. MASTRO: Objection. Calls for legal conclusion.
MR. MYERS: It's a fact question.
THE COURT: Well, ask a question, Mr. Myers. You're not testifying. You're asking him questions.
Q. Okay. When were you appointed Chapter 7 trustee in case 15-26033, my bankruptcy case?
A. In February of 2017.
Q. Yeah, I believe it was February 22, 2017.
A. I'd ask the Court to confirm that, if that's okay.
Q. Okay.

THE COURT: That's the date the case was converted, February 22nd, 2017.

A. That's the date I was appointed.

Q. Okay. And as Chapter 7 trustee, how long did you have to file an adversary proceeding against third parties? In other words, what was the bar date for you to file an adversary proceeding against third parties to bring property into my bankruptcy estate?

A. Well, if you -- if you think this is controlled by Section 546, it would be two years from the date of the conversion, assuming -- assuming the conversion was within -- I'm going to need a Code in front of me. I'm sorry. I can't do this by -- by guesswork because you're trying to get me to say something, and I'm going to make sure it's accurate.

THE WITNESS: If I have to answer those questions, Your Honor, I'll need a Bankruptcy Code.

Q. Forty-two years you've been a bankruptcy trustee, right?

A. You've been a debtor in bankruptcy for eight or ten years, sir.

Q. I didn't ask what I've been. I'm asking the questions. So you don't know how long you have from the date you're appointed as Chapter 7 trustee in a converted Chapter 11 to bring an adversary, say, for example, a section 5 adversary against Serv Trust?

MR. MASTRO: Objection, Your Honor. I don't see the

relevance of this, number 1, and it's beyond the scope of direct.

MR. MYERS: No, it's not.

THE COURT: Mr. Myers, I'm not sure -- you're not here to quiz him on provisions of the Code. If you have a question, ask him the question. If you're trying to get him to testify about how long he had to sue Serv Trust --

MR. MYERS: Here's where I'm going with it, Your Honor.

THE COURT: -- or to sue a third-party, then ask that question. I think we're just going to be spinning wheels here for a while if we're just going to quiz him.

Q. Have you ever filed an adversary proceeding against Serv Trust?

A. No, sir.

Q. So when you became Chapter 7 trustee on February 22, 2017, there would be a bar date. You seem to not recall what that is. But you have never, ever filed a adversary proceeding against Serv Trust to attempt to bring their property into my bankruptcy estate; is that correct?

A. I just answered that question. I said, I've never filed any action against Serv Trust.

Q. Okay. So you've never brought any of Serv Trust's property into my bankruptcy?

A. Judge Lease did that.

Q. No, I didn't ask. I said you.
A. I answered your question.
Q. Okay. No. Okay. Have you ever abandoned any property or claims in my bankruptcy case?
A. I honestly don't recall if I filed any abandonments in this cause of -- this case, Your Honor. I don't do them often, but we do do them. We did one in the last couple of weeks. But I -- I don't recall.
THE COURT: Next question.
Q. You ever abandon any claims against Serv Trust?
A. I have no recollection of an abandonment in this case as to Serv Trust or anyone else, but I'm not certain of that without reviewing the docket or my files in my office. This is a pretty old case.
Q. Well, I'll represent to you that I'm aware of the docket in this case, and you've never filed an adversary against Serv Trust.
THE COURT: Mr. Myers, you are not testifying. You're here to ask questions. Is there a question?
MR. MYERS: Yeah, there is. There is lots of questions.
THE COURT: Ask them, and stop testifying.
Q. Have you ever abandoned any property or any claims that I would possess -- that I'd possess prior to filing bankruptcy that once you became trustee were property of my estate? Did

you ever abandon any of those claims?

MR. MASTRO: Objection, Your Honor. Again, I don't really see the relevance of this, and it's well beyond the scope of the direct examination.

THE COURT: What does this have to do with the proposed settlement with the King parties?

MR. MYERS: The Chapter 7 trustee and his counsel have completely elided over the fact that Serv Trust is not property of my bankruptcy estate. He has no ability whatsoever to settle any claims in connection with nonestate property.

THE COURT: All right. Well, you can make that argument in your closing, and you can introduce any evidence that you would like. Your cross-examination of him has to fall within the scope of the questions that have already been asked to him so -- and he testified about his decision to enter into the settlement. He testified about --

MR. MYERS: Exactly.

THE COURT: -- the factors that he considered. So let's focus on the scope of, number 1, what is before the Court, which is whether he exercised good business judgment in reaching the settlement, and number 2, within the scope of his testimony that he has already provided.

BY MR. MYERS:

Q. Mr. Schlossberg, as Chapter 7 trustee, can you settle --

can you enter into a 9019 settlement agreement with the King parties concerning nonestate property?

MR. MASTRO: Objection, Your Honor. I mean, we're talking about estate property here. This doesn't seem relevant.

MR. MYERS: It's not estate property. That's my question.

THE COURT: Mr. Myers, let me talk.

I'm going to overrule the objection and give Mr. Myers a little bit of leeway here to ask where I think he -- what I think he's trying to ask here.

A. Please -- please ask the question again.

Q. Sure. Is it your opinion, as Chapter 7 trustee, that you can enter into a Rule 9019 settlement agreement with another party, for example, the King parties, to settle claims in connection with nonestate property?

A. You have asked -- you have posed a hypothetical question, and I state that it's hypothetical, Your Honor, because the Court has already decided this is entireties property, and of course it is entireties property. So it's a hypothetical. If you want me to answer hypotheticals, I will, Your Honor, but it looks like a slippery slope of a lengthy afternoon.

Q. Court has not decided this is a estate property.

A. Oh, the Court has.

THE COURT: Mr. Myers, please let me talk. Okay.

MR. MYERS: Okay.

THE COURT: And then I'll give you a chance, if I need more information from you.

Mr. Schlossberg, answer the question the best you can. I understand that it assumes things, facts that are not in evidence. But give a brief answer to this question, please.

A. Assuming, and it's hard to do that because the example you gave of nonstate property, you expressly posited that the property of Serv Trust would not be included among estate property. Let's take that particular example out of the way. I cannot enter into an agreement binding nonestate property. But I expressly note that the property of Serv Trust and that Serv Trust itself is estate property.

Q. How did Serv Trust property become a state property in my bankruptcy estate?

A. By order of Judge Lease in a case tried in the Circuit Court for Montgomery County, where you were present.

Q. Well, actually, I wasn't present, Mr. Schlossberg. Was I present? Do you know if I was present at that trial?

A. Be the first thing I know about that you weren't present at. I apologize if I'm wrong on that. I was otherwise engaged that day. I wasn't at the trial.

Q. Did you attend any hearings in the Montgomery County litigation?

A. No.
Q. Were you aware of the fact, Mr. Schlossberg, that on December 30th, 2022, I removed the Montgomery County litigation, which, just for the record, I will refer to the Montgomery County litigation as the King, et al., v. Serv Trust, et al. case, 436977V, and the Goldsboro v. Serv Trust, et al. case, 451611V. Are you aware that I removed that action to the United States District Court for the Middle District of Florida on December 30th, 2022?
A. Yes, I am.
Q. Okay. And are you aware that at 9:17 a.m. on January 3rd, before any hearing started in Montgomery County Circuit Court, I filed a notice of appeal in the United States Bankruptcy Court for the Middle District of Florida, appealing to the Middle District -- to the United States District Court for the Middle District of Florida from the order granting emergency motion from remand, entered in adversary 2:22 AP 0048-FMD, which is the King removed case. That's the caption down in the bankruptcy court. Were you aware that I filed that notice of appeal before the hearing in Montgomery County Circuit Court started?
A. Yes, sir.
Q. Okay. And --
A. Which restores the status quo. That means there was another --

Q. I didn't ask another question yet.
A. -- at 9:30 a.m.
Q. I didn't ask another question yet. And are you aware that the United States Bankruptcy Court for the District of Florida has never mailed a certified copy of the order back to Montgomery County Circuit Court?
A. No, I am not.
Q. Okay. And have you had an opportunity since February of this year to review a decision from the Fourth Circuit Court of -- a published decision out of the Fourth Circuit Court of Appeals, identified as City of Martinsville, Virginia v. Express Scripts, Inc. Have you ever reviewed that decision?
A. I can't say that I recall having reviewed that decision, Your Honor.
Q. Okay. It's rather prescient. I, of course, will take this up in my closing argument, but are you aware that if an appeal is filed before the bankruptcy court in Florida physically mails a copy of the remand order to Montgomery County Circuit Court, there is an automatic stay under Coinbase?
MR. MASTRO: Objection, Your Honor. I don't see the relevance in it. Assumes all kinds of facts not in evidence.
THE COURT: We have a sophisticated witness here. I'm going to overrule it, and let him answer.
A. What's the question again?

Q. Are you aware that under -- are you aware that when a case is removed, in this case, from the Montgomery County Circuit Court, to the United States District Court for the District of Florida and then initiates an adversary theory preceding. The bankruptcy court issued an order on January 3rd, 2023. I'm not sure exactly what time, but it was early in the morning. Granting emergency motion for remand but never physically sent a copy of that order, certified copy of that order, as required by 28 U.S.C. 1447(c), to the Montgomery County Circuit Court to restore jurisdiction to the Montgomery County Circuit Court? Never. Ever. It's not in the record.

MR. MASTRO: Objection, Your Honor. I mean, there's so much legal conclusions bound in there. If he wants to ask the witness is he aware that an order of remand was sent with or without --

MR. MYERS: Okay.

MR. MASTRO: -- a certification or something, I guess that's proper. But he's throwing in all these other qualifications and legal conclusions. I'm having a hard time following it. I don't know if Mr. Schlossberg can follow it.

THE COURT: Well, I'm going to give Mr. Schlossberg an opportunity to try and respond. The objection's overruled.

A. Your Honor, that question would require me to accept as accurate a number of representations that just passed from Mr.

Myers. I don't have any confidence in Mr. Myers to accurately testify as to these matters, nor do I necessarily think that he actually understands what it is he's talking about. It may be true, but I have no idea. And I'm not about to rely on the representations of Mr. Myers. Period.

THE COURT: Thank you.

Q. Thank you. Let me ask you a question, Mr. Schlossberg. Are you aware if there is an order remanding the case from the United States Bankruptcy Court for the Middle District of Florida, certified copy of an order that was physically mailed to the Montgomery County Circuit Court and entered in the circuit court litigation that we're talking about?

A. No, I have no idea, sir.

Q. You have no idea?

A. I have no -- no idea. None whatsoever.

Q. Okay. Have you ever heard of the Griggs principle? Have you ever heard of Griggs principle?

A. Grapes?

Q. Griggs.

A. No, sir. Don't know what it is.

Q. Okay. Now, do you recall, Mr. Schlossberg, that in my converted Chapter 11 as a Chapter 7 that the petition date remains the same as November 18, 2015, do you recall a memorandum opinion and order entering judgment issued by Judge Lipp on September 28th, 2018 in adversary proceeding 17-00193

that would be docket 94, docket 93, the opinion and the order, and that was in connection with the UST's objection to my discharge?

A. If you want to show me a copy of it, I'll be happy to tell you if I remember it. There's been lots of orders and lots of decisions in this case, many of which, of course, were issued by Judge Lipp.

Q. Well, you've cited that order many times in your papers.

A. I'm -- you're not going to trap -- try and trap me into saying something because I'm embarrassed that I can't remember something.

Q. Okay.

A. Mr. Myers, that's -- that intimidation stuff doesn't work with me.

MR. MYERS: Can I approach the witness and ask him to read the findings of fact from that order?

THE COURT: Do you have a copy for the Court and for the other parties in the courtroom?

MR. MYERS: No, it's verbatim out of Judge Lipp's order.

THE COURT: Is that a yes or a no?

MR. MYERS: I don't have copies. It's Judge Lipp's order and --

THE COURT: Show it to Mr. Schlossberg's counsel first.

MR. MYERS: Those are verbatim. No, not that. Just that. Just that paragraph.

MR. MASTRO: No, I object, Your Honor. This is not Judge Lipp's order here. This is just his outline. It's not Judge Lipp's order.

MR. VERSTANDIG: Portions of it also appear to be ellipsised.

THE COURT: If it's not a copy of the -- I'm sorry.

MR. VERSTANDIG: Portions of it appear to be ellipsised as well.

THE COURT: If it's not a copy of the order, then you may not introduce it into evidence.

BY MR. MYERS:

Q. Mr. Schlossberg, do you recall -- because you have testified previously concerning this order, do you recall that in Judge Lipp's -- I'm just going to call -- the memorandum opinion and order entering judgment, I'm going to call it the judgment. Under findings of fact, Judge Lipp said the following. This is "verbatim".

"The following facts are relevant to the issues at hand and are either uncontroverted or are supported by evidence in this case." Now, this is September 28th, 2018. "Serv Trust is a trust that was created by Myers' mother for the benefit of Myers' five children. Serv Trust was funded with an initial deposit of $1,000 from Myers' mother. Myers and

Daniel Ring are the cotrustees of Serv Trust."

Do you recall reading that in that opinion?

MR. MASTRO: Objection, Your Honor. I don't know what he's reading from and if that's the exact verbatim quote. And I also don't know what the relevance of it is to this.

THE COURT: I don't know either, but I'm going to give him a little bit of leeway to ask his questions. And if Mr. Schlossberg has that passage committed to his memory, then he can testify about it.

Mr. Schlossberg.

A. Mr. Schlossberg does not have that committed to memory. Your Honor. I don't recall the particular hearing. I know we had a lot of hearings in this courtroom over a long period of time.

THE COURT: Next question.

BY MR. MYERS:

Q. Do you recall in Judge Lipp's order, "It is undisputed that Serv Trust was established to pay educational and other expenses related to Myers' children. It is also undisputed that Myers is a cotrustee of Serv Trust, with the authority to direct Serv Trust to make payments on behalf of its beneficiaries, the Myers children. Myers was adamant at trial that every payment that he or Kelly received from Serv Trust was for the benefit of his children. If, as irrefutably He testified to by Myers," irrefutably testified to by Myers,

"Every payment from Serv Trust to Myers and/or Kelly was for the benefit of their children, then it appears Serv Trust was serving its intended purpose, i.e., providing for Myers' children."

And then, she says, "Such payments would not be loans to Myers and/or Kelly. They would be distributions to the trust beneficiaries."

Do you recall that, Mr. Schlossberg?

MR. MASTRO: Same objection, Your Honor. I'd also point out, for the record, that the trustee was not a party to the 727 adversary. That was brought by the United States Trustee. So myself and Mr. Schlossberg were not a party to this.

THE COURT: Understood, and Mr. Schlossberg can testify for himself as to that.

Mr. Schlossberg, the objection's overruled.

A. Same answer as I just gave a moment ago, Your Honor. I can't remember it as such.

THE COURT: Understood. Thank you.

Q. Did you ever appeal Judge Lipp's memorandum opinion and order entering judgment on September 28th, 2018 in adversary 17-00193, docket 94 and docket 93, Mr. Schlossberg?

A. If that's -- if that's the same proceeding, and -- and I -- I'm careful saying if because I don't have a lot of confidence that you're not going to take something out of

context. But if that's the same proceeding, I just heard my counsel say I wasn't a party to that proceeding. I don't see how I could have taken an appeal from the decision.

Q. Well, maybe I could be educated. If you're a Chapter 7 trustee and there's an adversary filed by the United States Trustee to deny my discharge, you'd have a right to file an appeal, wouldn't you?

MR. MASTRO: Objection, Your Honor.

Q. You don't know? Okay.

THE COURT: The objection's overruled. Answer best you can.

A. Never did the research on the subject, Mr. Myers, but I don't think I have any rights in that litigation, including especially taking an appeal from something I wasn't a party to.

Q. You testified earlier at length about the first amended and restated operating agreement of 6789 Goldsboro LLC. That's Trustee's Exhibit 1. Do you recall that?

A. Yes, I remember testifying.

Q. Okay. Do you know the history of 6789 Goldsboro LLC preceding that first amended and restated operating agreement?

A. No. I was commenting on this -- this contract of record in this case.

Q. Okay. Have you ever reviewed a copy of the Serv Trust agreement that was formed July 10, 2010 by my mother as the

trustee -- I mean, the settlor?
A. I may have over the years, but I don't recall.
Q. But you didn't review that agreement in connection with this?
A. No.
Q. Okay. And would it surprise you, if you read that agreement, it said Serv Trust is a common law trust, a Maryland common law trust, a Maryland common law spendthrift trust?
A. It would astonish me because Judge Lease is a pretty careful guy. And he made a decision on the merits in your case in Montgomery County. And he found, I believe I saw this, that it was a statutory trust. I'm not sure what the difference would be, but he found that it would be a -- it was a statutory trust and that it was your alter ego.
Q. You weren't present, were you, at the December 16th, 2022 pre-trial conference in the Montgomery County litigation with Judge Lease, were you?
A. I was not.
Q. Okay. So you're not aware that Judge Lease, on December 16, 2022, said that because of the automatic stay in my Florida case, which Judge Delano issued an order specifically saying there could be no claims against me personally, and at that point in time, I was no longer a trustee of Serv Trust, that Judge Lease on the record said Myers is not a party to

this litigation?

MR. MASTRO: Objection. Hearsay, Your Honor.

MR. MYERS: It's in the record.

THE COURT: Mr. Myers, you're asking him if he knows about things, and it's almost like you're testifying from the podium. If you want to say all those things, you're going to have an opportunity in your case. But ask him about specifically his decision making in entering into this settlement. That's the issue for the Court.

The issue for the Court is not whether this Court was right or that Court was wrong. The issue for this Court is whether he exercised good business judgment in determining that this settlement is something he should enter into. That's the sole question for me today. So and that was the focus of his testimony in his direct.

Your cross-examination is limited to the scope of what was asked in direct. I'm trying to give you some leeway. You've gone outside the bounds of what was asked in direct, and I'm trying to give you some leeway to give you an opportunity to show how that's relevant to the issue before the Court. But I'm not seeing it.

So with that in mind --

MR. MYERS: His business judgment --

THE COURT: With that in mind, ask him your next question. Okay.

MR. MYERS: Yeah.

BY MR. MYERS:

Q. In your business judgment, Mr. Schlossberg, if I wasn't a party to the trial on January 3, then how could I possibly be determined to be the alter ego of Serv Trust?

MR. MASTRO: Objection, Your Honor. I don't see what the relevance of this is.

MR. MYERS: It's his business judgment. I mean --

THE COURT: But he's not the one -- a court decided --

MR. MYERS: It didn't.

THE COURT: -- that you are the alter ego of Serv Trust. Mr. Schlossberg didn't decide that.

MR. MYERS: Okay. Let me go to the next question, and maybe we can get to that. Your Honor, where I'm going with this is that he's elided over the entire fact that this matter still rests in the Montgomery County Circuit Court.

THE COURT: Well, ask him that question.

Q. Okay. Mr. Schlossberg, are you aware that on -- are you aware that Judge Simpson entered an order remanding the litigation that we're talking about back to Montgomery County Circuit Court?

A. I don't know that I recall whose order it was that remanded this case back, but I do recall that there was an order remanding this case back to the circuit court for

Montgomery County after Judge Lease entered his final order and sent the case back here for further action because of the stay, which barred him from going forward --

Q. That's not --

A. -- the second issue.

THE COURT: Next question.

Q. Mr. Schlossberg, I wasn't referring to Judge Delano's order. I was referring to Judge Simpson's order in this court in 2019.

A. Okay. Well, then I was not thinking of the same period of time and transactions. I apologize. In the future, I'll ask that you put the dates on the orders that you're trying to characterize.

I do not recall whatever order it is you're talking about that sent this case back to -- Judge Simpson sent it back to Montgomery County? I would like to see the document you're talking about.

THE WITNESS: I apologize, Your Honor. I think that I was confused.

THE COURT: No apology needed.

MR. MYERS: Your Honor, may I request? I don't have access to it. It's Judge Simpson's remand order when Mr. VerStandig removed the Montgomery County litigation to this Court, and she remanded it very shortly thereafter. Is it possible I could ask you to look at that order so we can

refresh?

THE COURT: All right. This is what I'm going to do. Mr. Myers, I would like you to give Ms. Fernandez -- Ms. Fernandez, raise your hand -- whatever you need a copy of for this cross-examination. I want you to let her know. And if it's in the docket, we will make copies for everybody in the courtroom and -- but I'm not going to keep getting off the stand -- getting off the bench so that we can keep printing exhibits for you.

So if there's anything other than this order that you would like, please let Ms. Fernandez know, and we will make copies for everybody in the courtroom. Okay.

MR. MYERS: Yes.

THE COURT: All right.

MR. MYERS: Thank you, Your Honor.

THE CLERK: All rise. Court is now in recess.

(Whereupon a recess was taken)

THE CLERK: All rise. Silence, please, and come to order. The United States Bankruptcy Court for the District of Maryland now resumes its regular session, the Honorable Maria Ellena Chavez-Rurak presiding.

Please be seated.

THE COURT: All right. Mr. Myers, your next question. And actually, before you ask that question, Mr. Myers, can you tell me how much time you think you need for

your cross-examination? I'm just trying to manage our time for today.

MR. MYERS: Well, it's hard for me because of the way I am, because of the way Mr. Schlossberg is, and the interaction. So what time?

THE COURT: It's 3 o'clock now.

MR. MYERS: At least three --

THE COURT: He's been on the stand for almost an hour and a half.

MR. MYERS: Yeah, probably two more hours.

THE COURT: All right. Well, I'll give you until 5 o'clock. Okay. I want to make sure you have an opportunity to ask him what you want to ask him. But I'm just trying to manage our time because we come back tomorrow, but I have other things scheduled in the afternoon, so all right.

MR. MYERS: Well, I'll probably bring Mr. Schlossberg back in my case, so on direct.

THE COURT: Okay.

MR. MYERS: Your Honor, your nice clerk gave me exhibits. Are we going to mark these copies that I'm got?

THE COURT: Are you marking them?

MR. MYERS: Yeah, I'd like to put them in the record.

THE COURT: Okay. Well, you should have done that already.

MR. MYERS: So what exhibit do you want me to start

with?

THE COURT: Well, you're debtor. So Debtor's Exhibit 1 would be a good place to start.

MR. MYERS: So do I ask him questions? Do I show it to them?

THE COURT: Well, so let's -- I have four exhibits. So tell me what is Number 1. What's Number --

MR. MYERS: This is Judge Lipp's order entering judgment, case 17-00193.93, dated 9/28/18.

THE WITNESS: That's too much information.

THE COURT: All right. So that's Number 1.

THE WITNESS: Which one was that? I just hear mumbling.

THE COURT: It is the thicker one, docket number 93.

THE WITNESS: The big one? Big one?

THE COURT: The big one. Judge Lipp's decision from September 28th, 2018.

THE WITNESS: And this is Debtor's 1?

THE COURT: That's Debtor's 1. And what's going to be Debtor's Number 2?

MR. MYERS: I don't know until I finish this one. I'm just going to grab them as I go.

THE COURT: Okay.

MR. MYERS: Thank you.

THE COURT: All right. Your next question.

RESUMED CROSS-EXAMINATION

BY MR. MYERS:

Q. Okay. So Debtor's Number 1, Mr. Schlossberg, do you have that there?

A. Yes.

Q. Okay. And on memorandum and opinion, which starts on page 3, that's doc 94 in case 17-00193.

A. Page 3. Okay.

Q. Okay. And then that's the beginning of the memorandum opinion. And then the next page, page 2, findings of fact. This is Judge Lipp making findings of fact.

A. Wait a minute. Page 3. The page after that's not 2. That's 4.

Q. So the fourth page in on the exhibit should be 2 at the bottom.

THE COURT: He means page 2 of the memorandum opinion.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're welcome.

Q. 2 of 38.

A. You got two documents combined there. Okay. Got it.

Q. That's the way it was given to me so -- these are Judge Lipp's findings of fact. "The following facts are relevant to the issues at hand are neither uncontroverted or supported by the evidence in this case." That's the first sentence. Do

you see that?

A. Yes.

Q. And then do you see the footnote at the bottom, footnote 2, which is at the end of that sentence?

A. I see it.

Q. It says, "To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted." Do you see that footnote?

A. Yes.

Q. So let me ask you a question in your business judgment is Chapter 7 trustee. If Judge Lipp made a finding of fact that Serv Trust was a trust that was created by Myers' mother for the benefit of Myers' five children, that Serv Trust was funded with an initial deposit of 1,000 from Myers' mother, Myers and Daniel Ring are the cotrustees of Serv Trust, that would be a finding of fact and would be res judicata at anything different in this case, correct?

MR. MASTRO: Objection. It calls for a legal opinion, Your Honor.

MR. MYERS: I'm asking for his business judgment.

THE COURT: I'm going to overrule the objection and let him answer the question. Of course, this decision was rendered on September 28th, 2018.

So Mr. Schlossberg, I'll let you answer the question.

A. As the Court notes, this was entered on September 28th, 2018. Subsequent to that date, Judge Lease conducted a trial on the subject of the trust and fully adjudicated the issue of the existence of the trust and that the trust was the alter ego of Mr. Myers. That's the important fact for the trustee in even bringing this 9019 motion because it is that which placed me in control of the asset by the decision of that Court.

You can't take things out of context, respectfully. And if you find anything that is arguably favorable to your construct of facts, Mr. Myers, you ignore everything else in the world, including any other court decisions which must be construed together with it. That is the -- that is the signal pitfall in your reasoning process, and it carries through to each and every question you have put in front of me, which is nothing more than an invitation to me to reject the decisions of the courts --

Q. Okay.

A. -- that are in place here.

Q. Thank you, Mr. Schlossberg. Yeah.

A. I'm sorry. I'm still answering.

Q. You're not answering the question I asked.

A. Let me finish.

THE COURT: Yes. Mr. Myers, let him --

Q. Not asking -- yeah.

THE COURT: Mr. Myers, he's entitled to complete his answer. You asked him the question. I'm not going to cut him off.

MR. MYERS: Okay.

THE COURT: Please continue.

A. Each and every one of the various contentions that you've spent the last hour and a half on have been futile efforts to get me to reject the prevailing law in this case. You may try the rest of the afternoon and all day tomorrow. You're going to get the same results.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you, Mr. Schlossberg.

Mr. Myers, next question.

MR. MYERS: Are you finished, Mr. Schlossberg?

THE WITNESS: Your Honor, I've --

THE COURT: Mr. Myers, next question. We don't need the snippiness from anyone.

MR. MYERS: Well, the last time I questioned him --

THE COURT: Next question.

MR. MYERS: -- he started talking again.

Q. So you just said, Mr. Schlossberg, that Judge Lease fully adjudicated the case.

A. No, I said he fully adjudicated the question.

Q. What question?

A. The question of the alter ego. He expressly declined to

take on the redemption case because he said he was barred by the stay because I, as the successor to Serv Trust, am protected by the stay.

Q. What stay?

A. The bankruptcy stay. Section 362(a) of the Bankruptcy Code.

Q. There was no stay.

A. There is a stay, sir. That's just silliness. You know better than that.

Q. I don't need you to talk like that to me.

THE COURT: Mr. Myers, next question.

MR. MYERS: Well, please ask him to --

THE COURT: Next question.

MR. MYERS: -- control his remarks.

Q. Okay. We're in the -- we're going to mark this, or it's already been marked, Trustee's Exhibit 10. Do you want to pull that out, Mr. Schlossberg?

A. I have in front of me.

Q. So you're saying that Judge Lease fully adjudicated the question? So this is order entering partial judgment. How did he fully adjudicate anything in that case with a nonfinal order?

MR. MASTRO: Objection, Your Honor. I think this (indiscernible) --

THE COURT: Objection is overruled. Thank you.

A. Judge Lease fully adjudicated the issue of the alter ego claim. Judge Lease had in front of him a two-count complaint. It had the alter ego, and it also sought the remand. The remand --
Q. Do you mean the redemption?
A. Please let me finish.
Q. The remand.
A. The remand could not go forward because to do so would be to be taking acts that belong to this court because I am protected by the bankruptcy stay. And I am vested, was vested by him on that date and have been ever since with the rights, whatever they are, of Serv Trust.
Q. So when you say remand, did you mean redemption?
A. Sir, I don't know when you're talking about. I use the word remand.
Q. Well, I'd like to know. I don't understand what the answer means.
A. So --
THE COURT: Next question.
MR. MYERS: Well, he just used remand for the second count. There is no remand for the second count, Your Honor.
THE COURT: Ask him a question, Mr. Myers.
Q. What did you mean by remand just now?
A. The Court. I'm sorry. I see that the -- the word that was used by Judge Lease was that it was removed. No, actually

it wasn't. What he said was I am stayed by the bankruptcy by Section 362, and this case will remain stayed until either the case is removed, for the second time, back to the bankruptcy court or someone lifts the stay or the stay otherwise is lifted by operation of law. I apologize for saying it had been remanded. I was leaping to the result.

Q. And is there not a third item there in that paragraph you're reading?

A. I just said that at the end, sir.

Q. So where in this order entering partial judgment of the stay does it say that it's Serv Trust property is property of the bankruptcy estate?

A. Can't hear you, sir. You're talking into your chest.

Q. Where does it say in this order entering partial judgment and stay, Mr. Schlossberg, that Serv Trust property is property of my bankruptcy estate?

A. At the top of the page 2, the first complete paragraph says "Found and adjudged pursuant to the alter ego declaratory claim, and for those reasons stated on the record at the close of the trial, Serv Trust is, and as of November 18, 2015, was the alter ego of Gregory B. Myers pursuant to Maryland law."

Q. So is it your contention that after Judge Lipp makes a ruling that's final and unappealable and is res judicata to anything that Judge Lease does that he can just ignore her ruling?

A. I wouldn't be so bold as to say Judge Lease ignored any other court's ruling. I would say that he applied that ruling in light of the facts in front of him, and he made the decision. And if you got a problem with it, take an appeal, as you've done. And if you have a real problem, maybe you should have moved to stay everything and keep it in -- in that court. But you didn't do that. So we're here now. I'm vested with Serv Trust's rights. And I'm taking --

Q. You can stop. I didn't ask a question.

THE COURT: Mr. Myers, don't --

Q. I don't need you to continue on.

THE COURT: Stop. Mr. Myers, don't interrupt him.

MR. MYERS: I didn't --

THE COURT: Don't interrupt him. I didn't let him interrupt you. I didn't let Mr. Mastro interrupt you. I'm not going to let you interrupt anyone either.

MR. MYERS: Don't I get to ask the questions, and then he answers my question and not go off on some tangent about what he thinks the law is?

THE COURT: He's answering the question.

MR. MYERS: No, he's not.

THE COURT: He is. And you're not going to interrupt him anymore.

Mr. Schlossberg, please continue.

THE WITNESS: I'm sorry, Your Honor. He just got

what he wanted. Broke my chain of thought. And I don't want to sound like I'm not sensible about something, so I'm going to stop right here.

THE COURT: Okay.

THE WITNESS: I'll wait for the next question.

Q. Mr. Schlossberg, you just said that I should have filed a notice of appeal. I did file a notice of appeal, as you know, in the Maryland Court of Appeals back in January of 2023, and they determined that there is no final order in that case. So it has not been adjudicated, as you so state, unless you can tell me something I don't know, which you like to do.

A. I'm not going to parse words with you, Mr. Myers. You don't like some results, so you decide to, as you say -- you overuse the word elide, by the way. This is not what this case is about.

MR. MYERS: I'm sorry, Your Honor. This --

THE COURT: Stop interrupting.

This is not what this case is about.

A. This case is about taking action based on what I'm charged with by law and what Your Honor charges me with when you allow me to continue in the case. My actions are actions to preserve property of the estate, a phrase you -- you take exception to. Take exception all you like, but that's the fact of it.

If I'm wrong, you'll have an appellate court sometime

tell you that. In the meantime, unless you get a stay of the prior decision from which you are appealing, you're stuck with the effect of it until such time. I don't know why you can't understand this after all the appeals you've been in in this case alone.

THE COURT: All right. Thank you.

Mr. Myers, your next question, please. And Mr. Myers, are you moving Debtor's Exhibit 1 into evidence?

MR. MYERS: Yes, please.

THE COURT: Any objection?

MR. MASTRO: Your Honor, it's a limited objection as to 1 that's going to come into play later. Since there was no witness and exhibit list, we necessarily object to Mr. Myers introducing anything into evidence. However, Debtor's Exhibit 1 is on the docket in this case. The Court is welcome to take judicial notice of the docket in this case and related adversary proceedings. So preserving our objection as it may pertain to later items, we do not object to Debtor's Exhibit 1.

THE COURT: All right. Debtor's Exhibit 1 is admitted.

(Judge Lipp's decision was hereby received into evidence as Debtors' Exhibit 1, as of this date.)

Q. So Mr. Schlossberg, you just chided me about appellate matters. And on April 18th, 2023, in the Appellate Court of

Maryland, as you well know, I had filed a motion for stay pending appeal. On April 28th, 2023, the King parties, Mr. VerStandig, counsel, filed a response to my motion, which Goldsboro and the Chapter 7 trustee adopted and incorporated in their respective responses filed in the Appellate Court of Maryland. And this is what it said in Mr. VerStandig's motion, the King parties.

"The order from which Mr. Myers instantly seeks a stay is, by its own express terms, nonfinal. Indeed, the document is titled order entering partial judgment and stay." And the order most certainly does not dispose of the totality of the triable issues below. Here's the next sentence. "The order from which appellants appealed did not adjudicate or complete the adjudication of any claim in this matter." It, therefore, was not a final order. Those are your words, sir.

THE COURT: Mr. Myers, why does it matter? Why does it matter whether the judgment was final or not final? You're not here -- the Court is not determining any of the issues that were before the state court. The Court is only determining whether Mr. Schlossberg exercised good business judgment in reaching a settlement with the King parties.

MR. MYERS: I'm befuddled, Your Honor. If there's no final -- this case was remanded to Montgomery County Circuit Court from this Court. This Court lost jurisdiction. The case -- I will answer --

THE COURT: I'm not determining -- I'm not determining the alter ego issue. That issue was remanded to this -- that issue was -- the court abstained, and it was sent back to the state court. That issue was decided. Why does this Court no longer have jurisdiction over anything related to Serv Trust? That's not the case.

MR. MYERS: Yes, it is, Your Honor.

THE COURT: That one issue, the Court abstained with regard to that one issue. It was sent to the state court. The state court, whether the state court -- what happened in the state court after the state court issued this order doesn't matter.

MR. MYERS: Sure it does. Once you remand a case, once this Court remands that matter to Montgomery County Circuit Court, this Court loses all jurisdiction over the claims and issues in that matter. And Rooker-Feldman prevents you from exercising any kind of jurisdiction over the matters in the state court. And the state court has not completed any determination of the claims in that case, which is exactly what Mr. VerStandig just said.

He can't say, oh, Judge Lease entered a nonfinal order deciding this one issue, and therefore, I can run back to the bankruptcy court and say it's mine. No. Until there's a final judgment on all claims against all parties, Judge Lease can revise, can vacate, can do anything he wants with

that order, and that's in his court. And Rooker-Feldman says you can't interfere with that because now, you're sitting in an appeal of a state court.

THE COURT: Mr. Myers, what I am deciding today does not depend on what Judge Lease did in state court. The question for this Court is whether the disputes between the King parties and the trustee should be settled. What you're talking about is one issue that the Court abstained from, and that was a determination of whether you are the alter ego of Serv Trust. I'm not determining that. That's not what's being settled here.

What's being settled here is all disputes between the King parties and the trustee. And this Court has exclusive jurisdiction over the allowance and disallowance of claims. So this Court determines what claims are allowed. What claims are disallowed. And so this Court has jurisdiction over the settlement of things that are not related to the alter ego issue. That's all in the state court. That's not what's being decided here.

MR. MYERS: How can you -- how can you adjudicate a 9019 settlement motion when Serv Trust property is not property of the estate?

THE COURT: Serv Trust property is property of the estate, and that determination was made by Judge Lease in his order. I understand it says partial judgment. Whether it's a

final judgment or not does not impact whether the trustee can and should enter into a settlement with these parties. There are numerous issues involved.

MR. MYERS: Judge, the bottom line, the middle line, the top line, and any line is until the Montgomery County Circuit Court completes that case, Serv Trust property is not property of my bankruptcy estate.

THE COURT: Okay. Well, let's complete the witness examination. You're welcome to make that argument in your closing, and I look forward to your case citations to support that. So why don't you ask your next question? We have a witness on the stand.

BY MR. MYERS:

Q. Mr. Schlossberg, I'm going to mark this as --

A. Which one have you got there?

Q. Okay. Well, I'm going to mark the last one we just talked about, which was Myers' preliminary objection to the motion for approval of compromise. I'm going to do that Debtor's 2.

THE COURT: Wait. What are you marking? I have an email, I have a stipulation of dismissal, and I have an order remanding case.

MR. MYERS: This is. Filed in this case, doc 19, Gregory B. Myer's preliminary objection to the trustee's motion for approval of proposed compromise and settlement with

the King plaintiffs.

THE COURT: All right. Do you have copies for everyone?

MR. MYERS: No.

THE COURT: Mr. Mastro and Mr. VerStandig, do you have --

MR. MYERS: We've already --

THE COURT: -- copies of Mr. Myers' objection to the settlement?

MR. VERSTANDIG: Your Honor, I do not have a copy. I've reviewed it. I would point out the parties' briefs are not evidence for myriad reasons.

THE COURT: Understood.

MR. MASTRO: I might have a copy of it, Your Honor.

THE COURT: All right. Well, that's for you. Mr. Myers can give his copy to the witness. And that will become part of the body of exhibits on the witness stand.

MR. MYERS: Are you going to give that to him so I can read?

MR. MASTRO: Can read over his shoulder. That's fine.

THE COURT: You can hand it to the witness.

MR. MYERS: I need to read from it to ask him a question.

THE COURT: Well, then you should have brought an

extra copy. Either it's being marked as Debtor's Exhibit 2, in which case you hand it to Mr. Schlossberg, or it's not being admitted, in which case you can keep it in your hand -- or it's not being offered. So if you're offering it as an exhibit, you need to hand it to Mr. Schlossberg so he can look at it.

MR. MYERS: Mr. Mastro didn't do that.

MR. MASTRO: Your Honor.

THE COURT: Because Mr. Myers, you did not pre-file your exhibits. I'm giving you a lot of leeway by even allowing you to introduce exhibits because the protocols you received by email said that if you did not pre-file them at least three business days before this hearing, you would not be able to introduce any exhibits.

MR. MYERS: Okay. I'll give a --

THE COURT: So I'm trying to give you a little bit of leeway here.

MR. MYERS: All right. Thank you. Can I give it to him?

THE COURT: You may hand it to Mr. Schlossberg.

MR. MYERS: Debtor's Number 2.

(Myers' objection to settlement was hereby marked for identification as Debtors' Exhibit 2, as of this date.)

THE WITNESS: Thank you.

BY MR. MYERS:

Q. Can you read in the record starting at the top of that page, Mr. Schlossberg?
A. Page 2?
Q. Yeah.
THE COURT: You don't need to read it into the record. If you want to ask him a question about it, you can ask him a question about it.
MR. MYERS: Well, it states what Judge Lease said.
THE COURT: Okay. Well, then ask him --
THE WITNESS: I'm sorry. I didn't hear what he said.
THE COURT: I said, you don't have to read it into the record. He's marked it as an exhibit.
THE WITNESS: Okay.
THE COURT: So it's docket number 19.
MR. MYERS: Debtor's Number 2? Oh, docket number 19.
THE COURT: Okay. So it's sixty-three pages long, Mr. Schlossberg.
THE WITNESS: No, this is a ten-page document. This is docket number 19 in --
MR. MYERS: This adversary.
THE WITNESS: -- this adversary proceeding.
THE COURT: All right. So it's the ten-page objection without any of the exhibits, then?
THE WITNESS: No exhibits.
MR. MYERS: Yes.

THE COURT: I'm asking Mr. Schlossberg because he's the one who has it in his hand.

So it's a ten-page document?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. All right. Next question.

MR. MYERS: Well, I need -- I can't ask the question if I can't look at the document. So I'll take it back.

THE COURT: Well, it's been offered as an exhibit. You don't take it back now.

MR. MYERS: Well, I can't ask a question about it, Your Honor, if I can't see it.

THE COURT: Well, then you should have brought another copy. All right. So that's Debtor's Number 2. The Court will take judicial notice of the filing of the document. But the statements made therein do not have evidentiary effect because it's a pleading.

MR. MYERS: Well, you can take judicial notice, correct, of what happened in the Montgomery County Circuit Court?

THE COURT: Are you going to -- what are you offering me? Are you offering me orders from the court or a transcript of the proceedings?

MR. MYERS: Transcripts are already in the record of this case.

THE COURT: And where are they?

MR. MYERS: In one of the filings, I attached the December 16th, 2022 hearing transcript from Judge Lease in the Montgomery County Circuit Court matter.

THE COURT: All right. Well, let me see if it's attached to this pleading. Give me one moment.

MR. MYERS: It's possible it was attached to doc 22, which was a supplement. Actually, it was a doc attached to doc 22, which is a supplement. And it was attached as exhibit H.

THE COURT: All right. So this is a seventeen-page transcript, correct?

MR. MYERS: It sounds right. I don't know. But December 16, 2016.

THE COURT: 16 pages.

MR. MYERS: Okay.

THE COURT: All right. So the Court will take --

MR. VERSTANDIG: Your Honor, may I inquire, not having it in front of me, who the transcript is by, meaning is it from a court reporter, or is it from --

THE COURT: It was prepared by Deposition Services, Inc.

MR. VERSTANDIG: Thank you, Your Honor.

THE COURT: All right. It's a sixteen-page transcript. It's at -- we'll call this Debtor's Number 3. It is at docket number 22-1. It's exhibit H, and it's sixteen

pages. And it appears to be a transcript from December 16th, 2022.

(Transcript of hearing 12/16/2022 was hereby marked for identification as Debtors' Exhibit 3, as of this date.)

THE COURT: All right. So the Court will admit this into evidence. It appears to be a complete copy.

(Transcript of hearing 12/16/2022 was hereby received into evidence as Debtors' Exhibit 3, as of this date.)

THE COURT: So your next question, Mr. Myers.

MR. MYERS: Yeah. I'm going to read this paragraph from that transcript and then ask Mr. Schlossberg a question.

Judge Lease said on December 16, 2022, "There would not be a ruling that would impose liability on you", meaning me, Mr. Myers. "However, these plaintiffs would have to, if they wanted to proceed against you, would be required to try that matter again separately, and there would not be any rescue or collateral estoppel issues because you were not a party to that case at that time. Because you were stayed, you were not considered a party."

BY MR. MYERS:

Q. How could there be any ruling against me, Mr. Schlossberg?

MR. MASTRO: Objection, Your Honor.

A. Is there something I'm supposed to be reading because I have nothing in front of me. And I keep -- I am hearing most

of the words that you say, but I have no confidence that I'm -- I'm hearing something that -- that I can rely on. So if I may see it, I'll be happy to comment on it, or to tell you that I don't think it has much relevance to anything anyhow. But so be it.

THE COURT: Let me see if I can have somebody print it.

MR. MYERS: It's okay, Your Honor. I'll take care of it in argument. It's a transcript. It's Judge Lease statement that I wasn't a party and --

THE COURT: Okay. Next question.

Q. Is it your contention, Mr. Schlossberg, if I was not a live party in that case on January 3 because, according to Judge Lease, the upcoming trial does not involve you? Is it possible that there could ever be an alter ego ruling when I'm not even present?

MR. MASTRO: Objection, Your Honor. I don't see what this has to do with what we're here today about. I mean --

THE COURT: The objection's overruled. I'll let him answer.

Mr. Schlossberg.

A. Your Honor, I'm being asked to comment on the effect of a ruling that I'm bound honored to accept as the rule of law in the case. I am acting on that. I have brought to the Court a means of taking an asset, which otherwise essentially has zero

realizable value for this estate. And through an act of alchemy, I've turned it into $150,000 --

MR. MYERS: Your Honor, I didn't ask this question.

A. -- worth of gold.

THE COURT: Stop interrupting.

MR. MYERS: Well, he's --

THE COURT: Stop interrupting. Mr. Schlossberg.

A. I have turned that asset into gold. It's only $150,000. It's not a great big nugget, but it's gold. That's what I'm here for today. If he doesn't like the other rulings in the case, go get relief where you can get relief. You can't get it for me. My job is to liquidate the assets that are placed in my hands.

Q. And they weren't placed --

A. I have done so.

Q. -- in your hands, Mr. Schlossberg.

A. You're arguing with me. You're not supposed to argue when you ask questions.

Q. And you're not supposed to just run on and testify about legal matters.

MR. MASTRO: Your Honor (indiscernible) --

A. I'd ask that somebody be controlled.

THE COURT: Stop. Stop. Everybody, stop. Stop.

Mr. Myers, stop interrupting him. Stop interrupting him. Please do not put me in a position where I have to have

you silenced in these proceedings. I want to hear from you. I want you to have an opportunity to be heard. I want you to have an opportunity to question whatever witnesses are here.

But you have to observe the decorum of the Court. You cannot argue with the witness. When you're at that podium and there's a witness on the stand, you are asking questions. You are not testifying. You are not stating what you think is right or wrong about what he says. And you are not offering facts. You are simply asking questions. Please do not interrupt any more.

Mr. Schlossberg, please finish your --

MR. MYERS: Your Honor, may I respond? Am I not --

THE COURT: No, you may not.

MR. MYERS: To you?

THE COURT: No, you may not.

MR. MYERS: Well, in my --

THE COURT: There's a witness on the stand.

MR. MYERS: And in my --

THE COURT: He's in the middle of an answer. Stop interrupting.

MR. MYERS: You're interrupting my examination.

THE COURT: No, you're interrupting me. You're interrupting him. You're interrupting everyone. Stop it.

Mr. Schlossberg, please continue.

THE WITNESS: Your Honor, I'm sorry. I've completely

lost -- I don't even know what question we had going.

THE COURT: Okay. All right. Next question, Mr. Myers.

MR. MYERS: It's a stipulation of dismissal. Mr. Schlossberg has a copy.

THE COURT: All right. We'll call that --

MR. MYERS: 3.

THE COURT: -- Debtor Number 4.

MR. MYERS: 4? Well, number 2 was your opposition to the settlement. Number 3 was the transcript. So this is Debtor Number 4.

(Stipulation of dismissal was hereby marked for identification as Debtors' Exhibit 4, as of this date.)

BY MR. MYERS:

Q. Do you have Debtor Number 4 in front of you, Mr. Schlossberg?

A. Yes.

Q. Stipulation of dismissal?

A. Yes.

Q. Can you tell me what that is?

A. Stipulation of dismissal. What do you --

Q. Can you describe what you did there?

A. This is the dismissal of the state court iteration of the redemption dispute, which was wholly appropriate when this Court took over the proceedings in 24-007.

Q. How did this Court take over the proceedings from the Montgomery County Circuit Court case if the Montgomery County Circuit Court case was not removed to this Court, which you stated in your settlement motion couldn't be done?

A. You asked me the question. I gave you the answer. Again, you don't like the answer. When you don't like the answer, you try to --

Q. Please answer my question, Mr. Schlossberg.

THE COURT: Do not interrupt him.

A. I'm answering your question.

THE COURT: Do not interrupt.

Go ahead.

A. I answered the question just now, Your Honor.

THE COURT: All right. Thank you. Next --

A. I believe I answered it fully.

Q. Well, I don't know what your answer was. What was your answer to my question?

A. Well, I'll defer to the Court. The Court can determine whether I --

Q. No, I'm asking you.

A. No, because if you do that, that's asked and answered. It's a proper objection.

MR. MYERS: I'm sorry.

THE WITNESS: I'm sorry, Your Honor. I don't do --

MR. MYERS: Can his attorney do that, or --

THE WITNESS: I don't mean to be --

MR. MYERS: -- is he going to just be his own attorney?

MR. MASTRO: Objection, Your Honor. Asked and answered.

THE COURT: He can raise the objection.

MR. MYERS: He's here as a Chapter 7 trustee, not counsel for Chapter 7 trustee.

THE COURT: He's also counsel in the case. Read the order.

MR. MYERS: Okay. Well, he can't be both on the stand.

THE COURT: He's not testifying as an attorney. He's testifying as a Chapter 7 trustee. And you have asked the same question over and over and over again. I was going to let you do it because you have an hour and seventeen minutes left. And if you want to ask the same question for an hour and seventeen minutes, I was going to let you do it. But if you'd like to move on to something else, that probably would be advisable so you can cover more ground.

MR. MYERS: Your Honor, I just object to this entire proceeding. This case was removed to Montgomery County Circuit Court and has never come back to this court.

THE COURT: You can make that argument. There's a witness on the stand. Ask him a question.

MR. MYERS: Right. And I ask him, and he wouldn't answer.

THE COURT: Ask him the next question.

Q. How did the Montgomery County Circuit Court litigation come back to this court?

A. I'll defer to the record of the proceedings. It came back by proper orders of the court.

Q. What order?

A. Your Honor, I don't have the docket in front of me. I'm not going to be second guessing the way counsel put together the docket and which item happened first and what went down. This case is properly in this court. I don't think you have any doubt about it. I doubt that you'd be conducting this hearing if you had that doubt, Your Honor.

This is what we're here for. We're not here on any of these issues. This is an irrelevant inquiry because the only inquiry that matters that is a factual one, which justifies inquiring of a witness under oath, is my judgment and how I got to it. It doesn't matter. Nothing else matters here for that. Those are all interesting questions, and you certainly have the right to argue them. They're issues of law. Raise them up.

MR. MYERS: Can I sit down, Your Honor?

A. Raise them as issues of law.

MR. MYERS: Because he just keeps going on.

THE COURT: Stop interrupting, Mr. Myers.

MR. MYERS: I am not interrupting, Your Honor. He is just going on and on.

THE COURT: You asked him a question. I'm letting him answer it. Stop interrupting.

MR. MYERS: This is a sham proceeding.

THE COURT: Well, you're welcome to leave, Mr. Myers.

MR. MYERS: It's a sham proceeding. There's --

THE COURT: You're welcome to leave if you don't like it.

MR. MYERS: That litigation is in Montgomery County Circuit Court. You have no subject matter jurisdiction. Rooker-Feldman prevents it. The case was removed to Florida and was never remanded. And it was dismissed in Florida.

THE COURT: And you can make those arguments in your closing arguments. There is a witness on the stand. Either ask him a question, or I'm dismissing the witness and you're done with him.

BY MR. MYERS:

Q. Were you aware if I ever had an interest in Serv Trust?

A. Asked and answered.

Q. Just answer the question, please.

THE COURT: No, Mr. Myers, you don't instruct the witness to answer. I do. That's my job. Okay. So stop --

MR. MYERS: Well, his attorney's job is to say ask

and answer --

THE COURT: Stop. Stop.

MR. MYERS: -- if he wants to do an objection.

THE COURT: Stop. Stop. Stop. I'm trying to give you some leeway, and you're making it painful. So stop arguing with me.

Mr. Schlossberg, would you please answer the question?

A. Yes, ma'am.

THE COURT: One more time.

A. Yes, ma'am.

THE COURT: Last time.

A. Thank you for acknowledging I've tried to answer this question before. I will answer it again.

Mr. Myers' interest in Serv Trust was determined by the Circuit Court for Montgomery County to be affected by his alter ego status individually with Serv Trust. When that Court determined that Serv Trust's interests were bound up in Mr. Myers such that the alter ego doctrine took effect, they passed to me, as his bankruptcy trustee under Section 541 because it was part of the pervasive description of property contained in -- contained in that statute. To the extent that Mr. Myers had interests, they passed to me. And since then, I've been acting on those. I hope that's a complete answer.

THE COURT: Thank you.

Mr. Myers.

Q. Has the court ever entered a judgment with me present at trial?

A. You've told me you weren't present on the day of trial. I'll take you at your word. Judgment was entered --

Q. Are you aware that Mr. VerStandig filed papers in that Court that says I am an indispensable party to that case, and without it, it can't go forward?

THE COURT: You're talking about in the state court case, not this case, correct?

MR. MYERS: Correct, Your Honor. I guess, let's just -- here's where I'm going. He's trying --

THE COURT: No. Wait. Wait. Stop. There's a witness on the stand. I'm just trying to make sure the questions --

MR. MYERS: I'm trying to save us all some trouble.

THE COURT: The questions. You don't get to argue with people while a witness is on the stand. You get to ask questions.

MR. MYERS: Okay.

THE COURT: I'm trying to clarify what you're talking about. Are you talking about being an indispensable party in this adversary proceeding or in the state court proceeding?

MR. MYERS: Either one, I guess, I would be a required indispensable party, and I'm not named as a party.

THE COURT: Mr. Schlossberg, if you have an opinion on that, please answer.

A. To the extent that Mr. Myers is an indispensable party, those characteristics which make him an -- an indispensable party necessarily passed to me with the entry of the alter ego decision by Judge Lease. So to the extent that he was indispensable prior to the court determining the alter ego and rendering the alter ego decision, I believe that makes me that party.

THE COURT: All right. Thank you.

Mr. Myers, your next question.

BY MR. MYERS:

Q. So Mr. Schlossberg, property of my estate is determined on November 18, 2015, not one day after. Do you think a state court can enter an order eight years later nunc pro tunc and put property back in my estate?

A. I believe you've made a false statement of -- of law, that is, that the decision is made on that date, and nothing ever after that can ever affect it in any way, including decisions of the courts determining exactly what your rights were under state law as of that date.

Q. But there has been no determination of what my rights were on November 18, 2015 because Judge Lease said, I'm not a party.

A. You're -- you're -- you're testifying and arguing with me

both. I -- I mean, I don't know what I'm supposed to do with you. You didn't ask me a question. You say, you said, but, but. Well, it's not a but-but situation. You don't get to argue with me. You get to argue with the judge. You get to argue with other counsel. But not with me. I'm just a witness.

Q. Were you aware that Mr. VerStandig was my attorney beginning in 2010?

A. I knew that Mr. VerStandig had that privilege at some point prior to all this litigation in another matter.

Q. And do you realize he was my attorney at the beginning of my bankruptcy case?

A. To be honest with you, I've never given much thought to Mr. VerStandig's role with you or without you.

Q. Did you ask Mr. VerStandig to litigate this case for you?

A. Mr. VerStandig is not litigating anything for me.

Q. The Montgomery County Circuit Court case?

A. He's not litigating anything for me. He's never litigated anything for me.

Q. Well, not according to Mr. VerStandig.

A. Well, you'll have to call -- call Mr. VerStandig to the stand, although I think you may have some problems getting him as -- to testify as a witness here. But you'd have to get Mr. VerStandig to explain any statement he made to that effect. And as I said earlier, based on my judgment as to your

credibility, I doubt that Mr. VerStandig said that.
Q. Well, I have the transcript, so I'll show it to you.
A. Is it one that you typed up yourself? You have a habit of doing that.
THE COURT: Next question.
MR. MYERS: I don't need to hear that, Your Honor.
THE WITNESS: It's true.
THE COURT: Move on. You're arguing with the witness. It's inappropriate.
Q. So did Mr. VerStandig ever ask you or Mr. Mastro, to your knowledge, to pursue the declaratory judgment action in Montgomery County Circuit Court?
MR. MASTRO: Objection to the extent he's calling for the disclosure of attorney-client privilege.
THE WITNESS: Oh, that's good.
Q. Mr. VerStandig's not your attorney.
THE COURT: No. I'll allow the witness to answer the question. He knows he's not going to disclose attorney-client privilege communications, if there are any, that are relevant.
A. I have no knowledge of Mr. VerStandig ever having been employed on my behalf or my firm's behalf or Mr. Mastro, as my partner, having been done. And anyone who makes an allegation to the contrary is going to have to explain that to me because I don't know it.
Q. Well, I didn't ask you if he was employed. I said, did

you ever ask Mr. VerStandig to pursue this matter, whether he's employed or not? I don't know what you mean by employed, but to pursue this matter for you because you were time barred in this case?

A. Now, I see where you think you're going. The answer is no. Your Honor, I never requested Mr. VerStandig at any time to do anything for me in any fashion.

Q. So if Mr. VerStandig told Judge Lease that you did, what do you think of that?

A. I think you're posing hypotheticals again, and considering your reputation for credibility, I doubt that it actually happened.

Q. Do the King parties have -- since you never abandoned any claims or causes of action in this case, are you aware if the King parties were ever sought and an order was entered providing them with derivative jurisdiction to litigate claims that are exclusively the province of the Chapter 7 trustee?

A. I know of absolutely no derivative action requests made in this litigation. I doubt sincerely that there are any such actions ever filed, and I doubt that they very seriously that they exist. But you go ahead.

Q. When you say in this litigation, are you referring to the Montgomery County litigation or this case?

A. I'm referring to any matters involving Gregory Myers.

Q. That's not my question, Mr. Schlossberg.

A. Well, it's my answer.
Q. Well, that's not my question. So please answer my question. Are you aware --
A. Well, you want me to answer your question.
Q. Are you aware --
A. If you articulate a question that can be answered intelligibly, I will answer it.
Q. Fine.
A. Why don't you try and frame it again?
Q. Thank you. Are you aware if the King parties, any of them, ever came into this court to obtain an order providing them with derivative jurisdiction to litigate claims that are exclusively the property of the Chapter 7 trustee?
A. Asked and answered, Your Honor. I clearly answered that question not three minutes ago.
THE COURT: All right. Answer it one more time, please.
A. No, there are none.
Q. So would it surprise you if Mr. Mastro told Judge Lease that they were provided with derivative jurisdiction?
A. That they asked for derivative jurisdiction and were granted it by some court?
Q. No, that the bankruptcy court understood they had derivative jurisdiction?
A. I wasn't there. I haven't heard it. I don't believe it

actually was said. I'd like to see it in context.

Q. Okay.

A. You have an awful habit of taking things out of context.

Q. Sure. But would that surprise you?

A. Not a bit. Not a bit, coming from you.

Q. No, would it surprise you that, Mr. Mastro, when the issue of jurisdiction came up in the hearing before Judge Dwyer and she recognized that alter ego claims are the exclusive jurisdiction of the bankruptcy trustee. And she said, well, what are you doing here? And Mr. Mastro said, well, the bankruptcy court, and he kind of worked his way around it, is aware of this.

A. The bankruptcy court is aware that we're in the circuit court for Montgomery County. That Mr. Mastro was there on behalf of the Chapter 7 trustee. That's scarcely derivative jurisdiction. Is this an intentional -- do you, like, make these things up?

MR. MYERS: Your Honor. Mr. Mastro, I am not suggesting --

Q. I mean, Mr. Schlossberg, I am not suggesting stating the obvious. Mr. Mastro represented to the Court that the King parties had derivative jurisdiction, as did Mr. VerStandig.

THE COURT: Well, he said he wasn't there. You're asking him to opine on things that he has said he doesn't have any knowledge of.

Q. Okay. So as the Chapter 7 trustee, Mr. Schlossberg, when your counsel files papers in cases, are you aware of what they're doing? Are you aware of what they're saying in court cases?
A. If I'm not in the courtroom, I don't know what he said. If he files a pleading, I know what's in the pleadings.
Q. Okay.
A. You want to show me the pleading that says that we hereby grant -- excuse me hereby grant jurisdiction to assert these claims? And Mac (ph.) can do it for us.
Q. Well, there is --
A. You must have something like that.
Q. There is no order granting the King parties derivative jurisdiction.
A. Well, it sounds like you --
Q. When the --
A. Sounds like that -- that's not what you were saying a couple minutes ago.
Q. No, I said he misrepresented that it happened. So anyway, do you recall when Goldsboro filed the adversary in this case before the King parties filed their adversary in Montgomery County Circuit Court?
A. You have to give me a year. When was that filed?
Q. 2018 or so, Goldsboro came in here and said, we want to litigate that Serv Trust is Myers' alter ego and Judge Lipp

said, not a chance. And she abstained and accused you all of forum shopping. And in that case, do you recall that they requested that would you give them derivative jurisdiction? Do you recall what your answer was?

A. Don't recall the whole thing. And I know that Judge Lipp never said on the stand -- sat on her -- on the bench and said, not a chance. That's not her style.

Q. Yeah. I'm paraphrasing.

A. No, you're not paraphrasing. You're characterizing.

Q. I'm paraphrasing.

A. It's like a leading. You mess up on these things.

Q. Thank you, Mr. Schlossberg. So let's go back to Mr. VerStandig. So here you are, with your Chapter 7 trustee forty-two years of business judgment, and you find out that Mr. VerStandig has been my attorney since 2010. He has represented Serv Trust. He has represented 6789 Goldsboro LLC. He has represented me. And now, all of a sudden, he decides, wow, I'm going to represent just the King parties and kick everybody else to the curb. Does that not raise a red flag in your business judgment?

MR. VERSTANDIG: Objection. Assumes facts not in evidence, specifically that I ever represented Serv Trust or 6789 Goldsboro LLC.

MR. MYERS: We'll put that in evidence tomorrow. I'll call Mr. VerStandig.

THE WITNESS: Is he on your witness list for tomorrow? I missed that.

MR. MYERS: Well, he just spoke, so now he is.

Q. Are you aware of that, Mr. Schlossberg?

A. Aware of what?

Q. That he represented all those parties --

A. I don't think -- I --

Q. -- and has a conflict of interest, and now he's representing the King parties in this bogus 9019 settlement.

THE COURT: Hold on.

A. You know, I'd love to know your --

MR. MASTRO: Objection, Your Honor.

THE COURT: Hold on. Objection. Yes.

MR. MASTRO: I mean, it's hearsay. He's just saying what Mr. VerStandig said in open court. Is he aware of that? We don't have a transcript. I don't know what's going on here. I mean, we're getting so far afield, Your Honor. I'd throw in a relevance objection as well.

THE COURT: Thank you.

MR. VERSTANDIG: And assumes facts not in evidence, namely, that I ever represented Serv Trust or 6789 Goldsboro LLC.

THE COURT: All right. So Mr. Schlossberg, I'm going to ask the question a different way. To your knowledge, has Mr. VerStandig represented the King parties, Serv Trust, and

6789 Goldsboro at different times?

THE WITNESS: At different times, I believe -- I know that he has represented the King parties since this dispute about redemption started. Maybe a little bit -- maybe before that. I don't know. I know that Mr. VerStandig represented Mr. Myers. Mr. Myers seems to be saying continues to represent him. I -- is -- maybe that representation's still going on, but I can't believe that Mr. Myers couldn't find his way to the Attorney Grievance Commission if that were the case.

And maybe you have. Have you brought a proceeding?

MR. MYERS: You don't ask the questions.

THE WITNESS: Oh, I'm sorry. You're right.

THE COURT: So okay. So to your knowledge, Mr. VerStandig represents the King parties and has represented them for some time and at some point in the past represented Mr. Myers?

THE WITNESS: That is my understanding. Yes, Your Honor.

THE COURT: Okay.

THE WITNESS: And -- and -- and -- and Mr. VerStandig, I don't know. I think he just said he never represented Goldsboro and Serv Trust. Whatever he said. But you know, I don't know those things, Your Honor. So I do the best that I can, judging the credibility of the -- the -- the

people who are asking the questions and the reasonable implications of answers that are given by others.

THE COURT: All right. Thank you.

BY MR. MYERS:

Q. So Mr. Schlossberg, you said I wouldn't be a good witness, but can you rely on an attorney if he has a conflict of interest in this proceeding?

A. There's no evidence of a conflict.

Q. Okay. There will be tomorrow.

A. And I don't -- excuse me. He is not my attorney.

Q. Well, according to him, he is.

A. Your Honor, I'd love to know the proof on this.

Q. I have it right here. Here's the transcript. It's going into evidence, and I'll mark it.

A. Did you type that one?

Q. Yeah, I did. I typed it with a crayon. I don't need your comments, Mr. Schlossberg.

THE COURT: Well, Mr. Myers, we don't need yours.

MR. MYERS: Okay.

THE COURT: All right. Next question.

Q. So Mr. Schlossberg ,did you know that Mr. VerStandig was employed at Offit Kurman up until, I don't know, about 2017?

A. Yes, I did know that he worked at Offit Kurman.

Q. Okay. And do you know that Offit Kurman represents the King parties, 6789 Goldsboro, and Serv Trust at one point or

another, same time, while Mr. VerStandig was there? In fact, he -- well, you'll see it in the evidence when it's presented.

A. He represented you when he was working at Offit.

Q. No, he represented 6789 Goldsboro LLC and Serv Trust.

MR. VERSTANDIG: Same objection. Assumes facts not in evidence.

THE COURT: Understood. Mr. Myers, next --

MR. MYERS: I'm going to bring the evidence tomorrow. They're his emails. They're his time sheets.

THE COURT: Okay. Stop. Stop. Stop talking. There is a witness on the stand. I don't need your dialog.

Mr. Schlossberg, if you're able to answer the question, can you answer the question?

A. Give me the question again.

Q. If Mr. VerStandig was representing 6789 Goldsboro LLC, Serv Trust, me, Dan Ring as another trustee of Serv Trust, and Brian King, Cristina King, and the Cristina and Brian King Children's Trust, whether he was at Offit Kurman or after he left, would that give you pause in your experienced business judgment that there's a problem here?

A. Your Honor, if there's a problem there, it's not my problem. I'm the bankruptcy trustee. I'm trying to liquidate an asset that I have. And I'm happy to -- I'll sell it to any one of them or any combination of them if they bring me the money and the Court approves the -- the proposed purchase,

sale and purchase. But I -- I don't get to vet the -- the purchasers when I'm selling something at an auction. I stand on the steps. I got my hands up. I'm trying to build a crowd and get the prices to go up.

Q. Thank you, Mr. Schlossberg.

A. Green is green. I'm answering your question. Green is green, and I try to do what I can do.

Q. Okay.

A. I don't care much of anything about the -- this conflict issue that you're raising. Doesn't affect me.

Q. Well, apparently you -- Mr. Schlossberg, didn't you care earlier on direct exam by Mr. Mastro that I couldn't be a good witness because I couldn't be trusted? I couldn't tell the truth?

A. Demonstrably so.

Q. Okay. But you're okay with an attorney on the other side of this settlement agreement who's got a conflict of interest, a clear conflict of interest?

A. Well, the part --

MR. VERSTANDIG: Again, just for clarity of record, because there is a propensity to sometimes take things out of context --

THE COURT: I understand.

MR. VERSTANDIG: Objection.

THE COURT: Your objection is noted.

MR. VERSTANDIG: That's not in evidence.

THE COURT: Your objection is noted. And I'll let Mr. Schlossberg answer.

THE WITNESS: Thank you, Your Honor.

A. If there is a conflict between Mr. VerStandig and 6789 and Serv Trust and the King family but they're all comfortable with the fact that they're generally on the same side of one another and not raising an issue about it, it's not my business. Not your business. Not anybody's business but the parties who allegedly are the subjects of that conflict. And they can certainly waive that.

Q. Are you aware that Serv Trust has ever waived their privilege?

A. I am not aware of any of this, and I don't believe in any of it.

Q. Are you aware that I have ever waived my privilege?

A. I didn't include you in the laundry list just there of the people with conflicts. I --

Q. Why not?

A. Because we heard earlier, I believe, that this was a representation 2010 or something like that in some other matter. If I understood it correctly --

Q. No, you didn't. This was a representation that in 2013, Mr. VerStandig organized the meeting for 6789, Serv Trust, and the King parties. He was there present, and you'll see it in

the evidence. So let's move on.
A. Okay.
MR. MYERS: So I'm going to mark this as -- what are we up to, Your Honor?
THE COURT: Debtor Number 5. What are you marking, Mr. Myers?
MR. MYERS: This is a motion to disqualify Mr. VerStandig in my Florida bankruptcy case, which was written by an attorney. Not me. Not in crayon. And I'll be happy to hand it to Mr. Schlossberg.
THE COURT: Do you have copies for everyone?
MR. MYERS: Actually, this was a subsequent one. There was a previous one written by my attorney down there.
THE COURT: So no --
MR. MYERS: I don't have copies for everybody, but I can put it in on my case when I get Mr. VerStandig on the stand.
THE WITNESS: Can we make sure we get copies for tomorrow so that we can look at them tonight, like --
MR. MYERS: Well --
THE COURT: -- he's had the chance to look at ours?
MR. MYERS: -- I didn't look at yours.
THE COURT: Mr. Myers, that was your choice not to look at theirs. But all of this had to be filed three business days ago. So you're now almost a week late.

If there are any documents that you intend to introduce into evidence tomorrow, then you need to let me know before 5 o'clock today. So you have -- or at 5 o'clock.

You have Mr. Schlossberg on the stand for another forty-eight minutes.

MR. MYERS: Your Honor, are you saying I cannot complete my examination of Mr. Schlossberg if it goes over?

THE COURT: I asked you how much time you needed. You said two hours.

MR. MYERS: I said approximately.

THE COURT: Okay. So --

MR. MYERS: And you limited me to 5 o'clock. Are you limiting my examination of Mr. Schlossberg?

THE COURT: I am not going to let you have an unlimited amount of time to question this witness because you have chosen to argue with him over every little thing since he's been on the stand. That's your choice. You said you needed approximately two hours. I'm going to give you approximately two hours to complete your cross-examination. You are now an hour and thirteen minutes into that.

MR. MYERS: Yes, and every time --

THE COURT: So use your --

MR. MYERS: -- I ask a question --

THE COURT: So use your time wisely.

MR. MYERS: Every time I ask a question, Mr.

Schlossberg decides to filibuster.

THE COURT: Next question.

MR. MYERS: This is Debtor's Number 5. It's been passed out. It's an email chain dated October 11, 2019.

MR. VERSTANDIG: Your Honor, I'm going to object before this is read in court or otherwise referenced.

THE COURT: I'm sorry. Say that again, Mr. VerStandig.

MR. VERSTANDIG: I'm objecting before this is read on the record. The Email chain in question is a hybrid of communications that are protected by the attorney-client privilege and the accountant-client privilege. This was surreptitiously obtained by, I don't remember, Mr. Myers' counsel or Serv Trust's counsel through issuance of a subpoena without proper notice during state court proceedings.

At no point in time have the King parties, who are the holders of the subject privilege, waived or abrogated the privilege. The communications in here are exclusively between clients, their attorneys, and their accountants. Maryland recognizes both the attorney-client privilege and the accountant-client privilege.

Mr. Myers is aware that this is privileged. This has been raised several times in proceedings over time. Yet, he persists in trying to introduce it into the record, despite knowing that no one who holds the privilege has ever waived

it. And as my client's counsel, I will be clear, they are not waiving their privilege.

MR. MYERS: Your Honor, there's no privilege. The subpoena was issued to the CPA firm, and the CPA firm answered the request for documents. And they were submitted. That's as simple as it is.

THE COURT: Well, there is an accountant-client privilege --

MR. MYERS: The account is a --

THE COURT: -- and unless you have -- and if this is an inadvertent disclosure, then it is still privileged. Do you have anything to substantiate any argument that the privilege was waived?

MR. MYERS: Privilege of who?

THE COURT: The privilege belongs to the clients. It belongs to the King parties. Do you have anything --

MR. MYERS: The King parties? The CPAs are CPAs for Serv Trust and 6789 Goldsboro LLC.

THE COURT: Well, then, do you have anything to show that Serv Trust and 6789 Goldsboro have waived the privilege?

MR. MYERS: I was a manager when this happened of Serv Trust -- I mean, of 6789 Goldsboro LLC.

MR. VERSTANDIG: Your Honor, I --

MR. MYERS: They produced the tax returns.

MR. VERSTANDIG: Hold on. I don't --

MR. MYERS: There's no privilege.

MR. VERSTANDIG: -- believe Mr. Myers was the manager. These are post-litigation emails. It starts with an email from my client to myself on the last page, dated October 10th, 2019.

THE COURT: Well, the state court determined --

MR. MYERS: It didn't.

THE COURT: -- that as -- excuse me. The state court determined that as of November 18th, 2015, you were the alter ego of Serv Trust. And so your rights as of November 18th, 2015 are being exercised by Mr. Schlossberg.

MR. MYERS: I disagree. There is no final order from the state court, and you can't --

THE COURT: I don't need a final order.

MR. MYERS: -- do anything with a nonfinal order. You know that. I know that.

THE COURT: Don't tell me what you think I know.

MR. MYERS: Maryland law knows that.

THE COURT: Don't tell me what you think I know.

MR. MYERS: Well --

THE COURT: Because what you think and what I think are so diametrically opposed that there's no overlap. So don't presume to know what I know. You don't.

MR. MYERS: I don't presume to know, but I disagree with what you're saying.

THE COURT: Well, and you're welcome to say that you disagree when you get to your closing argument.

So the Court is not admitting Debtor's Exhibit Number 5.

Would you like to move Debtor's Exhibit Number 4 --

MR. MYERS: So how is Mr. VerStandig --

THE COURT: -- the stipulation of dismissal, into evidence?

MR. MYERS: How would Mr. VerStandig have --

THE COURT: Is that a yes?

MR. MYERS: I'm asking a question.

THE COURT: Debtor's Exhibit Number 4.

MR. MYERS: We're still on the other exhibit.

THE COURT: Stop talking over me. Debtor's Exhibit Number 4 is the --

MR. MYERS: Well, you're not letting me respond.

THE COURT: Debtor's Exhibit Number 4 --

MR. MYERS: So you're violating my due process right.

THE COURT: So Debtor's Exhibit Number 1, Number 3, and Number 4 have been admitted. 5 is not admitted. And Debtor's Exhibit Number 2, the Court has taken judicial notice.

(Stipulation of dismissal was hereby received into evidence as Debtors' Exhibit 4, as of this date.)

THE COURT: Next question, Mr. Myers.

BY MR. MYERS:
Q. Yeah. So were you aware that Mr. VerStandig, as counsel for 6789 Goldsboro LLC, filed a complaint in Garrett County.
A. I don't know what the possible relevance is, but I -- I don't -- I don't have any recollection of that. It may be that it was --
Q. It was a claim on a note.
A. I -- I -- I don't have any recollection of it. If I knew it, I don't remember it now.
Q. Okay. So he was 6789 Goldsboro LLC's attorney in the Garrett County action and --
A. I'm sorry. When was that?
Q. Somewhere around 2018 maybe.
A. Again --
Q. And then that action --
A. -- if I ever knew it, I don't recall it now. But go ahead.
Q. Okay. Do you have any knowledge of why he might file something in Garrett County?
A. I haven't --
Q. Isn't that where you are?
A. No, it is not where I am.
Q. Um-hum.
A. You don't know much about the geography of Maryland. I'm pretty far from there.

Q. Yeah. Thank you, Mr. Schlossberg, for that insult. So if Mr. VerStandig is representing 6789 Goldsboro LLC and the King parties, and Brian King is the manager of 6789 Goldsboro LLC, and he represented Serv Trust and me and Dan Ring, don't you think there's a conflict there?

MR. VERSTANDIG: Objection.

THE COURT: We've covered this ground. Move on to another subject, Mr. Myers.

MR. VERSTANDIG: Your Honor, just for clarity of the transcript so the context matters, there is no evidence that I ever represented Serv Trust. There is no evidence that I ever represented Mr. Ring. For what it's worth, I believe Mr. Myers is right. I think I did represent Goldsboro in filing an action, but I -- there is no evidence before the Court that I've represented Serv Trust or Mr. Ring.

THE COURT: Thank you, Mr. VerStandig. Your objection is noted.

MR. MYERS: Yeah. So that's --

THE COURT: And the objection is sustained for all the reasons Mr. VerStandig said and also because it's been asked and answered at least six or seven times at this point.

Q. Were you aware that Mr. King filed tax returns with the IRS that said Serv Trust was in bankruptcy?

A. I don't think that I do.

Q. Would that change your business judgment on this

transaction if Mr. King, as the manager, filed tax returns at the IRS that said Serv Trust is in bankruptcy?
A. Well, it wouldn't change my view of my role, my job, and the fact that I'm getting $150,000 for something that probably would liquidate on the market for 0.
Q. Okay. Let's talk about that. What do you mean when you say I would get?
A. Sorry. I take my cases personally. I'm -- I'm a little parochial about my job. If I am trusted with handling the assets of an estate, I try, Your Honor, to say the estate, this. The estate, that. But sometimes, especially when perhaps there is a degree of irritation in the circumstances, I will let you know just how personally I take my role in this job, and I will refer to the estate and myself as being one and the same. The trustee and the estate have the same interests, but I don't -- I'm not wild about the fact that from time to time, I might identify myself, as opposed to the estate.
Q. So if there were tax returns filed by Mr. King as manager of Serv Trust and it showed Serv Trust had zero percent before --
A. And it showed Serv Trust what?
Q. Zero percent interest.
A. Is there a question behind that?
Q. Yeah. Would that cause you to be concerned about a

settlement when Mr. King has already said in 2018 that Serv Trust had zero percent? False.

Q. I'm sorry. Are you answering your own question? Because I don't think I'd agree with that answer. If Mr. King was signing a tax return for Goldsboro and stated with respect to the K-1s that would have to go with it, Your Honor, that the -- to be wholly consistent with his articulated position because he has said that on -- excuse me just a minute, Your Honor.

By the fall of 2017, it was -- it was Mr. King's position and that of the King parties that they had successfully redeemed the class B stock. So if they had redeemed the class B stock, in 2018, looking back at it, maybe when he's filed the 2017 return or maybe Mr. Myers is referring to the '18 returns, it wouldn't be too surprising that someone who thought that they had successfully redeemed the stock -- the membership interest, the B membership -- class B membership interest, would state, perhaps in -- in trying to explain why the People who had K-1s before don't have K-1s anymore and why they don't no longer have an interest.

I've never seen these alleged returns, so it's a little hard for me to speculate further than that, but I think that would be wholly consistent with his position. Now, if he's wrong, Mr. Myers, if he's wrong and he -- and he didn't have a right to redeem it, then that return that he filed for

Goldsboro would be a bad return.
Q. Well, can you elaborate on bad?
A. I just did.
Q. No, what do you mean by bad return? Like, fraudulent return or --
A. No, it would be --
Q. -- illegal return or --
A. It would be an incorrect return. If you're right, it would be an incorrect return. But I can see also where there's an argument to be made either way on that. And I guess we'll figure out how that goes at some point down the road.
But you started the thing off would it changed my business judgment in making a deal with them. Might make them a little more unsavory if I had known that. But it doesn't change the fact that they're bringing money to the table for the creditors of my estate that I can't get any other way.
Q. Well, just so we're clear, Mr. Schlossberg, I don't think it's property of your estate.
A. Well, I -- I -- I'll concede you said that, sir. I concede.
THE COURT: Next question. We don't need dialog while a witnesses on the stand.
Q. So Mr. Schlossberg, you -- going back, I couldn't recall. Did you say you've reviewed the Serv Trust trust agreement?

Did you say earlier, either on cross or direct, that you've ever reviewed the Serv Trust trust agreement?
A. No, I said I've never seen it.
Q. Okay.
A. I don't think I've ever seen it.
Q. So if there is no final decision in the Montgomery County Circuit Court case, and I've never been -- there's never been a trial where I've been a party. And I wasn't a settler of Serv Trust, which you well know because you would have done something before the King parties tried to do it. I wasn't a settler. I wasn't a beneficiary. And I've never put any of my own property into Serv Trust. How, then, is it possible that it could be my alter ego?
A. I'm not going to revisit the judge's decision.
Q. Okay.
A. The judge made that decision. Judge Lease --
Q. Made a nonfinal order --
A. -- of the Circuit Court for -- let me answer my question. Your question.
Q. Okay.
A. Judge Lease of the Circuit Court for Montgomery County made his decision in this case and determined that you were the alter ego. I'm not going behind this decision.
Q. Yeah. That's not a final decision. It's not a judgment.
A. You're arguing.

Q. Well, that case is on appeal in the Maryland Court of Appeals.
A. You're arguing.
Q. So it divests this Court of jurisdiction. And this case is on appeal in the district court, so that divests this Court of jurisdiction. And then there's probably two or three other appeals that are out there, where you've brought up the issue of this Goldsboro thing. So pretty sure that this Court doesn't have any jurisdiction to be considering this. At any rate, you --
THE COURT: What's your question?
Q. You reference one document, the first amended and restated operating agreement. Are you aware that there was a second amended and restated operating agreement?
A. Asked and answered, Your Honor.
THE COURT: Answer it again, Mr. Schlossberg.
A. The only agreement that I'm aware of is the one that is in evidence here today.
Q. Okay. So is that, in your business judgment, a problem that you don't even know what agreements exist for 6789 Goldsboro LLC?
THE COURT: That's argumentative. You don't need to answer that.
Next question.
Q. So you don't know all of the agreements for 6789

Goldsboro LLC? You haven't reviewed the second amended operating agreement?

A. Your question --

THE COURT: That question is argumentative. You don't need to answer it.

THE WITNESS: Thank you, Your Honor.

THE COURT: The second question, I would like you to answer. Have you reviewed any other agreements?

A. No, that's the only one I've ever seen for their operating agreement.

THE COURT: All right. Thank you.

Q. So how can you form a business judgment based on one agreement out of numerous agreements?

A. Let's see how I can put this.

THE COURT: That's --

THE WITNESS: No, Your Honor, I can do this, if you allow me.

THE COURT: Okay.

A. I did not attend any meetings of the 6789 Goldsboro LLC. I've never seen any of its membership resolutions. I haven't seen the subscription agreements. I haven't seen the receipts for the capital contributions. But what I am aware of is they have $150,000 that they want to give to me for my bankruptcy estate so that I can swell the coffers of the bankruptcy estate.

Q. So if --
A. In the -- not finished.
Q. Yeah, well, I didn't ask that question.
A. I'm not finished.
THE COURT: Stop.
Q. I didn't ask you this question.
THE COURT: Stop. Stop. Do not interrupt him again.
MR. MYERS: He's going off.
THE COURT: I don't know how many times I have to say it, Mr. Myers. Stop it. You will observe --
MR. MYERS: Aren't I allowed to ask questions?
THE COURT: -- the decorum of this court -- do not interrupt me either.
MR. MYERS: Yeah, this is -- okay.
THE COURT: You will observe the decorum of this court. Stop interrupting people.
Mr. Schlossberg, finish your answer, please.
THE WITNESS: He did it again, Your Honor. I don't remember where I was going.
THE COURT: Okay. So --
MR. MYERS: No, we're good.
Q. Okay. So let me ask you this hypothetical. If the Maryland Court of Appeals or Judge Lease determines and he vacates the nonfinal order, which he certainly has jurisdiction to do, then you would be settling and accepting

money from the King parties for property that this estate doesn't own, which would constitute fraud and a violation of your fiduciary duties as a Chapter 7 trustee.

MR. MASTRO: Your Honor, objection.

Q. Is that correct?

THE COURT: I'm going to object. You don't need to answer that question.

MR. MYERS: Oh, yeah. Okay.

THE COURT: Next question. You have thirty minutes.

Q. This all boils down, Mr. Schlossberg, to a question, which is why your counsel never brought it up, is whether Serv Trust's property is property of the estate. You know it's not, so you elide it over it.

A. Asked and answered whatever question's come in, Your Honor.

THE COURT: That's stricken from the record.

Next question.

Q. Okay. So let's talk about value. Did you ever read Brian King's deposition testimony in the Montgomery County Circuit Court case?

A. No, sir.

Q. Okay. Would it surprise you if Brian King testified after Mr. VerStandig filed the amended declaratory judgment action that it was his opinion that the lots were worth $450,000 each --

A. It would --
Q. -- the nineteen lots?
A. It would neither surprise me or -- or not surprise me. I -- it --
Q. You don't care?
A. Really don't care.
Q. Okay. Would you care, based on your disparaging remarks about the value of the property, and oh, aren't you so lucky you get 150,000? Would you care that in August of 2016, before Brian King sent the memorandum of understanding, which was fully executed, that the Wormald Group made a written offer through CBRE for $8-1/2 million?
MR. VERSTANDIG: Your Honor, objection.
MR. MASTRO: Objection.
MR. VERSTANDIG: Assumes facts not in evidence. Assumes hearsay that's it's not in evidence. Attempts to proffer hearsay. Relevance. And I'm probably missing one or two things that Mr. Mastro will pick up on.
MR. MASTRO: What he said.
THE COURT: The objection is sustained. Next question.
Q. Would it surprise you that a builder would offer $8-1/2 million in 2016 for nineteen preliminary plan lots in that location?
A. It would surprise me in this fashion, sir. If there was

someone out there with an interest in this property, at those kind of numbers, it would surprise me that you waived the right to present a competing appraisal to slap down the attempted redemption under section 7.7. So yes, it would surprise me.

Q. I didn't waive anything because Mr. --

A. Arguing with the witness.

Q. I'm not arguing with you. On September 12, I believe, if my memory strikes me correct, you had looked at the memorandum of understanding. It was completely signed by all parties. I'm going to see if I can find a copy of that.

So this memorandum of understanding that Brian King sent to Serv Trust was executed by Serv Trust on September 12. I'll bring the copy that was submitted into the Montgomery County filing that Judge Albright said is enforceable agreement. I'll also bring the portion of the transcript where she said Brian -- she said Brian --

THE COURT: What's your question, Mr. Myers? We don't need to hear what your --

MR. MYERS: Can I do what he does?

THE COURT: No. No.

MR. MYERS: No? Okay.

THE COURT: Because you're asking questions.

MR. MYERS: Okay.

THE COURT: That's why. So --

MR. MYERS: So on September 12th --

THE COURT: -- stop giving narrative on what you're going to do and --

MR. MYERS: Uh-huh.

THE COURT: -- what you're not going to do. Ask a question.

Q. Okay. Why did you submit an incomplete copy of the memorandum of understanding as an exhibit in this record?

A. Because Your Honor, if there had been a timely executed memorandum of understanding, it called for a closing by October 6th, I think it was, or October 7th of -- October 7th of 2016.

And after that date -- oh, and there was supposed to be a $75,000 deposit have been paid to Mr. Myers between the time that the agreement got signed and that date of closing. It's my understanding that there was never a $75,000 payment made because it is the position of Mr. King, as I understand it and as makes sense to me, that he didn't receive back a signed copy.

That's further confirmed by the fact that Mr. Myers wasn't yelling and screaming that he wanted his $75,000 deposit and when October 7th passed without a closing and he didn't have the rest of his $2 million he was supposed to get. He would have been making trouble.

But instead, what we see is that Mr. Myers demonstrably

is working forward together with these folks at Goldsboro, trying to get -- look like some stream permit. I'm not going to pretend I understand that. I know there's a stream through the property, and that was something that affected its -- it's value. Not -- not favorably. I think they were trying to move it.

But Mr. -- Mr. Myers wouldn't have been working with them hand in glove in meetings. Very polite emails among them. Mr. Myers would have been raising all sorts of cane, Your Honor.

So the fact that there is a dispute about when Mr. Myers signed this thing and whether it was, in fact, done in a timely fashion and whether the absence of Mr. Myers taking action back against the Goldsboro guys for his two million bucks, there's an absence of that makes me believe -- makes me believe Mr. King's position on this.

I suppose I could have put either one in. I could have put both of them in and said, there's a dispute over this. But I don't believe Mr. Myers position on it. It doesn't make sense. And I'm not sure why -- I'm not sure why I chose that one over the other one. I don't think it makes much matter of a difference.

Q. Mr. Schlossberg, do you think it matters that Judge Albright reviewed the fully signed one at a hearing and determined that this is an enforceable agreement?

A. I don't know anything about anything from Judge Albright.
Q. Okay. Well, you will. We'll put that in the record. And you seem concerned that I would continue to work on this project, Paragraph 7 of this agreement. Manager's actions, that's me.
A. Um-hum.
Q. Prior to closing, the manager shall continue to act in the best interests of Goldsboro. So if I just dropped off and didn't do anything, then potentially Serv Trust would be in breach of this agreement?
A. Where is you making noise about your $75,000? Where is you making noise --
Q. I didn't ask you that question.
A. -- about the closing an your $2 million??
Q. Doesn't matter. And let me ask you another question, Mr. Schlossberg. It says execution and closing dates. Paragraph 6. It says, "This agreement must be executed by September 12th, 2016, or this agreement shall be null and void." So if the agreement was executed by September 12, 2016, then the agreement is not null and void, which is what Judge Albright found. And there is affidavits in the record from me. Mr. Ring signed it. He's a CPA. He's a well respected CPA. So I went down to Annapolis. We signed it. I mailed it. So now you're going to call him a liar?
MR. VERSTANDIG: Objection.

MR. MYERS: Yeah.

MR. VERSTANDIG: Assumes facts not in evidence, mot the least of which being Mr. Myers is repetitively construing a ruling on a motion to dismiss that, as matter of law, must assume facts in favor of the nonmoving party as some sort of series of binding judicial findings of fact.

I would also note there is no evidence that Mr. Ring is a respected CPA, but that seems less material.

THE COURT: I'm going to sustain the objection and direct Mr. Schlossberg not to answer.

Next question.

Q. So if, in fact, this agreement is a valid agreement, then in that event they've breached the agreement, and everything that comes after that, which is what Mr. VerStandig tried to pull a fast one --

A. Excuse -- I just make sure I heard you right because you said -- did you say assuming that this agreement is -- is not -- is -- is an invalid agreement or --

Q. No.

A. Okay. You said valid?

Q. I'm sorry.

A. Okay. Please continue.

Q. Assuming the Court determines that this agreement is a valid and enforceable contract entered into on September 12, 2016, which is what Judge Albright indicated, then all of Mr.

VerStandig's end run after in 2017 with his, oh, we want to do an appraisal and try and redeem Serv Trust's interest after they've already entered into a contract to purchase Serv Trust's interest, that would be a problem, wouldn't it?

A. Well, not with what I've just heard in Mr. VerStandig's objection sustained by the Court, which was that that was the judge explaining what the standard is on a motion to dismiss. And of course, that's a -- a proper statement of law that the Court has to assume all the allegations of the motion or the complaint, I'm not sure which thing we're dealing with there, in the light most favorable to the other party. Well, I assume you were the other party at that point, and they were getting -- you were getting the benefit of those assumptions for the purposes of a preliminary ruling that said not going to dismiss it.

Q. Well, that would be very similar to Judge Lease's preliminary ruling, wouldn't it, Mr. Schlossberg?

A. I don't even know what you're talking about.

Q. Sure you do.

A. But I'm probably not alone.

Q. Sure you do. Okay. And please, I would ask that you not refer to me. Serv Trust had counsel there. I wasn't the one talking. I wasn't the one filing the pleadings.

THE COURT: What? You don't get to tell him how to answer questions. You get to ask him --

MR. MYERS: No --

THE COURT: You get to ask him questions, so ask your next question.

MR. MYERS: Okay. I am requesting that he --

THE COURT: No. No. No.

MR. MYERS: -- not refer to me as Serv Trust.

THE COURT: No. No. Next question.

MR. MYERS: No. Nothing I do is worth anything.

Q. So we talked a little bit earlier about Judge Lipp's ruling in 2018, where, now you have it in front of you, the Debtor's Exhibit 1, where she says, Serv Trust is a trust that was created by Myers' mother for the benefit of Myers' five children. Serv Trust was funded with an initial deposit of 1,000 from Myers' mother. Myers and Daniel Ring are the cotrustees of Serv Trust. Myers testified that Serv Trust has a fifty percent interest in Maryland limited liability company named 6789 Goldsboro LLC. These are her findings of fact in 2018. But you think that Judge Lease isn't bound by these findings of fact that are final and unappealable.

And then Judge Lippe continues. Goldsboro continued to make post-petition -- these are her findings of fact. Judge Lipp. Goldsboro continued to make post-petition advances to Serv Trust, which funds were then made available to Myers and/or Kelly to pay for their children's education and household expenses. That was her finding.

She then went on to say, it is undisputed that Serv Trust was established to pay educational and other expenses related to Myers' children. She said it is also undisputed that Myers is a cotrustee of Serv Trust, with the authority to direct Serv Trust to make payments on behalf of its beneficiaries, the Myers children. And then, she says, if, as irrefutably attested to by Myers.

Okay. So you think it's okay that in a nonfinal order in a proceeding in circuit court that isn't over yet that I've never even been on trial. No party. I'm not a party. And by the way, that trial was not only never remanded by the Middle District of Florida, but Judge Delano entered an order saying no claims against me could go forward.

MR. MASTRO: Objection, Judge. He's arguing.

THE COURT: What's your question, Mr. Myers? What's the question?

Q. That question is that that doesn't give you any pause?

A. Asked and answered. That entire preface was done forty-five minutes ago, almost word for word, Your Honor, and the same question at the end.

THE COURT: The objection is sustained.

MR. MYERS: This is -- excuse me, Your Honor. What are we up to?

THE COURT: Debtor Number 6.

MR. MYERS: So we've admitted 1?

THE COURT: 1 was admitted. The Court took judicial notice of Number 2. The Court admitted Number 3. Admitted Number Four. Did not admit Number 5.

MR. MYERS: And I'm sorry. Number 3 was which?

MR. VERSTANDIG: Transcript.

THE COURT: Number 3 is the transcript from the December 16th, 2022 hearing.

MR. MYERS: And you took take judicial notice of 2?

THE COURT: And that was your objection to the proposed settlement.

MR. MYERS: Oh, okay. So this will be 6, correct? Debtor's 6?

THE COURT: Yes. This is still Debtor Number 6.

MR. MYERS: Okay. And Debtor's Number 6 is -- and I'm not sure if you all -- it's the trustee's opposition to debtor's motion to dismiss filed in the Montgomery County case.

MR. VERSTANDIG: No, Your Honor. I did not have a crystal ball. I did not know what exhibits that were not on a list would be introduced today. If (indiscernible) --

THE COURT: Mr. Myers -- I get it.

MR. VERSTANDIG: -- from state court, it's not evidentiary.

THE COURT: I gave you an opportunity. I told you, if you wanted to admit any documents into evidence, you had to

give them to the Court during either the last recess or the recess before that, and we would make copies for you, even though you did not comply with the Court's procedures and did not pre-file the exhibits. And I told you I was not going to be getting on and off the bench to make copies of exhibits for you.

So if you want to offer that, you can bring copies with you tomorrow, and maybe I will change my mind between now and tomorrow.

MR. MYERS: Okay. Thank you.

BY MR. MYERS:

Q. So Mr. Schlossberg, what would you think if Mr. Mastro on December 30, 2022, three days before this alleged trial, told the Montgomery County Circuit Court in a pleading, here, the claim asserted by the King parties in the declaratory judgment complaint has nothing whatsoever to do with the trustee's performance of his duties in Myers' Maryland bankruptcy case.

MR. MASTRO: Objection, Your Honor. He's taking this out of context. This was written --

MR. MYERS: It's not --

MR. MASTRO: -- in connection with an argument that -- it has to do with the Barton doctrine. And so that's where that came up because he wanted to dismiss the trustee, I believe, as a party to the case because we were named as a nominal defendant. And so that's what that's -- that's what

that's about.

MR. MYERS: Yeah, I'm not arguing Barton doctrine.

MR. MASTRO: He didn't --

MR. MYERS: Just a statement.

MR. MASTRO: In fairness to the witness --

THE COURT: Stop interrupting.

MR. MASTRO: In fairness to the witness, he's taking that out of context and just making it appear that I'm, stating this proposition for something that it was not intended to. So I would object to that extent, Your Honor.

THE COURT: So what is the question, Mr. Myers?

MR. MYERS: This is a statement by Mr. Mastro, Chapter 7 trustee's counsel. I don't care about the Barton doctrine. It simply says here the claim asserted by the King parties in the declaratory judgment complaint has nothing whatsoever to do with the trustee's performance of his duties in Myers' Maryland bankruptcy case.

THE COURT: And what's your question?

BY MR. MYERS:

Q. Is that true, Mr. Schlossberg?

THE COURT: If you're able to answer based on that snippet of information he's read from, and that's something you don't have in front of you.

A. Well, Your Honor, that's -- I'm -- I'm -- I'm afraid to answer something because I know I'm going to see this later on

in a -- in a noncontextual fashion.

Mr. Myers, I do not know exactly what was said in court. I would need to see that. And frankly, I'd have to think about what was up because I understand what Mr. Mastro was saying to the Court. I was not -- in that proceeding, at that point, I'm not really sure where the Barton doctrine would have even been a subject matter.

We were not bringing the cause of action. I was a defendant in that case. And I was not raising any Barton doctrine issues. I had participated in the proceedings because I was trying to get that case moved along. I was a necessary party and didn't have any interest other than that, unless it became successful, as it did. And then Serv Trust became part of my bankruptcy estate.

MR. MASTRO: Your Honor, and it's coming back to me now. I think the argument was that Mr. VerStandig didn't invoke the Barton doctrine prior to naming the trustee as a defendant, and that's why Mr. Myers sought to dismiss the trustee. And I think I was pointing out that the Barton doctrine wasn't applicable to this circumstance so --

THE COURT: And I have no idea why any of this has to do with whether the trustee has exercised good business judgment.

MR. MASTRO: You and me both, Your Honor.

THE COURT: Next question, Mr. Myers. You have seven

minutes.

MR. MYERS: I'll place an objection on the record that you cut me short. So and Mr. --

THE COURT: Your objection's noted.

MR. MYERS: And Mr. Schlossberg's filibuster.

BY MR. MYERS:

Q. So Mr. Mastro also told the court further, "Although the trustee has been joined herein as a nominal 'defendant'", "defendant", "the bankruptcy estate's interest in this litigation is more properly aligned with the King parties than it is with Myers or Serv Trust. The court, therefore, may properly reclassify and realign the trustee as a nominal plaintiff in this matter. Maryland Rule 2-213."

THE COURT: Mr. Myers, I'm going to cut you off. If you're going to read from a document, I'm not going to require the witness to answer your question because you haven't marked the document as an exhibit. You haven't provided a copy to him so that he could review the whole document. Instead, you're taking snippets out of pleadings and reading them to the trustee without him having the context of the pleading. So I'm not going to require him to answer any questions that you ask in that manner.

Q. If you dismissed -- if Count II was dismissed, the redemption claim, what are you doing here?

A. Mr. Myers, again, you have an uncanny ability to take

things out of context and ignore the rest of the context. Can't do that.

Q. Help me out.

A. The case was dismissed, as I explained before, and I know you were listening. As I explained before, the case was dismissed because by that point, we were in the bankruptcy court. We had brought the parallel claim. He had brought the parallel claim, and we consented to being sued in this court in this adversary proceeding. And at that time, the -- the agreed fashion of disposing of the -- of the dispute was that we would come back to this court. An adversary proceeding would proceed here. The parties were encouraged to negotiate and to try and reach an accord, like the one we have before the Court today. And if not, then we were going to go ahead and try the case.

And our negotiations failed. And we scheduled this case for trial. But we kept talking, and we reached a point where we reached an accord.

At that point, though, Mr. Myers, there was a case moving on its way to trial in this Court. There was no reason for the proceedings in Montgomery County to duplicate this proceeding, even just as a matter of record. And that is why that doesn't give me trouble in any way. It doesn't affect my judgment in any way. It doesn't implicate any thinking about why this is a good deal here today, which is why we're here,

Your Honor.

On the one hand, nothing. On the other hand, $150,000. I don't know, Your Honor, but the scales seemed to go like that.

Q. Well, you would agree that it'd be great if you could get $150,000 for property that's not nonestate property any day of the week, right? So you just said that the case was --

THE COURT: Hold. Wait. Wait a minute. Are you asking him a question?

MR. MYERS: Yeah. I'm asking this question.

Q. You just --

THE COURT: Then that's stricken then.

MR. MYERS: What?

THE COURT: Then that comment is stricken --

MR. MYERS: Yeah.

THE COURT: -- from the record.

Q. So you just testified that the case in Montgomery County was dismissed. It wasn't dismissed. Is that your testimony? That's part of the problem.

A. Mr. Myers, your exhibit, Debtor's Number 4, is a stipulation of dismissal that the redemption claim was dismissed in the Montgomery County Circuit Court, and I just explained it was dismissed so that we did not have parallel proceedings of record. The case is here. This Court has jurisdiction over it. This Court, if there -- the settlement

doesn't get approved, we have to try the case. This Court will try the case.

Q. Okay. Well, there are parallel proceedings because the case still exists in Montgomery County.

A. So says you.

Q. Are you disputing that the case --

A. I'm not giving legal opinions.

Q. I'm asking you your opinion. Are you disputing that the litigation in Montgomery County is still not open?

A. Those proceedings have been dismissed, Your Honor. There's a stipulation of dismissal.

Q. The whole case?

A. I just told you. There's a stipulation of dismissal.

Q. Of one count.

A. So be it.

Q. Great. You can't do that voluntarily.

THE COURT: What's your question, Mr. Myers? Stop arguing with the witness.

A. Mr. Myers is suggesting I didn't have the ability to --

Q. No, you didn't.

A. -- sign that stipulation.

Q. You didn't. It's fraudulent.

A. Fraudulent? That's a big word.

THE COURT: What's your question, Mr. Myers?

Q. How did you have authority on May 7, 2024, with no final

judgment in that case, to execute --

A. You -- you don't seem to understand. Once the --

Q. I'm asking my question.

A. Once the --

Q. Let me finish my question before you interrupt me.

A. You're right. I did interrupt you.

THE COURT: Finish your question.

Q. What authority did you have as a nominal defendant in a case that's still open, with no final judgment, to sign a stipulation of dismissal with Mr. -- well, you didn't sign it, but VerStandig Law Firm and Schlossberg Mastro. But it says the Chapter 7 trustee, who is by operation of law. What operation of law are you talking about?

A. Asked and answered, Your Honor.

Q. Well, I'm asking you. What operation of law? You put it in here.

A. Asked and answered, Your Honor. We've been over this.

THE COURT: The objection's sustained. Move onto the next question.

MR. MYERS: Okay.

THE WITNESS: Your Honor, I take note that it's 5 o'clock. May I inquire --

THE COURT: Mr. Myers, how much more time do you need to wrap this up?

MR. MYERS: I don't know. We can continue tomorrow.

THE COURT: No, we're not continuing tomorrow. I'm asking you how much time you need to (indiscernible).

MR. MYERS: I don't know, Your Honor.

THE COURT: Well, hours ago, you told me you needed two hours.

MR. MYERS: No, I said approximately.

THE COURT: You approximately two hours. So you need --

MR. MYERS: Well, he's --

THE COURT: So you need another five minutes? Ten minutes?

MR. MYERS: Probably another thirty minutes.

THE COURT: All right. I'll give you twenty.

MR. MYERS: Okay.

THE COURT: And then I'm cutting -- and then that's the end of your cross-examination of this witness.

MR. MYERS: Right.

THE WITNESS: Your Honor, may I ask one further question?

THE COURT: Yes.

THE WITNESS: Tomorrow's proceedings --

THE COURT: We'll talk about tomorrow after you're off the --

THE WITNESS: We need -- we need exhibits in the next couple hours, not at 10 o'clock tonight.

THE COURT: Understood. We'll talk about that after you're off the stand.

Mr. Schlossberg.

THE WITNESS: Thank you, Your Honor.

BY MR. MYERS:

Q. Mr. Schlossberg, before the hearing today, you saw a complaint and demand for trial by jury filed by me against Judge Ruark, Ramona D. Elliott, Roger Schlossberg, Frank Mastro, Schlossberg & Associates, P.A., and Maurice VerStandig; is that correct?

A. I saw the first page.

Q. Did you review anything else in here?

A. Nothing.

Q. Okay. So --

A. I did hear, though, that you're asking for $40 million. Is that correct? I -- I don't --

Q. So you're aware --

A. That's what I heard.

Q. You're aware there's a complaint demand for jury trial where you're a defendant, Judge Rurak's a defendant, Frank Mastro's a defendant, Maurice VerStandig's a defendant, and Schlossberg & associates is a defendant?

THE COURT: What's the question?

MR. MYERS: I'm just confirming what he said.

THE COURT: No, ask him a question.

MR. MASTRO: Move to strike, Your Honor.
Q. Are you --
THE COURT: Objection's denied.
Q. Are you aware that a notice of appeal was filed in this case a few days ago to the --
THE COURT: Okay. Then I am going to grant the motion to strike. You did not ask a question. You just --
MR. MYERS: I'm asking it.
THE COURT: -- just had a soliloquy. Now, you're asking about a notice of appeal. You just talked about a complaint that was filed and did not ask a question, even though I asked you to. So let's move on to the notice of appeal. It's been stricken from the record
MR. MYERS: No, Your Honor. He answered the question.
THE COURT: Yes, Mr. Myers. It's been stricken from the record.
MR. MYERS: Then I'll ask it again.
THE COURT: You can tell me no all you want.
MR. MYERS: I know.
THE COURT: It's been stricken.
MR. MYERS: Right. You'd strike everything from me.
THE COURT: Next question. You were asking about a notice of appeal.
MR. MYERS: What did you strike from the record, so I

know.

THE COURT: Your soliloquy about the complaint that was filed.

Q. Okay. So you've already answered, correct, Mr. Schlossberg, you saw this complaint this morning before this hearing started?

A. Told you --

THE COURT: He testified that he looked at the first page and that he heard that you're asking for $40 million. Next question.

MR. MYERS: Thank you. And that's in the record, correct? That answer is in the record?

THE COURT: What --

MR. MYERS: What you just said?

THE COURT: Yes. Yes, that's the record.

MR. MYERS: Thank you. Okay. I'm going to mark this as Defendant's 7. 7?

THE COURT: Well, 6 did not get marked because you were reading from it and not offering copies so --

MR. MYERS: Okay. So 6?

THE COURT: So this is 6.

MR. MYERS: They have copies of this, Your Honor.

THE COURT: Okay. Show a copy to Mr. Mastro and Mr. VerStandig.

MR. MYERS: I think they already have it.

MR. VERSTANDIG: No.

MR. MASTRO: No. No. We don't have it.

MR. VERSTANDIG: Your Honor, I'm confident I've seen this before in my life, but again, I think this was not on an exhibit list.

MR. MYERS: The clerk handed them out.

MR. VERSTANDIG: No.

THE COURT: Is this the order remanding case?

MR. MYERS: No.

MR. MASTRO: No.

THE COURT: What? Then what--

MR. MASTRO: This looks like some pleading (indiscernible) --

MR. VERSTANDIG: This is --

MR. MYERS: This the order --

MR. VERSTANDIG: -- the Judge Delano --

MR. MYERS: It's in the case already in the record. It's the order sustaining -- this is out of my Florida bankruptcy case. This is the order sustaining debtor's objection to proof of claim 3 filed by Brian King and Cristina King.

THE COURT: You didn't pre-file it. You don't have copies for everyone.

MR. MYERS: I believe she made copies.

THE COURT: I have copies of everything that she made

a copy of. And I'm telling you, that is not one of the documents that you gave. The only document I have left that you have not marked as an exhibit is an order remanding case issued by this Court on December 5th, 2019. It's a three-page order.

MR. MYERS: Okay. Let me take that one up, then.

THE WITNESS: I don't have such a document, Your Honor.

THE COURT: I don't know what he's --

The order remanding case, do we have copies of that?

MR. VERSTANDIG: Yes.

THE COURT: It's one of the documents that was given to me. Was it not given to the witness?

MR. VERSTANDIG: I can pass my copy to Mr. Schlossberg.

THE COURT: It's a two-page order from Judge Simpson on December 5th, 2019.

THE WITNESS: That's not here. I have four documents, Judge.

THE COURT: I'm going to have Ms. Fernandez come up and take a look.

THE WITNESS: Can you guys give me one of yours?

MR. VERSTANDIG: Yep. Your Honor, may I approach?

THE COURT: You may. So is this Debtor Number 6, Mr. Myers, the order remanding case?

MR. MYERS: As soon as I find it.

THE WITNESS: All right. I -- I've got it here. And what number is this, Your Honor, now? 6?

THE COURT: It would be 6.

(Judge Simpson's order was hereby marked for identification as Debtors' Exhibit 6, as of this date.)

THE WITNESS: Got it.

BY MR. MYERS:

Q. Do you have that in front of you, Mr. Schlossberg, Debtor's 6, order remanding case?

(Pause)

Q. I was waiting for you to say you've --

A. I -- I told the Judge I've got it.

Q. -- had a chance to look at it.

THE COURT: He's reading it.

MR. MYERS: Okay.

A. I'm done. I'm ready.

THE COURT: Okay.

A. Let's go.

THE COURT: And so what is your question, Mr. Myers?

Q. So this is an order remanding the case. So Mr. VerStandig had removed the Montgomery County case to this Court, establishing adversary 19-00427. And then on December 5, 2019, this Court entered an order remanding the adversary proceeding to Montgomery County, Maryland, pursuant to 28

U.S.C. 1452(b). So how does the case get back here? Because in your -- I'll add a piece of information for you. In your notice of stipulation of settlement or whatever you called it, you specifically said in there, there's no way to bring that case back here. It's too late.

MR. VERSTANDIG: Your Honor, objection. Assumes facts not in evidence. I think Mr. Myers is suggesting that the Montgomery County Circuit Court case, which was removed to this Court the first time Mr. Myers sued me and then remanded when he dismissed the claim against me for allegedly violating the automatic stay, is the case that is in front of you today, whereas the record has been clear that that case has a judgment on one count and a dismissal on the other. And the adversary proceeding in front of you today is a fresh, clean, new, whatever the terminology may be, that was filed on whatever date in 2024, I believe.

THE COURT: I don't even understand the question.

Q. The question is, is that when a case is remanded to the state court, under 28 U.S.C. 1452(b), this court loses all jurisdiction over the matters and claims in that case, and Rooker-Feldman prevents this Court from considering anything to do with that case. So you're essentially, in this case, sitting in review of a case that's ongoing in Montgomery County Circuit Court. Mr. VerStandig incorrectly stated that the one count was a --

MR. MASTRO: Your Honor, this is argumentative.

THE COURT: What's your question?

MR. MYERS: I'm responding to what Mr. VerStandig said. He misstated that he may -- he's trying convince the Court that the Montgomery County circuit case is over. It's not.

THE COURT: No, the Montgomery County case was seeking -- it was a declaratory judgment action to determine whether you are and were the alter ego of Serv Trust.

MR. MYERS: And that claim was stayed by Judge Delano.

THE COURT: There was a determination made on that.

MR. MYERS: Void. Was stayed.

THE COURT: Well, okay. You can make that argument. What is your question about this adversary proceeding, which has one count for a declaratory judgment regarding the redemption of interest?

MR. MYERS: So you can't have the same case in two different courts.

THE COURT: What's your question --

MR. MYERS: Never mind.

THE COURT: -- for this witness?

MR. MYERS: Okay.

THE COURT: What are you asking?

MR. MYERS: I'll move on. I mean, obviously, we

have --

THE COURT: We've been talking about this for four hours.

MR. MYERS: Right. And it's my position that once this case --

THE COURT: And you can make your position in closing argument. Ask this witness a question.

MR. MYERS: Well, we might not get that far.

THE COURT: You have eight minutes left. Seven minutes now.

BY MR. MYERS:

Q. Are you familiar that there was an order entered, Mr. Schlossberg, on -- are you looking at your phone?

A. No, I'm not looking at my phone.

Q. Are you familiar that there was an order entered on June 29, 2021, in my bankruptcy case in Florida, case number 2:21-bk-00123 sustaining my objection to a proof of claim filed by Brian King and Cristina King by Mr. VerStandig and the objection was sustained and the claim of Brian and Cristina King is disallowed in its entirety? Do you dispute that that would not have res judicata effect on this little charade you're doing here?

A. Well, I think that's insulting to everybody who's here trying to do this case and to the Court.

Q. Legal.

A. Excuse me.

Q. I said, what you're trying to do is legal.

THE COURT: So Mr. Schlossberg, are you familiar with the claims --

THE WITNESS: Your Honor --

THE COURT: -- that were filed --

THE WITNESS: Your Honor --

THE COURT: -- in the Florida proceeding, and if so --

THE WITNESS: I -- I'm not familiar with it. I heard some discussion about it today. But I've -- I've never looked at it.

THE COURT: Okay.

THE WITNESS: To my knowledge. Maybe some -- maybe -- maybe it was put in front of me someday to say, you know, this is interesting, but I -- I don't know anything about it.

THE COURT: All right.

THE WITNESS: I couldn't give you a -- a sensible answer.

THE COURT: Thank you. Mr. Myers.

MR. MYERS: Yeah. I want to get to his -- I'll mark this is defendant's answer to the complaint in this case. Can I mark it as an exhibit, or do I have to have copies of that too?

THE COURT: Same as the other exhibits that you don't have copies of.

MR. MYERS: Well --

THE COURT: Why don't you ask him a question about the answer?

BY MR. MYERS:

Q. Okay. This is your -- Mr. Schlossberg, I'll represent to you, this is your defendant's answer to the complaint in this case, adversary 24-00007. This is filed on April 15, 2024, doc 13, in this adversary. And in this answer, it says on page 5 of 7 -- this is paragraph 37 of your response, general allegations bankruptcy.

"The trustee admits that the parties engaged in settlement negotiation in the weeks prior to the filing of the complaint and that no agreement between the parties was reached as a result of such pre-filing settlement negotiations. The trustee is advised that plaintiffs filed the instant complaint in order to protect and preserve their litigation rights and not to stymie or otherwise interfere with the continuation of settlement negotiations between the parties."

So do you have any opinion at all on the King parties' standing in this case if their proofs of claim are -- if my objections to their proof of claims are overruled, why they're even here? What standing they would have to come into this

Court?

A. Mr. Myers, you're asking me if, if this Court should sustain your objections to the proofs of claim filed by the Kings, what's left in this case to decide? Is that what you're -- you're asking me?

Q. Well, let me rephrase it. The King parties, they're all identical, their proofs of claim. This is a Chapter 7 case, and they say they're owed $0. And the basis for their relief is equitable relief in this adversary. I've done a little reading, and that's not a valid basis for a proof of claim in a Chapter 7 case. So they have to have some monetary request.

Now, we just palavered a little bit about the fact that their objection, their proof of claim filed in my Florida case, which is good across the world, was my objection was sustained. And their claim, any claim they could bring, related claim, is gone forever.

MR. VERSTANDIG: Objection.

Q. So how is it that they're filing a claim in this case, and you're not concerned that their claim has already been overruled?

MR. VERSTANDIG: Objection. Assumes facts in evidence, specifically that there would be a prejudicial impact to the denial of a claim in a Florida case that was subsequently dismissed without a plan being confirmed and with the bar order being entered against the debtor. Assumes

various theories of law. Calls for an expert opinion. Calls for speculation. Lack of foundation.

THE COURT: The objection's sustained. Next question.

MR. MYERS: An objection to a proof of claim that's been sustained in a Chapter 13 case is a final order, regardless of whether the case is --

THE COURT: What's your question, Mr. Myers? Stop arguing.

MR. MYERS: Yeah, well, this is just so much garbage.

MR. VERSTANDIG: I'm sorry. What did you just say?

THE WITNESS: I'm sorry. I didn't hear that.

MR. MYERS: I don't know.

THE COURT: Mr. Myers, if you're going to say something, don't mumble. Have the guts to stand behind what you're saying.

MR. MYERS: Oh, I have guts, Your Honor.

THE WITNESS: What did you say?

THE COURT: Well, if you want to --

MR. MYERS: I've been here. I've been in this court for eight years putting up with this. I have guts.

THE COURT: Actually, you've been in this court for ten years. Ten years. And --

MR. MYERS: Yeah, and I've been -- and I've been --

THE COURT: And you have not yet learned the decorum

of the court.

MR. MYERS: I've been defrauded and ripped off.

THE COURT: You have not learned the court's procedures. You haven't learned the --

MR. MYERS: Well, oh, oh, I know the court's procedures.

THE COURT: -- Federal Rules of Bankruptcy Procedures. So if you're going to --

MR. MYERS: So --

THE COURT: -- say something, don't mumble. Have the guts to say it out loud so that I can hear it, and I can deal with it.

MR. MYERS: Yeah, well, okay. I think this whole thing is a sham. I think that they're trying to steal Serv Trust property. There's no final order in the Maryland case.

THE COURT: Okay. Well, you can make those arguments in your closing.

MR. MYERS: But here I'm going to ask my last question.

THE COURT: There's a witness on the stand.

MR. MYERS: Yeah, I'm going to ask him a question.

THE COURT: Okay. Ask him.

BY MR. MYERS:

Q. So as affirmative defenses signed by your attorney, the complaint, in whole or in part, fails to state a claim upon

which relief can be granted, wherefore the trustee prays for relief as follows. Dismiss plaintiff's complaint. Did you ever amend this?

A. May I see the document just a minute because I want to make sure that this isn't being taken as poorly out of context --

THE COURT: Here, I will actually -- you stay where you are, Mr. Myers. I will tell you that, under affirmative defenses, it says in paragraph number 1, the complaint, in whole or in part, fails to state a claim upon which relief can be granted, and this answer was filed on April the 15th, 2024.

THE WITNESS: Are there any following prayers, Your Honor?

THE COURT: It says the trustee reserves the right to amend this answer to assert any and all affirmative defenses, which may become known to it through discovery, wherefore, the trustee prays for relief as follows. Dismiss plaintiff's complaint and award such other and further relief as the court may deem just and proper.

A. Your Honor were this case going to trial, I would either be relying on my omnibus request for relief, or I'd be prosecuting the defense of it should be dismissed. We'd be having a hearing, I'm sure, on our motion to dismiss. But instead, we got to this glorious point, where we could get rid of this dispute, and we could liquidate this asset for the

benefit of the estate. And that is why we're here today. I don't have a clue what the relevance of that particular question was, but I've answered it.

BY MR. MYERS:

Q. Well, let me ask a follow-up question. You're here trying to do a settlement for a claim for their adversary that it's your position they don't even have a claim. Fails to --

A. Oh --

Q. -- state a claim upon which relief can be granted. How are you entering into a settlement? Why would you enter into a settlement, which is so far below the reasonable business judgment, when you think their claim -- when you think they failed to state a claim?

A. You can't possibly be that naive about the operations of business in this court and how the pleadings work.

Q. I'm fully aware of how things work in this court.

MR. MYERS: I don't have any further questions today, Your Honor.

THE COURT: All right. So Mr. Mastro, let me ask. Do you intend to do a redirect?

MR. MASTRO: No, Your Honor.

THE COURT: Mr. VerStandig.

MR. MYERS: No, Your Honor.

THE COURT: All right. Mr. Schlossberg, thank you for your testimony. The Court does not have any questions for

you. I would like you to leave on the witness stand only the documents that have been entered into evidence, which, again are Trustee's Exhibits 1, 2, and 4 through 11 --

THE WITNESS: Your Honor. I'm sorry, Your Honor. This, I brought this binder. Yeah. You're welcome to it.

THE COURT: No. Nope. Nope. You're right. That's your binder. You take that. The exhibits, the Trustee's exhibits and the King parties' exhibits are on the docket, and we have the electronic copies.

What I need you to leave on the witness stand are Debtor's Exhibits 1. I don't know that you ever had exhibit 2. That was Mr. Myers' objection to settlement.

THE WITNESS: I have 2.

THE COURT: You have 2? Okay. So 1, 2, 3, 4 --

THE WITNESS: Do not have 3.

THE COURT: -- 5, and 6.

THE WITNESS: I have 4 and 6.

THE COURT: 5 was not admitted, but still leave it.

THE WITNESS: Do you want that left on the bench? Left on the --

THE COURT: 1 through 6 should be on the bench. And to be clear --

THE WITNESS: Well, I don't have -- I don' have 6.

THE COURT: -- 1 through 4 were admitted, and 6, the order remanding, Judge Simpson's order remanding, the Court is

going to admit that. That's an order of this Court.

(Judge Simpson's order was hereby received into evidence as Debtors' Exhibit 6, as of this date.)

THE WITNESS: So Your Honor, I --

THE COURT: So Debtor's 1 through 6 should be on the witness stand, and 5 was not admitted.

What?

THE WITNESS: I do not have 3.

THE COURT: You don't have the transcript?

THE WITNESS: No.

THE COURT: It looks like this. Transcript, you do not have?

THE WITNESS: No transcript, Your Honor.

THE COURT: Okay. I am going to have my copy put on the witness stand so that any additional witnesses will have the benefit of these exhibits.

Okay. Okay. So we do have it --

THE WITNESS: Okay.

THE COURT: -- and we will put it on the witness stand.

THE WITNESS: Oh, so you had mine? Okay.

THE COURT: All right. Thank you, Mr. Schlossberg.

MR. SCHLOSSBERG: Thank you, Your Honor. Can we talk about exhibits?

THE COURT: Yes. So let me ask you, Mr. Mastro, at

this point in time, do you anticipate calling other witnesses?

MR. MASTRO: No. The trustee has no further witnesses, and we'll rest our case in chief.

THE COURT: All right. And Mr. VerStandig, do you have any witnesses that you intend to introduce tomorrow?

MR. VERSTANDIG: No, we do not.

THE COURT: All right. Mr. Myers, how many witnesses do you have for tomorrow?

MR. MYERS: Three.

MR. MASTRO: Objection, Your Honor.

THE COURT: And who are these witnesses?

MR. MYERS: Roger Schlossberg, Frank Mastro, and Maurice VerStandig.

MR. MASTRO: Your Honor, we object.

MR. MYERS: They're here in the Court.

THE COURT: All right. Well, I'm not going to allow you to put an attorney on the stand who is acting in their capacity as attorney unless you have a darn good reason so --

MR. MYERS: I do. Impeachment of their testimony in the Montgomery County case.

THE COURT: Who testified that Mr. Mastro testified in the Montgomery County case?

MR. MYERS: Well, he made representations to the Court --

THE COURT: All right. Well, you can --

MR. MYERS: -- which now, Mr. Schlossberg said are not true.

THE COURT: You can address that -- you can address that in your argument. And then --

MR. MYERS: What is the basis that I can't call Mr. Mastro? He's here in court.

THE COURT: Because he's an attorney, and you're not going to call him as a witness, which would have the impact of disqualifying him as counsel, which I think is part of your goal here to derail these proceedings. So I'm not going to allow it.

If you don't agree with something Mr. Mastro said, you're going to have an opportunity to address it with the Court. If you don't agree with something Mr. VerStandig said, you're going to have an opportunity to address it with the Court.

So you are not going to call Mr. Mastro or Mr. VerStandig. Are you going to testify, Mr. Myers?

MR. MYERS: When are you going to rule on the motion to disqualify -- disqualification of you?

THE COURT: Not before we resume first thing tomorrow morning.

MR. MYERS: Okay. Well, then I would ask for an emergency stay so I can go to the district court and --

THE COURT: Denied.

MR. MYERS: Denied?

THE COURT: So are you testifying --

MR. MYERS: Okay. Are you going to enter an order, please?

THE COURT: Are you testifying?

MR. MYERS: I don't know.

THE COURT: All right.

MR. MYERS: Think I will.

THE COURT: So I'll put you down as a possible witness. And then you said you may be recalling Mr. Schlossberg, which I may or may not allow. So you're going to have --

MR. MYERS: I will be on my direct.

MR. MASTRO: We would object to that.

THE COURT: Hold on. Hold on.

MR. MYERS: Of course he would object.

THE COURT: Hold on. You're going to have to be prepared to address the Court tomorrow morning and convince me why I should allow you to recall him, when he has been on the stand all day. I'm not going to allow you to call him as part of your case simply to prolong his testimony after you told me you needed a certain amount of time, and I've given you much more than what --

MR. MYERS: On cross-examination. This is my case, Your Honor. I'm entitled to call my witnesses.

THE COURT: Well, if I --

MR. MYERS: And that's in violation of my due process right.

THE COURT: Okay. If I do allow you to call him, it's going to be very limited in scope and --

MR. MYERS: So you're limiting my case.

MR. VERSTANDIG: Your Honor.

THE COURT: I'm limiting your case to the subject matter --

MR. MYERS: He had three hours.

THE COURT: -- that's before this Court.

MR. MYERS: Okay. I've told you time and time again that the issue for this Court is whether he has exercised good business judgment in reaching this settlement. You had an opportunity --

MR. MYERS: And I disagree that that's the issue.

THE COURT: Well, you can disagree all you want, Mr. Myers.

MR. MYERS: I will.

THE COURT: And you're going to disagree that today is Monday as well.

MR. MYERS: No.

THE COURT: You're entitled to do that.

MR. MYERS: That's insulting.

THE COURT: You can disagree.

MR. MYERS: That's insulting.

THE COURT: But I've told you the standard for this Court -- I have an application to compromise a controversy before me. The standard, the question, the sole question for me, is whether the Chapter 7 trustee has exercised good business judgment in deciding to enter into this settlement. That's the sole issue for me to decide. Not what your --

MR. MYERS: You have to decide jurisdiction.

THE COURT: -- not what your rights may have been in other litigation. Not what another court has decided. You spent all this time and all this stuff, even though I've told you numerous times what the question is for this Court. If you want to spend your time on other things, then you're welcome to spend your time on other things. But I'm not going to allow you to put him back on the stand to ask him about things that are not relevant to the issue before this Court.

MR. MYERS: Jurisdiction.

THE COURT: So I'm going to give you until tomorrow morning --

MR. MYERS: Jurisdiction is relevant.

THE COURT: Stop interrupting me.

MR. MYERS: Well, you're wrong. Jurisdiction is relevant.

THE COURT: Stop interrupting me.

MR. MYERS: No, I'm done.

THE COURT: You are done. You are welcome --

MR. MYERS: Are you going to issue the order?

THE COURT: -- to leave at any time, Mr. Myers.

MR. MYERS: Are you going to issue the order:?

THE COURT: Stop interrupting me. I'm talking.

MR. MYERS: This is a sham proceeding.

THE COURT: I told you. I told you, you cannot file pleadings minutes before a hearing begins and expect the Court to act on them before the hearing begins. And you and I both know that you filed these pleadings simply to derail these proceedings. I'm not going to allow it.

This has been pending too long. It is time to wrap up --

MR. MYERS: I am allowed.

THE COURT: -- these issues. It is time to wrap up these issues. I'm going forward with the hearing tomorrow morning.

Let's talk about timing. So --

MR. MYERS: Not if you have a conflict of interest.

THE COURT: Mr. Myers.

MR. MYERS: And you know it.

THE COURT: Mr. Myers, again, don't tell me what I know --

MR. MYERS: Okay.

THE COURT: -- because you don't have a clue what I

know --

MR. MYERS: Oh.

THE COURT: -- which is obvious from the way you have prosecuted this case. I have encouraged you time and time again to get experienced bankruptcy counsel to represent you. You've refused to do it. Instead, you want to come in here and prosecute the case on your own. You're welcome to do that.

MR. MYERS: I don't want to.

THE COURT: You're welcome to do that.

MR. MYERS: I don't want to. But he stole a million-110 of my money.

THE COURT: Stop interrupting me. Stop interrupting me.

MR. MYERS: I'm done.

THE COURT: You are welcome -- no, you've said you're done four times, and you're still going back and forth, interrupting me.

MR. MYERS: Because this is a sham.

THE COURT: You are welcome to prosecute your case as a pro se litigant. You are still bound by the statutes and the rules that govern this Court. You did not pre-file your exhibit and witness list, even though I know that that protocol was sent to you, even though I know it is on the court's website that you're required to do that. You didn't

do it. But I still gave you a chance to be heard. I still gave you an opportunity to introduce documents.

Now, let's talk about tomorrow.

MR. MYERS: I don't believe you --

THE COURT: If you want to --

MR. MYERS: -- have addressed jurisdiction yet.

THE COURT: If you want to introduce documents tomorrow into evidence, you must file them on the docket tonight with an exhibit list. Even then, I don't know if I'm going to allow you to introduce all of the documents that you offer. I'm going to give you until -- it's 5:32 now. I'm going to give you until 9 p.m. Whatever documents you want to introduce into evidence, file on the docket with an exhibit list. You must follow the protocol that was sent to you last week. It may have even been sent to you before that.

But you must file an exhibit list. You must identify the exhibits. You must attach the exhibits. You would be starting with Debtor's Number 7 because we have 1 through 6 already marked.

So I will excuse you from having to file a witness list. You have identified Mr. Mastro, Mr. VerStandig, Mr. Schlossberg, and then yourself as potential witnesses. And whoever you call as a witness tomorrow, I will deal with it tomorrow. But I can tell you that I am not going to allow you to put Mr. Mastro or Mr. VerStandig on the stand, and I very,

very well may not allow you to put Mr. Schlossberg back on the stand either. So --

MR. MYERS: Okay. When are you going to issue the order denying my motion to stay? Tonight, please?

THE COURT: So you know what? I don't believe you have the ability to file on the docket, and the clerk's office is closed. So what I'm going to tell you is that you must email your documents to Mr. Mastro and Mr. VerStandig with a copy to -- with a copy to the Court by email by 9 p.m. Again, you need an exhibit list. You need the numbered exhibits attached. And you will start with Number 7.

MR. MYERS: Your Honor, I don't believe you have jurisdiction --

THE COURT: So that will be --

MR. MYERS: -- so I don't know.

THE COURT: -- by 9 p.m. tonight. And Mr. Myers, as I told you at the beginning of the hearing, if you want to raise jurisdictional arguments, you are welcome to do that in your closing argument. We're going to complete the presentation of evidence, and I will hear --

MR. MYERS: Well --

THE COURT: -- whatever arguments you have after that.

MR. MYERS: Yeah. Okay.

THE COURT: All right. So --

MR. MYERS: So --

THE COURT: -- what time should we start tomorrow? Is 9 a.m. good for everyone?

MR. MYERS: may I have an answer to my question? Are you going to enter the order denying my motion to stay?

THE COURT: Is 9 a.m. good for everyone?

MR. VERSTANDIG: Your Honor, 9 a.m. is agreeable to the King parties.

MR. MYERS: 10 o'clock was what the schedule said.

THE COURT: Well, I wanted to give you additional time to put on your case. Okay. We'll start at 10 o'clock.

All right. So 10 o'clock. I will see everyone at 10 o'clock in person tomorrow.

Mr. Myers, I'm not going to give you an unlimited amount of time to put your case on. I was trying to give you a little more time. You don't want it. That's fine. We'll start at 10.

I am not ruling on the motions that you filed minutes before this hearing began today. I am not ruling on those motions before tomorrow. You have filed other motions against me, against the trustee, against others, and none of them have had --

MR. MYERS: That's not a motion, Your Honor.

THE COURT: -- none of them have had --

MR. MYERS: That's a complaint and a demand for jury

trial.

THE COURT: You filed a motion to disqualify. You didn't file a complaint in this court.

MR. MYERS: Filed a complaint.

THE COURT: Don't misstate the facts.

MR. MYERS: I filed the complaint. You're the one who's misstating what I'm saying. I filed the complaint in the district court before this hearing ever began.

THE COURT: You asked me if I was going to rule on any motions.

MR. MYERS: I asked you if you were going to enter an --

THE COURT: I'm not ruing on your motion to disqualify --

MR. MYERS: -- order on the --

THE COURT: Let me finish. I am not ruling on your motion to disqualify, which was docketed minutes before this hearing began. And that was only because you said you filed pleadings, and we had no knowledge of them. You've known about this hearing for two months. You waited until five minutes before the hearing began to file these things.

I'm not ruling on the motions you filed last night, and I'm not ruling on any motions you filed this morning because I haven't read them. I haven't seen them because you waited until the last minute, even though I've told you time

and time again not to wait until the last minute to file.

MR. MYERS: Then you should continue the hearing and rule on the motion to disqualify.

THE COURT: So I am not continuing the hearing. I am not continuing the hearing.

MR. MYERS: Okay.

THE COURT: We are going forward tomorrow. I'm going to give you a limited amount of time to put on your case. And then I'm going to rule.

MR. MYERS: Well, are you going to enter an order tonight denying my motion to stay? You just denied it.

THE COURT: I denied it. It's on the record. You didn't file a motion, and so I'm not going --

MR. MYERS: You denied it. Are you going to enter an order tomorrow then?

THE COURT: I'm not going to enter a written order when you have not filed a written motion. You made an oral motion. I denied it. Denied. I'm not staying it.

MR. SCHLOSSBERG: Your Honor. Your Honor, a motion to disqualify, it was docketed sometime during the day today. It was docketed this morning --

THE COURT: I haven't even read it yet.

MR. MASTRO: We haven't seen it. Haven't had a chance to respond to it. Nobody (indiscernible) --

MR. SCHLOSSBERG: Filing after 10 o'clock this

morning.

THE COURT: And parties-in-interests are going to have an opportunity to --

MR. SCHLOSSBERG: I just now (indiscernible).

MR. MYERS: Well, we'll see what the district court says.

THE COURT: Let me finish. Parties-in-interest will have an opportunity to respond. And so I am not ruling on anything before the hearing begins at 10 a.m. tomorrow, and we will wrap this hearing up by 1 or 1:30 tomorrow.

Anything further before we conclude?

Mr. Myers.

MR. MYERS: I think this is a sham. I think you don't have jurisdiction. I think you have a conflict of interest. And I'll be in the district court in the morning.

THE COURT: You have fun with that. Your objection's noted.

Mr. Mastro. Mr. Schlossberg. Mr. VerStandig. Anything further?

MR. VERSTANDIG: No, Your Honor. Nothing further. Just looking forward on scheduling, I want to be open with the Court. I'm obligated in another court on Wednesday, so I look forward to concluding tomorrow.

THE COURT: The Court has a full docket on Wednesday. We will not be continuing on Wednesday.

MR. VERSTANDIG: Thank you.

MR. SCHLOSSBERG: Thank you, Your Honor.

THE COURT: All right. Thank you.

MR. MASTRO: Thank you.

THE CLERK: All rise. Court is now adjourned.

(Whereupon these proceedings were concluded)

# I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Trustee: | | | | | |
| Roger Schlossberg | 14 | 72,79 | | | |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| Debtor: | | | |
| 1 | Judge Lipp's decision | 114 | 114 |
| 2 | Myers' objection to settlement | 120 | 120 |
| 3 | Transcript of hearing | 124 | 124 |
| 4 | Stipulation of dismissal | 128 | 154 |
| 6 | Judge Simpson's order | 189 | 201 |
| Trustee: | | | |
| 1 | Operating agreement | 35 | 35 |
| 2 | Demand letter from King parties | 37 | 37 |
| 4 | Memorandum of understanding | 51 | 51 |
| 5 | Email chain | 52 | 52 |
| 6 | Email chain | 56 | 56 |
| 7 | Email chain | 56 | 56 |
| 8 | Email chain | 56 | 56 |
| 11 | Judge Gunn's order | 62 | 62 |
| 9 | Redfin valuation | 70 | 70 |
| 10 | Judge Lease's decision | 72 | 72 |
| King Parties: | | | |
| 1 | Proof of claim 21 | 75 | 75 |
| 2 | Proof of claim 22 | 76 | 76 |
| 3 | Proof of claim 23 | 76 | 76 |

| RULINGS: | PAGE | LINE |
|---|---|---|
| Trustee's motion to strike is denied | 5 | 7 |
| Debtor's oral motion to stay is denied | 203 | 25 |

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



January 6, 2026

______________________________ ____________________

RIVER WOLFE DATE

TTA-Certified Digital Legal Transcriber CDLT-265